UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Mahmood Khan, | Civil Action No. _____ |
| Plaintiff, | **COMPLAINT** |
| vs. | **(JURY TRIAL DEMANDED)** |
| City of Minneapolis, a municipal corporation; and DOES 1-10, | |
| Defendants. | |

## **INTRODUCTION**

Plaintiff Mahmood Khan (hereinafter "Plaintiff") is a landlord who has 43 rental dwelling licenses, comprising 63 residential rental property units in Minneapolis. All but three of these properties are located on Minneapolis' "North Side," a historically impoverished neighborhood that is home to a preponderance of racial minorities. For upwards of 10 years, Defendant City of Minneapolis (hereinafter "City" or "Minneapolis") has subjected Plaintiff to a jaw-dropping onslaught of fines, fees, penalties, hearings, condemnations, demolitions, and landlord license revocations, despite the fact that all of his properties have passed inspection.

Plaintiff has been deprived of real property, cash, and investments totaling more than $4,000,000 in value. The City has made Plaintiff and other landlords who provide private, affordable, safe, sanitary, habitable housing to protected class members into

1

scapegoats, blaming them for the very existence of poverty, blight, and debris in a historically impoverished, blighted, and debris-ridden neighborhood.

Minneapolis has neglected the North Side for several decades. Over the past 10 years the City has sought to pin the blame for the challenging conditions in that neighborhood on landlords such as Plaintiff. The years of fines, fees, penalties, hearings, condemnations, demolitions, and rental dwelling license revocations constitute a custom, practice, policy, or pattern of discrimination against racial minorities and other "protected class" members, as that term is used in the context of civil rights and fair housing laws. The custom, practice, and pattern of targeting Plaintiff and similarly situated landlords and driving them out of business also add up to ongoing violations of Plaintiff's due process rights and other legal rights.

Minneapolis' barrage of punitive actions against Plaintiff has been unfair, unjust, indecent, oppressive, arbitrary, capricious, and flat-out immoral. The actions by the City against Plaintiff cry out for redress by a brave and impartial federal Court.

Plaintiff hereby alleges and states the following Complaint against the City of Minneapolis ("City" or "Minneapolis"), a municipal corporation.

## PARTIES

1.      Plaintiff is a Minneapolis landlord residing in Roseville, Minnesota who rents to racial minorities, persons with disabilities, and other "protected class" members, as described in the Fair Housing Act ("FHA") of the Civil Rights Act of 1968, at 42 U.S.C. § 3604, and applicable federal case law.

2

2.     Defendant City of Minneapolis is a municipal corporation existing under, and by virtue of, the laws of the State of Minnesota. The City of Minneapolis Mayor's office is located at 350 South Fifth Street, Room 331, Minneapolis, Minnesota, 55415, and the Office of the Minneapolis City Council is located in Room 307 in the same building.

3.     Defendants John Doe and Jane Doe are certain as-yet-unknown third parties who are or may be responsible for all or some of the liability and relief sought herein.

## JURISDICTION AND VENUE

4.     This civil action arises under the laws of the United States of America and under the laws of the State of Minnesota. This Court has jurisdiction over Plaintiff's claims under the Due Process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution, 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (Civil Rights), and 42 U.S.C. § 3613 (fair housing).

5.     Plaintiff's request for declaratory relief is brought pursuant to 28 U.S.C. §§ 2201, *et seq.* (Declaratory Judgment Act) and Rule 57 of the Federal Rules of Civil Procedure. Plaintiff's cause of action for declaratory relief is proper, as 28 U.S.C. § 2201 permits the Court to declare the rights of any interested party in a case of actual controversy.

6.     An "actual controversy" exists between Plaintiff and the City of Minneapolis regarding the constitutionality of Minneapolis Ordinance 244.1930; the City's ongoing violations of federal statutory law and federal regulatory law; and the City's failure to enforce its obligations to protect and promote the availability of affordable housing.

7.     Minneapolis' violations of the federal laws and regulations described herein have caused injury to the Plaintiff, who provides low-cost housing to protected class members.

8.      Minneapolis' violations of the federal laws described herein also harm "protected class" members who are occupying or looking for housing in Minneapolis.

9.      This action is a controversy of immediacy because as Plaintiff stands to lose all 43 of his rental dwelling licenses, and because approximately 350 protected class members in 63 affordable dwellings are on the verge of being deprived of their homes.

10.     The disparate treatment of Plaintiff and his tenants -- and the disparate impact caused by the City's housing policies, customs, patterns or practices -- is knowing and intentional, and therefore Plaintiff's claims survive the decision by the U.S. Supreme Court in the case of *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*

11.     Venue is proper under 28 U.S.C. § 1391(b).

## STANDING TO BRING ACTION

12.     Plaintiff began purchasing property for residential leasing beginning in 1985.

13.     Plaintiff currently has title interest in 43 duly licensed rental properties, comprising 63 units for residential rental.

14.     All of Plaintiff's properties are properly licensed and code-compliant, and all but one unit are rented to racial minorities, disabled persons, and other protected class members.

15.     Of Plaintiff's approximately 350 tenants, all but two are protected class members.

16.     Plaintiff has lost more than $3,000,000 to the City of Minneapolis, and has suffered extreme financial injury due to the unlawful policies and unlawful actions of the City.

4

17.   The City has acted to revoke all of Plaintiff's 43 rental dwelling licenses based on the revocation of just two.

## FACTUAL ALLEGATIONS

18.   Plaintiff holds 43 rental dwelling licenses in Minneapolis, for a total of 63 rental dwelling units.

19.   All but three of Plaintiff's rental dwelling properties are located on the City's "North Side," a collection of neighborhoods to the north of downtown.

20.   The North Side of Minneapolis is, historically and currently, home to impoverished protected class members, including racial minorities, persons with disabilities, and other protected class members.

21.   African-Americans and other racial minorities constitute approximately 36 percent of the City's population, but the North Side's racial minority population is approximately 70 percent, based on 2010 census figures.

22.   The City of Minneapolis has acted to revoke each and every one of Plaintiff's 43 rental dwelling licenses after losing just two licenses.

23.   With this mass revocation, the City ruins Plaintiff financially and pushes some 350 protected class members into the street and an expensive, tight rental market.

24.   Plaintiff is a devout Muslim who is dedicated to providing housing for the poor and disenfranchised.

25.   Plaintiff has passed the City's code inspections and obtained and maintained rental dwelling licenses for all of his rented properties since 1985.

5

26.     Plaintiff's rental dwellings are older structures; most were built more than 100 years ago.

27.     By and large, Plaintiff's protected class tenants are impoverished, and they are reluctant to notify Plaintiff when they break a window, or a door, or a screen, or a fence, for fear of being charged for the damage.  Under Plaintiff's rental agreements, tenants are responsible for damage that they cause.

28.     On March 3, 2014, the City sent notice, through its Department of Regulatory Services, to Plaintiff informing him that all of his rental dwelling licenses would be revoked because he had two rental dwelling licenses revoked.

29.     26 of Plaintiff's 43 rental dwelling licenses were identified in this notice.

30.     The mass license revocation was delayed while Plaintiff appealed his second license revocation by writ of certiorari to the Minnesota Court of Appeals.  The City opposed Plaintiff's appeal.

31.     On December 22, 2014, the Court of Appeals affirmed the second license revocation.

32.     Having received no further notice on the City's intentions regarding his rental dwelling licenses, Plaintiff continued to rent his properties and receive rent payments.

33.     On February 13, 2015, the City sent to Plaintiff a full list revoking all of Plaintiff's rental dwelling licenses, not just the 26 identified in the March 3, 2014 notice.

34.     The City based its revocation of all of Plaintiff's rental dwelling licenses on a city ordinance: specifically, Minneapolis Code of Ordinances 244.1910(a)(13), which allows revocation of all rental dwelling licenses based on the revocation of just two.

35.     Almost a year after revoking Plaintiff's rental dwelling licenses, the City cited

M.C.O. § 244.1910(19) -- the mysterious "good cause" -- as another reason for the *in toto*

revocations.

36.     M.C.O § 244.1910(19) allows for revocation based on "good cause as authorized

by the City Charter," but there is no such authorization in the City Charter.

37.     Plaintiff's first revocation came on October 22, 2010, when the Minneapolis City

Council approved the Council's Regulatory, Energy, and Environment Committee

recommendation for revocation of Plaintiff's rental dwelling license for a property at

3223 Bryant Avenue North in Minneapolis.

38.     The reason cited for this revocation was illegal occupation of the property's

uninhabitable basement.

39.     Plaintiff testified at a hearing held by the City's Department of Regulatory

Services that he was not aware, and reasonably could not have been aware, of anyone

living in the basement, but his testimony was to no avail.

40.     Plaintiff also testified that the lease for 3223 Bryant Avenue North specifically

prohibited the tenants from occupying the basement, and that when he did learn that

tenants were living in the basement, he evicted the tenants.

41.     Despite this testimony, the City held Plaintiff responsible for the code violation in

the City's administrative hearing.

42.     Plaintiff appealed the revocation by writ of certiorari to the Minnesota Court of

Appeals, but the appellate court confirmed the City's decision to revoke Plaintiff's rental

dwelling license. *In the Matter of the Rental Dwelling License held by Mahmood Khan*

7

*for the Premises at 3223 Bryant Avenue North, Minneapolis, Minnesota,* No. A10-2211

(Minn. App., filed September 6, 2011).

43.     The City acted to revoke a second rental dwelling license of Plaintiff's on February

21, 2014.

44.     This second revocation -- of the license for 2714 4th Street North in Minneapolis -

- was the culmination of a determined effort by the City to deprive Plaintiff of his

expected use for this property for failing to immediately remove bits of trash near the

alleyway.

45.     The bits of trash in the alley at 2714 4th Street North included illegally dumped

garbage by persons who could not afford their own trash service and were looking for a

place to dash their garbage.

46.     On petition for writ of certiorari to the Court of Appeals, which petition was

opposed by the City, the City's decision to revoke the second license was affirmed on

December 22, 2014.  *Khan v. Minneapolis City Council,* No. A14-0455 (Minn. App.,

filed 12/22/2014).

47.     Neither of Plaintiff's two license revocations had anything to do with safety or

habitability of Plaintiff's properties; both license revocations concerned extraneous

matters over which Plaintiff had no control.

48.     On February 19, 2015, the City took action to take all of Mr. Khan's properties off

the rental market by revoking all 43 of his rental dwelling licenses: a bright red notice

was glued onto the front and back doors of each and every one of his rental properties.

49.    Several days after February 19, 2015, a second bright red notice was glued onto the doors of all of Plaintiff's properties. This "Notice to Tenants of Rental License Revocation, Denial, Non-Renewal or Suspension" cited "Good Cause -- Chapter 4, Section 19" as the reason for kicking the tenants out of their homes.

50.    After the notices were glued onto the doors of all of Plaintiff's properties, one of Plaintiff's tenants, Donna Graham, called the City's Department of Regulatory Services and asked what was going on; the City employee said, "We finally got him," and told Ms. Graham that she did not have to pay rent to Plaintiff anymore.

51.    Plaintiff did still have the right to require and receive rent from his tenants.

52.    The statement "We finally got him" is a fact that reveals an illegitimate motivation behind the code enforcement applied to Plaintiff; the City was not aiming to apply legitimate and lawful code enforcement, it was out to "get" Plaintiff.

53.    As a result of this mass revocation of Plaintiff's rental dwelling license for garbage in the alley of one property, Plaintiff stands to lose his expected use for all 43 of his properties, and all 63 of his rental units, along with his expected rents.

54.    It is *not* reasonable for the City to assume that because a landlord has had two licenses revoked that he is not taking care of his other 43 properties, especially where all 43 properties have passed inspection and are duly licensed.

55.    It is a violation of Plaintiff's due process rights for the City to revoke all 43 of his rental dwelling licenses without any proof that the 43 properties are unsafe, unsanitary, uninhabitable, or somehow not up to code, especially where all 43 properties are duly licensed for rental.

9

56.     It is a violation of Plaintiff's due process rights for the City to revoke all 43 of his rental dwelling licenses without a hearing on each of those duly licensed properties, or at least more hearings on more of the properties to determine whether Plaintiff really is a landlord who does not care for his properties.

57.     When Plaintiff appealed the mass revocation to an Administrative Hearing Officer, the Hearing Officer, who was hired and/or paid by the City, refused to allow evidence relating to violations of the Fair Housing Act and the issues of disparate treatment and disparate impact.

58.     The refusal of the City's Hearing Officer to allow the Plaintiff to present evidence regarding fair housing and disparate treatment and disparate impact is another fact that illustrates that the City knowingly and intentionally maintains a policy, custom, pattern or practice that will create a disparate impact on the availability of affordable housing for protected class members.

59.     The City's intentional foreclosing of fair housing arguments at the administrative hearing level is evidence that creates an inference of discriminatory intent on the part of the City.

60.     Because of the financial distress that the revocations create, Plaintiff likely will lose all of his properties entirely and get virtually nothing in return.

61.     Plaintiff stands to lose more than $4 million in purchases and investments and property values.  Plaintiff is facing financial ruin and the loss of his life's work.

62.     Plaintiff has already lost approximately $3 million to the City from demolitions of four of his properties, fines, assessment, penalties, Vacant Building Registration fees,

10

attorney fees, condemnations, demolitions, and other costs related to the City's unlawful custom, pattern, policy, or practice of targeting Plaintiff for financial punishment.

63.    Since 1985, Plaintiff has purchased declining properties, rehabilitated them, made them code-compliant, and received licenses to rent each and every one of his rental properties.

64.    On or about May 31, 2008, Plaintiff attended an auction convention in the Minneapolis Convention Center and bought approximately 25 properties that had been foreclosed on.

65.    The City's campaign against Plaintiff began shortly after May 31, 2008.

66.    What ensued was an unlawful, concerted effort by the City to deprive Plaintiff of his properties.

67.    Although Plaintiff obtained licenses and passed code inspections to rent all of his properties, he was re-inspected and fined and penalized and assessed on a regular basis in amounts totaling more than $100,000.

68.    In addition to revoking all of Plaintiff's rental dwelling licenses, Minneapolis has wrongfully demolished four (4) of Plaintiff's rental dwelling properties.

69.    Plaintiff has been required to pay several Vacant Building Registration ("VBR") fees of up to $6,940 when a rental property went without a tenant for anywhere from five days to a month.

70.    The exorbitant VBR fees assessed by the City constitute an unconstitutional taking and a violation of due process, owing to the brief time frame and oppressive amount of the fees.

11

71.     Other cities in the United States have vacant building fees for residential landlords, but they do not approach the immediate $6,940 exacted by Minneapolis.

72.     In Philadelphia, the same kind of fee is $150.

73.     In San Francisco, the same kind of fee is $765.

74.     In Milwaukee, the fee is $253.50 per year, and that fee is not assessed until the property is vacant for six (6) months.

75.     Cincinnati, which seeks to be as punitive as Minneapolis, charges only $900 for a one-year vacancy, $1,800 for two years of vacancy, and $2,700 for two-to-five years of vacancy.

76.     Shortly after 2008, Plaintiff was placed under the jackboots of the City's "Problem Properties Unit," a squad that targets its victims for accelerated inspections and penalties, and fines and penalizes its victims into submission.

77.     Plaintiff's properties were condemned or demolished for trivial matters having nothing to do with safety or sanitation or habitability, and without regard for the age of the housing stock or the financial feasibility of the City's burdensome rehabilitation requirements.

78.     If Plaintiff had invested the $100,000 or $150,000 per property required by the City to completely overhaul the properties that the City condemned or demolished, he would not have been able to rent the properties for the dollar amounts required to make the investments financially worthwhile; the North Side simply does not command such high rental prices.

12

79. On October 30, 2014, Minneapolis demolished a property worth more than $500,000 owned by Plaintiff; this property was located at 2501 Golden Valley Road in Minneapolis.

80. The Golden Valley Road property had been damaged by tornadoes in July of 2011; within a six months of the tornadoes, the City prevented Plaintiff from making repairs to the property, and then proceeded to demolish the property because Plaintiff had failed to make repairs.

81. In 2004, the City demolished Plaintiff's nine-unit building at 2321 Fremont Avenue North. The property had been damaged by fire, and Plaintiff and co-owner Bashir Moghul spent dozens of thousands of dollars rehabilitating and repairing the property, giving the property new roofing, new flooring, new windows, and more. Despite all of the repairs, the City demolished the property because the repairs had not been completed within six months of the fire damage. The value of the property was approximately $450,000.

82. As a result of the fines, condemnations, demolitions, and mass revocation of his rental dwelling licenses, Plaintiff is losing all of the investment he put into his properties: millions of dollars in purchases, improvements, repairs and investments, all of which were made while Plaintiff was being financially penalized into oblivion by the City.

83. The City's policies, practices, patterns, customs, and actions deprive Minneapolis of an important, responsible, responsive, low-cost, landlord, one of few in the city who has the means and incentive to provide decent, safe, habitable, low-cost, private housing to protected class members in Minneapolis.

13

84.   Plaintiff's rental properties all have been licensed separately by Minneapolis under the City's rental licensing requirement set out in Minneapolis Code of Ordinances, Chapter 244.

85.   Minneapolis Ordinance 244.1910(a)(13), which is being used by the City to revoke all of Plaintiff's rental dwelling licenses, is unconstitutional as applied because it authorizes the revocation of 43 rental dwelling licenses for the loss of only two.

86.   The Due Process Clauses of the U.S. Constitution and the Minnesota Constitution state that the government cannot deprive a person of "life, liberty, or property without due process of law." *Boutin v. LaFleur,* 591 N.W.2d 711 (Minn. 1999).

87.   The revocation of 43 rental dwelling licenses with only one hearing on the validity of the mass revocation constitutes a deprivation of property without due process of law.

88.   The City could revoke all of a landlord's rental dwelling licenses without running afoul of due process if it used a sliding scale, percentage-based formula.  For example, if a landlord has only 10 rental dwelling licenses, revoking all of those licenses after the revocation of two might be fair and non-arbitrary and non-oppressive.  If a landlord has 75 licenses, they could all be revoked if the landlord has had five or seven revoked.  Such a sliding scale, percentage-based policy might be fair, and might not violate due process.  As it is now, a landlord with 43 licenses, or 100 licenses, can have all of them revoked for the revocation of only two.  This is arbitrary, capricious, oppressive, and a violation of due process.

89.   Plaintiff concedes that the City is taking away his rental dwelling licenses, and that it is not actually seizing his real estate.  However, the revocation of all of Plaintiff's rental

14

dwelling licenses without sufficient due process -- and the unlawful pattern, custom, or practice of excessive fines, fees, penalties, condemnations and demolitions -- so reduces the value of his properties and his expected use of the properties that it constitutes an unconstitutional taking of property.

90.     By its own gleeful admission, the City has, since 2005, "increased the number of rental licenses it has revoked by more than 500 percent." This language appeared on the City's Department of Regulatory Services website in 2011 and continued to be published thereafter.

91.     Upon information and belief, the City's unlawful rental dwelling license revocation policy has, in the past 11 years, resulted in the loss of many hundreds -- possibly thousands -- of safe, sanitary, and habitable private affordable housing units for protected class members in the City.

92.     Upon information and belief, the City's unlawful, unconstitutional rental dwelling license revocation policy has, in the past 11 years, resulted in the loss of hundreds of rental dwelling licenses for private, affordable properties for protected class members, which properties had passed inspections and were duly licensed for rental.

93.     Upon information and belief, the City's unlawful rental dwelling license revocation policy has, in the last 11 years, resulted in the displacement or removal of several thousands of protected class members from their safe, sanitary, and habitable private, affordable, duly licensed housing units in the City.

94.     The exact number of rental dwelling licenses lost to the City and the number of protected class members who have been deprived of their homes in recent years is

unknown; upon information and belief, the City does not even keep track of these figures anymore.

95.     In 2014, Minneapolis claimed in court documents that the prohibition against "disparate impact" on protected class members did not apply to Minneapolis' housing policies and actions no matter the nature and extent of the impact.

96.     In 2014, Minneapolis claimed in court documents that disparate impact claims are not cognizable under the Fair Housing Act ("FHA") because the text of the FHA does not support disparate impact liability.

97.     In 2014, Minneapolis claimed in court documents that there is no agreement between the City and HUD conditioning Community Development Block Grant ("CDGB") funds the City receives upon the City's acceptance of HUD's disparate impact regulation, which was issued February 15, 2013; Minneapolis' own "Specific CDGB Certifications" indicate otherwise.

98.     At the same that it has fined, assessed, penalized, demolished, and revoked Plaintiff into oblivion, the City has ignored the many violations that exist in the City's governmentally subsidized housing, which is managed by the Minneapolis Public Housing Authority ("MPHA"); not once has Minneapolis ever fined or even inspected MPHA's blighted, unsanitary properties.

99.     The fact that the City maintains a "hands-off" policy when it comes to public housing does not mitigate its disparate treatment of protected class members; rather, it illustrates how the City prefers to keep protected class members in one squalid, concentrated place, a publicly administered place where they can be kept and controlled.

100.   The City knows that all but two of Plaintiff's 350 tenants are protected class members, or at least it is aware that the vast majority, if not all, of Plaintiff's tenants are protected class members.

101.   It is not necessary for the City to mistreat *all* protected class members for Plaintiff to show disparate treatment; the City knows it cannot rid itself of all poor minorities, but it can keep most of them in one concentrated area -- MPHA housing -- that is free of rental dwelling code enforcement.

102.   The intentional deprivation by the City of private, affordable housing for some 348 protected class members is evidence -- a fact -- that creates an inference of discriminatory intent on the part of the City.

103.   Plaintiff asserts that the City's "hands-off" approach to code enforcement in public rental housing and its unlawful, unconstitutional "hands-on" approach to code enforcement in private rental housing *is* a fact that tends to show that the City maintains a custom and practice that constitutes disparate treatment of racial minorities and other protected class members.

104.   The City's "hands-off" approach to code enforcement in public rental housing and its "hands-on" approach to code enforcement in private rental housing *is* a fact that tends to show that the City maintains a custom and practice that it knows creates a disparate impact on the availability of affordable housing for racial minorities and other protected class members.

105.   During 2012 through 2014, the housing waiting list for MPHA's publicly subsidized affordable housing has included approximately 10,000 families.

17

106.   Approximately 76 percent of the families on MPHA's housing waiting list are racial minorities.

107.   According to the MPHA, the vacancy rate of affordable housing in Minneapolis was less than one percent in 2013.

108.   In 2011 and 2012, Minneapolis reported to the U.S. Conference of Mayors that the causes of homelessness in Minneapolis were lack of affordable housing, loss of homes to tornadoes, poverty, unemployment, and eviction.

109.   Minneapolis has required Plaintiff to refuse housing to persons who have criminal records, and has punished Plaintiff and held him responsible for any criminal actions of his tenants.

110.   The fact is, private affordable housing for protected class members in Minneapolis has become virtually non-existent, and there is nowhere near enough public housing to meet the demand of protected class members.

111.   The City is responsible for the shortage of affordable, private rental homes that are needed by racial minorities; Minneapolis issued a report in September 2009 stating that the City should make it harder and more expensive to rent homes in the City.

112.   The policy approach to affordable rental housing in the previous paragraph is being carried out in part by the City through enforcement of its "two strikes and you're out" Ordinance, which allows mass revocation of a landlord's rental dwelling licenses.

113.   Minneapolis' revocation of all of Plaintiff's rental dwelling licenses, its oppressive financial punishment of Plaintiff, and its condemnation and demolition of Plaintiff's

18

properties are facts that prove the City's intention to make private affordable housing unavailable to protected class members in the City.

114.    The City's discriminatory practice, pattern, and custom of fining, assessing, and penalizing Plaintiff and similar landlords for providing affordable housing and renting to protected class members began some 10 years ago and continues to this day, with the City's continuing efforts to deprive Plaintiff of all his rental dwelling licenses and forcing some 348 protected class members in the City into an expensive, tight rental market.

115.    All of the facts -- including 43 revocations based on the revocation of just two, the revocation of 43 valid licenses for properties that have passed inspection, the City's knowledge of dwindling affordable housing for protected class members -- indicate that there is insufficient justification for the drastic reduction in affordable housing in Minneapolis.

116.    The City's valid interest in ensuring safe, habitable, affordable housing for protected class members is not served by reducing the availability of such housing, where the housing that will be eliminated is properly inspected and licensed.

117.    The revocation of all rental dwelling licenses based on the revocation of just two is artificial, arbitrary, and unnecessary.

118.    There are many rational, reasonable alternatives to the mass revocation of rental dwelling licenses while still satisfying the City's legitimate interest in ensuring safe, sanitary, habitable rental dwellings.

119.    The City could re-inspect the already licensed rental dwellings of a landlord who has had two licenses revoked; the City could enter into an agreement with the landlord

19

requiring that the landlord fulfill certain additional obligations to ensure safety, sanitation, and habitability; the City could consult with tenants of the landlord to ascertain whether the landlord is responsible and responsive, and to determine just how much the tenants may be responsible for creating any unacceptable conditions; the City could create a reasonable, rational plan for the landlord to carry out to avoid additional revocations; and the City could do any number of other things short of mass revocation and still carry out its duties to ensure safe, habitable, affordable private rental housing.

120.   Ever since the City revoked all of Plaintiff's rental dwelling licenses, he has been prevented by the City from renting his properties to Section 8 tenants, and this has caused Plaintiff to lose rental income.

121.   Plaintiff has filed two Complaints with HUD: one in May of 2015, and an Amended Complaint in August of 2015. HUD has not acted on either of the Complaints.

122.   Plaintiff has incurred substantial attorney fees in defending himself against the mass revocation ordered by the City.

123.   Plaintiff has incurred other substantial attorney fees in defending himself against the fines, fees, penalties, assessments, condemnations, demolitions, and license revocations that have been ordered and exacted by the City.

124.   By revoking the rental dwelling licenses of Plaintiff and similarly situated landlords, and by fining, assessing, penalizing, condemning, and demolishing the duly licensed properties of Plaintiff and similarly situated landlords, the City is not protecting Minneapolis tenants from unsafe, unsanitary, and uninhabitable housing; it is eliminating duly licensed, private affordable housing for protected class members.

## CONCLUSION

125.   This Court would abdicate its power if it simply allows the City to do as it wishes, and accepts uncritically all excuses offered by the City for its campaign against landlords such as Plaintiff and their protected class tenants.  This Court has the right -- nay, the duty -- to review governmental actions for abuse of power, abuse of process, and violations of the law.

126.   Fair housing is not just a matter of holding racist landlords to account; it should also be a matter of holding cities to account.  Fair housing laws are designed to ensure the availability of affordable, safe, sanitary, and habitable housing for protected class members.  As the foregoing facts clearly show, the City of Minneapolis makes no bones about its goal of reducing private affordable housing for protected class members, paying no mind to affordable housing availability as it goes about collecting HUD grants while running landlords such as Plaintiff out of business and running protected class members out of town.  City officials openly flaunt their immunity to fair housing laws and principles in court documents, and seem to believe that they can do whatever they want to landlords who provide affordable housing to protected class members.  City officials believe that they are impervious to fair housing laws, and that no court will ever hold them accountable for their actions.  With this case, this Court has a perfect opportunity to correct the City's policy, and to adjust judicial oversight to provide much-needed teeth to fair housing laws.

## JURY DEMAND

Plaintiff demands a jury trial on each and every claim to which he is so entitled.

## COUNT I

### M.C.O. § 244.1910(13) IS UNCONSTITUTIONAL AS APPLIED

127.   Plaintiff incorporates herein by reference all the allegations and facts set forth in the preceding paragraphs.

128.   The City seeks to deprive Plaintiff of all 43 of his rental dwelling licenses based on its revocation of two (2) of his licenses.  The Ordinance that allows such mass revocation is unconstitutional, as it deprives Plaintiff of the legal process due to him for such a mass revocation of his property interests.  The Ordinance allowing mass revocation of so many rental dwelling licenses based on the revocation of only two is clearly unfair, arbitrary, oppressive, and capricious, and this can be shown by comparing the Ordinance to an Ordinance that would pass due process muster: an Ordinance allowing mass revocation based on a reasonable percentage of revocations.

129.   As a direct and proximate result of Plaintiff's unconstitutional Ordinance authorizing revocation of all of his rental dwelling licenses, Plaintiff has suffered monetary damages.  Plaintiff seeks compensation for his monetary losses.  Plaintiff also seeks an injunction preventing the City from using this subsection of the Ordinance as justification for its revocation of all of Plaintiff's licenses.

## COUNT II

### M.C.O. § 244.1910(19) SHOULD NOT EXIST

130.   Plaintiff incorporates herein by reference all the allegations and facts set forth in the preceding paragraphs.

131.   Minneapolis also has cited M.C.O. § 244.1910(19) as supporting its decision to revoke all 43 of Plaintiff's rental dwelling licenses.  This is the "good cause" provision, a mysterious, catch-all reason used by the City for revoking all of Plaintiff's licenses.  The provision allows for mass revocation based on "good cause as authorized by the City Charter," but there is no such authorization in the City Charter.  Therefore, this subsection of the Ordinance should not exist, and cannot be used to justify the mass revocation of all of Plaintiff's rental dwelling licenses.

132.   As a direct and proximate result of the City's use of "good cause" for the revocation of Plaintiff's rental dwelling licenses, Plaintiff has suffered monetary damages.  Plaintiff requests compensation for his monetary losses.  Plaintiff also seeks an injunction preventing the City from using this subsection of the Ordinance as justification for its revocation of all of Plaintiff's licenses.

## COUNT III

VIOLATION OF FEDERAL FAIR HOUSING ACT
42 U.S.C. § 3604(a)
MAKING UNAVAILABLE AND DENYING HOUSING

133.   Plaintiff incorporates herein by reference all the allegations and facts set forth in the preceding paragraphs.

134.   The foregoing facts asserted in this Complaint demonstrate that Minneapolis maintains a policy of denying, blocking, impeding, and otherwise making unavailable and denying affordable, private, fair housing to protected class members, and that the City knows that this policy, practice, or custom disparately impacts racial minorities.

23

135.   The City knows that racial minorities constitute almost all of Plaintiff's tenants, and the City knows that a disproportionate number of persons who need affordable, fair housing are racial minorities and other protected class members, yet the City persists in conducting a campaign against a low-income, private housing provider without considering the disparate impact on racial minorities in actions like mass revocation of 43 valid rental dwelling licenses, and this makes unavailable or denies rental properties to persons based on race.

136.   As a direct and proximate result of the City's violations of the Federal Fair Housing Act, Plaintiff has suffered monetary damages.  Plaintiff requests compensation from the City for his losses.

137.   Plaintiff requests an injunction preventing the City from revoking all of his rental dwelling licenses.  Plaintiff also requests a declaratory judgment requiring the City to conduct a sincere analysis of impediments to fair housing to qualify for HUD grants, and a declaratory judgment requiring HUD to withhold grant money from the City due to the City's failure to affirmatively further fair housing.

**COUNT IV**

VIOLATION OF FEDERAL FAIR HOUSING ACT
42 U.S.C. § 3604(b)
DISCRIMINATION IN THE TERMS, CONDITIONS, OR PRIVILEGES OF
DWELLING RENTALS

138.   Plaintiff incorporates herein by reference all the allegations and facts set forth in the preceding paragraphs.

139.   The City has discriminated against Plaintiff and his racial minority tenants in the conditions or privileges of rental of Plaintiff's dwellings based on race, color, or national origin.

140.   The foregoing facts in this Complaint, which illustrate the City's custom, pattern, and practice of eliminating affordable, private housing for racial minorities (preventing fair housing facts and evidence from being introduced at administrative hearings, failing to conduct analyses of impediments, failing to affirmatively further fair housing, along with statistics showing that racial minorities are disparately impacted by the reduction in affordable housing), are evidence of the discrimination required to prove violation of 42 U.S.C. § 3604(b).

141.   The foregoing facts in this Complaint, along with the City's acknowledgement that it has a policy of making rental dwelling license revocation decisions without regard to anti-discrimination or fair housing statutes, demonstrate that the City intentionally maintains a policy that it knows has a disparate impact on the availability of housing for racial minorities.

142.   Minneapolis has failed to affirmatively further fair housing, as is its obligation under the Fair Housing Act.  The facts will show that the City has made false certifications to HUD to qualify for Community Development Block Grants; it has failed to conduct analyses of impediments; and it has claimed that it is not required to conduct impediments analyses to receive HUD grant money.

25

143.   Because of the foregoing actions and inactions of the City that violate 42 U.S.C. §

3604(b), Plaintiff has lost tenants, has lost the full economic value of his properties and

investments, and has suffered other related economic damages.

144.   As a direct and proximate result of the City's violations of 42 U.S.C. § 3604(b),

Plaintiff has suffered damages.

145.   Plaintiff requests compensation from the City for his monetary losses.

146.   Plaintiff requests an injunction preventing the City from revoking all of his rental

dwelling licenses.  Plaintiff also requests a declaratory judgment requiring the City to

conduct a sincere analysis of impediments to fair housing to qualify for HUD grants, and

a declaratory judgment forbidding the City from collecting HUD grant money due to the

City's failure to affirmatively further fair housing and its failure to conduct analyses of

impediments to qualify for such grant money.

### COUNT V

VIOLATION OF 42 U.S.C. § 3617
COERSION, INTIMIDATION, THREATS, OR INTERFERENCE WITH RIGHTS
GRANTED BY THE FAIR HOUSING ACT

147.   Plaintiff incorporates herein by reference all the allegations and facts set forth in

the preceding paragraphs.

148.   By telling Plaintiff's tenant "We finally got him," and by telling Plaintiff's tenant

that the tenant no longer had to pay rent to Plaintiff after the City revoked all of Plaintiff's

licenses, but before Plaintiff had an opportunity to challenge the revocations, the City did

demonstrate an illegitimate motive for its revocation of all of Plaintiff's rental dwelling

licenses, which it knew would disparately impact racial minorities, and so the City did

26

coerce and interfere with Plaintiff's rights granted by 42 U.S.C. § 3604(a) and (b); that is, Plaintiff's right to rent to racial minorities without discrimination against him or his racial minority tenants.

149.    The foregoing facts asserted in this Complaint also establish that the City's pattern, policy, practice, or custom of reducing fair housing while simultaneously and unjustly fining, penalizing, and assessing private fair housing providers large sums of money has been maintained for at least ten to fifteen years, and this pattern, practice, policy or custom constitutes intimidation, threats, and interference with the rights of Plaintiff and his tenants to enjoy the rights granted in the Fair Housing Act.

150.    The City therefore has violated, and continues to violate, the provisions of 42 U.S.C. § 3617.

151.    As a direct and proximate result of the City's violation of 42 U.S.C. § 3617, Plaintiff has suffered damages.  Plaintiff seeks compensation for his monetary losses.

## COUNT VI

INVERSE CONDEMNATION
MINN. CONST. ART. I, SECTION 13 AND U.S. CONST. AMEND. V

152.    Plaintiff incorporates herein by reference all the allegations and facts set forth in the preceding paragraphs.

153.    The City has condemned, demolished, and otherwise taken away several of Plaintiff's properties without sufficient justification and in an arbitrary, capricious, and oppressive manner as a result of its custom, pattern, policy, or practice of eliminating as much private, affordable housing for protected class members as it can.

154.   The City has fined, assessed, and penalized Plaintiff and his properties so often and so much that it has prevented Plaintiff from investing sufficiently in his properties and has negatively affected the value of his properties.

155.   The City's revocation of all of Plaintiff's rental dwelling licenses has deprived Plaintiff of four (4) properties and has destroyed Plaintiff's reasonable, investment-backed expectations.

156.   The actions by the City violate Plaintiff's property rights under Article I, Section 13 of the Minnesota Constitution and the Fifth Amendment to the U.S. Constitution.

157.   As a direct and proximate result of the City's violation of Plaintiff's constitutional rights under Minn. Const. Art. I, Section 13 and U.S. Const. Amend. V, Plaintiff has suffered economic damages.

### COUNT VII

VIOLATION OF DUE PROCESS RIGHTS
MINN. CONST. ART I, SECTION 7; U.S. CONST. AMEND. V; U.S. CONST.
AMEND. XIV

158.   Plaintiff incorporates herein by reference all the allegations and facts set forth in the preceding paragraphs.

159.   By depriving Plaintiff of all 43 of his rental dwelling licenses without more than one hearing on the matter, and by fining, assessing and penalizing Plaintiff over his properties without legitimate motive or purpose, and by arbitrarily, capriciously, and oppressively depriving Plaintiff of his properties and the expected use of his properties without legitimate motive or purpose, the City has deprived Plaintiff of his rights to due

process in violation of Minn. Const. Art. I, Section 7, and in violation of U.S. Const. Amendments V and XIV.

160.   As a direct and proximate result of these constitutional violations by the City, Plaintiff has suffered economic damages.  Plaintiff seeks compensation for his monetary losses.

## RELIEF REQUESTED

Wherefore, Plaintiff Mahmood Khan requests judgment from this Court as follows:

1.   A judgment pursuant to Counts I - VII of this Complaint;

2.   A permanent injunction pursuant to 42 U.S.C. § 3613(a) and/or 42 U.S.C. § 3604, restraining the City of Minneapolis and its officials, employees, representatives, and agents, from further violations as set forth herein;

3.   A permanent injunction pursuant to 42 U.S.C. § 3613(a) and/or 42 U.S.C. § 3604, restraining the City of Minneapolis and its officials, employees, representatives, and agents, from revoking all of Plaintiff's rental dwelling licenses;

4.   Pursuant to 42 U.S.C. § 3613(a) and/or 42 U.S.C. § 3604, a judgment against the City of Minneapolis for actual or compensatory damages to be proved at trial;

5.   A judgment for all compensatory damages allowed by law;

6.   A judgment against the City of Minneapolis for Plaintiff's reasonable attorney fees, costs, and disbursements in this proceeding;

7.   A judgment against the City of Minneapolis for punitive damages as allowed under the Court's procedural rules and federal law;

8.    An order declaring unconstitutional M.C.O. § 244.1910(13);

9.    An order declaring invalid or unconstitutional M.C.O. § 244.1910(19); and

10.   For such other relief as this Court deems proper and just.


Date: 9/16/16

Respectfully submitted,

James Heiberg
Bar No. 0386503
Attorney for Plaintiff Mahmood Khan
476 ½ Summit Avenue
St. Paul, MN 55102
(763) 276-3285
heiberglaw@outlook.com

30