# Exhibit C

1               CITY OF MINNEAPOLIS

2         DEPARTMENT OF REGULATORY SERVICES

3   _____

4   In Re:
    The Residential Rental Licenses
5   of Mahmood Khan, Licensee

6   _____

7

8

9

10                  VOLUME I

11

12

13

14          The above-entitled matter came on for hearing

15   before James D. Gurovitsch, Administrative Hearing

16   Officer, taken before Kelly L. Brede, Court Reporter,

17   a Notary Public in and for the County of Anoka, State

18   of Minnesota, taken on the 12th day of August, 2015,

19   at 350 South Fifth Street, Minnesota, commencing at

20   approximately 9:00 a.m.

21

22

23

24

25

```
1                    A P P E A R A N C E S

2    ADMINISTRATIVE HEARING OFFICER:

3              JAMES D. GUROVITSCH, ATTORNEY AT LAW
               Concorde Executive Center
4              6160 Summit Drive North
               Suite 425
5              Brooklyn Center, Minnesota 55430

6    ON BEHALF OF THE LICENSEE:

7              EDWARD F. ROONEY, ATTORNEY AT LAW
               100 North Sixth Street
8              Suite 550A
               Minneapolis, Minnesota 55403
9
               ronneylaw@visi.com
10
     ON BEHALF OF THE CITY:
11
               LEE C. WOLF, ATTORNEY AT LAW
12             ASSISTANT CITY ATTORNEY I
               350 South Fifth Street
13             Room 210
               Minneapolis, Minnesota 55415
14
               lee.wolf@ci.minneapolis.mn.us
15

16

17            *The Original is in the possession of

18               Attorney James D. Gurovitsch.*

19

20                         *   *   *

21

22

23

24

25
```

```
1                    I N D E X

2    WITNESS                              PAGE

3    KATHY ZIERKE
```

```
4    Direct Examination by Mr. Wolf ..........   27
     Questions by Hearing Officer Gurovitsch    56
5    Cross-Examination by Mr. Rooney ........   57
     Redirect Examination by Mr. Wolf  .......   93
6    Recross-Examination by Mr. Rooney  ......  101
     Questions by Hearing Officer Gurovitsch..  103
7    Further Recross-Examination by Mr. Rooney  104
     Further Redirect Examination by Mr. Wolf   105
8    Further Recross-Examination by Mr. Rooney  105
     Further Redirect Examination by Mr. Wolf   106
9    Further Recross-Examination by Mr. Rooney  110
```

```
10   VU TRAN
```

```
11   Direct Examination by Mr. Wolf  ........  112
     Questions by Hearing Officer Gurovitsch   140
12   Cross-Examination by Mr. Rooney ........  141
     Redirect Examination by Mr. Wolf  .......  166
13   Questions by Hearing Officer Gurovitsch   172
     Recross-Examination by Mr. Rooney  ......  174
```

```
14
```

```
15   FARROKH AZMOUDEH
```

```
     Direct Examination by Mr. Wolf  ........  177
16   Cross-Examination by Mr. Rooney  ........  196
```

```
17

18

19

20

21

22

23

24

25
```

```
 1                      E X H I B I T S

 2    NUMBER       DESCRIPTION        MARKED   OFFERED   RECEIVED

 3    City's 1   Appeal Letters         39      251       251

 4    City's 2   Property Records       40      251       251

 5    City's 3   Rental License         41      251       251
                 Applications
 6    City's 4   Notices                42      251       251

 7    City's 5   Revocation Action      28      251       251

 8    City's 6   Revocation Action      32      251       251

 9    City's 7   Property History       43      251       251

10    City's 8   Property History       44      251       251

11    City's 9   Property History      182      251       251

12    City's 10  Property Summary       45      251       251

13    City's 11  Property Summary      108      251       251

14    Khan's 35  Violation Codes        78       78        80

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        P R O C E E D I N G S

2                   HEARING OFFICER GUROVITSCH:  Are

3     both sides ready to proceed?

4                   MR. WOLF:  The City is ready, Your

5     Honor.

6                   HEARING OFFICER GUROVITSCH:  My

7     name is James Gurovitsch.  I am the Hearing Officer

8     appointed to hear this matter of the City's action to

9     revoke the rental licenses of Mahmood Khan.  Mahmood

10    Khan is present with his counsel, Edward Rooney, and

11    the City is represented by Assistant City Attorney Lee

12    Wolf.

13                   Since the City has taken this action, the

14    City will proceed first, and call on Mr. Wolf to

15    begin.

16                   MR. WOLF:  Your Honor, just prior to

17    starting, we had some discussion off the record and

18    prior to today's hearing, and Mr. Rooney and I were

19    able to meet to go over the City's exhibits and

20    Mr. Khan's exhibits, and I believe -- and Mr. Rooney

21    can correct me if I'm wrong -- is Mr. Rooney would not

22    be objecting to any of the City's exhibits listed,

23    1 through 11, which will be labeled as they come in as

24    City's Exhibit 1, City's Exhibit 2, and City's

25    Exhibit 3, and so on.
```

1      We've preliminarily agreed to stipulate to

2   certain of Mr. Khan's exhibits, and the City has

3   stated they will be objecting to several others, and I

4   believe we can then get to those as Mr. Rooney

5   presents, and the City will state which ones they are

6   objecting to as Mr. Rooney goes through, if that works

7   for you or if we want to state that on the record

8   ahead of time.

9           MR. ROONEY:  First of all, I agree

10  with Mr. Wolf.  He stated correctly that we have no

11  objection to his 11 exhibits in the book that he's

12  prepared.  If the Court please, I would prefer that we

13  get a ruling on the admissibility of the exhibits in

14  my book, because is may affect the nature of the

15  cross-examinations that I conduct before I even start

16  putting in my case in chief, so I think it would be

17  helpful and make the hearing proceed more smoothly if

18  we got those issues out of the way.

19          I think, frankly, from what I have talked

20  with Mr. Wolf, he is raising the same relevance issues

21  that were raised respecting my subpoena requests, so I

22  don't believe it is too particularized with respect to

23  any one exhibit, but I don't want to speak for him on

24  that.

25          MR. WOLF:  And, Your Honor, we could

```
1    certainly do that, if Your Honor feels that is
2    appropriate to go through.  I did write an e-mail to
3    you and Mr. Rooney detailing which ones I would be
4    objecting to.  We can put that on the record now, if
5    Your Honor would wish.
6                    HEARING OFFICER GUROVITSCH:
7    Mr. Rooney has stated that this might affect the
8    nature and scope of his cross-examination.
9                    MR. ROONEY:  That is correct, sir.
10                   HEARING OFFICER GUROVITSCH:  And,
11   perhaps, as well, his direct examination, so I think
12   it is appropriate to, even though it is out of order,
13   consider these exhibits.
14                   MR. WOLF:  Okay.  Your Honor, do you
15   want me just to go though which ones the City would be
16   then objecting to?
17                   HEARING OFFICER GUROVITSCH:  Yes,
18   and if you can refer to them as Khan Exhibit whatever
19   number.
20                   MR. WOLF:  Okay.  Your Honor, the
21   first exhibit of Mr. Khan's that the City would be
22   objecting to would be Khan's Exhibit Number 6, which
23   is listed as a spreadsheet showing the number of
24   residents in each of Mahmood Khan's licensed
25   residential rental properties and showing how many of
```

1    these rental units are occupied by members of a

2    protected class for purposes of fair housing laws and

3    regulations.

4            The City would be objecting to that as to

5    relevance.  The City has brought this Revocation

6    Action based on Licensing Standard 13 for having had

7    two prior license revocations and under the Good Cause

8    Standard in 1910.

9            The fact Mr. Khan has made attempt -- or

10   it appears that based on the subpoenas that they

11   requested and certain of their exhibits listed, making

12   a case for a fair housing claim, Mr. Khan has already

13   filed an action with HUD regarding a fair housing

14   claim.

15           They are also free to file a civil

16   lawsuit, if they are bringing up a claim that the City

17   is violating the Fair Housing Act, that would be the

18   appropriate place for that to take place, not in a

19   license Revocation Action where the City has based it

20   on standards of having two prior license revocations

21   and Good Cause as to how Mr. Khan has maintained his

22   properties.

23           The City, at this point -- it does not

24   matter what race or religion Mr. Khan's tenants are,

25   it is based on his prior actions in maintaining the

1    properties and having had two prior license

2    revocations, so the City would be objecting to any of

3    this Fair Housing evidence.

4                     HEARING OFFICER GUROVITSCH:  Let me

5    address a question to Mr. Rooney:  Has Mr. Khan, in

6    fact, filed an action under the Fair Housing Laws?

7                     MR. ROONEY:  He has filed an

8    administrative complaint with the federal HUD that I

9    am aware of.  I know that he has spoken about civil

10   action under the Fair Housing Laws, I don't know

11   whether it has actually been commenced or is in the

12   works, so that is my answer to your question.

13                    HEARING OFFICER GUROVITSCH:  All

14   right.  Thank you.

15                    MR. ROONEY:  But I would like to be

16   heard in response to the objection.

17                    HEARING OFFICER GUROVITSCH:  You

18   will.  What, if you know, are the remedies that could

19   be granted to Mr. Khan if, in the event, the City

20   Council decides to revoke the licenses?

21                    MR. ROONEY:  Well, I don't know in

22   any detailed way.  What I know, in a very superficial

23   way, is injunctive relief, financial compensatory

24   damages, attorney fees, there maybe penalties I am not

25   aware of, but that, of course, would be after the fact

1   and after the damage was done.

2                        HEARING OFFICER GUROVITSCH:  I don't

3   believe HUD has the authority to direct the City to

4   reverse a revocation of licenses, does it?

5                        MR. ROONEY:  I don't believe it

6   does.

7                        HEARING OFFICER GUROVITSCH:  Okay.

8   All right.

9                        MR. ROONEY:  But may I be --

10                       HEARING OFFICER GUROVITSCH:   You

11   maybe heard now.

12                       MR. ROONEY:   Thank you.

13   Mr. Gurovitsch, this is the crux of the difference

14   between the City in this position and Mr. Khan's

15   position.  The City would like you to mechanically

16   approve the operation of their housing ordinance.

17                    Our position is that that operation, the

18   way they want it done, is illegal, is a violation of

19   federal status -- the Fair Housing Act -- is a

20   violation of the Minnesota Human Rights Act, and is a

21   violation of the HUD regulations under which the City

22   has bound itself in return for receiving federal money

23   to operate, among other things, the Housing

24   Inspections -- or at least to assist in the operation

25   of the Housing Inspections Office.

1          The Fair Housing Act says:  Local

2     government actions -- this is 42 USC 3615 -- local

3     government actions that are contrary to the Fair

4     Housing Acts are invalid.  And US Supreme Court has

5     said:  Local government housing regulation that has a

6     disparately harmful impact on protected classes --

7     which gets to the crux of Exhibit 6 -- is invalid if

8     it is arbitrary, artificial, and unnecessary.

9          And the Inclusive Communities Project

10     versus Texas Housing Department decided on July 25th

11     of this year by the Supreme Court, we need to show --

12     in order to show that this lose-two/lose-all licenses

13     approach of the City's, when applied to a landlord

14     such as Mr. Khan who is renting to protected-class

15     citizens who are on the margins of the rental market,

16     is arbitrary, artificial, and unnecessary, and to do

17     that, we need to know who Mr. Khan's tenants are, and

18     that is what Exhibit 6 is.

19          But in general, and maybe to save some

20     time, all of our exhibits, I believe, that the City is

21     objecting to, go to the Fair Housing issues, to the

22     fact of what the City has assured HUD in return for

23     getting Fair Housing money, what outside groups have

24     looked at the extremely tight rental market in the

25     Twin Cities, which is particularly tight for

1    low-income tenants, and the fact that low-income

2    tenants are disproportionately members of protected

3    classes under both the Fair Housing Act and the

4    Minnesota Human Rights Act.

5            You will do be doing Mr. Khan a grave

6    injustice and, in my opinion, denying him due process

7    if you do not let him raise the Fair Housing issues

8    the crux of his resistance to the application of the

9    ordinance.

10            HEARING OFFICER GUROVITSCH:

11   Response, Lee, please.

12            MR. WOLF:  Briefly.  Your Honor,

13   just the objections to 8 and 9 were more of a general

14   relevance, not necessarily the Fair Housing.  The

15   other objections that the City would be making were to

16   Exhibits 14 through 32, and that would be based on the

17   relevancy of the Fair Housing information compared to

18   what the City's action is going about.

19            Mr. Khan has two prior license

20   revocations.  The City Council has passed an ordinance

21   saying that if a landlord has had two prior

22   revocations, they are unfit to be a landlord in the

23   City of Minneapolis.

24            Not only that, but the City is going to

25   show that based on how Mr. Khan has managed his

1    properties -- besides the fact that he has two prior

2    revocations -- that he should not be a landlord in the

3    City of Minneapolis, and I think that is the sole

4    relevancy of what the City's action is about, and

5    everything should be relevant to that, how he has

6    managed his properties and the lack of management that

7    caused him to have two prior revocations.

8            Thank you, Your Honor.

9            HEARING OFFICER GUROVITSCH:  All

10   right.  Well, under the ordinance that gives me the

11   authority to conduct this hearing -- that is 259.255,

12   Subdivision 1 -- the Hearing Officer shall hear all

13   relevant evidence and argument, and my feeling is that

14   even though Mr. Rooney raises these other issues, they

15   are not relevant to the City's proceeding regarding

16   the rental license revocations due to the City's claim

17   of lack of maintenance or lack of good management of

18   the property, so I am going to sustain the City's

19   objection to Number 6.

20           Let's go on to Number 8.

21           MR. WOLF:  Your Honor, the objection

22   to Number 8 would be relevance as to the City's

23   action.  The fact that Mr. Khan has done eviction

24   actions and settlements in eviction actions is

25   irrelevant to the City's proceeding at this time.

1                    HEARING OFFICER GUROVITSCH:

2      Mr. Rooney?

3                         MR. ROONEY:  Your Honor, this is a

4      Fair Housing exhibit.  This is fact to show that

5      Mr. Khan bends over backwards to keep these people

6      within the margins of the rental market -- almost

7      exclusively members of protected classes -- in stable

8      rental housing so they don't become homeless.

9                    If you are going to refuse to let me

10     introduce Fair Housing evidence, then I supposed you

11     should sustain this objection too, but I think it is a

12     gross denial of due process for you to do so.

13                         HEARING OFFICER GUROVITSCH:  Again,

14     I am dealing with narrow issues, here, and I don't

15     find that this is relevant, and I am going to sustain

16     the objection.

17                         MR. WOLF:  As far as Exhibit 9, I

18     think the City would -- I will not object to the order

19     to dismiss on the converse advance, assuming

20     Mr. Rooney goes through Mr. Khan to lay the

21     foundation.

22                         MR. ROONEY:  That is my intention.

23                         MR. WOLF:  And I have an opportunity

24     to cross-examine regarding that.

25                         HEARING OFFICER GUROVITSCH:

1   Certainly.

2                          MR. WOLF:  But Exhibits 10 and 11,

3   Mr. Rooney and I discussed, it would just be a matter

4   of as long as Mr. Rooney is able to lay the foundation

5   for who took the pictures and when, the City would

6   have no objection to those, but they were not dated

7   and we did not have listed who took the pictures, so I

8   think the City would object or not object based on how

9   they were coming in and who is introducing those

10  exhibits.

11                         MR. ROONEY:  If I may be heard?

12                         HEARING OFFICER GUROVITSCH:  Yes.

13                         MR. ROONEY:  With respect to those,

14  we certainly would be able to establish the foundation

15  of what is depicted and when it was depicted.  I don't

16  think, for purposes of admissibility of the photo, we

17  need to establish who took it, we need only to

18  establish that the photo accurately depicts what was

19  depicted on the specific date, and we will be able to

20  do that.

21                         HEARING OFFICER GUROVITSCH:  Well,

22  that is part of the foundation.

23                         MR. ROONEY:  Yes.  So we wait until

24  our testimony on that one?

25                         HEARING OFFICER GUROVITSCH:  We

1    don't get hyper-technical on this kind of a hearing,

2    so I think that would be fine.

3                    MR. ROONEY:  Okay.

4                    HEARING OFFICER GUROVITSCH:

5    Numbers 10 and 11 will be admitted, subject to laying

6    the proper foundation.

7                    MR. ROONEY:  Sure.

8                    MR. WOLF:  And, Your Honor, then the

9    City would have the same objection for 14 through 32.

10   I don't know if you want to go through those

11   individually, but they are, basically, reports and HUD

12   information regarding community development that would

13   all go to Mr. Khan's Fair Housing claim.

14                   MR. ROONEY:  Your Honor, I think it

15   is most efficient to treat these as one.  They are all

16   Fair Housing exhibits.

17                   HEARING OFFICER GUROVITSCH:  Yes.

18   All right.  Mr. Rooney, your response.

19                   MR. ROONEY:  I will say it again:

20   How can it be -- one of your responsibilities in

21   deciding this case is:  Is the City's behavior

22   reasonable?  Is the City's action with respect to

23   these licenses reasonable?

24            It cannot being reasonable for a municipal

25   government to take an unlawful action, and it has to

1    look beyond its own ordinances.  It has to look at the

2    law of the land, the enactments of the US Congress.

3    It has to look at the law of the State, the Minnesota

4    Human Rights Act.

5             You cannot, in any real world, carve out a

6    separate little niche and kingdom for the City to

7    apply its housing ordinance irrespective of the

8    governing laws the City is subjected to.

9             Once again, you are creating a great

10   appeal record, but I would rather not appeal.  I would

11   rather win.

12             HEARING OFFICER GUROVITSCH:  It is

13   basically a collateral attack on the ordinances.

14             MR. ROONEY:  It is a direct attack

15   on the ordinances.  They are unlawful as applied to

16   this person.

17             HEARING OFFICER GUROVITSCH:  In any

18   event, understand that the City Council ultimately

19   bears the responsibility for making the decision here.

20   They are going to have to weigh the benefits of the

21   housing that Mr. Khan provides against the burdens

22   that the City claims it is left with insofar as it

23   pertains to making sure that the housing is safe and

24   it is liveable and habitable.  That is something the

25   City has to wrestle with.

1          MR. ROONEY:  May I ask you

2    something?  Certainly, the ultimate decision is to the

3    Minneapolis City Council -- well, not really.  The

4    ultimate decision could be to the Minnesota Court of

5    Appeals, Minnesota Supreme Court, or US court system,

6    but the one and only opportunity that Mr. Khan has to

7    present evidence concerning this whole situation is

8    right here, right now.

9          You know as well as I know that when we go

10   up in front of the committee of City Council and when

11   we go up in front of the whole City Council with

12   respect to your decision, I can argue my lungs out,

13   but I cannot introduce any new evidence.  Whatever

14   evidence there is going to be has got to be introduced

15   in this hearing, and that is why it is so unfair to

16   Mr. Khan for you to not consider the Fair Housing

17   evidence.

18          HEARING OFFICER GUROVITSCH:  The

19   fact that I am disallowing these exhibits does not

20   necessarily foreclose testimony about the subject

21   matter of the exhibits.

22          MR. ROONEY:  Thank you.  That is

23   some small consolation, I appreciate that.

24          HEARING OFFICER GUROVITSCH:  And if

25   there is testimony regarding the impact of a potential

1    denial of licenses on Fair Housing and things of that

2    nature, you are certainly free to introduce testimony

3    in that regard.

4                    MR. ROONEY:  Thank you, sir.

5                    HEARING OFFICER GUROVITSCH:  I am

6    just thinking that this is all repetitious and it is

7    something that is probably well within the knowledge

8    of the City officials.

9                    MR. ROONEY:  Yes, but we dispute

10   this on the basis of evidence, not what people know,

11   so this is my chance to put evidence into the record.

12                   HEARING OFFICER GUROVITSCH:  Well, I

13   think Mr. Khan or whoever else he wishes to have as

14   witnesses can testify about these things, and I am

15   going to allow it.

16                   MR. ROONEY:  Allow the testimony?

17                   HEARING OFFICER GUROVITSCH:  Yes.

18                   MR. ROONEY:  All right.  Thank you.

19                   MR. WOLF:  I think that was the end

20   of the City's Exhibits [sic], Your Honor, was the

21   Exhibits 14 through 32.

22                   MR. ROONEY:  Your Honor, two

23   questions.  One is just with respect to the record.  I

24   will certainly take the exhibits that have -- the

25   objections to which you have sustained out of the

1    exhibit book, but, maybe, kept in the record

2    separately by way of an offer of proof of what I

3    wanted to introduce as exhibits that the Court -- and

4    this, of course, has to do with proceedings in higher

5    forums.

6            It seems to me it is much simpler to make

7    an offer of proof that way then to make me read though

8    each single exhibit and say what this would have shown

9    if it had been allowed.  It is just simply setting

10   some documents aside to know what it was that I wanted

11   to present.

12           HEARING OFFICER GUROVITSCH:  Well,

13   you are entitled to make a proper record, and as long

14   as the City has no objections, I have no concern about

15   that.

16           MR. WOLF:  No, Your Honor.  That

17   would be --

18           MR. ROONEY:  And one other item --

19   and I apologize for not bringing it up when we met

20   before -- I would like you to restrict these

21   proceedings to the City's claim that Mr. Khan's

22   licenses should be revoked because of the two previous

23   revocations, and not permit the City to claim that

24   there should be a revocation on so-called Good Cause.

25           I have asked for months for Mr. Wolf to

1    specify what exactly the City is talking about by way

2    of its so-called Good Cause.  I have gotten no

3    specifics.  I am sitting here guessing what it might

4    be, and that is no way for a man to defend his

5    livelihood.  It is a denial of due process once again.

6    I just don't know.

7              I am assuming, once again -- I am

8    guessing, just like I was guessing what the City

9    wanted to do when it sent out those Notices of

10   Revocation.  That is not the way a legal system should

11   operate when a man's -- virtually his wealth and his

12   livelihood are at stake.  They have not told me what

13   the Good Cause is, and I don't think they should now,

14   at this late date, be allowed to proceed on that basis

15   when I have demanded it and not received the

16   specifics.

17             HEARING OFFICER GUROVITSCH:

18   Mr. Wolf, are you proceeding on the grounds of the two

19   revocations and no other grounds?

20             MR. WOLF:  No, Your Honor.  The

21   City's notices included, and specifically I can -- the

22   March 6th notice, which is Khan Exhibit Number 2,

23   notified Mr. Khan and Mr. Rooney that the City was

24   going to be going on Good Cause, as well as the two

25   prior license revocations.

1          The City's exhibits after the two

2     revocation packets, which particularize what has

3     occurred at each of the properties, starting on City's

4     Exhibit 7, listing all of the properties Mr. Khan owns

5     in order with details regarding the number of Request

6     for Services, the citations issued, the Site Visits,

7     the violations as far as interior or exterior, the

8     number of nuisance violations, the number of times the

9     property has been boarded or posted with a Letter of

10    Intent to Condemn.

11         Each property has a full summary of those

12    issues, and those were provided to Mr. Khan and

13    Mr. Rooney, I believe, back in May, when we had met

14    when the matter was first set and we used that time

15    period as kind of a pretrial conference, and the City

16    gave its -- at that point it was the whole usual

17    evidence packet that the City puts together, not set

18    out and tabbed as exhibits, but the evidence packet

19    was given to Mr. Khan and Mr. Rooney, and it included

20    all the property summaries of all the issues that have

21    been occurring, and they are limited to the history

22    from when Mr. Khan bought the property, so it is not

23    prior history prior to Mr. Khan.

24         It fully lists out all the issues that

25    have gone on at each of these properties since

1   Mr. Khan has purchased them, and that is the basis of

2   the City's Good Cause is in the testimony from the

3   City's witnesses who will describe what this summary

4   entails, what the specifics are, and why that would be

5   considered Good Cause to revoke Mr. Khan's license,

6   but that information has clearly been presented to

7   Mr. Khan and Mr. Rooney several months ago.

8                   HEARING OFFICER GUROVITSCH:  Well, I

9   received the same packet that included that

10  information, and there is no formal discovery

11  requirements in this ordinance.  I think that you have

12  been adequately apprised of what the City's intentions

13  are, sir.

14                  MR. ROONEY:  I don't think so, sir.

15  With all due respect, I know these things, I see these

16  things, I have been provided with them, but what do

17  they tell me?

18         I am going to hear for the first time from

19  their witness today with no preparation how the City

20  interprets this as Good Cause for Revocation of

21  License.

22         I could look at it and say,

23  Congratulations, Mr. Khan, you keep these modest old

24  buildings up, notwithstanding all these problems.  You

25  keep them licensed.  You keep them available for

1     low-income tenants.  You are carrying the weight, in

2     large part, for the City of Minneapolis' duty to

3     affirmatively further fair housing.

4          These tell me the history of the property.

5     They tell me nothing about why this should be Good

6     Cause to deny the licenses.  Once again, they are just

7     throwing everything at the wall and hoping so some

8     will stick, and due process entitles my client to much

9     better notice than that.

10          HEARING OFFICER GUROVITSCH:  Well, I

11    think the core of what the City's exhibits say fits

12    within the definition of showing Good Cause, and it is

13    not a surprise to Mr. Khan that that is where the City

14    is coming from, with respect to Good Cause.  I am

15    going to allow the testimony.

16          MR. WOLF:  Your Honor, I would like

17    to add that Mr. Rooney did a Data Practices Request

18    from the Department of Regulatory Services asking for

19    a number of information that the City would have

20    gotten this information from regarding Mr. Khan's

21    properties.  I know that occurred several months ago

22    when there was a Data Practices Request for

23    information regarding citations and notices that were

24    issued to Mr. Khan, and that is, basically, summarized

25    in the City's documents that have been presented and

1   out there for months.

2                      HEARING OFFICER GUROVITSCH:  Okay.

3   Any other issues before we start taking testimony?

4                      MR. ROONEY:  I have some, Your

5   Honor.  I guess, only one.  Just to make a record of

6   the fact that there is no waiver of my previous

7   objections to the Court's authority to proceed at all

8   here, or to this forum's authority to proceed at all

9   that I made with the Motion to Dismiss with the lack

10  of the required recommendation from the Director by --

11  it is on the record.  I just want to make sure that

12  there is no suspicion or misunderstanding that by

13  appearing and proceeding in this hearing that we in

14  any way acknowledge that this is an appropriate

15  hearing to proceed.

16                      MR. WOLF:  And, Your Honor, to

17  follow up on that, I think we will probably will have

18  to just meet after the hearing to get those formal

19  documents together into the record.

20                      MR. ROONEY:  Yes.  We will want to

21  agree on what is in the prehearing record.

22                      HEARING OFFICER GUROVITSCH:  I

23  believe that you had initiated the request that I

24  dismiss the proceeding on the grounds that I had no

25  authority to hear it, and I, in kind, wrote back in a

1    letter indicating why I thought I did have the

2    authority to hear the matter.

3                    MR. ROONEY:  And after you received

4    the City's response to my request to dismiss, yes.

5                    HEARING OFFICER GUROVITSCH:  And I

6    did send copies to the City, if you want them as part

7    of the record, I think that is a good idea.

8                    MR. WOLF:  And also, then, I would

9    guess Mr. Rooney's request for subpoenas, the City's

10   response, and your response.  We can take time after

11   the hearing is concluded to get all that paperwork

12   together.

13                   MR. ROONEY:  I agree with that, sir.

14                   HEARING OFFICER GUROVITSCH:  All

15   right.  Anything else from either side?

16                   MR. ROONEY:  Not at this time, sir.

17                   HEARING OFFICER GUROVITSCH:  All

18   right.

19                   MR. WOLF:  Your Honor, the City

20   would call Kathy Zierke to the stand.

21                        KATHY ZIERKE,

22             the witness in the above-entitled

23           matter, having been first duly sworn,

24              testifies and says as follows:

25

```
 1                    DIRECT EXAMINATION

 2   BY MR. WOLF:

 3         Q    Good morning, Ms. Zierke.

 4         A    Good morning.

 5         Q    For the record, could you state and spell

 6   your name.

 7         A    Kathy, K-A-T-H-Y, Zierke, Z-I-E-R-K-E.

 8         Q    What is your current employment with the

 9   City of Minneapolis?

10         A    Administrative analyst.

11         Q    And what are your duties as an

12   administrate analyst?

13         A    I help with the revocation hearings for

14   housing inspections, and I do data requests.  I'm in

15   an operations and business improvement area now where

16   we handle all the data requests that Regulatory

17   Services receives.

18         Q    And how long as an administrate analyst

19   have you been involved with the license revocation

20   process?

21         A    Since 2008.

22         Q    And what are your duties with that portion

23   of your job?

24         A    I run Cognos reports.  Cognos is the

25   software program we used to monitor the licensing
```

1    standards of property owners.  I put together the

2    evidence packets, with help from the Director of

3    Housing Services, Housing Inspections.

4         Q    And as part of your duties, were you

5    involved with prior license revocations involving

6    Mr. Khan?

7         A    Yes.

8         Q    And showing you --

9              MR. WOLF:  Your Honor, may I

10   approach?

11             HEARING OFFICER GUROVITSCH:  Yes,

12   sir.

13   BY MR. WOLF:

14        Q    -- what is in the City's folder as

15   Exhibit 5.  Could you state what that document is?

16        A    This is the evidence packet for the

17   revocation of 3223 Bryant Avenue North.

18             MR. WOLF:  Your Honor, if I could

19   have that specifically marked as City's Exhibit 5.

20             (City's Exhibit Number 5 was marked for

21             identification by the court reporter.)

22             HEARING OFFICER GUROVITSCH:  Do you

23   have something to hold that together?

24             MR. WOLF:  I don't.

25             MR. ROONEY:  Your Honor, as long as

1    I have no objection to any of the City's exhibits, I

2    have no objection to the whole book being in front of

3    the witness.

4                      MR. WOLF:  Can we do that, and then

5    I will just have the exhibits -- if we are going to

6    enter all the City's exhibits, then after the hearing

7    or when we have a break, I will just have the court

8    reporter mark them, if that works, Your Honor?

9                      HEARING OFFICER GUROVITSCH:  Well,

10   for my purposes, I need them marked and identified as

11   we go through the testimony.

12                      MR. WOLF:  Okay.

13   BY MR. WOLF:

14        Q    So City's Exhibit 5, which you have been

15   shown, Ms. Zierke, is that the entire record of the

16   revocation proceeding regarding 3223 Bryant Avenue

17   North?

18        A    Yes.

19        Q    And what does that all include?

20        A    It includes the index, and then the letter

21   telling Mr. Khan when the hearing is going to be, the

22   Minneapolis ordinances that apply, property

23   information records for the property, and then all the

24   housing documentation for -- this happened to be an

25   illegal occupancy -- with photos and all of the

1    correction notices, the Director's Determination of

2    Noncompliance letter that was sent, summary of events

3    from the inspector, more correction notices, and then

4    the Notice of Revocation sent with the copy of the

5    placard -- this one happened to be sent certified, and

6    we had copies of that receipt -- copy of his appeals

7    and his appeals payment, and then we have the hearing.

8         Q    Does that, Exhibit 5, also include the

9    hearing documentation and the Court of Appeals

10   decision?

11        A    And then the Findings of Fact, I believe,

12   is that what -- yes.  The Findings of Fact from after

13   the hearing, Council action, and then the judgment

14   when Mr. Khan appealed it to the State Court of

15   Appeals, and that information behind it.

16        Q    And when was the judgment entered by the

17   Minnesota Court of Appeals?

18        A    Looks like November 15, 2011.

19        Q    Now, after that appeal was finalized and

20   the revocation was upheld, what did you do regarding

21   Mr. Khan's properties?

22        A    Standard operating procedure is if

23   revocation is appealed, we wait to placard the

24   property to vacate until due process has happened, and

25   so in this case, now, we got notified that they upheld

1    the revocation, so we sent a letter and placard the

2    property that it must be vacated, usually a month

3    after whatever month we're in.

4         Q    So you indicated earlier that part of your

5    duties is to monitor the Cognos report to monitor the

6    compliance with the licensing standards.

7              Did anything occur, then, to bring notice

8    regarding Mr. Khan or any of his properties after that

9    first revocation in 2011?

10        A    I -- no.  I guess I monitor licensing

11   standards just on a quarterly basis, so this would not

12   have generated anything special.

13        Q    So you just continue to monitor all

14   properties regarding compliance with licensing

15   standards?

16        A    Right.

17        Q    Regarding Exhibit 6, can you state for the

18   record what that document is?

19        A    That is the evidence packet for the rental

20   license revocation of 2714 4th Street North.

21              MR. WOLF:  Your Honor, if I could

22   have that marked as City's Exhibit 6?

23              HEARING OFFICER GUROVITSCH:  You

24   may.

25

1                    (City's Exhibit Number 6 was marked for

2                    identification by the court reporter.)

3   BY MR. WOLF:

4        Q    Ms. Zierke, looking at what has been

5   marked as City's Exhibit 6, could you indicate what

6   that document is, just briefly going through --

7        A    This was for Licensing Standard 5,

8   Municipality Nuisance Service, where we were not only

9   notifying the owner that they had to mow the grass or

10  pick up garage, but we also have to send a contractor

11  out to take care of it and/or have solid waste or

12  recycling -- they have a program called Dirty

13  Collection Point -- and they notify the owner, send

14  them the letter if there's extra garbage around the

15  collection point, and then if it's not taken care of,

16  they have to clean it up.

17       Q    What licensing standard did you say that

18  was?

19       A    Five.

20       Q    And does that come up through your regular

21  monitoring of the compliance with the licensing

22  standard?

23       A    Yes.

24       Q    And what occurred after that came up on

25  your notice?

1     A     I believe there were about ten different

2    properties involved that after I sent the Director's

3    Determination of Noncompliance telling them that

4    they've had three or more instances of nuisance

5    abatement at their property, they get one more, and

6    then we may proceed to revoke their rental license.

7          We send those out, and then I write a

8    report, and about ten of them came up, ten different

9    properties that we had go out again and clean up or

10   mow the grass, and, so in this instance, this was one

11   of the ten.

12     Q     And so the City proceeded with revocation

13   in that matter?

14     A     Right.  On, I believe, all of them.  A

15   couple were dropped off.

16     Q     And regarding what is in Packet 6, is that

17   the full history of the appeal in that matter?

18     A     The appeal of the revocation or to the

19   State?

20     Q     If you can review and just indicate what

21   you see in there as far as the history of that

22   exhibit.

23     A     The State Court of Appeals upheld our

24   Revocation Action.

25     Q     So could you, just for the record, explain

1    what all is in Exhibit 6?

2         A    The evidence packet the City used to

3    revoke the rental license, the Findings of Fact from

4    the appeal hearing, the Council action from the City

5    to revoke the rental license, and the State Court of

6    Appeals' findings after Mr. Khan appealed the City's

7    action to revoke.

8         Q    And does Exhibit 6 state when the decision

9    of the Minnesota Court of Appeals occurred?

10        A    December 22, 2014.

11        Q    Now, after you received notice that that

12   appeal had been unsuccessful by Mr. Khan in

13   December of 2014, what did you do as a part of your

14   regular duties as administrative analyst?

15        A    Then we sent a letter to Mr. Khan and

16   placarded the property to vacate.

17        Q    And showing you --

18             MR. WOLF:  And Mr. Rooney, is your

19   folder up there?  Because I did include those notices

20   because you had those in your evidence.

21             HEARING OFFICER GUROVITSCH:  While

22   we are waiting for that, I did not hear what standard

23   your claim was violated regarding the property at

24   3223 Bryant Avenue North.

25             THE WITNESS:  That was 3, Illegal

1  Occupancy.

2                    HEARING OFFICER GUROVITSCH:  Thank

3  you.

4                    MR. ROONEY:  I don't know that I had

5  copies of placards.

6                    MR. WOLF:  No, the letters.

7                    MR. ROONEY:  Oh, the letters.  Yes.

8                    MR. WOLF:  I think they are your 1,

9  2, and 3.

10                    MR. ROONEY:  Yes.  Do you want to --

11                    MR. WOLF:  And, Your Honor, I did

12  not include these letters in my exhibits because

13  Mr. Khan had those in his, so I thought, why be

14  duplicating.

15                    HEARING OFFICER GUROVITSCH:  Well,

16  we want to save as many trees as we can.

17                    MR. ROONEY:  I wish that we were

18  saving trees, but -- I just want to pull these.

19                    HEARING OFFICER GUROVITSCH:  We are

20  off the record.

21              (A discussion was held off the record.)

22  BY MR. WOLF:

23       Q    Ms. Zierke, I am showing what has been

24  labeled as Khan Exhibit 1.  Could you indicate what

25  that document is for the record?

1      A     It is the Notice of Revocation due to

2  Licensing Standard 13 after the two licenses were

3  revoked.

4      Q     And that was sent to Mr. Khan; is that

5  correct?

6      A     Yes.

7              MR. WOLF:  Your Honor, do we need

8  this labeled if they have already had it printed with

9  Khan's Exhibit 1, or should we have the court reporter

10  also label that?

11              HEARING OFFICER GUROVITSCH:  I think

12  we can avoid that, as long as these are properly

13  indicated at the bottom of each page.

14              MR. ROONEY:  They are, Your Honor.

15              HEARING OFFICER GUROVITSCH:  That is

16  very helpful.  Thank you.

17  BY MR. WOLF:

18      Q     Okay.  Ms. Zierke, showing what has been

19  labeled as Khan Exhibit 2, could you state what that

20  document is.

21      A     That's the Director Determination of

22  Noncompliance for Licensing Standard 19, Other Cause.

23      Q     And when was that dated?

24      A     March 6th of 2015.

25      Q     Showing you what has been labeled as Khan

1    Exhibit 3, could you state what that document is.

2         A    The Notice of Revocation, dated March 18,

3    2015, for Licensing Standards 13 and 19.

4         Q    Okay.  So you stated that after the Court

5    of Appeals' decision came down on the second

6    revocation, you sent Khan Exhibit 1.

7              Can you explain why, then, Khan Exhibit 2

8    and Khan Exhibit 3 were sent later?  And explain the

9    process of that.

10        A    Okay.  Well, it's driven under Ordinance

11   244.1910, and under 13 -- I want to say B -- under

12   Subsection 13 it states, If the owner has had two or

13   more revocations, they shall no longer be eligible to

14   hold a rental license in the City of Minneapolis.

15             It also states that a Director's

16   Determination of Noncompliance does not have to be

17   sent under certain licensing standards, and I believe

18   that's in the 1930 or -- 1930.

19             So a Director's Determination Notice was

20   not sent ahead of the Revocation Action because

21   according to ordinance, it's not required in that

22   licensing standard instance.

23             So when it was decided to add Licensing

24   Standard 19 to the Revocation Action, it's required by

25   ordinance that a Director's Determination of

1    Noncompliance letter be sent for that licensing

2    standard number.

3              So I sent a Director's Determination of

4    Noncompliance letter first, and then followed up with

5    the Notice of Revocation, included both standards, to

6    be clear.

7         Q    And that initiated the revocation process

8    that we are in today; is that correct?

9         A    Correct.

10        Q    And as part of then going forward with the

11   revocation, did Mr. Khan appeal that action?

12        A    Yes.

13        Q    And showing you what has been labeled as

14   City's Exhibit -- Could you state what has been

15   labeled as City's Exhibit 1.

16        A    A letter from Attorney Rooney letting us

17   know that he'll be representing Mr. Khan and he's

18   appealing the Revocation Action.

19        Q    And is there also from Mr. Khan, as well,

20   an appeal signed by him?

21        A    Yes, a three-page appeal.

22              MR. WOLF:  Your Honor, if I could

23   have that labeled as City's Exhibit 1?

24              HEARING OFFICER GUROVITSCH:  Yes.

25

1                     (City's Exhibit Number 1 was marked for

2                     identification by the court reporter.)

3       BY MR. WOLF:

4              Q     Now, Ms. Zierke, after Mr. Khan, through

5       himself and through his attorney, appealed, did you

6       proceed with revocation, and what process did you go

7       through when you decided to go through revocation, as

8       far as -- just what process do you go through when you

9       are revoking a license?  With regards to --

10             A     Once an appeal has been received or just

11      from the beginning?

12             Q     Just from the beginning.

13             A     From the beginning.  When an owner has --

14      has not abided by the licensing standards, and it's --

15      a Director's Determination of Noncompliance has been

16      sent, giving them time to fix the problem, then it

17      goes into Revocation Action, and you send a revocation

18      letter to the owner, and copies of placards to the

19      residents of the building, the property is placarded,

20      and you send the applicable ordinances along with an

21      appeal application.

22             Q     Okay.  Showing you what has been labeled

23      in the City's exhibit book as Exhibit 2, could you

24      describe what the documents in 2 are?

25             A     These are Hennepin County property

1   information records.

2         Q    And what are they records of?

3         A    Of the properties involved in the

4   Revocation Action.

5         Q    So those would be all the properties

6   Mr. Khan owned and had a rental license for?

7         A    Correct.

8              MR. WOLF:  Your Honor, could I have

9   this exhibit marked as City's Exhibit 3?

10             MR. ROONEY:  Isn't it 2?

11             MR. WOLF:  Is that 2?

12             HEARING OFFICER GUROVITSCH:  Yes.

13             (City's Exhibit Number 2 was marked for

14                 identification by the court reporter.)

15  BY MR. WOLF:

16        Q    And Ms. Zierke, did you retrieve all that

17  information regarding which properties were owned by

18  Mr. Khan?

19        A    Yes.

20        Q    And was that --

21             MR. WOLF:  If you don't mind me

22  leading to go through this quicker?

23             MR. ROONEY:  Oh, that is fine.

24  BY MR. WOLF:

25        Q    Was that done to determine which

1    properties Mr. Khan owned so that they could be

2    placarded and notified?

3              A    Correct.

4              Q    And after discovering which properties

5    Mr. Khan owned, did you then verify that they had been

6    licensed with the City of Minneapolis?

7              A    Right.

8              Q    And are those documents -- showing you

9    what has been labeled in the City's exhibit packet as

10   Number 3, and --

11             A    Right.  And these --

12             Q    -- are those all the rental applications?

13                      HEARING OFFICER GUROVITSCH:  Just

14   one person talking at a same time --

15                      THE WITNESS:  Oh, sorry.

16                      HEARING OFFICER GUROVITSCH:  -- so

17   the court reporter can make an accurate record here.

18                      THE WITNESS:  I copied all the

19   rental licenses from our files.

20   BY MR. WOLF:

21             Q    Does that, from Number 3, line up with the

22   properties in City's Exhibit 2?

23             A    Yes.

24                      (City's Exhibit Number 3 was marked for

25                      identification by the court reporter.)

BY MR. WOLF:

Q    So after looking at Hennepin County records of what properties Mr. Khan owned, you then checked to see which of those properties were licensed with the City of Minneapolis' rental units?

A    Correct.

Q    And then with regards to what has been labeled as 4 in the City's exhibit list, could you describe what those documents are.

A    These are copies of the placards.  When a property goes into Revocation Action, we placard the property with this notice.

Q    And that is according to the city ordinance?

A    Correct.

MR. WOLF:  Your Honor, if I could have this marked as City's Exhibit 4?

HEARING OFFICER GUROVITSCH:  Yes.

(City's Exhibit Number 4 was marked for

identification by the court reporter.)

BY MR. WOLF:

Q    So after you sent the notices to Mr. Khan of the revocation and checked which properties he was licensed in the city and posted those, what, if any, action did you take with regard to this revocation

1  process?

2      A    I proceeded to put the evidence packet

3  together.

4      Q    And that included Exhibits 5 and 6

5  regarding the prior revocations; is that correct?

6      A    Correct.

7      Q    So that gets us through the first

8  licensing standard that was notified, which is the two

9  prior revocations.

10         With regard to the Good Cause Revocation,

11  could you -- reviewing Exhibit 7, could you state what

12  those documents are.

13      A    These are what I call profile summary of

14  each property that Mr. Khan has open-rental license on

15  or not.  All the properties that we found that

16  Mr. Khan owned, we did a summary of.

17      Q    And so Exhibit 7 appears to have purple

18  highlights, could you --

19      A    And those are properties that have open

20  rental licenses, according to our records.

21              MR. WOLF:  Your Honor, could I have

22  that marked as Exhibit Number 7?

23              HEARING OFFICER GUROVITSCH:  Yes.

24         (City's Exhibit Number 7 was marked for

25              identification by the court reporter.)

```
 1   BY MR. WOLF:

 2        Q    So City's Exhibit 7 would be the summary

 3   of the properties that had a current rental license at

 4   the time.

 5             And do you recall when you pulled the

 6   documentation?

 7        A    I pulled all the information over a period

 8   of one month from March 20 -- March 23rd to

 9   April 23rd.

10        Q    And so Exhibit 7 was for properties that

11   were licensed at that time; is that correct?

12        A    Correct.

13        Q    And now what has been in the City's folder

14   as Exhibit 8 -- which appears to have an orange-ish

15   coloring to them -- could you state what those

16   documents are?

17        A    These are summaries of the properties that

18   Mr. Khan owns that do not have open rental licenses on

19   them, according to our records.

20             MR. WOLF:  Your Honor, could I have

21   this marked as Exhibit 8?

22             HEARING OFFICER GUROVITSCH:  Yes.

23             (City's Exhibit Number 8 was marked for

24             identification by the court reporter.)

25
```

```
1    BY MR. WOLF:
2         Q    And then what is labeled as Exhibit 10,
3    which appears to be the same type of summary -- with a
4    greenish color to the headers -- could you describe
5    what that is.
6         A    These are summaries to the three
7    properties that are in the PPU unit.
8         Q    Could you describe what PPU is?
9         A    Problem Properties Unit, and at the time,
10   they were in -- those three properties were part of --
11   fall under PPU, we call it, Problem Properties Unit.
12        Q    And that was during the time period you
13   had pulled in April --
14        A    Correct.
15        Q    -- 2015?
16             MR. WOLF:  Your Honor, if I could
17   have this marked as City's Exhibit 10?
18                  HEARING OFFICER GUROVITSCH:  Yes.
19                  (City's Exhibit Number 10 was marked for
20                  identification by the court reporter.)
21                  MR. ROONEY:  You are skipping over
22   9 for the moment?
23                  MR. WOLF:  Yes.
24   BY MR. WOLF:
25        Q    Now, Ms. Zierke, if we could take a little
```

1   time to -- there is a lot of information on those

2   Exhibits 7, 8, and 10.

3           Could you, kind of, give us a summary of

4   what this information is, where you got it from,

5   and --

6       A    We have a software system called Cognos,

7   and that pulls from our land management system, KIVA,

8   and the Administrative Analyst Unit do what they call

9   summaries on different properties, just to find out

10  what's going on there, and what the history is.

11          And so this is labeled Inspection

12  Information and then the number of requests for

13  service, Administrative Citations issued, and Site

14  Visits -- and Site Visits is the number of times an

15  inspector had to physically, you know, visit the

16  property.

17      Q    And can you state what a Request for

18  Service is.

19      A    I cannot.  That would have to come from an

20  inspector.  I mean, Request for Service to me is a

21  Request for Service.

22      Q    Okay.  And, now, under Violations and Flag

23  Information -- Dirty Collection Point, Director's

24  Determination of Noncompliance -- could you kind of

25  summarize what those different labels mean.

1          A     Well, the violations -- when I ran the

2     report, I searched for what types of violations were

3     going on at the properties, and so I used what they

4     call violation codes to search, and so they're

5     actually labeled Interior Housing, Exterior Housing,

6     Environmental Housing, just how they're listed here.

7          Q     And it seems pretty obvious what Interior

8     Housing, Exterior Housing Violations are.

9               Could you describe what the Housing

10    Environmental, Housing Zoning, and the other ones,

11    what they relate to.

12         A     The Housing Environmental Violations are:

13    Cease the storage of, down-fallen trees, leaves in the

14    street, managed landscape, insufficient cans,

15    insufficient carts, a Dumpster is required, dirt on

16    the walk, environmental advisory, graffiti, there's

17    actually parking in the yard.

18              There's a number of different violations

19    that would fall under that category.

20         Q     And as far as Housing Zoning and some of

21    the others, I assume Pluming, Heating, and Electrical

22    are obvious as to what they are, but could you

23    describe Zoning, Rental License, Building Security,

24    some of those other headings of what type of

25    violations would come up under those.

1        A     Under the Zoning, it says, Keeping

2    animals, permitted uses, home signing, damaged

3    property, open fires, car repairing, commercial truck

4    parking, recreational vehicle storage, a maximum of

5    two vehicles, oil disposal, maintain driveway, parking

6    surfaces, inoperable vehicle, tow without notice.

7              That would be under the Zoning, and then

8    you wanted to hear about --

9        Q     Rental License, Building Security, and

10   Fire.

11       A     Rental License, Registered co-op, condos,

12   post-registration, arsenic disclosure, licensing -- if

13   it's time to update your license -- post your license

14   on 311 poster, required vacating, application update,

15   nuisance condition, warrant, weather conditions,

16   truth-in-housing repair.

17             They all could fall under Rental License.

18       Q     And then if you could just briefly

19   describe what Building Security, Fire, Occupancy --

20       A     I have Building Security is, Security

21   doors, buzzers, repair the public area, repair the

22   buzzer, clean halls, interior handrails, ceiling

23   height.

24             The Fire is, Repair support system,

25   interior stairs, fire exits, fire egress, repair fire

1    door, provide closers, provide latches, blocked open

2    doors, tents and trailers, hall door closers, exit

3    signs, flammable liquids, clean the basement, smoke

4    detectors, provide CO alarms, combustible storage,

5    stop cooking, bathroom facility, clean the rooming

6    house.

7         Q    And Housing Occupancy and Housing Utility,

8    would utility be water and electric?

9         A    Occupancy is, Smoke gaskets required, unit

10   doors three plus, rooms too small, illegal building,

11   unlawful occupancy, attic occupancy, attic uses,

12   basement occupancy, garage occupancy, remove illegal

13   appliances, seal garbage chutes, illegal bedroom.

14        And what was the Utility?  Require gas,

15   water, or electricity, would fall under that.

16        Q    Okay.  And you have Housing Nuisance

17   Violation.

18        Could you briefly describe what would be

19   included under the Nuisance Violation.

20        A    I specifically subtitled this Housing

21   Nuisance Violations to show the rubbish violations and

22   the grass and shrub violations.

23        Q    So would that also be included somewhere

24   else in the summary?

25        A    No, not in the summaries.

1        Q     Okay.

2        A     I separated them out so that it wouldn't

3    be a double count.  Actually, the Housing Nuisance

4    title here is, Tires, hazardous tree limbs, brush and

5    branches, remove carpet, remove the rubbish.  But I

6    just line-itemed these two specific things.  I didn't

7    count the rest of them, if he had any.

8        Q     And then going over to the right-hand

9    column, just the Ownership and Parcel, and I've got

10   Dirty Collection Point, Directive Determination,

11   Occupied, and Flag Information.

12             Could you briefly just summarize what

13   those headers mean.

14       A     The Dirty Collection Point is a report I

15   can run through another software program, and that

16   tells us how many times solid waste has had to send

17   them letters or cleaned up rubbish around -- within

18   4 feet of the trash container, the dirty collection --

19   the collection point.

20       Q     Okay.

21       A     And Director's Determination of

22   Noncompliance, we can also query that and find out how

23   many letters were sent.

24       Q     I know you talked a little bit about

25   Determinations and Noncompliance, but could you expand

1    on that a little bit on when that would be sent out.

2         A    Periodically throughout the year, I run

3    Cognos reports looking for Licensing Standard

4    Violations on any open rental license property, so

5    there would be -- Licensing Standard 11 would be

6    Unpaid Administrative Citations, so that one I

7    generally do quarterly.

8              If there's a property owner who has

9    pending assessments due to Administrative Citations,

10   they're going to receive a letter if they haven't paid

11   their citations.

12        Q    And that is just a warning letter that

13   they are not in compliance with the licensing

14   standard?

15        A    Right.  It gives them ten days to come

16   into compliance, or the City may code a Revocation

17   Action.

18        Q    Okay.  Now, the Flag Information header,

19   could you summarize what those are.

20        A    The Flag Information -- every property has

21   a page that we call -- if we flag a property, and so

22   we can query all that information, and if you take a

23   look at the flag information on a property, you can

24   generally get a feel for what's going on at a property

25   before you jump into the details.

1          Q     And can you summarize what -- and some of

2     them are fairly obvious -- but what these --

3          A     The VBR is a Vacant Building Registration,

4     and that will tell as if the building is vacant or

5     not; Restoration Agreement, that tells us if there's a

6     restoration agreement with the owner to bring the

7     building up to code; Problem Properties Unit, if they

8     are in charge, that tells us if there is any issues

9     with the property, we contact PPU; Con1 or Con -- it's

10    condemnation because of lack of maintenance or because

11    of boarded windows; Director's Orders to Demolish;

12    Letter of Content to Condemn and/or Boarded is what

13    LINT1/B means; Illegal Occupancy, if there's an

14    illegal basement unit, bedroom, whatnot, an ILOC flag

15    will go up on the property; Resolved Revocations,

16    there's a revocation flag alerting people that

17    Revocation Action is going on at the property; UPWR

18    means un-permitted work, if they've been found to be

19    doing work without permits at the property; and then

20    COP, Conduct on Premise, if they've received a Conduct

21    on Premise letter from the police department, there's

22    a flag with information about what's going on about

23    that.

24               And the Abate List is if two or more times

25    in a year the owners had to become notified by the

1    City to either mow their grass or pick up rubbish, an

2    automatic flag goes on and we call it the Abate List,

3    and that's a property that would generate our

4    contractor to go out and take care of things for them

5    without notification -- or with notification to the

6    owner, but we don't have to go back as an inspector to

7    make sure they mowed or not.

8            Q    It just automatically gets issued to mow

9    the grass to the contractor?

10           A    Correct.

11           Q    Now, you pulled that information.  Is that

12   the same information in all of the properties in 7, 8

13   and 10?

14           A    Yes.

15           Q    This is the same form and same headers --

16           A    Yes.

17           Q    -- in each of those, and that is for each

18   of the properties owned by Mr. Khan; is that correct?

19           A    That we're aware of, correct.

20           Q    And were you responsible for pulling all

21   of this information?

22           A    I had help from an office mate.

23           Q    Is that Mr. Johnson?

24           A    Scott Johnson, correct.

25           Q    But together, you two pulled this

1    documentation and put these documents together,

2    summarizing the events occurring at Mr. Khan's

3    properties since he owned them; is that correct?

4         A    Yes.

5         Q    But you were not an inspector, and you

6    were never out at the properties; is that correct?

7         A    Correct.

8         Q    I think the only question I have left for

9    you, Ms. Zierke, is:  Regarding the two prior

10   revocations, they occurred in 2011 and 2014.

11             Does the City have a policy with regards

12   to if somebody had a revocation ten years apart -- or

13   what is the City's policy as far as proceeding to

14   revoke all licenses based on two?

15        A    The standard is --

16             MR. ROONEY:  Object, Your Honor.  I

17   think what the City's unwritten policies are is

18   irrelevant.  If Ms. Zierke can point to an ordinance

19   or something in writing, that would be one thing, but

20   I don't think unwritten policies ought to enter into

21   the period.

22             HEARING OFFICER GUROVITSCH:  Well,

23   if there is some directive regarding the City's

24   decision to proceed or not to proceed in these

25   instances, I think that is relevant.

1           You may answer.

2                THE WITNESS:  We generally go five

3    years for a summary of a property.

4  BY MR. WOLF:

5           Q    So with regard to either a revocation or

6    something like if a property has illegal occupancy, is

7    that also a five-year --

8           A    The rule of thumb is five years, correct.

9           Q    And based on the fact that revocations in

10   this matter were approximately four years apart, the

11   City decided to move forward with revocation; is that

12   correct?

13          A    Correct.

14               MR. ROONEY:  Object, unless

15   Ms. Zierke was part of the decision-making process.

16   You can establish foundation with that.

17               HEARING OFFICER GUROVITSCH:

18   Overruled.

19               MR. WOLF:  I have nothing further

20   for Ms. Zierke, Your Honor.

21               HEARING OFFICER GUROVITSCH:  I think

22   this is one of the points that you raise in your

23   argument against the process, that the period between

24   the two revocations was excessive.  Am I correct?

25               MR. ROONEY:  Yes.  As written, the

1    statute is arbitrary and provides no period.

2                    HEARING OFFICER GUROVITSCH:  Okay.

3    Anything else?

4                    MR. WOLF:  I have no further

5    questions for Ms. Zierke.

6                    HEARING OFFICER GUROVITSCH:  All

7    right.  Before we start with cross-examination, I have

8    just a couple of very quick questions, one of which

9    is:  Did the properties that are listed and detailed

10   in Exhibit 7 correspond to the ownership documentation

11   that you obtained from the Hennepin County record?

12                    THE WITNESS:  Yes.

13                    HEARING OFFICER GUROVITSCH:  Okay.

14   And the date range that you used to pull up the

15   information is -- you mentioned March 23rd to

16   April 23rd?

17                    THE WITNESS:  That's how long it

18   took to pull the information and the dates it took us

19   in the office to get it all -- all the reports run and

20   put together.

21                    HEARING OFFICER GUROVITSCH:  These

22   statistics that you pulled up, then, would be relating

23   to any time between those two dates, the totals that

24   you obtained?

25                    THE WITNESS:  The total obtained

```
 1    were from date of ownership or date of rental license

 2    issuance.

 3                    HEARING OFFICER GUROVITSCH:  I

 4    understand that, but as far as the total violations,

 5    it could have been anywhere from March 23rd to

 6    April 23rd, is that a fair statement, of '15?

 7                    MR. WOLF:  I think I know where you

 8    are going, Your Honor.  Maybe I could explain it.

 9                I think what the judge is saying,

10    Ms. Zierke, the final stats -- either the Housing

11    Interior Violations or Housing Exterior or Housing

12    Utility -- those final stats could have been as of

13    March 23rd or April 23rd, depending on when you pulled

14    the specific --

15                    THE WITNESS:  Correct.

16                    MR. WOLF:  -- history?

17                    HEARING OFFICER GUROVITSCH:  Or any

18    time in between those two dates?

19                    THE WITNESS:  Correct.

20                    HEARING OFFICER GUROVITSCH:  All

21    right.  Thank you.  That is all I have.

22                Mr. Rooney?

23                    CROSS-EXAMINATION

24    BY MR. ROONEY:

25        Q    Good afternoon.  I am Edward Rooney, and I
```

1    am Mr. Khan's attorney.  I just want to get back to

2    that last issue that came up to make sure it is

3    crystal clear for the record.  If you look at

4    Exhibit 7, the first page is the profile for 4011

5    Dupont Avenue North.

6              Do you have that in front of you?

7         A    Yes.

8         Q    Where it says the total violations of 93,

9    that is not 93 violations between March 2015 and

10   April 2015, it is whenever that record was made, that

11   is what is showed, but was going back to the date of

12   ownership of 6/7/2008 or the date of rental license

13   issued of 8/7/2008; is that correct?

14        A    So from -- we ran the query with the start

15   date of 8/7/2008 and then the end date could have been

16   somewhere between March 23rd and April 23rd of 2015.

17        Q    And the total of 93 was the total of what

18   you found between that start date and that end date?

19        A    Correct.

20        Q    Thank you.

21             How long have you worked for Housing

22   Inspections?

23        A    Since 2008.

24        Q    Okay.  And you are an administrative

25   analyst now.  Has that always been your position

1    there?

2         A    Yes.

3         Q    Okay.  Just to confirm, you have never

4    been an inspector, and you have never gone out and

5    inspected any of Mr. Khan's properties; is that

6    correct?

7         A    Correct.

8         Q    I think, at the beginning of your

9    testimony, in response to one of Mr. Wolf's questions,

10   you said one of things to do in your work is monitor

11   licensing standards for property owners; is that

12   correct?

13        A    Correct.

14        Q    What exactly do you mean by that?

15        A    Well, there's 23 licensing standards, and

16   some of the 23 can be monitored via the software

17   program, and those are the reports I run quarterly,

18   monthly, annually.

19        Q    Are those the licensing standards that

20   appear in Code of Ordinances 244.1910?

21        A    Yes.

22        Q    Okay.  Now, respecting Exhibit 5, the

23   revocation proceedings for 3223 Bryant Avenue North,

24   do you recall whether there was ever a transcript

25   prepared of the administrative hearing concerning that

1    revocation?

2          A    Yes.

3          Q    All right.  But that transcript is not in

4    Exhibit 5; isn't that correct?

5          A    Correct.

6          Q    Okay.  So it really, in that respect, is

7    not a complete record of the administrative

8    proceedings.

9                That is a document that the City has

10   available to it, is it not?

11         A    Yes.

12         Q    Okay.  And it is not included in

13   Exhibit 5?

14         A    Correct.

15         Q    Okay.  Another thing, I don't see, in

16   Exhibit 5, any copy of any written recommendation from

17   the Director to the City Council as to what action the

18   Director recommends the City Council take respecting

19   violation.

20               Could you point me to where that is?

21         A    No.

22         Q    Okay.  Likewise, with respect to

23   Exhibit 6, the record of the revocation proceedings

24   for 2714 North 4th Street, I believe there was a

25   transcript prepared for the Administrative Hearing in

1    that instance as well.

2             Do you know whether that is the case?

3    Because it was appealed to the Minnesota Court of

4    Appeals.  Let me back up --

5        A    So are you looking -- right.

6        Q    Okay.  Am I correct, or do you agree with

7    me, that both of these two revocation proceedings,

8    reflected in Exhibits 5 and 6, ultimately went up to

9    the Minnesota Court of Appeals?  In fact, you have got

10   the Court of Appeals' decision included in the

11   exhibit.

12       A    Right.

13       Q    And in connection with each of those

14   appeals, a transcript of the evidentiary proceedings

15   before the administrative hearing officer was

16   prepared; is that correct?

17       A    Correct.

18       Q    And in neither Exhibit 5 nor Exhibit 6 is

19   the hearing transcript included?

20       A    Correct.

21       Q    Okay.  Now, with respect to Exhibit 6,

22   likewise, can you point me, in the record, where the

23   written statement of the Director's recommendation to

24   the City Council as to what action should be taken

25   respecting this license violation can be found?

1          A     And do you just mean the Request to

2     Council?

3          Q     No.  I will tell you what I mean, and I

4     don't know if you have a copy of the ordinances in

5     front of you, but I am looking at 244.1930 -- no,

6     excuse me, 244.1940, and I can provide you a copy

7     unless you have got one up there -- I guess, I am

8     afraid, I can't.

9               But it appears to me that 244.1940 says --

10    and it is headed, Denial Nonrenewal Revocation

11    Suspension -- it says, The Director shall mail the

12    owner, and the person designated by the owner as the

13    person responsible for the maintenance and management

14    of the building or dwelling unit, a notice of denial,

15    nonrenewal, revocation, or suspension of the license

16    or provisional license.

17               Then it goes on to say, The notice shall

18    state; 1, the Director has determined that the

19    building has failed to comply; 2, the specific reason

20    why the building fails to meet licensing standards;

21    and 3, that the Director has referred the matter to

22    the City Council with the recommendation to deny, not

23    renew, revoke, or suspend the license, and I am trying

24    to find in this Exhibit 5 or Exhibit 6 or, frankly,

25    with respect to these proceedings, where is there a

1    copy of the Director's recommendation?

2                    MR. WOLF:  Your Honor, I object.  He

3    has already made this argument to you in his motion to

4    dismiss, and that has been ruled on.

5                    HEARING OFFICER GUROVITSCH:  Let me

6    make an inquiry of the City, here.  In looking at

7    these exhibit packets, it appears that, appended to

8    5 on page 21, is a Notice of Director's Determination

9    of Noncompliance, and Exhibit Number 6, at page 24,

10   there is another Notice of Director's Determination of

11   Noncompliance.

12                    Is that what Counsel is referring to, that

13   is missing?

14                    MR. ROONEY:  I think I can answer

15   that rather than the City.

16                    HEARING OFFICER GUROVITSCH:  Yes.

17                    MR. ROONEY:  No.  I am referring

18   something else, because neither of those notices state

19   what the Director recommends to the City Council

20   should be done, and I am trying to look at the

21   document, which the ordinance seems to require, in

22   which Director states to the City Council his or her

23   recommendation as to what should be done, and I am

24   asking this witness to identify where in the exhibit

25   that can be found.

1              THE WITNESS:  Right.  And it's not

2   in the packet at this time.  It's the Council Request.

3   BY MR. ROONEY:

4        Q    So do you know whether such a written

5   recommendation from the Director to the Council has

6   ever existed?

7        A    Yes.  It's called a Council Action

8   Request, and I fill those out when it -- when the

9   revocation goes to City Council.

10             Is that what you mean?

11        Q    If it exists.

12        A    And it's not part of the evidence packet.

13        Q    And it is not provided to the licensee?

14        A    The letter telling him that it will be

15   heard at City Council?

16        Q    But he is not put on notice as to what the

17   Director is recommending to the City Council.

18             Would you agree was that?

19        A    I'd have to read the letter.

20        Q    But the letter does not go to the

21   licensee; isn't that correct?

22        A    A letter goes to the licensee.

23        Q    The written statement that the Director

24   provides to the City Council stating the Director's

25   recommendation as to what action taken is not provided

1    to the licensee; isn't that correct?

2         A    I can't answer.  I have to look at the

3    letter.

4         Q    Can you show me where in the -- either

5    with respect to the historic evidence from the

6    2010 revocation from 3223 Bryant --

7         A    No, it's not included in this packet.

8         Q    Okay.  So we are having to take it on

9    faith that it exists, and also take it on faith that

10   maybe a copy of it was provided to the licensee?

11        A    Yes.

12        Q    Okay.  Thank you.

13             As far as you know, no copy of it has been

14   provided to Mr. Gurovitsch respecting this hearing?

15        A    I've never included it in any packet or

16   hearing.

17        Q    So, specifically, then, if it has never

18   been included, then it, specifically, has not been

19   included for this one?

20        A    It comes after the fact.

21        Q    But to respond to my question, if there is

22   one, in connection with this pending revocation

23   proceeding, a copy of it has not been provided to

24   Mr. Gurovitsch?

25        A    It's not ready to go to Council until

1    after the hearing on the finding of facts council.

2    According to this particular instance, the

3    recommendation isn't going to Council, yet, until we

4    find out how this hearing pans out.

5        Q    Oh, so the recommendation doesn't even

6    exist at the time the hearing appeal is started, the

7    recommendation is only made afterwards.

8            And you don't need to look at Mr. Wolf

9    about that.  You would know better than anybody.

10       A    No, I'm just wondering what you're talking

11   about.

12               MR. WOLF:  Your Honor, if I could, I

13   think I understand --

14               MR. ROONEY:  No, I would prefer to

15   have the witness testify.

16               HEARING OFFICER GUROVITSCH:  Well, I

17   think we are talking about two different things here.

18               MR. WOLF:  I believe we are.  I

19   believe Ms. Zierke is talking about the Request for

20   Council Action that gets sent to Council after the

21   hearing officer makes a recommendation.

22           I think Mr. Rooney is talking about either

23   the Director's Determination -- not the Director's

24   Determination of Noncompliance, but the Notice of

25   Revocation, under 244.1940 --

1          MR. ROONEY:  That is absolutely

2    wrong.  That is not what I am talking about.  I'm

3    talking about what the ordinance references, and I am

4    looking at 244.1943, which says, At the outset, before

5    any appeal has begun, the Director has referred the

6    matter to the City Council with a recommendation.

7          And my question to you, is, and you have

8    mentioned that the Director does make a

9    recommendation -- I think you called it a Request for

10   Action to the City Council -- but you said that only

11   happens after the Administrative Hearing Officer has

12   rendered a decision; is that correct?

13        A    Yes.

14        Q    And there is no recommendation from the

15   Director, at least not in writing, to the City Council

16   as to what action should be taken until after the

17   Administrative Hearing Officer has rendered a

18   decision; is that correct?

19        A    No.

20        Q    What is there?

21        A    I need more information to answer that.  I

22   don't want to answer something here that I don't have

23   all the information.  I feel like I'm not getting all

24   the information and you're trying to trick me, so --

25        Q    Well, I am not trying to trick you.  I am

1    trying to get you to concede that the Director does

2    not, first of all, make a written recommendation to

3    the City Council for what action should be taken until

4    after the hearing.  Is that true?

5         A    I can't answer any more.

6         Q    Okay.  But in any event, you will agree

7    that neither the record respecting the 2010 revocation

8    for 3223 Bryant Avenue North, nor the record

9    respecting the 2013 violation for 2714 North 4th

10   Street, nor the record respecting these pending

11   proceedings for the lose-two/lose-all revocation.

12            In none of those instances does the record

13   show a copy of a written recommendation from the

14   Director to the City Council; is that true?

15        A    I can't -- I can't answer that.

16        Q    Well, you have the record in front of you.

17   Can you point to me where it is?

18        A    Well, you're -- I can't answer that.  I

19   can't think straight anymore.

20        Q    Well, we are in proceedings to take

21   Mr. Khan's livelihood away from him.  We need to have

22   you think straight.

23            Can you please show us in the record where

24   this recommendation is?

25        A    I think you have that answer.

1              HEARING OFFICER GUROVITSCH:  I think

2    it has been asked and answered more than once, and if

3    the witness doesn't know, the witness doesn't know.

4    Excuse me --

5    BY MR. ROONEY:

6         Q    Okay.  Well, in other words, no, you

7    cannot --

8              HEARING OFFICER GUROVITSCH:  Excuse

9    me, please.

10   BY MR. ROONEY:

11        Q    -- show us in the record where that

12   exists?

13             HEARING OFFICER GUROVITSCH:  I

14   think, after our recess, we may ask Ms. Zierke to take

15   a look at her records and review the situation and see

16   if she can shed any more light on it.

17             MR. ROONEY:  That would be --

18             HEARING OFFICER GUROVITSCH:  But I

19   don't think we are going to accomplish anything by

20   putting her on the griddle about something that she

21   says she does not know because she does not have all

22   the records in front of her.

23             MR. ROONEY:  Very well.  Do you want

24   to recess now, or should we proceed?

25             HEARING OFFICER GUROVITSCH:  We can

```
1    continue with your cross-examination.

2                    MR. ROONEY:  Thank you.

3                    HEARING OFFICER GUROVITSCH:  And

4    when that is done, we will take a brief recess, maybe

5    ten minutes.

6                    MR. ROONEY:  It is --

7                    HEARING OFFICER GUROVITSCH:  Unless

8    you have a --

9                    MR. ROONEY:  I have a fairly lengthy

10   cross-examination.

11                   HEARING OFFICER GUROVITSCH:  Well,

12   let's go until 11:00, then.

13                   MR. ROONEY:  That's fine.

14   BY MR. ROONEY:

15        Q    Now, is part of your job to send out the

16   notices to rental property owners about trash that

17   needs to be picked up or lawns -- or weeds that need

18   to be mowed, or would someone else do that?

19        A    I believe what you're talking about is

20   done by a housing inspector.

21        Q    I presume these are form letters,

22   basically, in which the housing inspector can fill in

23   the details of the particular incident?

24        A    Again, a housing inspector will have to

25   answer that.
```

1          Q    But is the idea of sending out these

2     notices of action that needs to be taken is that you

3     send them out and the housing inspector expects the

4     licensee to take care of it promptly, whether it is

5     mowing or removing trash or removing weeds?

6          A    Are you talking about the Director's

7     Determination --

8          Q    No.  I am changing --

9          A    -- of Noncompliance --

10         Q    -- I am changing --

11         A    -- letter or --

12         Q    No.  I am changing the subject from the

13    Director's Notice of Recommendation letters.  Now I am

14    talking about in general, in the practices in the

15    Housing Inspections Office.  One of the requirements

16    of a licensee is that the licensee not let weeds

17    accumulate or not let the lawn grow too tall; isn't

18    that correct?

19         A    One of the licensing standards?

20         Q    Standards, yes.

21         A    Licensing Standard 5, correct.

22         Q    Okay.  And another licensee standard is

23    that a licensee -- there should not be accumulated

24    trash on the premises?

25         A    Part of the same, correct.

1          Q    Okay.  And if an inspector notices that,

2     the inspector can send a letter to the licensee

3     calling it to the licensee's attention, and directing

4     that the licensee promptly remove the problem; isn't

5     that true?

6          A    You'll have to ask a housing inspector

7     their process.  I don't know their process.

8          Q    For example, you don't know whether the

9     housing inspectors actually send out letters that are

10    dated after the deadline that the housing inspector

11    might state for complying with the problem?

12         A    I can't answer that.

13         Q    Okay.  But I think that you said that

14    after these two appeals -- the appeal for 3223 Bryant

15    Avenue North -- became final -- in other words, after

16    the Minnesota Court of Appeals entered its judgment

17    upholding the City's action -- that is when that

18    particular property was placarded with a notice that

19    the tenants had to vacate?

20         A    To the best of my knowledge.

21         Q    Okay.  And it is unlawful, is it not, for

22    the landlord to continue to let the tenants remain

23    there after it has been -- and notice to vacate has

24    been put up?

25         A    I believe so, but I'm not the housing

1    inspector, so I don't have the rules.

2         Q    Okay.  Now, I think you said in your

3    direct testimony to Mr. Wolf that 13A says that if two

4    licenses have been revoked, the licensee shall no

5    longer be eligible to hold licenses.

6              Do you recall testifying to that respect?

7         A    Right, not knowing if it was A or B.

8         Q    But, actually, do you have a copy of 13A?

9    Take your time.

10        A    I'm looking for it.

11        Q    It might be one of the attachments to -- I

12   will see if I can help you.

13             Ma'am, if you look at Khan -- it is the

14   book that has got "Khan's Exhibits" at the bottom.  It

15   is Khan Exhibit 1, page 3.  Probably the other book

16   there on the edge.

17        A    Okay.  It is 13A.

18        Q    Okay.  And, actually, it does not say that

19   the licensee shall no longer be eligible, it says the

20   licensee shall be ineligible, right?

21        A    "Any person who has had an interest in two

22   or more licenses revoked pursuant to this article or

23   canceled pursuant to Section 244.1925, or a

24   combination of revocations or cancellations, shall be

25   ineligible to hold or have an interest in a rental

1    dwelling license or provisional license for a period

2    of five years."

3         Q    Okay.  So we agree it does not say no

4    longer eligible, it says "ineligible."

5         A    Is that a question?

6         Q    Yes.  Do we agree on that?  You don't see

7    the words, "Shall no longer be eligible," in there, do

8    you?

9         A    Oh, "Shall be ineligible."

10        Q    Okay.  Do you have anything to do with

11   initial applications for rental housing licensing?  Do

12   you do intake for those?

13        A    No.

14        Q    Okay.  But if someone were to make -- do

15   you understand, from this ordinance, that if someone

16   were to make an initial application or an application

17   for a rental housing license and had two prior

18   revocations within five years, that person would not

19   be eligible to be granted a new license; is that

20   correct?

21        A    Correct.

22        Q    And you said, I think, at the end of the

23   questions that Mr. Wolf was asking you, that the City

24   has an unwritten policy of, generally, if it is more

25   than five years between revocations, the City will not

1    try to do a blanket revocation of all licenses.

2              Do you recall giving that testimony?

3         A    That the rule of thumb of five years?

4         Q    Yes.

5         A    Well, there's actually a list of

6    ineligible owners, with dates of when they become

7    eligible again.

8         Q    Okay.  But that is after the revocations

9    have caused --

10        A    Or one.

11        Q    You said it was generally, as a rule of

12   thumb, up to five years.  There is nothing binding on

13   the City to follow that rule of thumb, is there?

14        A    No.

15        Q    So if the City did not like somebody,

16   under this ordinance, if the two revocations were

17   20 years apart, the ordinance would give the City to

18   conduct a blanket revocation?

19        A    Yeah.  Ordinance interpretation.

20        Q    Yes.  Ms. Zierke, I am going to represent

21   to you that there will be testimony from another

22   witness in this hearing who was a tenant of Mr. Khan's

23   at one of his properties, and in February or March of

24   this year, when someone from the City posted the

25   placard that is, I think, that is in -- the placard

1    about the revocation -- the placard dated February 13,

2    2014, and this witness will testify that the person

3    who posted the placard seemed delighted --

4                        MR. WOLF:  Your Honor --

5                        MR. ROONEY:  -- to be doing so.

6                        MR. WOLF:  -- I would object.  I

7    don't know if he is testifying or --

8                        MR. ROONEY:  I am -- I am --

9                        MR. WOLF:  -- asking.

10                       MR. ROONEY:  I am going to ask --

11                       HEARING OFFICER GUROVITSCH:  Well,

12   he is asking the witness to assume a state of facts

13   that is not yet --

14                       MR. ROONEY:  Not yet in the record.

15                       HEARING OFFICER GUROVITSCH:  -- in

16   the record, so it is not a proper question.  You are

17   assuming facts not in evidence.

18                       MR. ROONEY:  But which will be in

19   evidence, in the order in which the witness is called.

20                       HEARING OFFICER GUROVITSCH:  Maybe,

21   maybe not.  We do not know.

22   BY MR. ROONEY:

23       Q    Ms. Zierke, in the time that you have been

24   in the City Inspector's Office, have you had a sense

25   of particular enthusiasm among either your coworkers

1    of higher up for removing Mahmood Khan as licensee of

2    residential property in North Minneapolis?

3            A    No.

4            Q    None of your coworkers have ever

5    demonstrated to you any enthusiasm for doing that?

6            A    No.

7            Q    Okay.  I want to look at City's Exhibit 7,

8    which is that profile that you prepared for the

9    properties with open licenses.

10                       HEARING OFFICER GUROVITSCH:  Pardon

11   me for a minute, but it sounds like you are getting

12   into --

13                       MR. ROONEY:  This would be a good

14   time to take a break.

15                       HEARING OFFICER GUROVITSCH:  -- a

16   little different area.  We will recess until 11:05.

17                  (At this time a short break was taken

18                   from 10:55 a.m. to 11:05 a.m.)

19                       HEARING OFFICER GUROVITSCH:  All

20   right, Mr. Rooney.

21                       MR. ROONEY:  Thank you, sir.

22   BY MR. ROONEY:

23            Q    Ms. Zierke, before we go on, you were --

24   turning your attention to -- I will, in a minute, be

25   turning your attention to the profiles that are

```
1    Exhibit 7, but I would like you to take a look --

2                     MR. ROONEY:  May I approach, Your

3    Honor?

4                     HEARING OFFICER GUROVITSCH:  Yes.

5    BY MR. ROONEY:

6         Q    I am having you look the exhibit that is

7    marked Khan Exhibit 35.  It is a copy of what Mr. Wolf

8    provided you.

9              Is this, sort of, the key that you

10   prepared for the different housing codes?

11        A    For the violation --

12        Q    Right.

13        A    -- section here, correct.

14        Q    And you or someone in your office prepared

15   that?

16        A    Correct.

17                    MR. ROONEY:  I would like to offer

18   Khan Exhibit 35, Your Honor.

19                    MR. WOLF:  No objection, Your Honor.

20                    HEARING OFFICER GUROVITSCH:  And I

21   am sorry, I was not listening as carefully as I should

22   have been.  What does this Exhibit 35 depict?

23                    MR. ROONEY:  Well, if you look at

24   Exhibit 7, which is the license property profiles that

25   have been created, there is a number of -- for
```

1    example, on the left side, if you look at the

2    categories of violations, there is:  Housing Building,

3    Security, Housing Electrical, and this -- well, if I

4    understand it, this depicts what particulars fall

5    within those general categories that are shown under

6    Violations.

7                    HEARING OFFICER GUROVITSCH:  So this

8    is just an explanation of what all these violation

9    codes mean?

10                   MR. ROONEY:  I guess it is

11   Ms. Zierke's.  I probably shouldn't be saying more

12   than I said.

13                   HEARING OFFICER GUROVITSCH:  Well,

14   you started to testify.  I am just assuming you had

15   full knowledge of the exhibit.

16                   MR. ROONEY:  To me, it is less the

17   number of -- matter of attaching words to the

18   violation codes in the left column, because those

19   don't show.  In the profiles in Exhibit 7, it is more

20   a matter of showing what particulars fall within the

21   categories that are shown under it.

22                   HEARING OFFICER GUROVITSCH:  So it

23   is a definition key, basically.

24                   MR. ROONEY:  Basically.

25                   HEARING OFFICER GUROVITSCH:  All

1    right.  Thank you.  Exhibit 35 will be received.

2                    MR. ROONEY:  Thank you.

3    BY MR. ROONEY:

4         Q    Now, just one more thing with respect to

5    Mr. Khan's history of license revocations.  We have

6    brought in Exhibit 5, which is the history of the

7    revocation for the property at 3223 Bryant Avenue

8    North, right?

9         A    Yes.

10        Q    And you brought in Exhibit 6, which is the

11   revocation for the property at 2714 North 4th Street;

12   is that correct?

13        A    Yes.

14        Q    And it is true, is it not, that as far as

15   you know, and as far as City records show, those are

16   the only two license revocations that have ever been

17   invoked on any of Mr. Khan's licensed properties?

18        A    Revocations, correct.

19        Q    Those two and no others?

20        A    Now, there's Revocation Actions.

21        Q    No, I mean actual --

22        A    Just actual through Council?

23        Q    -- events.

24        A    Correct.

25        Q    Okay.  Now we can start taking a look at

1       the profiles that are Exhibit 7.

2                Do you have that in front of you?

3       A    I do.

4       Q    So the first page is 4011 Dupont Avenue

5       North.  Is it fair to say that you do not know any of

6       the details of the incidents that are reflected on

7       these profiles?

8       A    That would be fair.

9       Q    Okay.  And for example, on 4011 Dupont

10      Avenue North, I think you start from -- RLIC is rental

11      license issuance or something?

12      A    The rental license issued date?

13      Q    And that is August 7, 2008.

14      A    Correct.

15      Q    So that is a little more than seven

16      years -- well, a little less than seven years since

17      you pulled up this data sometime in March or April of

18      this year; is that correct?

19      A    Correct.

20      Q    So the total violations listed are 93, so

21      that averages 13 violations a year, roughly?

22      A    Roughly.

23      Q    And this profile does not show how

24      promptly Mr. Khan complied with fixing the violations;

25      is that correct?

1         A     Correct.

2         Q     And does it show somewhere on this profile

3    how many times the property was visited by City

4    inspectors over the nearly seven years?

5         A     Yes.

6         Q     Where?

7         A     Site Visits.

8         Q     106.  Okay.

9              So if they visited the property 106 times,

10   they found less than one violation per visit, right?

11        A     How are you doing your math?

12        Q     I am looking at 106 Site Visits, and total

13   93 violations, so on average, there is less than one

14   violation found per sight visit?

15        A     I'm going to have to defer to an inspector

16   to answer that question.  There's a lot of ins and

17   outs, and it's not my expertises.

18        Q     Okay.  So there is things about this

19   document that you cannot explain?

20        A     Correct.

21        Q     Can you provide me -- I'm looking at the

22   bottom right-hand corner of the first page in

23   Exhibit 7 -- Abate List, where it is X'd.

24              What does that mean?

25        A     That means that this property is on the

1    Abate List.  It's only trackable monthly.  They go in

2    every month and run the report.  If it's on, it's on,

3    and there's no dates tied to that.

4         Q    Explain once again, if you would, what the

5    Abate List means?

6         A    That means that over the course of one

7    year, the City has had to issue orders to cut the

8    grass, trim hedges, remove rubbish.  If they've had to

9    send the owner two or more letters, then you're going

10   to be on the Abate List.

11        Q    And what is the consequence of being on

12   the Abate List?

13             Well, let me help you out.  First of all,

14   if the City sends 2 or more letters within 12 months,

15   that puts that property on the Abate List?

16        A    Correct.

17        Q    And it does matter whether the licensee

18   promptly complied with those letters or not, as long

19   as two or more of them are issued within a year, it

20   goes on the Abate List?

21        A    Correct.  And it has been explained to me

22   that it should not be the City's job to let you know

23   when to mow the grass or remove the rubbish.

24        Q    And it is up to the inspector's discretion

25   as to whether or not to send that letter?

1          A     You'd have to ask an inspector now,

2     because I'm not sure.

3          Q     It may be, it may not be?

4          A     Right.

5          Q     Okay.  But if the property is on the Abate

6     List, does that mean, then, that without having to

7     send notice to the licensee, the City can have one of

8     its contractors take the action that the licensee

9     would otherwise be notified of?

10          A     How I understand it is the letter goes to

11     the owner and authorization goes to the contractor

12     with a specific date.  The letter tells the owner when

13     he has to -- how long he has to mow the grass.

14               Say he has until August 10th and then the

15     contractor has the paperwork that says go out there

16     after August 10th, if it's not mowed, you can go ahead

17     and mow it; if it is mowed, then submit the paperwork

18     back in.

19          Q     And if the contractor does go ahead and

20     mow it or go ahead and remove the trash, the

21     contractor -- there is a fee for that that is -- what,

22     is it billed to the licensee?  Does it put an

23     assessment on the property?  How does that work?

24          A     I believe it is an assessment to the

25     property.

1          Q    Okay.  And, of course, if the licensee --

2    there is a letter that is prepared to go out to the

3    licensee with a due date, and it says, If this is not

4    done by the due date, a contractor is authorized to do

5    it?

6          A    Something to that effect.

7          Q    And, of course, if the licensee does not

8    receive that letter, or if that letter doesn't even

9    get sent out to the licensees until after the due

10   date, then the licensee really has had no chance to

11   prevent the contractor from being able to bill him; is

12   that correct?

13         A    Correct.

14         Q    Okay.  And if a contractor did do that --

15   let's say a contractor did go out and mow grass or

16   pick up trash -- does that show, anywhere else on this

17   profile, as an incident or --

18         A    Contractor work is not on this profile.

19         Q    Does the notice that would have given rise

20   to the contractor work show on the profile?

21         A    Under Housing Violations, if a rubbish

22   order was sent, then it's listed.  If, you know, mow

23   the grass or cut the shrubs, then that's listed under

24   the Housing Nuisance Violations.

25         Q    Yes.  Now, rubbish on the property can

1    come from any number of people, you agree with that.

2              It is not necessarily the landlord who

3    dumps rubbish on the property?

4         A    That's opinion.

5         Q    Well, in your experience, is dumped

6    rubbish a problem, generally, in the neighborhoods in

7    the North Side over where Mr. Khan's property is?

8         A    I can't answer that.

9         Q    Okay.  What is covered by Illegal

10   Occupancy?

11        A    Illegal Occupancy would be everything in

12   that last exhibit under Occupancy.

13        Q    I am trying to figure out which page.

14        A    Rooms too small, illegal building,

15   unlawful occupancy, added uses, basement occupancy,

16   garages occupancy, remove illegal appliance or

17   fixtures, seal garbage chutes, seal transoms,

18   overoccupancy, and this is from the Housing Violation

19   Codes.

20        Q    Okay.  And so it appears from various

21   pages that are in the profiles in Exhibit 7, that

22   Mr. Khan has had very few instances of Flag

23   Information for illegal occupancy?

24             I think I can see two.

25        A    Yeah, they're zeros and ones, from the

1    pieces I'm spot-checking.

2         Q    And of your own personal knowledge, you

3    don't know which of the little subcategories Illegal

4    Occupancy might be covered by?

5         A    Correct.

6         Q    Okay.  Do you know -- strike that.  I will

7    ask another witness.

8              Do you have access to information about

9    application for building permits for improvements or

10   maintenance?  In other words, does your office have

11   access to that kind of information?

12        A    We have access through our land management

13   system, but it doesn't fall under Regulatory Services.

14        Q    Okay.  There is nothing on these profiles

15   that -- the various pages of Exhibit 7 -- that

16   indicates how many applications for building permits,

17   for improvements, the licensee would have made during

18   the course of ownership; is that correct?

19        A    Correct.

20        Q    Okay.  Would it surprise you to learn that

21   Mr. Khan has done numerous improvements on his

22   properties for which he has --

23                   MR. WOLF:  Your Honor, I object.

24                   HEARING OFFICER GUROVITSCH:  That is

25   testimony again.

```
1    BY MR. ROONEY:
2         Q    Okay.  As far as you know, does the City
3    provide licenses to or supervision for the 750, or so,
4    scattered-site properties that the Minneapolis Public
5    Housing Authority rents to people in Minneapolis?
6         A    You'll have to defer that to an inspector.
7    As far as I know, I have no knowledge of that.
8         Q    I am only asking as far as you know.
9         A    Okay.
10        Q    As far as you know, does the Minneapolis
11   Public Housing Authority come under the regulation of
12   your office?
13        A    I can't answer that.
14        Q    Okay.  So you don't have any records in
15   terms of what amount of trash accumulates on
16   Minneapolis Public Housing properties?
17        A    I can't answer that.  We may have it, but
18   I just don't know positively.
19        Q    In your experience managing or being
20   involved in license revocations, do you recall there
21   ever being an action to revoke a rental license for a
22   property owned by the Minneapolis Public Housing
23   Authority?
24        A    No.
25        Q    Do you recall if your office even takes
```

```
1    licensing supervision over rental properties?

2         A    Right.  I'm not sure that we even license

3    public housing.  I can't answer that one.

4         Q    Okay.  Are you aware of any instances

5    where Mr. Khan has done repairs or maintenance on his

6    licensed properties or made improvements to them

7    without being prompted to do so by the City Inspector?

8         A    I am not aware.

9         Q    Okay.  Now, are you aware of whether any

10   part of the activities of the Housing Inspections

11   Office in Minneapolis is funded by grants from the

12   Community Development -- block grants from the US

13   Department of Housing and Urban Development?

14        A    I'm not aware.

15        Q    Okay.

16             MR. ROONEY:  Mr. Gurovitsch, this

17   seems like a good time to make an offer of proof,

18   because among the documents that you sustained the

19   City's objections to based on the Fair Housing issue

20   is documents establishing that City Inspections is

21   funded, in part, by Federal Community Development

22   Block grant money, and my inability to establish that

23   fact has limited cross-examination that I can subject

24   this witness to, and I would --

25             HEARING OFFICER GUROVITSCH:  First
```

```
 1    of all, this witness is more of a clerical employee of
 2    the City than one who is out in the field making
 3    inspections and things like that, so a lot of this
 4    cross-examination, I think, is pretty far afield for
 5    her.
 6              Second of all, I don't see the relevance
 7    of sources of funding, as it pertains to these
 8    particular alleged violations in this particular
 9    proceeding by the City.
10              MR. ROONEY:  Well, if I may, let me
11    state an offer of proof to establish the relevance of
12    that, which is that in exchange for receiving federal
13    grants, among them Community Development Block grants,
14    the City of Minneapolis certifies that, among other
15    things, it will affirmatively promote fair housing in
16    its activities.
17              MR. WOLF:  Your Honor, I continue my
18    objection of relevancy.  We are here for a Revocation
19    Action based on two specific revocations, and then the
20    Good Cause, as far as Mr. Khan's upkeep of the
21    property, not whether the City wants to kick people
22    out of their houses.
23              I think it is totally irrelevant, I think
24    Mr. Khan has already made a claim with HUD, and can
25    file a federal lawsuit if he wants to, but it is not
```

1    relevant to this action.

2                    HEARING OFFICER GUROVITSCH:   I

3    agree, and I am going to sustain the City's objection

4    to this line of questioning.

5    BY MR. ROONEY:

6         Q    Okay.  Let me ask you this, Ms. Zierke:

7    Are there ever workshops or training programs or

8    seminars that employees of the -- in-service training

9    or whatever you want to call it -- where employees of

10   the Housing Inspections Office are brought together to

11   discuss how they can be doing their job better, or

12   what problems they are facing, that sort of thing?

13        A    That, now, a supervisor, again.  I defer

14   that.  I can't answer that intelligently.

15        Q    Well, do you ever attend such meetings?

16        A    I do not.  I tend to go to more

17   data-analysis training just because of my job.

18        Q    Have you ever attended a meeting at work,

19   related to your job, where the topic came up of how

20   the City Inspections might do its job better so as to

21   more affirmatively further the fair housing?

22                    MR. WOLF:  Your Honor, I object

23   again.

24                    HEARING OFFICER GUROVITSCH:  I am

25   going to sustain the objection.

1                    MR. ROONEY:  Okay.

2                    HEARING OFFICER GUROVITSCH:  Please

3    move on to another line of questioning.

4                    MR. ROONEY:  I understand that.

5    BY MR. ROONEY:

6         Q    Do you recall, Ms. Zierke, ever attending

7    any kind of meeting, among your fellow employees of

8    City Inspections, where the topic was trying to figure

9    out how to best deal with the problem of the shortage

10   of low-income rental housing in Minneapolis?

11                   MR. WOLF:  Your Honor, I have to

12   object again, on relevancy.

13                   HEARING OFFICER GUROVITSCH:

14   Sustained.

15   BY MR. ROONEY:

16        Q    Okay.  Ms. Zierke, how would you feel

17   about being a employee of a City department that did

18   not conduct its operations according to law?

19                   MR. WOLF:  Your Honor, I would

20   object as to relevancy and speculation.

21                   HEARING OFFICER GUROVITSCH:  That is

22   also argumentive.

23                   MR. ROONEY:  Thank you.  I have no

24   more questions for you, Ms. Zierke.  Thank you for

25   your help.

```
 1              MR. WOLF:  Your Honor, just a few

 2     follow-ups.

 3

 4                    REDIRECT EXAMINATION

 5     BY MR. WOLF:

 6          Q    Ms. Zierke, Mr. Rooney, early on, was

 7     asking you questions regarding a recommendation that

 8     was being made as far as revocation, and there was

 9     some confusion.

10              When you stated earlier your process in

11     issuing -- the revocation process, could you state

12     again, once there has been found a violation of one of

13     the Licensing Standards, what your process is when you

14     go through that.

15          A    When a Licensing Standard has been

16     violated, then a Director's Determination of

17     Noncompliance is issued giving the owner ten days --

18     using that as an example, ten days is pretty

19     standard -- to fix the violation.  If after ten days

20     the violation hasn't been fixed, then the City may

21     proceed to Revocation Action.

22          Q    And that is the Director's Determination

23     of Noncompliance, and is that pursuant to 244.1930?

24          A    Yes.

25              MR. ROONEY:  Object; that calls for
```

1    a legal conclusion.

2                    HEARING OFFICER GUROVITSCH:  Well,

3    Ms. Zierke seems to be very familiar with the

4    ordinances, and I am sure she has them numerous times

5    and knows what they say.  I don't know if it is really

6    relevant, but I believe she can testify as to what the

7    ordinances say.

8    BY MR. WOLF:

9         Q    244.1930 indicates that a Director's

10   Determination of Noncompliance does not have to be

11   sent; is that correct?

12        A    Correct.

13        Q    And that is unless certain licensing

14   standards that don't require that.

15        A    Right.

16        Q    If a Director's Determination of

17   Noncompliance is not to be sent or doesn't have to be

18   sent or if compliance is not gained, what is the next

19   step?

20        A    Then a letter of Revocation Action is sent

21   to the owner/property manager.

22        Q    And I will just bring your attention to

23   Exhibit 6, and this is just a copy --

24                    MR. ROONEY:  Your Exhibit 6.

25                    MR. WOLF:  Yes.

```
 1    BY MR. WOLF:
 2         Q    City's Exhibit 6, page 46, which is just a
 3    copy of the ordinance, Section 244.1940.
 4              Now, Mr. Rooney was asking you
 5    specifically about Subsection 3, that the Director has
 6    referred the matter to the City Council with the
 7    recommendation to revoke, deny, suspend the license or
 8    provisional license.
 9              That would be part of the Notice of
10    Revocation; is that correct?
11                   MR. ROONEY:  Object, Your Honor,
12    leading.  This is a crucial point I don't think
13    Counsel should be able to lead the witness on.
14                   HEARING OFFICER GUROVITSCH:
15    Objection is sustained.
16              Could you rephrase?
17                   MR. WOLF:  I can, Your Honor.
18    BY MR. WOLF:
19         Q    Ms. Zierke, Mr. Rooney asked you if a
20    recommendation was made in either of the two
21    revocations that are in City's Exhibits 5 and 6, and
22    in the action regarding revocation of all of
23    Mr. Khan's licenses that we are now before, in the
24    Notice of Revocations that were sent out, did they
25    include a recommendation as set out in Subdivision 3?
```

```
1          A    I interpret that as -- I mean, all my work

2     comes from the Director of Regulatory Services, and,

3     so we wouldn't be that far if the Director isn't

4     wanting it to go further, so I'm not --

5          Q    Do the notices specifically state that the

6     Director is recommending --

7          A    Oh, that sentence?

8          Q    Yes.

9          A    I don't believe so.  I don't think the

10    verbiage says that specifically.

11         Q    But it does notify the license holder that

12    there is a Revocation Action?

13         A    Correct.

14         Q    And now, to clarify what you were talking

15    about during that, after a hearing, and the Hearing

16    Officer makes a recommendation to either revoke, not

17    revoke, or a stay of revocation, then what does your

18    office send to the --

19         A    Request for Council Action --

20         Q    -- license holder?

21         A    -- from the Director.

22         Q    And that states a specific recommendation?

23         A    Correct.

24         Q    Now, Mr. Rooney also asked you regarding

25    the City's informal five-year policy, and you
```

1    indicated that there is a list of people that are

2    ineligible and when they will be eligible; is that

3    correct.

4            A    Correct.

5            Q    Has the City ever not given a person a

6    rental license after that five-year period listed has

7    been set?

8            A    The City has never denied a rental license

9    once the person is off the list.

10           Q    Mr. Rooney also asked you if there was

11   ever specific directive to remove Mr. Khan as a

12   landlord in the City of Minneapolis.

13               You have been an administrative analyst

14   dealing with license revocation since 2008; is that

15   correct?

16           A    Correct.

17           Q    Approximately how many License Revocation

18   Actions have you processed or gone through in that

19   period of time?

20           A    Hundreds, as far as actions.  Total

21   revocations, I mean -- they fall into different

22   categories.  Some get resolved along the way.

23           Q    So would you say a Revocation Action would

24   start with a Director's Determination of

25   Noncompliance?

1          A     Correct.

2          Q     And some of those get resolved by the

3     licensee taking appropriate action?

4          A     Right.

5          Q     How many actual license revocations,

6     either that have got set for hearing or have gone

7     through Council, would you estimate that you have

8     done?

9          A     400, 500.

10         Q     And how many people have lost two or more

11    license that are on the ineligible list during that

12    period?

13         A     Somewhere -- I want to say around a dozen,

14    but they've been falling off now, and once they fall

15    off, they're just off of my radar.

16         Q     You are saying there is currently

17    approximately a dozen on?

18         A     Currently, there's probably a half a dozen

19    left.

20         Q     Okay.  At the most, there has been 12 on

21    the ineligible list?

22         A     Right.

23         Q     So Mr. Khan --

24         A     For LS13.

25         Q     Yes.  And there is also the ineligible to

1    gain a new license if you have had one revoked,

2    correct?

3         A    Right.

4         Q    But as far as having had two license

5    revoked and being ineligible to hold for five years,

6    how many landlords have become ineligible?

7         A    So I want to say, since 2008 -- I'd have

8    to look at the specific numbers on my spreadsheet --

9    but that's where the dozen or so comes in, and now

10   they're starting to fall off.

11        Q    So Mr. Khan has not been the first person

12   that has had this action taken against him?

13        A    No.

14        Q    And Mr. Rooney asked you regarding that

15   Mr. Khan has had only two final revocations; is that

16   correct?

17        A    Correct.

18        Q    How many Revocation Actions have started

19   against Mr. Khan?

20             MR. ROONEY:   Object, Your Honor, it

21   is irrelevant.

22             HEARING OFFICER GUROVITSCH:   I think

23   you opened the door with your cross-examination, so I

24   am going to allow it.

25             THE WITNESS:   Again, I'd have to

1    refer back to the record log.  A dozen at best.

2                        MR. ROONEY:  Object, Your Honor,

3    speculation.

4                        HEARING OFFICER GUROVITSCH:

5    Overruled.

6    BY MR. WOLF:

7         Q    Would those be listed anywhere in the Flag

8    Information?  Would that be included?

9         A    Right.  Yep.  Resolved Revocations, those

10   would be past Revocation Actions that have been

11   resolved.

12        Q    Okay.  So that information can be totaled,

13   and each property is listed, correct?

14        A    Correct.

15        Q    And I understand that most of the

16   specifics regarding the Property Information Sheets

17   you cannot answer because it really needs to be

18   answered by an inspector or supervisor/inspector, but

19   as far as the Abate List, you indicated that that is

20   either on it or not?

21        A    Right.

22        Q    So I just wanted to clarify.  So on the

23   property records summaries that, you know, are in

24   City's Exhibits 7, 8, and 10, would that indicate if

25   they were on the Abate List at the time that you ran

```
1    it, or is that just showing that they were on at some
2    point?
3             A    At the time I ran it.
4             Q    Okay.  So if it is not showing an X by the
5    Abate List, it could have been on at a different time?
6             A    Correct.
7             Q    But you could not pull that information;
8    is that right?
9             A    Correct.
10                     MR. WOLF:  I have no further
11   questions, Your Honor.
12                     HEARING OFFICER GUROVITSCH:  All
13   right.  I just have -- unless you have any recross?
14                     MR. ROONEY:  I do.  Just a couple.
15
16                     RECROSS-EXAMINATION
17   BY MR. ROONEY:
18            Q    Ms. Zierke, the City software system from
19   which you generated the profiles that are Exhibit 7,
20   is that called Cognos?  What is the name of that?
21            A    Correct.  That's the main software program
22   the analysts use.  It pulls information from KIVA, our
23   land management system.
24            Q    Okay.  And to get this information, you do
25   it by property address?
```

```
1            A    You do --
2            Q    I mean, it is probably more complicated
3    than that, but you don't --
4            A    We generally use the parcel number.
5            Q    Okay.  But the identity of the property,
6    rather than the identity of the licensee?
7            A    Correct.
8            Q    Okay.  So there are other licensees who
9    hold licenses for multiple rental properties in North
10   Minneapolis, aren't there?
11           A    Yes.
12           Q    And you could have generated records
13   reflecting their profiles, could you not?
14           A    Sir, did you say could I or --
15           Q    Yes.  It would have been possible for you
16   to create records similar to this --
17           A    We have --
18           Q    -- and other properties?
19           A    Correct.  We have -- we have profiles on
20   numerous properties.
21           Q    And if those had been presented into
22   evidence, that would have given us a chance to compare
23   Mr. Khan's circumstances with the circumstances of
24   other North Side rental licensees -- or his history is
25   probably --
```

1        A    If done, you know, the same dates, the

2   same -- I guess that would be fair.

3        Q    So it is not an overwhelming task?

4        A    It takes a long time.  It is -- I'm going

5   say it; it takes a long -- It took a month, and then

6   you had to clean it and scrub it, and -- but, it took

7   a long time to put this together.  It doesn't look

8   like it, but it did.

9        Q    But having comparison would let us know if

10  Mr. Khan is unique or in the normal range, and we do

11  not have that benefit in this record, do we?

12       A    This record does not show comparison.

13       Q    Okay.

14            MR. ROONEY:  Thank you.  That is all

15  the questions I have.

16            HEARING OFFICER GUROVITSCH:  I just

17  have a question.

18            With reference to Exhibits 7, 8, and 10,

19  there is no information that would show year by year

20  what violations were accumulated?

21            THE WITNESS:  Correct.  It was

22  decided to display this particular way.

23            HEARING OFFICER GUROVITSCH:  So, for

24  example, in the very first one regarding 4011 Dupont

25  Avenue North, which shows a total of 93 violations

1    since 2008, there could have been some years where

2    there were no violations and other years where there

3    were several violations --

4                    THE WITNESS:  Possibility.

5                    HEARING OFFICER GUROVITSCH:  --

6    right?

7                All right.  Thank you.  I have nothing

8    further.

9                    MR. WOLF:  I have nothing further,

10   but I will allow if Mr. Rooney has a --

11                    MR. ROONEY:  Just a follow-up.

12                    MR. WOLF:  -- question based on your

13   question.

14                    MR. ROONEY:  Yes.

15

16                FURTHER RECROSS-EXAMINATION

17   BY MR. ROONEY:

18       Q    So we have no idea.  For all we know from

19   this record, Mr. Khan's properties might be crystal

20   clean of violations for the last two years.  From this

21   record, we cannot tell; isn't that correct?

22       A    From this record, there are no dates

23   attached to the violations.

24                    MR. ROONEY:  Okay.  Thank you.

25                    HEARING OFFICER GUROVITSCH:  All

```
 1    right.
 2                        MR. WOLF:  I am going to have one
 3    follow-up, because I know we had a conversation not
 4    long ago.
 5
 6                   FURTHER REDIRECT EXAMINATION
 7    BY MR. WOLF:
 8         Q    Do you know what the current status of
 9    violations on Mr. Khan's properties are?
10         A    As of, like, today or yesterday, I don't.
11    I didn't run that.
12                        MR. WOLF:  Okay.  I am sorry.  No
13    further questions.
14
15                  FURTHER RECROSS-EXAMINATION
16    BY MR. ROONEY:
17         Q    So just to follow that up, right now, all
18    of Mr. Khan's licensed rental properties are deemed
19    fit by habitation by Housing Inspections, as far as
20    you know?
21         A    I can't answer that.  That's kind of a
22    wide open -- I don't know if there's a condemned
23    property out there that happened yesterday, or -- I
24    just don't have that information.
25         Q    But absent that, if they are licensed,
```

1    that means they can be rented to residents, in

2    general?

3              A    In general, if the property is licensed,

4    it can be rented to residents.

5                        MR. ROONEY:  Thank you.

6                        MR. WOLF:  Just a quick follow-up.

7

8                   FURTHER REDIRECT EXAMINATION

9    BY MR. WOLF:

10             Q    You do not know what the current status

11   is?  Since you ran this in late April of 2015, you do

12   not know how many properties have come into

13   condemnation or out of condemnation or --

14             A    Correct.

15                        MR. WOLF:  Okay.

16                        MR. ROONEY:  We could go for

17   forever, but I have no more questions of this witness.

18                        HEARING OFFICER GUROVITSCH:  All

19   right.  Then you may be excused.  Thank you.

20                        MR. WOLF:  Do we want to break for

21   lunch now, or how would you like to handle that, Your

22   Honor?

23                        HEARING OFFICER GUROVITSCH:  I think

24   we could go to 12:15, 12:30.

25                        MR. WOLF:  Okay.  Your Honor, the

1   City, after a conversation with Mr. Rooney and his not

2   objecting to the property report, is not going to be

3   calling Scott Johnson.  He just helped Ms. Zierke pull

4   the documentation that is listed, so we agreed that

5   that would, basically, be redundant, so the City will

6   be calling Mr. Johnson as a witness.

7                    MR. ROONEY:  As I understand it, all

8   of your documents, except for Number 9, have been

9   offered and received; is that correct?

10                   MR. WOLF:  I think Number 9.  And

11  Number 11 is just a summary of all the information on

12  the individual property sheets.

13                   MR. ROONEY:  Can we get that taken

14  care of now?

15                   HEARING OFFICER GUROVITSCH:  I think

16  you already stipulated.

17                   MR. ROONEY:  I did.  That is right.

18                   MR. WOLF:  I don't know if you need

19  Ms. Zierke to come back and testify as to what that

20  is.

21                   MR. ROONEY:  I will stipulate that

22  it is an --

23                   HEARING OFFICER GUROVITSCH:  Excuse

24  me, please.

25                   If that is something that Ms. Zierke

1    prepared from the software, then I think it would be

2    appropriate to recall her, very briefly, to testify

3    about it.

4                      MR. WOLF:  Okay.

5                      HEARING OFFICER GUROVITSCH:

6    Ms. Zierke, you are still under oath.

7                      MR. WOLF:  I apologize for that,

8    Your Honor.

9    BY MR. WOLF:

10        Q    Ms. Zierke, showing you what has been

11   entered in the City's Exhibit Packet as Number 11,

12   could you describe what that document is?

13        A    That is the profile summary of all these

14   little single reports added up into one main report.

15                      MR. WOLF:  Your Honor, if I could

16   have that marked as City's Exhibit 11?

17                      HEARING OFFICER GUROVITSCH:  Yes.

18                      (City's Exhibit Number 11 was marked for

19                      identification by the court reporter.)

20   BY MR. WOLF:

21        Q    Now, Ms. Zierke, did you prepare that

22   document?

23        A    Yes.

24        Q    And again, could you just, basically,

25   summarize what it is and where you got the numbers

1    that are in City's Exhibit 11?

2         A    I took the headings from Exhibit 8 -- 7,

3    8, and 10, I believe -- is it 10? -- and laid them out

4    into this format.  I believe I added a couple of

5    titles as far as how many letters were sent to the

6    property owner over the course of ownership.

7         Q    Could you state where that is?

8         A    That's under Inspection Information.

9    Total Site Visits would be the total of how many times

10   the inspector had to visit the property, Total

11   Requests for Service, Total Ordinance Violation

12   Letters Sent, Total Extension Letters Sent, Total

13   Warning Letters Sent, and Letters of Intent to

14   Condemn.  Citations were already one of the headings

15   on the previous summaries, and then we added, down

16   under Nuisance Abatement, how many rubbish orders were

17   sent and how many times the City had to abate the

18   issue and how many grass orders -- grass and shrub

19   orders were sent, and how many times the City had to

20   abate the issue.

21        Q    Okay.  So the Rubbish Order Sent and Grass

22   Order Sent would be --

23        A    The same as the Nuisance.

24        Q    As those listed under the Housing Nuisance

25   Violations, Rubbish and Grass?

1        A    Correct.

2        Q    And you just ran a total of or -- added

3   how many times that the contractor had to abate?

4        A    Correct.

5        Q    And then you added the number of letters

6   sent, correct?

7        A    Correct.

8        Q    And that summarized all the 50 properties

9   that show as being owned by Mr. Khan in City's

10  Exhibit 2, the Property Information Records?

11       A    Right.  The county ones, yep.

12                 MR. WOLF:  I have nothing further,

13  Your Honor.

14                 MR. ROONEY:  Briefly, Your Honor.

15

16             FURTHER RECROSS-EXAMINATION

17  BY MR. ROONEY:

18       Q    With regard to Exhibit 11, Ms. Zierke, it,

19  like the other ones, is not broken down into any

20  shorter periods than the periods that show on the

21  Exhibits 7, 8 and 10, from which it was compiled.

22            Is that true?

23       A    Broken down monthly?

24       Q    Annually, quarterly, monthly, or anything.

25       A    This is all --

1          Q    So there is --

2          A    -- inclusive, since ownership.

3                    HEARING OFFICER GUROVITSCH:  Wait,

4     wait.  Let the witness answer.

5     BY MR. ROONEY:

6          Q    So there is no way, from looking at

7     Exhibit 11, just as there is no way from looking at

8     Exhibits 7, 8 or 10, of discerning whether the trend

9     of violations was diminishing, increasing, or

10    remaining stable, just from looking at these

11    documents?

12         A    Correct.  It's decided at the beginning

13    how you want to show your picture.

14                    MR. ROONEY:  Thank you.  That is all

15    the questions I have.

16                    HEARING OFFICER GUROVITSCH:  All

17    right.  Any redirect?

18                    MR. WOLF:  No, Your Honor.

19                    HEARING OFFICER GUROVITSCH:  You may

20    be excused again, and this time I hope it sticks.

21              All right.

22                    MR. WOLF:  Your Honor, the City

23    would call Vu Tran.

24

25

```
1                    VU TRAN,

2          the witness in the above-entitled

3      matter, having been first duly sworn,

4          testifies and says as follows:

5

6                 DIRECT EXAMINATION

7  BY MR. WOLF:

8       Q    Mr. Tran, could you state your name and

9  spell it for the record, and state what your current

10 employment is.

11      A    My name is Vu Tran, V-U, Tran, T-R-A-N.

12 I'm a supervisor with the City of Minneapolis.

13      Q    And what are you a supervisor of?

14      A    Housing Inspection Services.

15      Q    And how long have you been a supervisor

16 with Housing Inspection Services?

17      A    Nine years.

18      Q    And prior to being a supervisor with

19 Housing Inspections, what was your job?

20      A    Prior to supervisor, I was a Housing

21 Inspector 2, which does rental licenses inspections.

22 Prior to that, I was a Housing Inspector 1, which does

23 structural inspection, nuisance inspection, all of

24 that, and in total I've been here 19 years.

25      Q    So nine years as supervisor, and ten years
```

1   as a housing inspector, either as a 1 or a 2?

2       A   Yes.

3       Q   And so you basically stated what you did

4   as a housing inspector.  What are your duties as a

5   supervisor?

6       A   As a supervisor, in addition to managing a

7   team of inspectors, I also do the training for the

8   inspectors, served on committees going over procedures

9   of how the inspectors go on with daily business.

10  Stuff like that.

11      Q   And as part of your duties as a

12  supervisor, are you also out in the field?

13      A   I am.  When an inspector calls for it,

14  needs another pair of eyes to do an inspection, I do

15  go out in the field.

16      Q   As part of your duties as a supervisor,

17  were you assigned to assist with this Revocation

18  Action?

19      A   Yes.

20      Q   And as part of your duties, did you review

21  the documentation put together by Ms. Zierke and

22  Mr. Johnson in Exhibits 7, 8, and 10?

23      A   Yes.

24      Q   And being a supervisor, what were things

25  that you were looking for when you were reviewing that

1    documentation?

2         A    Well, some of the things I look for, in

3    example, in Exhibit 7, the address is 4011 Dupont

4    Avenue North.  It shows the summary of the property.

5    The things that jump out at me are the Site Visits to

6    a property, that's on the upper left corner of the

7    page.  This is 106 Site Visits.  That seems very high.

8              The Administrative Citation issued, where

9    after the notice is sent, the orders are not complied

10   with, inspectors have to issue Administrative

11   Citations.  I look at that number.

12             How many cases are open on this property

13   or how many cases has been issued, this is the Request

14   for Service.

15             I look at the Abate List.  If a property

16   is on the Abate List, it shows that, you know, that

17   they have been issued -- ordered to clean up their

18   properties.  They've been issued those letters at

19   least 2 or more times in a 12-month period.

20             If they have a rental license and the

21   status of the rental license, that's important.  Stuff

22   like that.

23        Q    Okay.  So with those things standing out,

24   if, perhaps, you can go through the normal process

25   when an inspector is sent out to a property.

1          What is the normal process when they

2     respond to either a tenant complaint or citizen

3     complaint or observe some violation on the property?

4     What is the normal process?

5          A    The normal process comes in, either

6     through our 311 Call Center, a complaint about some

7     housing violation to a property.  It could be an

8     environmental complaint like tall grass and weeds.

9     That complaint is entered into the system the next

10    day.  That complaint report is printed and placed in

11    the inspector of the area's inbox.

12              It could be a tenant calling the 311

13    Center again, requesting an inspection made to their

14    apartment unit, saying certain things are wrong with

15    it, and the owner hasn't fixed it or something, or in

16    the time that they had requested, and now they are

17    requesting an inspector to show up and verify those

18    violations.

19              Once the inspector shows up at the sight,

20    if there is indeed a violation, they would issue an

21    order.  That letter would be entered into the

22    computer, it generates a letter, a form letter, and

23    that letter is sent to either the owner or whoever the

24    owner has listed as their rental license contact

25    person.  That information is on the rental license

1   application that the owner fills out and turns into

2   our office.

3           So the notice pretty much gives the owner

4   or their agent a list of what is wrong with the

5   property, and then the due date for compliance, so the

6   owner has an opportunity to fix those orders.

7       Q    And what is expected when that notice is

8   sent out giving a timeframe for the violations to be

9   corrected?

10      A    This is -- the expectation is that those

11  violations be followed by the due date.

12      Q    And does the inspector have the ability,

13  if there is a lot of violations or depending on what

14  the violations are, do they have different timeframes

15  that can be given out?

16      A    Yes.  For tall grass and weeds or to

17  remove rubbish in the yard, 7 days, 10 days to comply.

18  On structural orders on a home that they're inside the

19  property, we take into account that the owner has to

20  either fix it themselves or have to hire a contractor

21  to get bids and all that stuff, so we would give them

22  more time, 30 days, 40 days, and we would state that

23  in the letter.

24          So, normally, environmental orders are

25  7 to 10 days; structural orders on the home, 30 to 60

1    days.

2         Q    So if the inspector gives a landlord

3    30 days to come into compliance, what is their process

4    after they send that notice out giving them 30 days or

5    giving them that timeframe?

6         A    When orders for the exterior of the home

7    comes due, the inspector doesn't have to send out an

8    appointment letter notifying them that the inspector

9    is going to be coming out to do the reinspection after

10   the due date.

11             On cases where the orders are on the

12   inside of the home, we do mail out appointment

13   letters.  If it's a rental license case, we would then

14   mail one letter, the appointment letter, out to the

15   owner or the agent, and then one letter to the tenant

16   of that unit, saying, We're coming out on certain date

17   and time, you need to be there to let us in to do the

18   inspection.

19        Q    And what happens if the inspector goes

20   back and the work isn't complete?

21        A    Several things.  The inspector -- if the

22   work is not done, let's say there are ten orders

23   issued, and the five, or half, are in compliance, they

24   have the opportunity to give the owner a Letter of

25   Extension saying, You have another due date -- let's

1    say 30 days from now or ten days from now -- to get

2    the rest of them done.

3            They could send the owner a Warning Letter

4    saying pretty much the same thing, or they could issue

5    an Administrative of Citation meaning you have not

6    done the work as stated, a photo is taken of that

7    violation, the Administrative Citation is $250, and

8    then the due date is set for a future reinspection.

9       Q    So if, as you stated, part of the work is

10   completed and the inspector decides to issue a Warning

11   Letter or a Letter of Extension giving the landlord or

12   rental contact person additional time to come into

13   compliance, what process does the inspector go

14   through?

15      A    I am sorry.  Could you say that again?

16      Q    No problem.  You stated if the landlord or

17   rental contact has a portion of the work done -- like

18   you stated if there is ten orders or ten violations,

19   and five of them completed, but five had not been

20   completed yet -- and the inspector decides to issue a

21   Warning Letter or Letter of Extension, what process do

22   they go through after they issue that letter?

23      A    That letter -- that Warning Letter or that

24   Letter of Extension letter would be sent to the owner

25   telling them that they have these items left to get

1    done.

2            Also, in the letter it states that if it

3    doesn't get complied -- get done or fixed or something

4    like that, and Administrative Citation could be

5    issued.

6        Q    So then they have to set up another

7    reinspection?

8        A    Yes.  On interior orders, they'd have to

9    mail out another Appointment Letter saying, We're

10   coming on this date and time, please be there to let

11   us in.  If you can't be there, let us know, too, and

12   that's the process.

13       Q    Okay.  Now, referring to Exhibit 7, and,

14   since we have 4011 as the first property in that, when

15   you see the inspection information -- and you stated,

16   you know, all three of those under that heading are

17   important things to look at as a sample -- what does

18   the information under Inspection Information tell you

19   regarding this property?

20       A    The Request for Service is if the property

21   is issued a violation, it'll show up as RFS.  Right

22   now it's 15 for 2015, followed by 7 other digits.  It

23   pretty much states that we have issued 52 RFS's in

24   this time period for this property -- this one

25   property, three Administrative Citations was issued,

1   so -- and then the Site Visits, we've been there

2   106 times.

3        Q    So what does that, as opposed to just

4   reading it, what does that say to you through your

5   experience as an inspector and a supervisor?

6        A    It tells me that this inspector -- this

7   property or the management of this property is --

8   could be doing a better job.

9             The process is:  We issue the order the

10  first time, and then if it's structural or interior

11  stuff, 30 or 40 days from now it should be in

12  compliance.  We show up and we check off our list and

13  the process is done.

14            We should not have to be -- to go back

15  over and over and over, 106 times for this one

16  property.  That's what it tells me on this report.

17       Q    Now, you also stated that the Abate List

18  is a very important thing for you to look at when you

19  are reviewing these property summaries.

20            Can you explain why that is important.

21       A    The Abate List was created -- when a

22  nuisance order is issued to an owner, the first time

23  we send out the letter, and we give the owner a chance

24  to comply saying, Hey, you've got a violation at your

25  property, please send someone to cut the grass or

1    remove the rubbish.

2              The second time it happens, we'll send out

3    another letter to you, Please cut your grass, remove

4    your rubbish.  It's the City's -- we've been there two

5    times already on the same particular issue or similar

6    issue, you should manage your property.  Maybe go

7    there once a week and see if the grass is tall or

8    rubbish is on your property.  Even if somebody dumped

9    trash on your property or the trash blows down from

10   down the block and lands on your property, you're

11   responsible for removing that.

12             The Abate List is now that we've issued

13   you two letters saying, You've got to take care of

14   this.  Any time we've got to be back a third time,

15   fourth time, fifth time, we're just going to send the

16   notice to our contractor saying, Hey, go abate this

17   situation.  We've let the owner know twice already in

18   this one-year period, and they haven't been getting

19   the message that this is a violation.

20        Q    And that is, you stated, in a one-year

21   period, so a property can go on and off of that if

22   they go a period of time --

23        A    Yes.

24        Q    -- without having nuisance orders written

25   to them, correct?

1      A    Correct.

2      Q    Now, the rental license status, you also

3  stated, was important information that you were

4  looking at when you were reviewing these documents.

5           Could you explain why that is an important

6  thing for you to review.

7      A    Every rental property in this City, prior

8  to renting it out, needs to have a rental license.  If

9  it shows up that it has a rental license, then the

10  owner is at least following the rules of getting the

11  requirement.

12          Some -- some properties don't have that.

13  It shows that they're renting without a license, and

14  it's in violation of our standards.

15              MR. WOLF:  Your Honor, I am just

16  wondering if this would be a good time to break before

17  we do a review of the individual properties to see

18  what the inspector has viewed when reviewing the

19  documents.

20              HEARING OFFICER GUROVITSCH:  All

21  right.  I think that is going to work.  Do you need

22  more than 45 minutes?

23              MR. WOLF:  I think we can probably

24  go through fairly quickly.

25              HEARING OFFICER GUROVITSCH:  No.  I

1    am sorry, 45 minutes for lunch.

2                    MR. WOLF:  Yeah, I could just --

3                    HEARING OFFICER GUROVITSCH:  What

4    about you, Mr. Rooney and Mr. Khan?

5                    MR. ROONEY:  I would be happy with

6    an hour, but 45 minutes -- I will accommodate you.

7                    HEARING OFFICER GUROVITSCH:  You can

8    have an hour.

9                    MR. ROONEY:  Thank you.

10                    HEARING OFFICER GUROVITSCH:  All

11   right.  We will reconvene at 1:15 p.m.

12                    MR. WOLF:  Thank you very much.

13                    (At this time a break was taken from

14                    12:15 p.m. to 1:15 p.m.)

15                    HEARING OFFICER GUROVITSCH:  All

16   right.  Mr. Wolf?

17                    MR. WOLF:  Thank you, Your Honor.

18                    HEARING OFFICER GUROVITSCH:  You can

19   proceed would your direct examination with Mr. Tran.

20   BY MR. WOLF:

21        Q    Mr. Tran, you understand you are still

22   under oath?

23        A    Yes.

24        Q    So where we kind of left off we had talked

25   about the normal process for inspectors when they are

1    issuing violations and responding to a party, and

2    specifically what you look for in the property summary

3    sheets.  So I kind of would like to go through each of

4    these properties --

5            A    Okay.

6            Q    -- and if you could just explain for each

7    of the properties -- and I will state the name of the

8    property address -- and if you can just describe what,

9    if anything, stands out on the properties based on

10   their summary of information that Ms. Zierke --

11           A    Okay.

12           Q    -- came up with.  Okay?

13           So I think we basically discussed

14   4011 Dupont as you were going through your normal

15   description of what you are looking for, so the next

16   property would be 2007 Russell Avenue North.

17           What on this summary report would pique

18   your attention as a supervisor and housing inspector?

19           A    For the property at 2007 Russell, the RFS

20   count, again, here is 50.  That means we have issued

21   roughly 50 letters to Mr. Khan or his agent citing

22   something -- some violation of the Housing Maintenance

23   Code.

24           Five Administrative Citations have been

25   issued as a result of work not done in the time

1    specified.  We've been there 87 times.  Again, that

2    number is high.  This property is on the Abate List,

3    meaning that we have issued at least 2 of these

4    Environmental Orders to this property in the past 12

5    months.

6              And that's that one.

7         Q    With regard to 1607 Hillside Avenue North,

8    what, if anything, on that property piques your

9    interest?

10        A    Again, 1607 we have issued 48 RFS's to

11   this property, five Administrative Citations, we've

12   been there 78 times.  This property is also on the

13   Abate List.

14        Q    The next property at 4010 Dupont Avenue

15   North, what is interesting or intriguing to you on

16   this property?

17        A    We've been here 73 times, we've issued

18   37 RFS's, we have issued two citations on this

19   property, and this property is also on the Abate List.

20        Q    With regards to 4000 Dupont Avenue North,

21   on this property, is anything unusual?

22        A    We've been here 66 times, 6 Administrative

23   Citations have been issued, we've issued 31 letters

24   with the RFS's -- on the upper left corner -- and this

25   property is also on the Abate List.

1      Q    If you can, just for the record, indicate

2  when the property -- or when the rental license was

3  issued?

4      A    It was issued December 29, 2010.

5      Q    Just so we can get an idea of how long the

6  ownership was and the number of visits and such.

7      A    Twenty-six days.  Mr. Khan owned this

8  property 26 days, and we visited here 66 times.

9      Q    What?

10     A    That's a lot.

11     Q    You said 26 days?

12     A    It's from -- December 3, 2010, it looks

13  like, the ownership took place.  The rental license

14  was issued December 29, 2010.  That's how I got to 26.

15     Q    Oh, I think Ms. Zierke stated that the

16  numbers were from when the rental license was issued.

17     A    Oh, okay.

18     Q    So it has been five years, approximately,

19  correct?

20     A    Yes.

21     Q    With regard to 3414 Emerson Avenue North,

22  can you state when the rental license was issued and

23  any numbers that --

24     A    Well, 3414 Emerson, the rental license was

25  issued August 7, 2008, we've issued 29 RFS's to this

```
1   property, we have been there 63 times, and for this
2   particular property, we haven't issued any
3   citations -- any Administrative Citations, and this
4   property is also on the Abate List.
5        Q    With regards to the next property at
6   3557 Dupont Avenue North.
7        A    3557 Dupont, we've issued 38 RFS's, we've
8   issued 8 Administrative Citations, we've been there 61
9   times.  This property is also on the Abate List.
10       Q    And when was the rental license issued?
11       A    February 15, 2011.
12       Q    So all that activity in a four-year
13  period?
14       A    Yes.
15       Q    With regards to 2008-21st Avenue North,
16  when was the rental license issued, and what numbers,
17  if any, stand out to you?
18       A    The license was issued November 20, 2008,
19  we've been there 56 times, we've issued 37 RFS's.
20  This property is also on the Abate List.
21       Q    And the next property at 2906 Emerson
22  Avenue North.  When was the rental license issued, and
23  what numbers stand out to you?
24       A    The rental license was issued May 11,
25  2011, we've been there 54 times, we've issued 28 RFS's
```

1   resulting in 6 Administrative Citations issued.  This

2   property is also on the Abate List.

3          Q    The next property is at 2123 Oliver Avenue

4   North.  When was that rental license issued, and what

5   numbers stand out, if any?

6          A    The rental license was issued on

7   September 11, 2008, we've been here 52 times, issued

8   33 RFS's, and we didn't have to issue any

9   Administrative Citation at this property, and this

10  property is also on the Abate List.

11         Q    And if you could, if certain of those

12  numbers or Site Visits at sites -- if they seem high

13  or low or normal -- if you just want to explain, you

14  know, if that number seems high or it is normal, why

15  that concerns you or not.

16              The next property at 2631 Newton Avenue

17  North, when was that rental license issued to

18  Mr. Khan, and what numbers, if any, stand out to you?

19         A    2631 Newton rental license was issued

20  April 22, 2009, we've been there 51 times, we've

21  issued 26 RFS's, resulting only in 1 Administrative

22  Citation issued, which is low, and this property is

23  not on the Abate List.

24         Q    The next property at 819 Sheridan Avenue

25  North, when was the rental license issued, and what,

1    if anything, stands out with regard to this property?

2         A    The rental license was issued on

3    September 18, 2009, we've been there 48 times, issued

4    28 RFS's, issue Administrative Citation 6 times --

5    that's high.  The Abate List -- this property is not

6    on the Abate List.

7         Q    The next property is located at 2116-25th

8    Avenue North.  When was the rental license issued on

9    this property, and what, if anything, stands out?

10        A    The license was issued November 20, 2008,

11   we've been here 47 times, 30 RFS's were issued,

12   1 Administrative Citation issued, which is low, and

13   this property is also on the Abate List.

14        Q    And the next property at 313-26th Avenue

15   North, what was the date of the rental license to

16   Mr. Khan, and what, if anything, stands out?

17        A    The rental license was issued

18   July 1, 2010, we've been there 47 times, we've issued

19   24 RFS's, we've issued 3 Administrative Citations,

20   which is low to medium, and this property is on the

21   Abate List.

22        Q    With regards to the next property at

23   2126 Queen Avenue North, when was the rental license

24   issued, and what numbers stand out to you?

25        A    The rental license was issued

1    September 11, 2008, we've been at this property

2    47 times, we've issued 24 RFS's resulting in

3    1 Administrative Citation, which is low, and this is

4    not on the Abate List.

5         Q    The next property at 2135-4th Street

6    North, can you state when the rental license was

7    issued to Mr. Khan, and what numbers stand out to you.

8         A    The rental license was issued

9    August 7, 2008, we've been there 47 times, issued

10   28 RFS's, issued 1 Administrative Citation, which is

11   low, and it's on the Abate List as well.

12        Q    The next property is at 2722 Oliver Avenue

13   North.  Can you state when the rental license was

14   issued and what numbers stand out to you.

15        A    The rental license was issued on

16   August 7, 2008, we've been here 45 times, issued

17   28 RFS's, issued 4 Administrative Citations, which is

18   low to medium, and this property is not on the Abate

19   List.

20        Q    The next property at 1611 Sheridan Avenue

21   North, can you state when the rental license was

22   issued, and what numbers, if any, stand out to you.

23        A    The rental license was issued

24   December 23, 2008, we've been here 44 times, issued

25   27 RFS's, issued 2 Administrative Citations, and this

1    property is on the Abate List.

2         Q    The next property, at 410-30th Avenue

3    North, can you state when the rental license was

4    issued to Mr. Khan, and what numbers, if any, stand

5    out to you.

6         A    The rental license was issued on

7    December 8, 2008, we've been here 43 times, 22 RFS's

8    was issued, 6 Administrative Citations was issued,

9    which is kind of high for this property -- or any

10   property -- and it's not on the Abate List.

11        Q    The next property, located at 2813 Aldrich

12   Avenue North, can you state when the rental license

13   was issued for this property, and what, if any,

14   numbers stand out to you.

15        A    The rental license was issued on

16   January 21, 2010, we've been here 41 times, we've

17   issued 21 RFS's, we've issued 2 Administrative

18   Citations, and this property is not on the Abate List.

19        Q    The next property at 2319-3rd Street

20   North, can you state when the license was issued to

21   Mr. Khan, and what, if any, numbers stand out to you?

22        A    The rental license was issued on

23   November 9, 2011, we've been here 41 times, we've

24   issued 26 RFS's and we have issued 5 Administrative

25   Citations, which is high, and this property is on the

1    Abate List.

2         Q    The next property is a property located at

3    2401 Ilion Avenue North.  Could you state when that

4    rental license was issued to Mr. Khan, and what, if

5    any, numbers stand out.

6         A    This property -- the rental license was

7    issued on October 12, 2011, we've been there 39 times

8    we've issued 19 RFS's, we haven't had to issue any

9    Administrative Citations to this property.  It's on

10   the Abate List.

11        Q    The property at 3406 Penn Avenue North,

12   can you state when the rental license was issued, and

13   what numbers stand out.

14        A    The rental license was issued

15   April 21, 2011, we've been here 39 times, issued 23

16   RFS's, we haven't had to issue any Administrative

17   Citations, and this property is on the Abate List.

18        Q    The next property is at 2414 Bryant Avenue

19   North.  Can you state when the rental license was

20   issued to Mr. Khan, and what numbers, if any, stand

21   out to you.

22        A    The rental license was issued

23   September 18, 2009, we've been here 38 times, issued

24   21 RFS's, issued 2 Administrative Citations, and this

25   property is not on the Abate List.

1        Q    The next property at 1604-27th Avenue

2   North, can you state when the rental license was

3   issued to Mr. Khan, and what, if anything, stands out

4   to you.

5        A    The rental license was issued

6   August 7, 2008, we've been here 38 times, issued

7   26 RFS's, issued 1 Administrative Citation, and this

8   property is on the Abate List.

9        Q    The next property at 2325 James Avenue

10  North, can you state when the rental license was

11  issued to Mr. Khan, and what numbers stand out to you.

12       A    The rental license was issued

13  April 16, 2010, we've been here 36 times, issued

14  18 RFS's, we haven't had to issue any Administrative

15  Citations.  The property is on the Abate List.

16       Q    The next property is at 321-24th Avenue

17  North.  Can you state when the rental license was

18  issued to Mr. Khan, and what numbers stand out to you.

19       A    The rental license was issued

20  August 7, 2008, we've been here 35 times, we've issued

21  20 RFS's, we haven't had to issue any Administrative

22  Citations, this property is on the Abate List.

23       Q    The next property is at 2714-35th Avenue

24  North.  Can you state when that rental license was

25  issued to Mr. Khan, and what, if anything, stands out

1    to you.

2         A    The rental license was issued on

3    September 23, 2011, we've been here 34 times, issued

4    20 RFS's, issued 11 Administrative Citations, which is

5    high.  This property is on the Abate List.

6         Q    The next property is at 2714 Emerson

7    Avenue North.  Can you state when Mr. Khan was issued

8    a rental license, and what, if anything, stands out.

9         A    The rental license was issued

10   February 26, 2010, we've been here 34 times, we've

11   issued 26 RFS's, we haven't had to issue any

12   Administrative Citations, and the property is not on

13   the Abate List.

14        Q    The next property is at 2223 Emerson

15   Avenue North.  Can you state the date the rental

16   license was issued to Mr. Khan, and what, if anything,

17   stands out.

18        A    The rental license was issued

19   August 7, 2008, we've been here 30 times, we've issued

20   16 RFS's, we've issued 3 Administrative Citations, and

21   this property is on the Abate List.

22        Q    The next property is at 1237 Knox Avenue

23   North.  Can you state when the rental license was

24   issued to Mr. Khan, and what, if anything, stands out.

25        A    The rental license was issued

1     April 27, 2012, we've been here 30 times, we've issued

2     19 RFS's, we haven't had to issue any citations -- any

3     Administrative Citations, and this property is not on

4     the Abate List.  I mean it is on the Abate List,

5     excuse me.

6          Q    With regard to 2600 Oliver Avenue North,

7     when was Mr. Khan granted a rental license, and what

8     numbers, if any, stand out to you.

9          A    The rental license was issued on

10    July 23, 2010, we've been here 25 times, we've issued

11    13 RFS's, we've issued 3 Administrative Citations, and

12    this property is not on the Abate List.

13         Q    The next property at 818-44th Avenue

14    North, when was Mr. Khan granted a rental license, and

15    what numbers stand out to you?

16         A    The rental license was issued on

17    November 20, 2008, we've been here 25 times, we've

18    issued 14 RFS's, we haven't had to issue any

19    Administrative Citations, and the property is not on

20    the Abate List.

21         Q    The next property at, 101 [sic] Logan

22    Avenue North, can you state when Mr. Khan was granted

23    a rental license, and what numbers stand out to you.

24         A    Actually, this property is on 1001 --

25         Q    Oh, 1001.  Sorry.

1          A     -- Logan.  The rental license was issued

2    on April 22, 2010, we've been here 24 times, we've

3    issued 21 RFS's, we haven't had to issue any

4    Administrative Citations, and the properties is on the

5    Abate List.

6          Q    The next property, at 1614 22nd Avenue

7    North, can you state when Mr. Khan was granted his

8    rental license, and what numbers stand out to you.

9          A    The rental license with issued on

10   October 12, 2011, the Site Visits -- we've been here

11   22 times, we've issued 14 RFS's, we've issued

12   5 Administrative Citations, which is high.  The Abate

13   List -- this property is on the Abate List.

14         Q    The next property, at 1621-22nd Avenue

15   North, when was Mr. Khan granted a rental license, and

16   what numbers stand out to you?

17         A    The rental license was issued

18   August 7, 2008, we've been here 21 times, we've issued

19   15 RFS's, we've issued 2 Administrative Citations.

20   This property is on the Abate List.

21         Q    And the next property is at 1714 Oliver

22   Avenue North.  Can you state where Mr. Khan was

23   granted a rental license, and what numbers stand out

24   to you.

25         A    The rental license was issued on

1    August 7, 2008, we've been here 20 times, we've issued

2    15 RFS's, we haven't had to issue any Administrative

3    Citations, and this property is not on the Abate List.

4          Q    The next property is at 1827 Oliver Avenue

5    North.  Can you state when Mr. Khan was granted a

6    rental license, and what numbers, if any, stand out to

7    you.

8          A    The rental license was issued on

9    July 30, 2009, we've been here 8 times, we've issued 4

10   RFS's, we haven't had to issue any Administrative

11   Citations, and this property is not on the Abate List.

12         Q    The next property, located at 1800 LaSalle

13   Avenue, Unit 104, can you state when Mr. Khan was

14   granted a rental license, and what, if anything,

15   stands out on this property.

16         A    The rental license was issued on

17   August 7, 2008.  We haven't had to visit this

18   property, which is very good.  We haven't had to issue

19   any RFS's or issue any citations, and the property is

20   not on the Abate List.

21         Q    Now, Ms. Zierke had testified that all

22   these properties in Exhibit 7 are the ones with rental

23   licenses.

24              Do you recall that?

25         A    Yes, I do remember.

1        Q     Now, it seems to me that a couple of

2   properties that had a fair amount of citations, but,

3   overall, there was not a lot of citations issued.

4             Would you agree with that?

5        A     I would agree.

6        Q     But looking at these properties as a

7   whole, what do these numbers tell you, based on your

8   experience in the field and as a supervisor, about

9   what is occurring at these properties?

10       A     Looking at them as a whole, all these Site

11  Visits, it's all double digits, triple digits, times

12  that we have been here.  It's showing that Mr. Khan or

13  his management company has a lot of room for

14  improvement.

15            We shouldn't have to be going back to

16  these properties over and over and issuing this

17  citation and that citation with letters, and telling

18  you to fix this and fix that on your property.

19            It's great that some of your properties we

20  haven't had to issue any letters, and I hope you take

21  that as an example for your other properties, but as a

22  whole, it shows that you're not managing your property

23  well.

24       Q     And we did not even get into how many --

25  did not really look at Letters of Intent to Condemn or

1    Boarding, just those numbers that kind of stood out to

2    you, as far as having your inspectors go back to these

3    properties over and over again.

4           What does that do to the City resources?

5    A    It drains it.

6    Q    Could you explain?

7    A    We have limited resources of X amount of

8    inspectors in the City.  They're responsible to

9    everything that pretty much goes on in their district,

10   and they have an X amount of properties that they have

11   to inspect for rental licensing each year.

12          They have to follow up with all complaints

13   within the district, any environmental calls, any

14   tenant calls, any Council Member calls, that we need

15   to do a sweep of the neighborhood, so their

16   assignments are stretched already, and they could be

17   doing other proactive stuff, but they're not, because

18   these properties are requiring them to go back over

19   and over in the same property, and so it drains the

20   resources that we have -- the limited resources that

21   we have of the inspectors.

22          MR. WOLF:  I have nothing further at

23   this time, Your Honor.

24          HEARING OFFICER GUROVITSCH:  Before

25   you cross-examine, I just have one question about 1800

1   LaSalle Avenue North, Unit 104.  Could you turn to

2   that.  It is the last one under Tab 7.

3                   THE WITNESS:  Yes, Your Honor.

4                   HEARING OFFICER GUROVITSCH:  What

5   kind of a property is that?  I notice that it says,

6   Unit 104.

7                   THE WITNESS:  It could be an

8   apartment, Your Honor.  It doesn't say it on this

9   summary, but you know, I'm guessing, it's an

10  apartment, anything that's not a single-family house.

11                  HEARING OFFICER GUROVITSCH:  Would

12  there be other apartments involved in the ownership of

13  1800 LaSalle Avenue, or is this, perhaps, a

14  condominium?

15                  THE WITNESS:  I'm not sure, Your

16  Honor.

17                  HEARING OFFICER GUROVITSCH:  Okay.

18  Thank you.

19                  MR. ROONEY:  Just for the record, it

20  is a condominium.

21                  HEARING OFFICER GUROVITSCH:  Thank

22  you.  My curiosity was getting the better of me.

23           Please go ahead.

24                  MR. ROONEY:  Thank you.

25

```
 1                    CROSS-EXAMINATION

 2   BY MR. ROONEY:

 3        Q    Good afternoon, Mr. Tran, I'm Edward

 4   Rooney, I'm Mr. Khan's attorney.

 5        A    Yes, sir.

 6                 HEARING OFFICER GUROVITSCH:  I am

 7   going to run back to my office.  I forgot my notes

 8   from today, and I am running out of paper on this pad.

 9                 MR. ROONEY:  Very well.

10                 HEARING OFFICER GUROVITSCH:  I will

11   be back in just a second.

12                 (At this time a short break was taken

13                 from 1:48 p.m. to 1:50 p.m.)

14                 HEARING OFFICER GUROVITSCH:  All

15   right.  We are back on the record.  Please proceed.

16                 MR. ROONEY:  Thank you.

17   BY MR. ROONEY:

18        Q    Mr. Tran, could you turn to, I guess, the

19   front page of Exhibit 7.  The profile for 4011 Dupont

20   Avenue North.

21        A    All right.

22        Q    And I apologize for having to be repeating

23   an explanation that you gave this morning, but I am

24   still not sure about it.

25                 A Request for Service, am I correct in
```

1    understanding that is a request that the City Housing

2    Inspections communicates to the licensee.  It is not a

3    neighbor or a tenant calling up, or is it?

4         A    An order for a Request for Service is a

5    document with a number stating that -- showing that

6    the property at 4011 has some housing violation, and

7    the RFS number is attached to that case.

8         Q    So it is a document that comes out of the

9    City Housing Inspections Office?

10        A    Yes.

11        Q    Okay.  And it is a document calling the

12   licensee's attention to some way in which the property

13   has not been compliant with the court requirements?

14        A    Yes.

15        Q    Okay.  Now, can those Requests for Service

16   be initiated by the inspector, or can they only be in

17   response to a complaint from a neighbor or a tenant or

18   passerby?

19        A    Both.

20        Q    Okay.  For example, an inspector could

21   drive by one of Mr. Khan's houses, see a few issues on

22   the lawn, and if the inspector wished to, he could

23   send a Request for Service to Mr. Khan saying, You

24   have accumulated trash that needs to be picked up.

25        A    Yes.

```
 1        Q    And that is without knowing who put the
 2   trash there or how long the trash had been there?
 3        A    Yes.
 4        Q    Now, Site Visits are those visits by City
 5   Housing Inspection personnel?
 6        A    Yes.
 7        Q    Okay.  Basically inspectors?
 8        A    Basically.
 9        Q    And those could be prompted by complaints
10   from neighbors, complaints from tenants?
11        A    Yes.
12        Q    Or they could be done at the inspector's
13   own initiative?
14        A    Yes.
15        Q    Okay.  And they include follow-up visits
16   to make sure that something that had been noncompliant
17   has been made compliant?
18        A    Some -- you know, certain nuisance cases,
19   like properties on the Abate List that we talked
20   about, those properties on the Abate List, they've
21   already gotten two letters sent out, so the third
22   time, fourth time that the inspector of the staff is
23   at the property, they can just issue an order, and it
24   goes right to the contractor, and they don't have to
25   go back to follow up.
```

1        Q     Thank you.  And I apologize that I was not

2   clear.  I did not mean to suggest that I thought there

3   had to be a follow-up visit in every instance, but if

4   there is a follow-up visit, that would be counted as

5   one of Site Visits?

6        A     Yes.

7        Q     Okay.  And that could include actually

8   making an appointment to go inside the premises if

9   there were interior things that needing to be checked

10  out, or driving by and looking at the exterior, could

11  it not?

12       A     Yes.

13       Q     And Administrative Citations --

14            MR. ROONEY:  Is something going

15  wrong with the plumbing?

16            MR. WOLF:  It almost sounds like a

17  shredder, but I don't know where it is coming from.

18            MR. ROONEY:  In City Hall, you never

19  know.

20  BY MR. ROONEY:

21       Q     Administrative Citations are also issued

22  by Housing Inspection Office?

23       A     Yes.

24       Q     And what is the circumstance in which

25  those are issued?

1          A      When orders are not complied with, the

2     order -- the letter was issued given a due date, say

3     30 days.  They went back after the due date, it's not

4     done, a citation is issued.

5          Q      And the particular inspector assigned to

6     the property or the inspector who initiated the

7     Request for Service has some discretion, with respect

8     to Administrative Citations, because the inspector --

9     I think you testified -- could give an extension

10    letter or could give a warning letter in lieu of an

11    Administrative Citation?

12         A      That's correct.

13         Q      And that is up to the discretion of the

14    inspector?

15         A      Yes.

16         Q      If there is an extension letter given, or

17    a warning letter given, do those get counted as

18    additional Requests for Service?

19         A      Anytime that we're there physically, it's

20    going to count.

21         Q      As what?

22         A      As a Site Visit.

23         Q      I am saying, let's say you told me, you

24    know, Request for Service is something that is sent

25    out with a particular number to it, describing a

1    particular one or more noncompliant situations.

2         A    Right.

3         Q    If the inspect, when he or she comes back,

4    sees that there has been progress, but it is not

5    finished, and the inspector issues an extension

6    letter, does that extension letter get counted in the

7    Request for Service?

8         A    No, no.  The RFS is the same.

9         Q    Okay.  And then the Abate List.  Please

10   explain again how a licensee gets a -- one of the

11   licensee's properties gets on the Abate List, let's

12   say, for grass that is not mowed?

13        A    Anytime that a letter is generated and is

14   sent out, it's -- it gets a tally.  Okay.  We have

15   issued one letter at this property, all the letters

16   are dated.

17             When two -- the second letter goes out, it

18   goes into this automatic spreadsheet that keeps track

19   of all these properties.

20        Q    Is that, I think you said, it is not just

21   the second letter, it is the second letter within

22   12 months?

23        A    Yes.

24        Q    Now, does the second letter create the

25   situation where the contractor can just go fix the

1    problem, or is it only the third time it happens?

2        A    The third time.

3        Q    And I think you testified, on your direct

4    examination, that when one of these letters goes out,

5    it has a due date by which the licensee is expected to

6    solve this problem?

7        A    Yes.

8        Q    Okay.  So it is possible, for example,

9    for, let's say trash accumulating, City Inspections

10   would send a letter notifying that there is trash at

11   this address and it needs to be picked up by a certain

12   date, and let's say the licensee does it, and then

13   11 months later, they send another letter saying there

14   has been trash and it needs to be picked up, and let's

15   say the licensee promptly does that.

16            Notwithstanding that the licensee promptly

17   complied with both requirements, that property is now

18   on the Abate List?

19       A    That's correct.

20       Q    And the inspector could send that letter

21   out for, let's say, accumulated trash, without having

22   any idea of how long the trash had been sitting on

23   that property; is that correct?

24       A    Correct.

25       Q    Okay.  And, of course, if the letter --

1    the RFS -- is not sent out and not actually mailed to

2    the licensee until after the due date for correction

3    stated in the letter, that's sort of unfair to the

4    licensee.

5              Wouldn't you agree?

6        A    I don't know.  Anytime that we needed

7    something to be removed from one of Mr. Khan's

8    properties, we send it in the mail.  We're required to

9    give notice, we're required to use the Post Office,

10   and send it to the contact person that Mr. Khan has

11   listed as the rental license contact person, and we

12   did that on all those properties.

13       Q    Let's suppose Mr. Khan could show you

14   numerous letters with City Housing Request with

15   Requests for Service stating a due date for the repair

16   that is dated as the same day that the letter is

17   postmarked, so he only got it after the due date.

18             That is not fair, is it?

19       A    On some cases -- well, not some cases.

20   All the properties on the Abate List have a zero-day

21   due date on them, so, yes, it's probably considered

22   that he would get the letter after the work has

23   already been done by the contractor.

24             On any other property that is not on the

25   Abate List, yeah, we've got to give an order, and

1    they'd have a seven-day window, figuring the mail

2    might take two days to get the mail and for the

3    respondent to receive that letter and have a few days

4    leftover to abate that condition, but properties on

5    the Abate List, the properties -- by the time they got

6    notice, the contractor -- the City contractor is

7    already there to abate the situation.

8         Q    Where is the fairness in that?

9         A    The ordinance states that if you received

10   two or more letters, that's how the process is going

11   to occur for your third and fourth and fifth time that

12   we're going to be there.

13        Q    And how does a licensee get his property

14   off the Abate List for, let's say, lawn mowing?

15        A    So you're on there for 12 months from that

16   second notice out for another year, you don't received

17   anything -- any nuisance or any environmental stuff

18   from us, it gets off that list.

19        Q    But while you are on the Abate List, you

20   can keep continuing to receive these letters that you

21   do not have any opportunity to abate because there is

22   a zero deadline?

23        A    That is correct.

24        Q    And each one of those letters extends the

25   12 months, doesn't it?

1         A     Yes.

2         Q     All right.  But you are saying that that

3    should only happen with respect to properties that are

4    on the Abate List?

5         A     Yes.

6         Q     If you are not on the Abate List, you get

7    a longer period of time to comply?

8         A     You get seven to ten days.

9         Q     Okay.  And the Abate List is costly to

10   licensee, right?  He has to pay for the services that

11   the contractor performs?

12        A     They get assessed to the property tax.

13   The owner -- or the respondent has the right to appeal

14   it, if they want to, or they can pay it.

15        Q     Okay.  Now, just curious, since you are

16   knowledgeable, how many times a week would you expect

17   that a licensee taking diligent care of his property

18   should inspect -- or have it done by someone else --

19   just inspect the exterior or yard?

20        A     I'm sorry.  What was that?

21        Q     How many times would you think is

22   satisfactory for a licensee to go by his property to

23   see if there is any trash or if the lawn needs mowing?

24        A     Once a week.

25        Q     Okay.  So if a licensee is doing it more

1    than once a week, that is really better than you

2    expect?

3          A    Yes.

4          Q    Now, you indicated that, in response to

5    Mr. Wolf's question, that overall -- if you look at

6    the profiles in 7 -- overall, they show -- I can't

7    remember exactly your words -- but, subpar management,

8    or something like that?

9          A    I'm sorry, what?

10         Q    If you look at Mr. Khan's properties

11   overall, there is too many Requests for Service and

12   too many Site Visits?

13         A    Yes.

14         Q    Okay.  But, of course, you agree that the

15   Minneapolis rental properties are not rented overall,

16   they are rented one at a time.  Each property has a

17   separate license?

18         A    That's correct.

19         Q    Okay.  And so, for example, if you turn to

20   the last page of Exhibit 7, the profile for 1800

21   LaSalle, Unit Number 104.

22         A    Okay.

23         Q    Does that -- looking at the profile for

24   that property -- is there any reason to believe that

25   that property is not being adequately managed?

1          A     No, it looks like it is being managed very

2     well.

3          Q     How about the one ahead of it, 1827 Oliver

4     Avenue North.  Is there any reason to believe that

5     that property is not being adequately managed?

6          A     It's lower.  It's lower than the other

7     Site Visits.

8          Q     Well, since November of 2008 -- so for

9     almost seven years -- there has only been four

10    Requests for Service; is that right?

11         A     That's good.

12         Q     So nothing you see, if you just look at

13    the profile of that property, that makes you think

14    there is any reason to revoke the license for that

15    property?

16         A     No.

17         Q     How about the one ahead of that,

18    1714 Oliver Avenue North.  Zero Administrative

19    Citations, right?

20         A     That's correct.

21         Q     Over 7 years, and there has only been 15

22    Requests for Service?

23         A     Yes.  We've been there 20 times, and we've

24    issued 15 RFS's.

25         Q     So if you look at that profile, there is

1  no reason to believe that the license for that

2  property should be revoked?

3         A    Yes.  If I were to just look at this one

4  property.

5         Q    Yes, it should be revoked, or, yes, you

6  agree with me, there is no reason to think that it

7  should be revoked?

8         A    I agree with you for this one particular

9  address.

10        Q    All right.  And this one particular

11 address has its own license, it is not licensed as a

12 bunch?

13        A    Exactly.

14        Q    I won't drag you through the litany of

15 going though each of these properties, but there are a

16 number of these properties, which, if you looked at

17 them alone, appear to be adequately managed, wouldn't

18 you say?

19        A    I'd say that's correct.

20        Q    Okay.  Now, you were here when Ms. Zierke

21 was testifying this morning?

22        A    Yes.

23        Q    You agree that these profiles, from

24 looking at them alone, they do not give any indication

25 of trends, whether the number of Requests for Service

1    is increasing or decreasing or remaining stable over

2    the life of the license?

3         A    If you look at just any one of them, you

4    don't know that.

5         Q    Well, if you look at one of them, you

6    won't know that, so if you look at all of them

7    together, you won't know that.

8         A    If you look at all of them, you will know

9    that.

10        Q    How do you know from looking at all of

11   these, that Mr. Khan had any Request for Service in

12   2014?

13        A    Right, right.  I thought you were asking

14   me if you would see a trend by looking at all of these

15   to see if there are more Request for Services at one

16   property or the other.

17        Q    Oh, got you.  Comparing property to

18   property, bit over time, you cannot tell from looking

19   at these?

20        A    Right.

21        Q    And for some reason, it appears these

22   profiles are not complete.  As I look at Exhibit 7, I

23   don't see a profile from Mr. Khan's licensed property

24   at 315 Buchanan Street.

25        A    What page is that?

1        Q    It is not in there.

2        A    If it's not on there, then I can't comment

3   on that.

4        Q    Because I think the profile is 35 units,

5   or there is profiles for 35 units, and, I believe, the

6   Notices of Revocation -- the notice letters coming out

7   listed 43 units, so I'm just -- you don't have any

8   explanation?

9        A    I don't.

10       Q    Oh, by the way, do you recall how many

11  times you have actually inspected the interiors of any

12  of Mr. Khan's properties?

13       A    I haven't inspected anything.

14       Q    Interior or exterior?

15       A    That's correct.

16       Q    So you are talking about what is shown in

17  these spreadsheets, you are not talking about anything

18  you have seen with your own eyes?

19       A    That's correct.

20       Q    All rental properties are subject to

21  annual licensing inspections; is that correct?

22       A    Not annual.  We -- the properties are on a

23  tier system.  We have a Tier 1, Tier 2, Tier 3.

24  The 3 -- if you're on a Tier 3, then you're on the

25  end.

```
 1          Q    Mr. Khan's property are on Tier 3?

 2          A    They are being considered, yes, or they

 3     are on it.

 4          Q    And an RFS goes out for the annual

 5     inspection, does it not?

 6          A    The -- if we have issued an order, yes,

 7     they are, an RFS would go out for that.

 8          Q    So the order for the annual inspection,

 9     even though it is not necessarily indicating any

10     deficiency in code compliance with the property, would

11     be included in that profile for a particular property?

12          A    You know, let me back up.  The notice

13     saying -- the letter saying your property will be

14     inspected, that's not an RFS.  That's not -- that's

15     just a letter notifying you that your property is

16     going to be inspected.  That doesn't count towards

17     this RFS that we've issued.

18          Q    How do you know that?

19          A    I know that because I've been doing this

20     for 19 years, and if we send out a letter notifying

21     someone that their license is going to be -- that

22     their property is going to be inspected, that's just

23     an appointment letter, just like an appointment

24     letter.

25               If we were there to do the inspection, and
```

1    we mailed the notices to the respondent to fix, each

2    one of those notices will have an RFS number, but the

3    letter itself is just an appointment letter.

4         Q    So if an annual inspection finds one thing

5    on the interior and one thing on the exterior that

6    need fixing, that is going to generate two RFS's?

7         A    That's correct.

8         Q    Okay.  Mr. Tran, would you look -- I think

9    it is the book that is over on the edge, there, and

10   the cover says, "Khan Exhibits" or "Licensee

11   Exhibits," or something like that?

12        A    Yes.

13        Q    Okay.  Would you look at Exhibit -- the

14   tab behind Exhibit 4, which is just information from

15   city records as to the year of construction of

16   Mr. Khan's licensed properties.

17        A    Okay.

18        Q    Is it fair to say that on average, they

19   are probably about a hundred years old?

20        A    Yes.

21        Q    Some of them go well into the 19th

22   century?

23        A    Yes.

24        Q    Is it also fair to say that as properties

25   age, they require more maintenance?

1      A    Yes.

2      Q    Okay.  And, well, I guess you have not

3 inspected, personally, any of Mr. Khan's properties,

4 so you cannot talk about the style of construction,

5 can you?

6      A    No.

7      Q    Now, when you were testifying for Mr. Wolf

8 about going through these profiles and the number of

9 Administrative Citations -- sometimes you said it was

10 low, sometimes you said it was low to medium,

11 sometimes you said it was high -- is that based on

12 your experience or your awareness of Administrative

13 Citations for rental properties citywide or

14 concentrated in any particular neighborhood?

15      A    Citywide.  You know, I've worked pretty

16 much all over the city, so it's not -- I've been in

17 north, I've been in northeast, I've been in south,

18 southwest.

19                MR. ROONEY:  Okay.  Excuse me for a

20 minute, I just need to see if --

21           Counsel, did you object to my Exhibit 15?

22                MR. WOLF:  I thought it was 14.

23                MR. ROONEY:  I thought it was 16

24 through 32.

25                MR. WOLF:  I thought it was 14.

1                    MR. ROONEY:  Okay.  You are right.

2                    MR. WOLF:  It was 14 through 32.

3    BY MR. ROONEY:

4         Q    Would you agree that Mr. Khan's properties

5    are primarily located in North Minneapolis?

6         A    Yes.

7         Q    And are primarily located in what we might

8    call the poorer neighborhoods of Minneapolis?

9         A    There are pockets all over the city that

10   are poor, but, yes, I would agree that the properties

11   that Mr. Khan owns are in North Minneapolis.

12        Q    And are located in the areas of highest

13   crime and highest vandalism?

14        A    Yes, unfortunately.

15        Q    And would you agree that many of the

16   lapses in code compliance that can show up on a

17   profile can be caused by tenant behavior or behavior

18   of complete strangers to the property?

19        A    It could.

20        Q    Vandalism, broken windows, trash on the

21   lawn, but you do not know who put that there?

22        A    Correct.

23        Q    All right.  Would you also agree, from

24   your experience, it is better for people to live in

25   stable rental housing than homeless shelters?

1               MR. WOLF:  Your Honor, I would

2    object.

3               HEARING OFFICER GUROVITSCH:  It is

4    irrelevant, sustained.

5    BY MR. ROONEY:

6         Q    Your experience working with the City --

7    well, strike that, and ask you another question.

8               There is nothing in the record that you

9    have seen here today at this hearing that let's you

10   compare -- shows you documents you can compare to

11   Mr. Khan's profiles to see how his history compares to

12   the history of other landlords who rent to low-income

13   tenants; is there?

14        A    I haven't seen anything like that this

15   morning.

16        Q    Okay.  Are you aware that the Minneapolis

17   Public Housing Authority owns what it calls scattered

18   sites -- 753 scattered sites that it rents to --

19               MR. WOLF:  Your Honor, I would

20   object to the relevancy.

21               HEARING OFFICER GUROVITSCH:  Offer

22   up proof.

23               MR. ROONEY:  Yes.  To show that the

24   City does not attempt -- it is an equal protection

25   situation.  The City does not attempt to license or

1   supervise or revoke licenses, or monitor the

2   conditions of the Public Housing Authority properties.

3            The policy of this government is to ask

4   the private sector to participate in providing

5   affordable housing, yet they are held to a higher

6   standard, unfairly.

7                    HEARING OFFICER GUROVITSCH:  I will

8   allow it.

9   BY MR. ROONEY:

10       Q    Were you aware that the Public Authority

11  has scattered-site housing?

12       A    Yes.

13       Q    Does the City of Minneapolis do any

14  inspections on that?

15       A    Those properties are inspected by

16  Section 8 inspectors.  They have their own inspection

17  programs that inspect those properties.

18       Q    Does the City of Minneapolis issue and

19  Code Compliance Requests for Service to those

20  properties?

21       A    I am not sure.

22       Q    Are those properties required to be

23  licensed by the City of Minneapolis?

24       A    I believe so.

25       Q    Okay.

1        A    But you know, you asked that question

2   about have we issued any orders to those properties,

3   we might have if they're exterior, environmental

4   stuff, nuisance stuff.

5        Q    But you cannot point to any recollection

6   of having done it.

7        A    No.

8        Q    Would you agree that the inspection

9   standard to qualify a dwelling for participation in

10  the Section 8 Subsidized Housing Program is less

11  strict than the inspection standard of the Minneapolis

12  Housing?

13       A    I'm not sure.  I'm not sure what they're

14  inspection programs are in detail, what their

15  inspectors check versus us, but, no, I'm not sure.

16       Q    Okay.  Does City Housing Inspection have

17  any coordination with the Minneapolis Police

18  Department in monitoring the level of police calls to

19  particular properties that you know of?

20       A    You know, every year in, you know -- the

21  rental licenses expire every year on August 31st.  The

22  inspection program, we try to get all of our rental

23  licenses done by September 15.

24            For that two-week window from

25  December 15th to January 1st, we have a system that

1    tracks all of the rental license orders that are

2    issued to a property, all the police calls that have

3    been called to this property, excluding heart attacks

4    or anything like that or any medical stuff, that all

5    gets a point, and those points add up to what accounts

6    to whether your property is going to be placed in the

7    Tier 1, Tier 2, or Tier 3, but as far as coordinating

8    or checking what kind of calls, no.

9         Q    And, of course, police calls are, for the

10   most part, based on tenant or neighbor behavior, not

11   on landlord behavior, right?

12        A    Yes, it's behaviors.

13        Q    So the only way it relates to the landlord

14   is who the landlord chose to rent to?

15        A    Yes, it could.

16        Q    And it is not uncommon for low-income

17   people to have a life of less stability and a life

18   that generates more police calls --

19             MR. WOLF:  Your Honor, I object.

20   This is speculation and facts not in the record.

21             HEARING OFFICER GUROVITSCH:  Well, I

22   think it also goes beyond the scope of the witness'

23   knowledge.

24   BY MR. ROONEY:

25        Q    Okay.  Do you know whether Minneapolis

1    Housing Inspections Office monitors or checks the

2    level of police calls to any of these Minneapolis

3    Public Housing Authority scattered-site properties in

4    Minneapolis?

5         A    I'm not aware of it.

6         Q    Am I correct in thinking that if you look

7    at the language of the Minneapolis Housing Code, the

8    problem that a landlord gets into with a licensed

9    property is not by having City Inspections issue a

10   Request for Service, it is by not satisfactorily

11   responding to the Request for Service.

12        A    It's tracked every time we issue an order.

13   It's also tracked any time that the order is not

14   complied with.

15        Q    Okay.  But could you point to anything in

16   the Minneapolis Housing Code that authorizes or

17   jeopardizes a licensee's license for having too many

18   Requests for Service alone?

19        A    Under the Just Cause Standards that we

20   have, I believe it's -- I believe it was 19 -- but

21   it's pretty much saying that if you have too many

22   visits from us requiring our staff to issue these

23   RFS's to your property, yeah --

24        Q    Well, what it is really saying is Good

25   Cause, and then what you are telling me is that that

1      is the way your office interprets it, right?

2             A     That's the way it is.

3             Q     And that is irrespective of other social

4      policies that might also be considered with Good

5      Cause?

6                          MR. WOLF:  Your Honor, I object.

7                          HEARING OFFICER GUROVITSCH:

8      Sustained.

9                          MR. ROONEY:  All right.

10     BY MR. ROONEY:

11            Q     In your 19 years of employment, Mr. Tran,

12     with the City Housing Inspections, are there periodic

13     training programs or seminars or in-service trainings

14     that employees are gathered together to attend?

15            A     Yes.

16            Q     All right.  At any of those in-service

17     trainings, do you ever recall a topic being covered

18     about how the City might better affirmatively further

19     the Fair Housing?

20                          MR. WOLF:  Your Honor, I object to

21     relevancy.

22                          HEARING OFFICER GUROVITSCH:  I am

23     going to sustain the objection.

24                          MR. ROONEY:  Okay.  Well, the rest

25     of what I might want to ask would probably be

1    considered argumentative.

2    BY MR. ROONEY:

3         Q    I guess the final question is:  If you

4    don't like what you see when you look at Mr. Khan's

5    profiles, is that, overall, his involvement in rental

6    housing is draining City resources; is that fair?

7         A    Yes.

8         Q    That is the cost.  Did you ever consider

9    what the benefit is of Mr. Khan's involvement in

10   Minneapolis City housing?

11        A    I don't.

12             MR. ROONEY:  All right.  Thank you.

13   No further questions.

14             HEARING OFFICER GUROVITSCH:  Any

15   redirect?

16             MR. WOLF:  Yes, Your Honor.

17

18             REDIRECT EXAMINATION

19   BY MR. WOLF:

20        Q    Inspector Tran, going back to the Abate

21   List, Mr. Rooney asked you, once a property is on that

22   Abate List and there is a need to have the grass

23   cut -- the notices get sent, but the City contractor

24   arrives and cuts the grass -- continues that property

25   on the Abate List; is that correct?

1        A     That's correct.

2        Q     When would an inspector, due to that

3    authorization, have the contractor cut the grass

4    again?

5        A     When the grass is at least 8-inches high.

6    When there's a violation, we will be there again.

7        Q     So if an inspector, if a property is on an

8    Abate List -- just say 4011 Dupont since that's right

9    in front of me -- that's on the Abate List, an

10   inspector goes by all summer and never notices high

11   grass, and never has to call the contractor to have

12   the grass cut, is the property taken off the Abate

13   List?

14       A     In 12 months after the second notice, then

15   it gets off that list.

16       Q     So if the property is maintained to a

17   point where the inspector doesn't have to call a

18   contractor, it will come off the Abate List?

19       A     That's correct.

20       Q     Now, Mr. Rooney asked you if you thought

21   an inspection once a week by a landlord or the

22   landlord's property manager was a sufficient amount to

23   monitor a property, and you said that you thought that

24   would be sufficient.

25       A     I said that.

1    Q    Mr. Rooney also brought up the fact that a

2  lot of properties that Mr. Khan owns, or a majority of

3  them, are in North Minneapolis and indicated that that

4  is a more challenging area to own property, and you

5  agreed with him; is that correct?

6    A    I believe I did agree with that.

7    Q    Would you also agree, then, if you are

8  owning property in that area, you have to be a little

9  more active than if you own property in a quieter

10  community in Minneapolis?

11    A    Yes.

12    Q    And if garbage collects on a property more

13  in one area that you chose to buy property in, you are

14  going to have to be a little more proactive in that

15  area; is that correct?

16    A    That's correct.

17    Q    And nobody made Mr. Khan purchase these

18  properties in North Minneapolis, to your knowledge?

19    A    To my knowledge.

20    Q    And Mr. Rooney also relooked at the

21  history of when properties owned by Mr. Khan were

22  built, and most of them were around the turn of the

23  century, and you stated that presents an issue for

24  requiring more maintenance because of the age of the

25  properties; is that right?

1        A    That's correct.

2        Q    What would a property owner then need to

3    do to maintain those properties?

4        A    Be there more than one time a week.  If a

5    property has nothing going on there and you receive no

6    orders from the City saying you need to fix, maybe one

7    time a week is okay.

8             If you get numerous letters from the City

9    saying you have got to fix this, fix that, cut this,

10   cut that, maybe two or three times a week is required.

11       Q    And Mr. Rooney pointed out a few of the

12   properties in Exhibit 7 that did not have as many

13   Calls for Service or Site Visits, and you stated that

14   it appeared that those properties were managed

15   correctly.

16       A    Yes.

17       Q    But when you see numerous Site Visits and

18   Request for Services, what does that tell you?

19       A    It tells me that if you look at just one

20   property -- and those properties on the last page are

21   well-managed -- but taken as a whole, Mr. Khan owns

22   multiple properties.  Taken as a whole, it's not

23   well-managed.

24       Q    And I think you clarified when Mr. Rooney

25   talked to you about the annual inspection and the

1    tiered inspections, and whether or not that counted as

2    an RFS, and I think you clarified that, but I just

3    wanted to go back to that.

4            When a property is going to be set for an

5    annual inspection, can you explain the process and

6    what occurs.

7        A    Yes.  A letter is sent out notifying the

8    respondent that their property will be inspected.

9    That's just a letter notifying them that that's going

10   to occur, it's not an order to fix anything, so then

11   there's no RFS's assigned to that letter, it's just a

12   letter.  It's just an informative letter.

13       Q    And if one of your inspectors was going to

14   be conducting the annual rental license inspection or

15   a tiered, you know, every-other-year inspection, and

16   they arrived at the property and found no violations,

17   what would, if anything, be recorded?

18       A    Yes.  We would close the case, and we

19   would issue the respondent an approved license, and

20   there would be no letters -- no letters to correct.

21       Q    Now, when did the tiered licensing process

22   go into place?

23       A    The tiered license inspection was just a

24   few years ago, it's very recent.  It hasn't been since

25   I've been here, 19 years.  We've, you know -- I don't

1    have the correct date -- the correct year that it went

2    into existence, but it's less than ten years.  That

3    would be a true statement.

4        Q    Was there a period of time where

5    properties were not necessarily inspected on a regular

6    basis?

7        A    That's correct.

8        Q    When Mr. Rooney stated that there is no

9    other properties to compare in the exhibits -- compare

10   Mr. Khan's properties to -- and you stated that is

11   correct that you could not do a comparison of numbers

12   by numbers?

13       A    Yes.

14       Q    But you have been an inspector for

15   19 years, working with the City.

16            When you state that these numbers are a

17   lot, depending on what properties you are looking at,

18   what do you base that on?

19       A    Throughout the years of doing inspections,

20   properties that you show up and issue an order that

21   they comply with, that's how it's supposed to be, you

22   know.

23            Some of these properties that are on this

24   Exhibit 7, we've been there multiple times.  It shows

25   that it's not being managed.

1          Q    And as a supervisor, do you become more

2     involved with properties that your inspectors are

3     having problems with, than compared to ones that are

4     not issuing RFS's or orders?

5          A    Right.

6          Q    And how does that comparison -- when you

7     look at these numbers, how do you -- let me strike

8     that.

9                    MR. ROONEY:  Thank you.

10                    MR. WOLF:  It sounded better in my

11     head.

12               I have no further questions, Your Honor.

13                    MR. ROONEY:  Briefly, if I may, or

14     if you want to -- I am sorry.

15                    HEARING OFFICER GUROVITSCH:  I just

16     want to touch on something that Mr. Wolf mentioned

17     that I would like to know more about, and that is the

18     tiered licensing system.

19                    THE WITNESS:  All right.

20                    HEARING OFFICER GUROVITSCH:  Are you

21     familiar with what delineates a Tier 1 from a Tier 2

22     from Tier 3 property?

23                    THE WITNESS:  I know just the basics

24     of it, Your Honor.  It's a point system.  At the end

25     the year -- I mentioned that the inspector needs to do

1   all their initial inspections by September 13th of

2   each year of the properties that they were assigned.

3              For that two-week window before they get

4   assigned a new batch of properties to do in January,

5   we run a study -- it's called a P.U.R.E. System,

6   Property-something -- anyway, it tallies up all of the

7   calls for service to a property, any police calls, any

8   housing visits, anything like that, and each one of

9   those has a point system, and, then, doing that

10  report, if a property is at a low number -- a low

11  point, then that property is designated as a Tier 1,

12  and then Tier 2, and Tier 3 -- Tier 3 being the

13  worst -- and they have to be inspected on an annual

14  basis.

15             HEARING OFFICER GUROVITSCH:  How

16  often do Tier 1 properties need to be inspected?

17             THE WITNESS:  It could be 1, every

18  eight years; Tier 2, every five years; Tier 3, every

19  year.

20             HEARING OFFICER GUROVITSCH:  Are you

21  aware of the classification for Mr. Khan's properties?

22             THE WITNESS:  Yes.

23             HEARING OFFICER GUROVITSCH:  What is

24  the classification for these properties?

25             THE WITNESS:  They're Tier 3.

1          HEARING OFFICER GUROVITSCH: All of

2     them?

3          THE WITNESS: I believe -- not all,

4     but a chunk of them, Your Honor. The reason why I

5     know that is that I think the City Attorney also

6     mentioned -- or the witness had mentioned the Problem

7     Property Unit.

8          When the Problem Property Unit is assigned

9     properties to inspect, one of the criteria is that

10    they're in the Tier 3 Program.

11         HEARING OFFICER GUROVITSCH: So it

12    is fair to say that you don't know the number of

13    Mr. Khan's properties that are classified as Tier 3?

14         THE WITNESS: Yes.

15         HEARING OFFICER GUROVITSCH: Okay.

16    Thank you.

17         MR. ROONEY: May I? Thank you.

18

19              RECROSS-EXAMINATION

20    BY MR. ROONEY:

21         Q    Mr. Tran, Tier 3 properties are subjected

22    to a significantly higher annual license fee; isn't

23    that correct?

24         A    The fee is higher.

25         Q    So that is one way to ameliorate the drain

1    on City resources, is that you demand more from the

2    properties that appear to be calling on more City

3    resources.

4         A    Yes.

5         Q    Okay.  And once again, I want to cover

6    something -- and I apologize if I inadvertently misled

7    anybody -- there are three properties listed behind

8    Tab 10 of the City's Exhibit Book, and those are the

9    three properties of Mr. Khan that are currently in the

10   Problem Properties Unit, and I just wanted to ask you

11   about them, and I am going to go from back to front,

12   if you don't mind.

13        The third property is 315 Buchanan Street

14   Northeast, which it appears, from parcel information,

15   that it is a nine-unit building that has been licensed

16   since October 1, 1999, to Mr. Khan.

17        That has only had one Administrative

18   Citation issued, right?

19        A    That's correct.

20        Q    And so for nine units, you would expect a

21   higher number of Requests for Service?

22        A    I don't expect anything.

23        Q    Okay.  And if you look at the -- and it is

24   not on the Abate List, right?

25        A    It is not.

1      Q    Okay.  And if it has been licensed for 16

2  years, you would have to take that into effect in

3  looking at the total number of Requests for Service

4  and Site Visits, wouldn't you, to evaluate how much of

5  a drain on the City resources it is?

6      A    Well, the Site Visits, we've been there

7  116 times --

8      Q    In 17 years.

9      A    I don't average it out.  All it shows me

10  is that we've been there 116 years [sic].  I don't

11  average anything when I'm looking at this thing.

12     Q    Okay.  How about the page before that.

13  1204 Knox is on the Abate List, and it is licensed

14  since January 2010, it has only had three

15  Administrative Citations issued.

16          Would you agree?

17     A    Yes, it shows that.

18     Q    On the first page, 310 Pierce Street

19  Northeast, for instance, is not on the Abate List, but

20  it has had a whole bunch of Administrative Citations

21  issued.

22     A    Yes, it has 17.

23     Q    Okay.  I just did not want -- those were

24  the ones missing from 7 -- I did not want to leave any

25  misapprehension.

```
 1                     Thank you.  That is all the questions I
 2      have, Mr. Tran.
 3                          HEARING OFFICER GUROVITSCH:  Do you
 4      have any redirect?
 5                          MR. WOLF:  No, Your Honor.
 6                          HEARING OFFICER GUROVITSCH:
 7      Mr. Tran, you may step down.  Thank you.
 8                     I think at this time we will take a short
 9      break, and we will reconvene at 3:00.
10                          (At this time a short break was taken
11                          from 2:41 p.m. to 3:01 p.m.)
12                          HEARING OFFICER GUROVITSCH:
13      Mr. Wolf, ready to proceed with your next witness.
14                          MR. WOLF:  Thank you, Your Honor.
15      The City would call Farrokh Azmoudeh.
16                       FARROKH AZMOUDEH,
17               the witness in the above-entitled
18            matter, having been first duly sworn,
19                  testifies and says as follows:
20
21                     DIRECT EXAMINATION
22      BY MR. WOLF:
23           Q    Mr. Azmoudeh, for the record, and for the
24      court reporter's benefit, could you spell your name.
25           A    My first name is Farrokh, F-A-R-R-O-K-H,
```

1    and my last name is Azmoudeh, A-Z-M-O-U-D-E-H.

2         Q    Mr. Azmoudeh, could you state what your

3    current employment is with the City of Minneapolis.

4         A    Currently, I'm the Problem Properties

5    supervisor.

6         Q    And how long have you been supervisor of

7    the Problem Properties Unit?

8         A    Year and a half.

9         Q    And prior to being appointed as the

10   supervisor of the Problem Properties Unit, what was

11   your appointment with the City?

12        A    I started with the City in 2001 as a

13   Housing Inspector 1 for three or four months.  I was

14   promoted to Inspector 2.  I was Inspector 2 through

15   2005, and since 2005 to early 2014, I was a Lead

16   Inspector.

17        Q    And were you assigned to the Problem

18   Properties Unit as an inspector?

19        A    I was assigned January 1st of 2005.

20        Q    So you have been with the Problem

21   Properties Unit since 2005?

22        A    Correct.

23        Q    In the last year and a half as the

24   supervisor?

25        A    Correct.

1        Q     And what are your duties as a supervisor

2   of the Problem Properties Unit?

3        A     Managing the inspectors, admin staff,

4   coordinating inspection in the field, interpreting

5   codes and ordinances, attending Council presentations,

6   nuisance condition, meetings, and any other duties as

7   assigned to me.

8        Q     And could you explain to the Court what

9   the Problem Properties Unit entails and what the

10  purpose and the scope of the Problem Properties Unit

11  is.

12       A     Yes.  Problem Properties Unit used to be

13  in the City for as long as home inspection was

14  formalized, but in 2004, the management -- they

15  thought that Problem Properties are -- basically, are

16  the properties that requires multidisciplinary action,

17  which means that by conventional means of enforcement,

18  issues at those properties are not abated, so for that

19  reason, the unit was established in summer of 2004.

20            The prerequisites and conditions that were

21  envisioned at that time, and has been looked at

22  numerous times by different managers, state that the

23  property has current activity, open regulatory or

24  other department orders, or open police case.

25            If it becomes chronic, probably has a

1    history of violations, but not necessarily a high

2    volume.  Owner has demonstrated a lack of

3    responsiveness, does not manage the property without

4    intervention by a regulatory agency.  The property has

5    sufficient evidence and documentation of violation

6    associated with the people in the house or the owner

7    of the property.

8              Increased activity:  Property has a jump

9    in activity which may indicate future problems or more

10   series problems that have not been surfaced.

11             Serious Problems:  The property has police

12   activity, which is a property safety concern; gang

13   violation, crimes, weapons, et cetera.  Those that

14   need a safety or health and welfare test should take

15   precedence.

16             Multiple Agencies:  Property has more than

17   one department agency already involved.

18             And neighborhood impact:  Property has a

19   negative impact on the surrounding neighborhoods and

20   community creating disinvestment and decreased

21   stabilization of the neighborhood.

22             These are basically the criteria for the

23   Problem Properties.

24        Q    And during your involvement as an

25   inspector or now as the supervisor of the Problem

1   Properties Unit, have you come into contact with any

2   of the properties owned by Mr. Khan?

3           A    Yes, I did.

4           Q    And can you state how you first became

5   involved in Mr. Khan's properties?

6           A    If I'm not mistaken, the first exposure I

7   had was a follow-up on 2501 Golden Valley Road that

8   was taken as a Problem Property on July 16th of 2014.

9                At that time I was not with Problem

10  Properties.  I joined Problem Properties

11  January 1, 2005.  But in 2005, I was involved with the

12  inspections at that property, and ever since, I've

13  been involved in numerous meetings with Mr. Khan, or

14  numerous inspections at this property.

15          Q    So your first involvement started in 2004,

16  but your involvement with the Problem Property Unit

17  started in 2005?

18          A    Correct.

19          Q    Now, when you initially, with the Problem

20  Properties Unit, became involved with Mr. Khan's

21  properties, was it a single property, a couple

22  properties, all of his properties?

23               How would you describe your involvement?

24          A    At the beginning, if I'm not mistaken, it

25  was a single property, and then as the years went on,

1    then the number of properties that qualified to be on

2    Problem Property grew, and I have one that I got from

3    a record, February 8, 2013, there was a meeting, and

4    three properties were added at the time.

5           Q    And now, bringing your attention to the

6    City's folder, and specifically Exhibit 9, could you

7    describe what that document is.

8           A    This is the short history of the

9    current -- Mr. Khan's property that they are, indeed,

10   problem properties.  These are the current -- and for

11   each there is a short history of what has been going

12   on in the past.

13          Q    That is a summary created by yourself?

14          A    Yes.

15                  MR. WOLF:  Your Honor, if I could

16   mark that as Exhibit Number 9.

17                  HEARING OFFICER GUROVITSCH:  Yes.

18                  (City's Exhibit Number 9 was marked for

19                  identification by the court reporter.)

20   BY MR. WOLF:

21          Q    Based on your summary, for the record,

22   could you summarize the summary that you have written

23   that is in City's Exhibit 9, as to involvement with

24   those properties that are in Exhibit Number 9?

25          A    To start with, the property at 2501 Golden

1  Valley Road, that was identified as a problem property

2  in July 15, 2004, for excessive police incidents and a

3  housing violation, and the case was worked on in

4  conjunction with Mr. Khan, and finally it was resolved

5  December 21, 2006.

6        The next one, 315 Buchanan, again was

7  identified and referred to us on November 17, 2010,

8  for excessive police incident and a housing violation,

9  and property was monitored on September 9, 2011.  The

10  case was closed due to compliance, so this case was

11  reopened in January 11, 2013, and has been an open

12  case ever since.

13        Mr. Khan, we met with him on

14  September 6, 2012, to express the City's concern and

15  expectation, and at this meeting, Mr. Khan introduced

16  his property manager contact, Alex Eaton, of EIG, who

17  signed a management plan with Mr. Khan on

18  August 29, 2012.

19        All of Mr. Khan's properties was

20  designated as problem properties on

21  September 12, 2012, and September 13, 2012.  At this

22  time, two lead inspectors were assigned to conduct

23  inspection, as Mr. Khan's properties would be batched,

24  to properties ten at a time, forcing them to be

25  closely monitored by the police officer assigned to

1   Problem Properties.

2          Properties in question gradually resolved

3   their problems on November 20, 2012, to February 6th

4   of 2014, which means it took us about two years to

5   resolve the issues.

6          Mr. Khan's case was reopened, and we met

7   with Mr. Khan for the second time on February 8, 2013.

8   At this meeting, inspections resulting in

9   observations, since October 6, 2012, meeting, were

10  reviewed.

11         Police department crime prevention

12  specialist provided observation on the police issues.

13  Mr. Khan responded to inspection and CPS comments,

14  indicated that EIG Property Management contract has

15  been terminated as of November of 2012, due to unmet

16  performance issues.

17         Mr. Khan agreed to work closely with the

18  Fourth Precinct CPS.  Mr. Khan to learn about other

19  land or rental property management best practices.

20         Mr. Khan offered using property at

21  313 26th Avenue North, with fire damage, as a rehab

22  model to demonstrate his commitment to high-quality

23  rehab.  This offer never materialized.  Problem

24  Property inspectors to continue monitoring Mr. Khan's

25  property with the same frequency.

1          Inspectors to accommodate Mr. Khan's

2     request for inspections as soon as repairs are

3     completed.  Mr. Khan to strive to make use of licensed

4     contractors.

5          After inspecting and monitoring all of

6     Mr. Khan's properties since September of 2012, there

7     are three properties currently on Problem Properties:

8     310 Pierce Avenue Northeast, 315 Buchanan Northeast,

9     and 1204 Knox Avenue North.

10         Q    So you started out with a couple of

11    Mr. Khan's properties, but eventually took on, through

12    the Problem Properties Unit, all of Mr. Khan's

13    properties?

14         A    Correct.

15         Q    Now, you indicated that after a period of

16    time a majority of those properties came off, to a

17    point where there was only three properties being

18    under your unit's purview.

19         A    Correct.

20         Q    Could you explain for the Court what you

21    would do during a monitoring, and how a property would

22    come out of the PPU Unit.

23         A    At the time that we sit down with the

24    owner, we explained what are the expectations and what

25    are the problems, and at that time, they indicate that

1    once the compliance is obtained, we're going to

2    monitor the property 6 to 12 months to make sure that

3    there is no housing violation, and there is no call

4    for service -- and by call for service, we don't mean

5    emergencies for medicals and such.

6            If that two criteria is achieved in 6 to

7    12 months, then we remove the property from the list

8    of problem properties.

9        Q    Now, looking at what has been noted as

10   City's Exhibit Number 10, I believe those are the

11   three properties that are presently on the Problem

12   Properties list.

13       A    Uh-huh.

14       Q    Could you review the summary sheets for

15   those properties, and what your concerns are regarding

16   those properties.

17       A    Okay.  The ownership happened 7th of

18   August, 2008, the same day rental license was issued,

19   and there are 28 RFS's, Request for Service, and 17

20   Administrative Citations, 59 Site Visits, and then, if

21   you look at for the Housing Nuisance, you will see

22   there are 7 nuisance, for a total of 67 violations.

23            And then on the right-hand side, the Flag

24   information, you will notice that there is a Letter of

25   Intent to Condemn for lack of maintenance, and then

1    there is a Conduct on Premises that was issued by the

2    police department.

3        Q    Could you explain why those things jump

4    out to you, with regard to the property.

5        A    Due to the fact that this particular

6    problem has been a drag on the neighborhood because of

7    the fact that a lot of issues have been going on with

8    the maintenance of the structures, and then there has

9    been issue about car repairs, too many vehicles on the

10   premises, and then on top of that, Conduct on Premise

11   that the police department issued.

12            So those are the highlight of that

13   property, is that still we are monitoring, because of

14   the concern of the neighborhood.

15       Q    Now, going to the next property at

16   1204 Knox Avenue North.  That is a property currently

17   under PPU; is that correct?

18       A    Correct.  This is property, as you can

19   see, that has been owned since 2009, rental license

20   was issued in 2010.  There's been 22 Requests for

21   Service; Site Visits, 38 times; Administrative

22   Citation, 3, and if my memory serves me correctly, I

23   started the rental licensing, but I was a lead

24   inspector, and still there are 3 or 4 violations, from

25   almost 2 years ago, exist and has not been complied

1    with.

2           This particular property has been great

3    concern for us due to the fact that the garage was

4    rented by Mr. Khan to two mechanics and was not part

5    of the lease of the tenants.

6           Then, the area housing inspectors

7    discovered that -- talked to mechanics and told them

8    that they cannot do car repair in a residential area.

9    Documentation was developed and returned to the

10   Illegal Auto Repair Task Force, and then, at that

11   point, apparently car repairs stopped, and now

12   tenants, they have access to the garage.

13          So for that reason, this particular

14   problem and not complying with the

15   two-or-more-year-old violations alone, but having that

16   car repair issue and things that go along with it, we

17   kept it as a Problem Property, and it's been on the

18   Abate List as well.

19       Q    So there was a separate lease for the

20   garage at that property?

21       A    I have no knowledge whether it was a

22   separate lease or if it was a verbal, but the tenants

23   at the time, they indicated that they have no access

24   to that garage, and it is used by two mechanics --

25   they're using it for car repair, and at one point,

1    those two mechanics installed a privacy fence on the

2    alley side of the property just to make sure that the

3    inoperable vehicles won't be seen from the alley.

4        Q    And have you been out to that property as

5    part of your duties?

6        A    I've been there two years ago, but I had

7    my inspector out there yesterday to see if the

8    violation for the garage and the exterior violation

9    have been abated or not, and they have not.

10       Q    Last property currently in Problem

11   Properties Unit is 315 Buchanan Street.

12            What, if anything, on that property

13   concerns you?

14       A    Well, as you can see, as I mentioned

15   before, Mr. Khan owned it since 1999, there has been

16   100 Requests for Service, and 116 Site Visits, and a

17   total violation of 137, and one COP, conduct on

18   premises by police department, 2 Letters of Intent to

19   Condemn.

20            These are what stand out, and there has

21   been a lot of Calls for Service.  A lot of, again,

22   concerns of the neighborhood, because 310 Pierce and

23   315 Buchanan are in the same neighborhood, and,

24   actually back-to-back, and there is a lot of issues at

25   315 have caused the neighborhood --

1          Q    Now, looking at Exhibit 8, those are

2     properties that are not currently licensed.

3          A    Uh-huh.

4          Q    In your position with the Problem

5     Properties Unit as an inspector, have you had a

6     history with those properties?

7          A    No.  At 2501 Golden Valley Road, there was

8     a Problem Property until May of 2011 when the tornado

9     hit North Minneapolis, property was damaged, and no

10    action was taken on the part of Mr. Khan, and

11    Director's Order to Raze was issued, and eventually it

12    was demolished, I think, early 2014 or late 2015.

13         Q    With regard to 4425 Aldrich?

14         A    4425 Aldrich, that one, again, if my

15    memory served, that one had fire, and Mr. Khan took

16    the initiative and demolished it.

17         Q    2714-4th Street North.

18         A    This is the one that the rental license

19    has been revoked and part of the whole case.

20         Q    So it has been vacant since the rental

21    license revocation --

22         A    Yes.

23         Q    -- was finalized.

24         A    Because he doesn't have a rental license.

25         Q    Prior to the rental license being revoked,

1    was this property in PPU as part of the main --

2          A    Uh-huh, right.

3          Q    -- the whole group?

4               Is there anything in the property summary

5    that stands out to you?

6          A    Well, Request for Service 23 times,

7    5 Administrative Citation, 41 Site Visits, total of 73

8    violations.  Then, if you look at the right-hand

9    column, we would see for the single-family home, we

10   have 2 Boardings, then we have it's been vacant for a

11   while, and then they signed the registration agreement

12   that was never completed, and then you have the Letter

13   of Intent to Condemn, and then, of course, revocation,

14   and it's been on the Abate List.

15         Q    And 2639 Oliver Avenue North, did you

16   have, as part of your duties, to deal with that

17   property?

18         A    Yes.  This one, again, had the tornado

19   damage in May of 2011, and Director's Order to

20   Demolish was issued and given through the whole series

21   of due process, and eventually was demolished by the

22   City.

23         Q    And 3420 Chicago Avenue North --

24              MR. ROONEY:  South.

25              MR. WOLF:  South, sorry.

1   BY MR. WOLF:

2        Q    Are you familiar with that property?

3        A    Yes, I am.  This is the four-unit building

4   that lost its rights and now is being converted to a

5   duplex, and has been going through the code

6   compliance, and the code compliance is taking his last

7   steps and should be approved shortly.

8        Q    And the property at 1512 West Broadway,

9   are you familiar with that property?

10       A    That property, as long as I remember, has

11  been a vacant lot, so I have no experience with that

12  particular lot.

13       Q    And 1900-26th Avenue North.

14       A    It has no rental license history on this

15  one.

16       Q    And 1800 LaSalle Avenue, Unit Number 202?

17       A    That's a condo and hasn't been inspected

18  and I have no record.

19       Q    Now, as part -- other than the three

20  properties that are active under PPU, did you have a

21  chance to review the property summaries that are

22  listed that have current rental licenses under City's

23  Exhibit Number 7?

24       A    Uh-huh.

25       Q    At one point, all of those properties

1    would have been in PPU; is that correct?

2          A    At one time or the other, yes.

3          Q    And prior to today's hearing, did you have

4    an opportunity to review the numbers or the documents

5    in Exhibit Number 7?

6          A    I have.

7          Q    And rather than going through property by

8    property, as part of your duties as a PPU officer,

9    having had those properties in there and having

10   reviewed that, what does the documentation in

11   Exhibit 7 and Exhibit 10 -- what does that information

12   tell you as a supervisor in PPU and inspector for over

13   ten years?

14                    MR. ROONEY:  Object, Your Honor.

15   This is repetitive from what the previous witness

16   testified to.

17                    HEARING OFFICER GUROVITSCH:  It is

18   not repetitive as to this witness.  I will allow it.

19                    MR. ROONEY:  All right.

20                    THE WITNESS:  My experience has been

21   the fact that when you look at the number of visits

22   and you look at the number of RFS's, you cannot go by

23   that average because of the fact that one property may

24   not have been inspected for two, three years.

25                    Now, at one time you go there and you find

1    quite a few violations, and then those violations,

2    nine out of ten, my experience has been, that they

3    don't get results in the first three inspections.  It

4    takes numerous visits, and at times -- at the time of

5    inspections, while the inspector is there to do his

6    job, you will see the handyman is painting or fixing

7    something, which is interfering with the inspection

8    process.

9              For that reason, numerous visits have been

10   made more than ordinary, and we deal with

11   Tier 3 properties, and we are familiar with the type

12   violations, and Mr. Khan's property is exceptional of

13   having too many visits and too many lack of

14   maintenance, so that's been my experience.

15        Q    Now, you brought up that the Tier 3, and

16   those properties would fall under your purview; is

17   that correct?

18        A    That -- some of it, yes, because we take

19   the overflow from Housing Inspections, yes.

20        Q    Do you recall -- I know Mr. Tran wasn't

21   sure exactly -- when the Tiered system went in?

22        A    The Tiered system is in place, as Mr. Tran

23   mentioned, about six to seven years.  It's been in

24   place for that many years and the billing that was

25   mentioned went into effect as of this year.

1        Q    Okay.

2                  HEARING OFFICER GUROVITSCH:  I am

3    sorry.  I did not get that.

4                  THE WITNESS:  The Tier Program has

5    been in place for the last six or seven years.

6                  HEARING OFFICER GUROVITSCH:  Yes, I

7    understand that.

8                  THE WITNESS:  Mr. Rooney mentioned

9    that different tiered -- the rental fee is different.

10   I said that new fee has been effective as of this

11   year.

12                  HEARING OFFICER GUROVITSCH:  You are

13   talking about the fees for the rental licenses?

14                  THE WITNESS:  Rental licenses.

15                  HEARING OFFICER GUROVITSCH:  Okay.

16   I have got it now.

17   BY MR. WOLF:

18        Q    So when Mr. Rooney questioned Inspector

19   Tran about regarding if you are in Tier 3 that you pay

20   a higher fee then if you are in Tier 1.

21        A    Uh-huh.

22        Q    That difference in rental license fee went

23   up this year in 2015?

24        A    Uh-huh, yes.

25        Q    When you just stated that your experience

```
1    is that a lot of times when you go for a reinspection

2    Mr. Khan had somebody working on the properties.

3                    Have you been inside Mr. Khan's

4    properties?

5              A    Yes.

6              Q    As an inspector and as a supervisor?

7              A    As a supervisor, no, but as an inspector,

8    yes.

9                    MR. WOLF:  I have nothing further at

10   this time, Your Honor.

11                   HEARING OFFICER GUROVITSCH:  Your

12   witness.

13                   MR. ROONEY:  Thank you, sir.

14

15                   CROSS-EXAMINATION

16   BY MR. ROONEY:

17             Q    Good afternoon, Mr. --

18             A    Azmoudeh.

19             Q    Thank you.  If I get it right the first

20   time, I will lock it in.  I'm Edward Rooney, I'm

21   Mr. Khan's attorney.

22                   Your last bit of testimony from Mr. Wolf

23   was that you have been inside Mr. Khan's properties as

24   an inspector, but not as a supervisor.

25             A    Correct.
```

1      Q    Okay.  And how long have you been at least

2  a supervisor?

3      A    I've been supervisor for year and a half.

4      Q    Okay.  So the last year and a half you

5  have not been inside any of Mr. Khan's properties?

6      A    No.

7      Q    As far as you know, am I correct in

8  thinking that the Problem Properties Unit was created

9  in 2004?

10     A    Exactly.

11     Q    So the provision of the Housing Code that

12 talks about revoking all licenses if there have been

13 revocations of two properties, that is older than the

14 existence of the Problem Properties Unit?

15     A    Correct.

16     Q    So the existence and operation of the

17 Problem Properties Unit is a means by which Housing

18 Inspections can monitor properties of landlords who

19 appear to have difficulty; is that correct?

20     A    Correct.

21     Q    And that is a means that did not exist in

22 the code provision calling for a revocation or

23 ineligibility for licenses if you have had two

24 revocations?

25     A    It did exist in a different term and name,

1    they used to be Citywide Inspections.  They did the

2    same thing before that -- it was before my time -- it

3    was called another thing.

4         Q    But you do not have any firsthand

5    knowledge about what went on before your time.

6         A    Before my time -- before 2001, I don't.

7         Q    Okay.  When you first began your

8    testimony, and I think you were describing the nature

9    of the Problem Properties Unit, it appeared to me that

10   you were reading from a document.

11        A    Yes.

12        Q    What was that?  Was that something you

13   created or is it a --

14        A    No, it's part of the mission of the

15   Problem Properties.

16        Q    Oh, okay.  Is that available on a website,

17   as far as you know?

18        A    You can access it on the website, yes.

19        Q    Website of --

20        A    Problem Properties through Regulatory

21   Services.

22        Q    So it is a mission statement?

23        A    It is the goal of Problem Properties.

24                   HEARING OFFICER GUROVITSCH:  If you

25   need that document for cross-examination, you can have

1    a copy made.

2                    MR. ROONEY:  No.  Thank you very

3    much.  I do not need it.  Well, we will see whether I

4    get finished.  I can always do it overnight.  Thank

5    you, though.

6                    HEARING OFFICER GUROVITSCH:  All

7    right.

8    BY MR. ROONEY:

9         Q    When you were an inspector or since you

10   have been a supervisor in the Problem Properties Unit,

11   do vacant residences pose an undesirable condition in

12   a neighborhood?

13        A    Yes.

14        Q    Okay.  And it is better to have residences

15   occupied than vacant for extended periods of time?

16        A    It depends on the occupants.

17        Q    Sure.  But you agree that if all of

18   Mr. Khan's licenses were to be revoked, that would

19   raise the prospect of 40-plus vacant buildings in

20   residential neighborhoods in Minneapolis?

21        A    Well, then it would fall under Chapter 249

22   of the City ordinance.  That would be the ultimate

23   difference, so whether it has an adverse effect or

24   not, I cannot tell at this time.

25        Q    He cannot rent to tenants if his license

1    to rent has been revoked; isn't that true?

2         A    That's true.

3         Q    So those tenants who have to vacate,

4    correct?

5         A    Yes.

6         Q    Those tenants would have to find new

7    housing?

8         A    Correct.

9         Q    Do you agree that it is a very tight

10   market for low-income housing in Minneapolis these

11   days?

12        A    Correct.

13        Q    And it is particularly tight for tenants

14   who have had difficult rental histories, things like

15   prior history of unlawful detainers --

16             MR. WOLF:  Your Honor, I object to

17   relevancy and speculation.

18             HEARING OFFICER GUROVITSCH:  Well,

19   if this is within the knowledge of the witness, he can

20   answer.

21   BY MR. ROONEY:

22        Q    Do you agree?

23        A    Well, I have an explanation, rather than

24   agree with what you stated.  Sometimes the bad tenants

25   or bad occupants, they are more headache than the

```
1    vacant building.  Vacant building I can drive by and
2    see it is not open to trespass and well-maintained and
3    that is the end of it, as opposed to a tenant that is
4    a headache for the owner and is a headache for the
5    neighborhood, and drains a lot of resources from the
6    City.
7         Q    Okay.  But how about a tenant who is not a
8    headache for the owner, who the owner took a chance
9    on, and has turned out to be a good tenant.  That
10   tenant, if that tenant has in his or her past a
11   criminal record --
12                  MR. WOLF:  Your Honor, that is going
13   a little too far.
14                  MR. ROONEY:  He got to give a
15   speech.
16                  HEARING OFFICER GUROVITSCH:  He
17   answered your question.
18                  MR. ROONEY:  No, he did not.
19                  HEARING OFFICER GUROVITSCH:  I don't
20   believe there was a speech involved.
21   BY MR. ROONEY:
22        Q    Okay.  Let's look at your summary to
23   Problem Properties Unit, Exhibit 9.  Number 1 on your
24   outline, Property 2501 Golden Valley Road.
25                  It was put on the Problem Properties Unit
```

1    on July 15, 2004, for excessive police incidents and

2    housing violation.  Mr. Khan complied, did he not,

3    with what was needed, and the property was taken off

4    the Problem Properties Unit in December of 2006; is

5    that right?

6         A    Correct.

7         Q    One of things Mr. Khan did was hire, at

8    his own expense, a security guard for the building and

9    the area around the building.

10             Are you aware of that?

11        A    Correct.

12        Q    Okay.  And he did what was necessary to

13   take that building off the Problem Properties Unit.

14        A    Correct.

15        Q    And it continued to provide low-income

16   rental housing for people until it was demolished by

17   the tornado in --

18             MR. WOLF:  Your Honor, I would

19   object.  He is testifying, not necessarily asking a

20   question.

21             HEARING OFFICER GUROVITSCH:   I

22   believe they are in the nature of questions, and it is

23   proper cross-examination if he is asking a witness to

24   affirm the statements that the questioner is asking.

25             MR. ROONEY:  Thank you.

BY MR. ROONEY:

         Q    Can you answer that question, sir, or
would you like me to restate?

         A    Restate it, please.

         Q    Sure.  Mr. Khan's building at 2501 Golden
Valley Road was taken off the Problem Properties Unit
on December 21, 2006 -- and I know it might have gone
on later than the other ones -- but in any event, it
remained available, then, from December of 2006 to
May of 2011, when it was so badly damaged by the
tornado.

              It was providing rental housing for
low-income people.  Wouldn't you agree?

                        HEARING OFFICER GUROVITSCH:  That is
a yes-or-no -- if you know -- answer.

                        THE WITNESS:  Yes.

BY MR. ROONEY:

         Q    Number 2 on your outline is the property
at 315 Buchanan Street, that is the one that is a
nine-unit property.

         A    Correct.

         Q    Okay.  And is that the one where Mr. Khan
has a management agreement with the Minneapolis Police
Department?

         A    I'm not aware of this management.

```
 1          Q    So you do not about Mr. Khan's compliance

 2    with any agreement he has got with the Minneapolis

 3    Police Department to see that that building remains

 4    crime-free?

 5          A    Do you mean the management plan with

 6    Luther Krueger?

 7          Q    Yes, that is what I meant to say.  Yes.

 8          A    Yes.

 9          Q    And that has not been revoked, he has been

10    following it?

11          A    Yes.  Once they submit the plan and if the

12    police department approves it at this stage, yes.

13          Q    Okay.

14               MR. ROONEY:  Your Honor, I don't

15    want to make Mr. Wolf's son late for football

16    practice.  I can ask a couple more questions.

17    BY MR. ROONEY:

18          Q    I wanted to ask you about this "properties

19    crime-free."  I am looking at Section 944.2020 of the

20    Housing Code, the one that talks about criminal

21    behavior on the property, where -- okay.

22               Here we go.  944.2020 appears to me to

23    provide that if gambling, prostitution or acts of

24    prostitution, unlawful sale, possession of controlled

25    substances, unlawful sale of alcoholic beverages,
```

1    noisy assemblies, unlawful possession, transportation,

2    sale or use of a weapon, or disorderly conduct occurs

3    on a licensed premises, the licensee needs to

4    cooperate and take appropriate action with the

5    assistance of a crime prevention specialists.

6            Am I reading that according to your

7    understanding of it as well?

8        A    I defer that to the police department.

9        Q    Okay.  Would you agree that it appears

10   that the licensee, where there is criminal behavior by

11   tenants on the premises, is treated more leniently

12   than Mr. Khan is being treated here, where he is

13   subject to blanket revocation of all of his licenses

14   for one instance of overoccupancy, and one instance of

15   failure to pick up trash in the backyard?

16       A    I don't think so.

17            MR. ROONEY:  Okay.  Now, I better

18   not make Mr. Wolf's son late for football practice.

19            HEARING OFFICER GUROVITSCH:  All

20   right.  I am not sure I understood the question that

21   Mr. Rooney asked.  Would you read that back.

22            (At this time the court reporter read

23            back the question and answer.)

24            HEARING OFFICER GUROVITSCH:  All

25   right.  Thank you.  We are adjourned until tomorrow at

```
 1    9:00 a.m.

 2                    MR. ROONEY:   Thank you, sir.

 3               (At this time the hearing was adjourned

 4               at 3:45 p.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    STATE OF MINNESOTA)
                      ) SS.
2    COUNTY OF ANOKA   )

3

4                  REPORTER'S CERTIFICATE

5

6

7         I, Kelly L. Brede, do hereby certify that the

8    above foregoing transcript, consisting of the

9    preceding 207 pages is a correct transcript of my

10   stenographic notes, and is a full, true, and complete

11   transcript of the proceedings to the best of my

12   ability.

13

14        Dated and signed the 20th day of August, 2015.

15

16

17                        _____

                          Kelly L. Brede
18                        Court Reporter

19

20

21

22

23

24

25
```

1          CITY OF MINNEAPOLIS

2       DEPARTMENT OF REGULATORY SERVICES

3    _____

4    In Re:
     The Residential Rental Licenses
5    of Mahmood Khan, Licensee
     _____

6

7

8

9

10                  VOLUME II

11

12

13

14         The above-entitled matter came on for hearing

15    before James D. Gurovitsch, Administrative Hearing

16    Officer, taken before Kelly L. Brede, Court Reporter,

17    a Notary Public in and for the County of Anoka, State

18    of Minnesota, taken on the 13th day of August, 2015,

19    at 350 South Fifth Street, Minnesota, commencing at

20    approximately 9:00 a.m.

21

22

23

24

25

```
1                    A P P E A R A N C E S

2    ADMINISTRATIVE HEARING OFFICER:

3              JAMES D. GUROVITSCH, ATTORNEY AT LAW
               Concorde Executive Center
4              6160 Summit Drive North
               Suite 425
5              Brooklyn Center, Minnesota 55430

6    ON BEHALF OF THE LICENSEE:

7              EDWARD F. ROONEY, ATTORNEY AT LAW
               100 North Sixth Street
8              Suite 550A
               Minneapolis, Minnesota 55403
9
               ronneylaw@visi.com
10
     ON BEHALF OF THE CITY:
11
               LEE C. WOLF, ATTORNEY AT LAW
12             ASSISTANT CITY ATTORNEY I
               350 South Fifth Street
13             Room 210
               Minneapolis, Minnesota 55415
14
               lee.wolf@ci.minneapolis.mn.us
15

16

17          *The Original is in the possession of

18             Attorney James D. Gurovitsch.*

19

20                         *   *   *

21

22

23

24

25
```

```
1                      I N D E X

2

3   WITNESS                                  PAGE

4   FARROKH AZMOUDEH

5   Cross-Examination (cont.) by Mr. Rooney    213
    Redirect Examination by Mr. Wolf  .......   251
6   Recross-Examination by Mr. Rooney  ......   260
    Further Redirect Examination by Mr. Wolf   268
7   Further Recross-Examination by Mr. Rooney  269

8   DONNA GRAHAM

9   Direct Examination by Mr. Rooney  .......   272
    Cross-Examination by Mr. Wolf  .........    293
10  Questions by Hearing Officer Gurovitsch    295
    Redirect Examination by Mr. Rooney  .....   298
11
    MAHMOOD KHAN
12
    Direct Examination by Mr. Rooney  ........  300
13  Questions by Hearing Officer Gurovitsch    402
    Cross-Examination by Mr. Wolf  ..........   408
14  Questions by Hearing Officer Gurovitsch    436

15  JODY WAULTERS

16  Direct Examination by Mr. Rooney  ........  443
    Cross-Examination by Mr. Wolf  ..........   445
17  Redirect Examination by Mr. Rooney  ......  448

18  WAYNE MURPHY

19  Direct Examination by Mr. Rooney  ........  449

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2    NUMBER       DESCRIPTION      MARKED     OFFERED     RECEIVED

 3    Khan's 9     Order              Pre        319         320

 4    Khan's 10    Photographs        Pre        324         324

 5    Khan's 11    Photographs        Pre        326         326

 6    Khan's 36    Photographs        361        365         365

 7    Khan's 37    Photographs        383        384         384

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    MR. ROONEY:  Mr. Gurovitsch, we are
 3    not ready to proceed.  I got a call from my client
 4    yesterday; he got called away unavoidably.  He will be
 5    here at 9:30 this morning, he said.
 6                    I am hoping that, perhaps, we can take
 7    care of some of those housekeeping things that we
 8    talked about in terms of what we want in the record,
 9    because I would rather not proceed, in my client's
10    absence, with testimony.
11                    He is here, so it is a moot issue.  May I
12    have a moment to get set up, sir?
13                    HEARING OFFICER GUROVITSCH:  Go
14    ahead.
15                    All right.  And where we left off, I
16    believe the City was conducting the direct examination
17    of Mr. Azmoudeh.
18                    MR. ROONEY:  I believe I had started
19    my cross-examination.
20                    MR. WOLF:  Yes.
21                    HEARING OFFICER GUROVITSCH:  Okay.
22    Thank you for correcting me.  You are still under
23    oath, and Mr. Rooney, you may proceed.
24                    MR. ROONEY:  Thank you.
25
```

```
 1                    CROSS-EXAMINATION

 2                       (continued)

 3   BY MR. ROONEY:

 4        Q    Mr. Azmoudeh, did I say that correctly?

 5        A    Right.

 6        Q    Do you agree that for rental housing

 7   purposes, a dwelling has to provide a safe, habitable

 8   housing to be licensed?

 9        A    Correct.

10        Q    And if it were not safe and habitable, the

11   City would not license someone to rent it to people?

12        A    Correct.

13        Q    All right.  Now, as of right now, all of

14   the units that Mr. Khan currently has licensed to him

15   are providing safe, habitable housing under the City's

16   code.

17             Would you agree with that?

18        A    Correct.

19        Q    Okay.  And Mr. Khan has not had a license

20   for any of his rental properties revoked since that

21   incident in 2013 about failing to pick up trash.

22             Do you agree with that?

23        A    I think Mr. Khan has lost two rental

24   licenses at 2714 Bryant [sic] and 2223 [sic] --

25        Q    I think it is 2714-4th Street, and
```

1    3223 Bryant.

2         A    Right, those two, and if you allow me for

3    a second to look at my file, then I can --

4         Q    Sure.

5         A    Give you a more precise answer.

6              Mr. Khan had -- since he owned these

7    properties, he had 13 different Revocation Actions.

8         Q    But only two revocations.

9         A    Exactly, but those other 11, they reached

10   to a level that Revocation Action has started.

11        Q    But not completed --

12        A    Not completed, you're correct.

13        Q    -- with the revocation.

14             And during those Revocation Actions, for

15   example, his tenants were allowed to remain living in

16   the houses, correct?

17        A    Correct.

18        Q    So in the years that he has been licensed

19   by the City of Minneapolis, and all the low-income

20   properties he has rented to tenants, he has only had

21   two revoked; is that correct?

22        A    Correct.

23        Q    And the revocation in 2010 was not because

24   of the condition of the property, it was because of

25   the tenants' use of property, and specifically a

1    tenant -- or not a tenant -- someone sleeping in the

2    basement; is that correct?

3           A    Correct.

4           Q    Okay.  And the revocation for

5    2714 North 4th Street, it had to do with failing to

6    pick up trash in a timely fashion; is that correct?

7           A    Correct.

8           Q    And the last incident of Mr. Khan being

9    cited for failing to pick up trash in a timely fashion

10   at that address was in April of 2013.

11              I am just putting that to you, but it is

12   in the record.

13          A    Okay.

14          Q    Okay.  And since then, Mr. Khan has been

15   filling his license properties with tenants in

16   compliance with the housing code?

17          A    I'd have to refer back to the file, and I

18   don't have any recollection of what has happened since

19   last April, so I don't have the documentation in front

20   of me to tell you if Mr. Khan has any code violations

21   since then or not.

22          Q    Okay.  So you certainly cannot testify

23   that he does.

24          A    No.

25          Q    Okay.  Now, when a person is assessing how

1    much care a landlord has taken to maintain and improve

2    his license properties, do you think it is worthwhile

3    to look at the building permits that the landlord has

4    taking out for work on the properties?

5              A    Correct.

6              Q    And do you agree the City has not produced

7    any records of building permits for Mr. Khan's license

8    properties?

9              A    No.  We don't have it, but if I may expand

10   on it?

11             Q    No.  Mr. Wolf may ask you to expand, I

12   just want you to agree that we do not have, in the

13   record, any building permits.

14             A    Okay.

15                  THE WITNESS:  Then, Mr. Wolf, I want

16   you to make a note to ask me about the permits.

17   BY MR. ROONEY:

18             Q    And do you agree that the Minneapolis

19   Rental Licensing Ordinance does not state that in

20   order to remain eligible for licensing, a licensee may

21   have no more than any specified number of Requests for

22   Service to the property.

23                  There is no limit, as a condition of

24   licensing, on Requests for Service to a licensed

25   property, is there?

1          A    The number of Request for Service, no,

2    there is not.

3          Q    Okay.  And would you likewise agree that

4    to remain eligible for licensing, the licensee does

5    not have any upper-specified limit on Administrative

6    Citations that can be issued to a property?

7          A    They don't.

8          Q    Okay.  And likewise, you would agree that

9    th City's Rental Housing Ordinance does not state that

10   in order to remain eligible for licensing, the

11   licensee may have no more than any specified number of

12   Site Visits to the property.

13              That does not specify that, does it?

14         A    No, it doesn't.

15         Q    Okay.  Now, part of the proceeding here

16   has to do with the City's wish to revoke all of

17   Mr. Khan's licenses because of, historically, the two

18   revocations.

19              Is your understanding that that is a

20   mandatory duty on the part of the City, that it must

21   revoke all licenses?  Or that it is a discretionary

22   privilege that the City can revoke all licenses, if it

23   wishes to?

24         A    I can't speak on behalf of City Council,

25   it is their decision to deny, revoke, or cancel their

1    rental license.  That's their discretion and their

2    decision.

3         Q    And their decision is also to do nothing,

4    if they wish?

5         A    That's their decision.

6         Q    Okay.  But do you agree that that is an

7    option that is available to them?

8         A    That's what it states in the ordinance.

9         Q    Yes.  Now, are any of the -- what the

10   Minneapolis Public Housing Authority refers to as its

11   scattered-site rental units -- are any of them under

12   the supervision of the Problem Properties Unit at this

13   time?

14        A    No.

15        Q    Are you aware if any of them ever have

16   been?

17        A    No.

18        Q    Do you know whether City Housing

19   Inspections even inspects any of the scattered-site

20   properties?

21        A    No.

22        Q    No, you don't know, or, no, you don't

23   inspect?

24        A    I don't think they inspect them.

25        Q    Do you know whether the City even subjects

1    these scattered-site properties from the Minneapolis

2    Public Housing Authority to rental licensing?

3          A    No.

4          Q    No, you don't know, or, no, they don't?

5          A    I don't think they license the public

6    housing.

7          Q    Okay.  I am curious, as far as you know,

8    does the City Rental Housing Code place any upper

9    limit on the number of individuals who can live in a

10   licensed rental unit?

11         A    Yes.  We have the occupancy code that

12   tells you how many people can stay at the property,

13   and it depends --

14         Q    Do you know what it is for a single

15   family?

16               HEARING OFFICER GUROVITSCH:  Let him

17   finish his answer.

18               MR. ROONEY:  I am sorry.

19               THE WITNESS:  For a single family,

20   it depends on the square footage of the property, but

21   if they are a family, we are not that restrictive

22   about the numbers, unless that the number is so high,

23   that in a one-bedroom house, there are ten people

24   living there.

25

1    BY MR. ROONEY:

2         Q    Sure.  Is it fair to say it is somewhat a

3    rule of reason, if it is family, you look and see if

4    the house could handle it?

5         A    Right.  And then the overoccupancy is the

6    rule and governed by the Zoning Ordinance.  It depends

7    on the zoning district of the property.  Each one has

8    different limitations on how many people can live at

9    the property.

10        Q    Are you aware of any zoning restriction

11   that prohibits more than six family members from

12   living in a three-bedroom house?

13        A    I don't.

14        Q    I would like you to turn, if you would, to

15   your three-page summary, I think it is Exhibit 10 from

16   the City's exhibits.  I may have that number wrong, if

17   I do, I apologize.

18        A    That's all right.  Yep, right here.

19             MR. WOLF:  I believe it is 9.

20             MR. ROONEY:  I'm sorry.  Exhibit 9.

21   BY MR. ROONEY:

22        Q    I think we covered the property

23   2501 Golden Valley Road because I believe that when we

24   finished yesterday, you were acknowledging it was

25   taken off the Problem Properties Unit after

1    December of 2006?

2            A     Uh-huh.

3            Q     Okay.   Number 2 is the property at

4    315 Buchanan Street Northeast.

5            A     Right.

6            Q     And that went on, it appears, in

7    November 17, 2010, having to do with police calls and

8    housing violations?

9            A     Correct.

10           Q     And there was compliance, so it was

11   closed, initially, in September of 2011; is that

12   correct?

13           A     Correct.

14           Q     But then it was reopened again 15 months

15   later, or so, in January 2013, and remains open; is

16   that correct?

17           A     Correct.

18           Q     Now, did you sit in on any of the meetings

19   that Mr. Khan had with various city officials,

20   including people from the Minneapolis Police

21   Department, in which the city officials asked Mr. Khan

22   to evict a mentally disabled woman who was living in

23   the building?

24           A     I've been in meetings with Mr. Khan

25   numerous times, and I've been in meetings that a

1    police department officer has been present, but I

2    don't recall, not once, that anybody has asked

3    Mr. Khan to evict anybody.

4              Q    Okay.

5              A    I don't recall, and if the police

6    department have done it on their own, I am not aware.

7              Q    Okay.  So going down to Number 3 on your

8    Exhibit 9 --

9              A    Uh-huh.

10             Q    All of Mr. Khan's property were designated

11   as Problem Properties on September 12, 2012, and the

12   next day, it appears, two lead inspectors were to be

13   assigned to conduct inspections on all of Mr. Khan's

14   properties, and police incidents were to be closely

15   monitored.

16             That is a correct summary?

17             A    Correct.

18             Q    And then Number 4 on Exhibit 9 indicates

19   that the properties in question were gradually

20   resolved, it says from 11/20/2012 to 2/6/2014.  That

21   means variety properties went off the Problem

22   Properties Unit at different times within that time

23   period?

24             A    Correct.

25             Q    I am trying to figure out -- the three

1    properties that are currently on the Problem

2    Properties Unit, did they remain on or did they go

3    off, as well?

4        A    Well, as you mentioned in Number 2, that

5    the 315 Buchanan Street Northeast, it went on, and

6    after almost a year, that was our protocol and our

7    standard operating procedure.  After a year we

8    analyzed it and looked at it, we took it off and then

9    the whole thing flared up, we put it back on in 2013.

10       Q    Oh, I am sorry.  You are right.

11   January 11, 2013, 315 Buchanan went on?

12       A    Right.

13       Q    And it has been on continuously since

14   then?

15       A    Right.  And then when we took all

16   Mr. Khan's properties in 2012, that most of them, with

17   the exception of three, they've all been in

18   compliance, and we have reviewed them, and we have

19   taken them off the Problem Properties List, but these

20   three properties, they have to stay because of

21   different reasons.

22       Q    Sure.  So the three properties on the

23   Problem Properties List now have all been on there

24   since January of 2013?

25       A    They must have, yes.

1          Q    Okay.  Now, I asked you about the City

2     Housing Code Request for Service, Administrative

3     Citations, and Site Visits, there is nothing in City

4     Housing Code that makes a property ineligible for

5     licensing because it is on the Problem Properties

6     List, is there?

7          A    No.

8          Q    In fact, part of the purpose of the

9     Problem Properties Unit is to gain compliance so the

10    property can remain eligible for licensing?

11         A    Correct.

12         Q    Now, on Number 5, you indicate -- it is

13    the bullet point second to the bottom on the first

14    page of Exhibit 9 -- Mr. Khan offered using property

15    at 313-26th Avenue North, with fire damage, as rehab

16    model to demonstrate his commitment to high-quality

17    rehabs.

18              You say this offer never materialized.

19    Are you saying that he never did any rehabilitation?

20         A    No, that is not what I meant.  What I

21    meant was at the meeting that we had with Mr. Khan,

22    and we were discussing the quality of work, and

23    Mr. Khan volunteered and indicated that while I am

24    rehabbing these particular addresses, I'm going to

25    have inspectors starting to be monitoring, so he would

 1    be observing the quality of work that I'm going to

 2    present.

 3            That never happened, but as far as

 4    compliance, yes, Mr. Khan complied with our violations

 5    and property was brought back to code.

 6        Q    Now, if Mr. Khan pulled building code

 7    permits for rehab of that address, one of the

 8    procedures of getting a building permit is that the

 9    work that you got the permit for is then inspected --

10        A    Correct.

11        Q    -- when the work completed.

12        A    Correct.

13        Q    And it is either passed or does not pass

14    inspections?

15        A    Right.  They have to pass inspections.

16        Q    And you agree that there is nothing in

17    City's exhibits put in evidence with respect to

18    building code applications or inspection for the

19    property at 313-26th Avenue North?

20        A    Right.

21        Q    I want to go over a little bit of what you

22    testified concerning some of the properties that we

23    have profiles for in the City's exhibits, and

24    specifically, I think, it was with reference to the

25    profile that is in Exhibit 8 for the property at

1    2501 Golden Valley Road, and I believe your

2    testimony -- well, take your time to get that, if you

3    wish, I believe your testimony yesterday was as to

4    that address, after the tornado damage in May of 2011,

5    no action was taken on the part of Mr. Khan.

6              Do you recall saying that yesterday?

7         A    Yes.

8         Q    Now, you really -- that is wrong, isn't

9    it?  In fact, Mr. Khan beseeched the City Council to

10   rehabilitate that building and show City Council the

11   commitments of financing sources for the building and

12   showed the cooperation of his bank in his efforts to

13   restore that building.

14             Isn't that the case?

15        A    When I said no action, I meant by

16   maintaining the property.  Of course Mr. Khan has

17   taken a lot of steps, somehow, to bring the building

18   back up to code or repair it or sell it.  He's done a

19   lot, I think, to 2501, two, three years before it got

20   demolished.

21             What I was referring to was the fact that

22   that property was not maintained, and that was the

23   result of deterioration of the building.

24        Q    Well, I will get back to that --

25        A    Sure.

1          Q     -- but I thought I heard you say that
2     after the property was so badly damaged in the tornado
3     of May 2011, it was rendered uninhabitable.  I thought
4     I heard you say that Mr. Khan -- no action on his part
5     was taken with respect to that property.
6          A     By action, I meant maintaining the
7     property.
8          Q     Well, if it is storm damage so that it
9     cannot be occupied, don't you first have it fix it
10    before you can maintain it?
11         A     Well, even damaged properties you have to
12    maintain, which means that you have to close out the
13    openings to save it from the elements.  You have to
14    cut the grass, you have to pick up the rubbish --
15         Q     You are aware -- I am sorry.  Go ahead.
16         A     -- and for that reason, that property was
17    broken into many, many times, and a lot of damage was
18    done to the property, and the City had to spend a lot
19    of time and resources just to maintain the security of
20    the building.
21         Q     You are aware that Mr. Khan put a new roof
22    on that building?
23         A     Correct, I am aware of that.
24         Q     And the purpose of putting the new roof
25    was so he could then proceed with the remainder of the

1    repairs.

2         A    Exactly, but meanwhile, he left all the

3    windows open on the second floor, and they were open

4    to the elements, or some of the windows were stolen or

5    removed, so a lot of damage was done to the building

6    due to the fact that it was not maintained.

7         Q    So the City is not satisfied with his

8    efforts, with respect to that property, after the

9    tornado, but it is not fair to say that he took no

10   action, with respect to that property, is it?

11        A    Action in regard to maintaining it, no.

12        Q    Now, with respect to 4425 Aldrich -- just

13   before I go on from 2501 Golden Valley Road, at the

14   time of the storm, that was an 11-unit building that

15   provided licensed rental housing in each of those

16   11 units.

17             It was licensed to do it; is that correct?

18        A    Uh-huh.

19        Q    Okay.  So it was occupied with tenants and

20   was licensed to be occupied with tenants?

21        A    Correct.

22        Q    Okay.  4425 Aldrich is also another

23   property that is profiled in Exhibit 8.  I think you

24   said, with respect to that one, there was a fire, and

25   Mr. Khan took the initiative of having the structure

1    demolished?

2         A    That's my understanding.

3         Q    That is what you hope and expect a

4    responsible landlord to do, wouldn't you -- or

5    respectable property owner?

6         A    I had no negative intent on that response.

7         Q    Okay.

8         A    I think, if I'm not mistaken, I said

9    Mr. Khan took the initiative to demolish it.

10        Q    You did, and I am grateful for your

11   acknowledging it.  So you have nothing negative to say

12   about what went on at 4425?

13        A    Absolutely not.

14        Q    2713 North Fourth Street, I believe you

15   said there was a Restoration Agreement that was never

16   completed.

17        A    Correct.

18        Q    What did you mean by that?

19        A    A Restoration Agreement, it's a contract

20   between the owner and the City of Minneapolis that

21   there is a timeline of six months that the owner

22   agrees to complete that Restoration Agreement, and if

23   it is not completed, that Restoration Agreement is to

24   waive the vacant building registration, and if they

25   are not in compliance with the registration agreement,

1    then that registration agreement is canceled and the

2    fees put back on and assessed against the property.

3         Q    Okay.  So you are not saying that the

4    restorations that Mr. Khan represented would take

5    place never happened; you are simply saying they did

6    not happen within the timeframe required by the

7    Restoration Agreement?

8         A    Exactly.

9         Q    Now, there was a property at 2639 Oliver

10   Avenue North that had tornado damage, and I think what

11   I remember you saying about that from yesterday was

12   that after his due process hearings were held, that

13   property was eventually ordered condemned and ordered

14   demolished?

15        A    Correct.

16        Q    And Mr. Khan complied with those orders?

17        A    For demolishing?

18        Q    Yes.

19        A    Yes.

20        Q    And there was certainly nothing wrong in

21   his asserting his rights to oppose the effort to

22   condemn and try to assert that he could fix this

23   building?

24        A    Right.

25        Q    Okay.  So there is no misconduct that

1    could be attributed to Mr. Khan with respect to

2    2639 Oliver Avenue North?

3         A    Correct.

4         Q    Now, what can you tell me about the

5    situation at 3420 Chicago Avenue?

6              Is that a building that was ever subject

7    to Condemnation Order, as far as you know?

8         A    Yes.  It was condemned, and because of the

9    condemnation, Mr. Khan has followed the code

10   compliance, and he's in the process of finishing the

11   code compliance.

12        Q    Okay.  So condemned does not mean it must

13   be demolished, it means it is not habitable and cannot

14   be used for rental purposes?

15        A    Correct.

16        Q    There is no effort that Mr. -- there is no

17   suggestion that Mr. Khan tried to use the property for

18   rental purposes during the periods --

19        A    Correct.

20        Q    And, in fact, your understanding is that

21   he has, or is very close to, completing the

22   refurbishing of that property that will bring it back

23   into a habitable condition?

24        A    Correct.

25              MR. ROONEY:  Thank you,

```
1    Mr. Azmoudeh.  That is all the questions I have.

2                        THE WITNESS:  Thank you.

3                        HEARING OFFICER GUROVITSCH:  Do you

4    have any redirect?

5                        MR. WOLF:  I do, Your Honor.

6

7                        REDIRECT EXAMINATION

8    BY MR. WOLF:

9         Q    Mr. Azmoudeh, Mr. Rooney asked you if,

10   currently, all of Mr. Khan's properties are providing

11   safe, habitable housing, and you indicated that they

12   were at this time; is that correct?

13        A    Correct.

14        Q    Based on your history of dealing with

15   Mr. Khan, with regards to having the property up to

16   code, what is your understanding of, in your

17   experience with him, with regard to all of his

18   properties, the standards that are met or not?

19                       MR. ROONEY:  Your Honor, I have to

20   object to that question.  It is vague and calling for

21   speculation, and I cannot understand it.

22                       HEARING OFFICER GUROVITSCH:

23   Mr. Wolf, will you please rephrase that question.

24                       MR. WOLF:  I will, Your Honor.

25
```

1    BY MR. WOLF:

2         Q    Mr. Azmoudeh, if I can bring you to City's

3    Exhibit Number 11.  If we can look at the Flag

4    Information, under the LINT, it indicates that there

5    are 28 properties.

6              Could you explain what a LINT is?

7         A    LINT is a Letter of Intent to Condemn, and

8    that can happen in case of lack of maintenance, or

9    being boarded or for lack of utilities or health

10   hazard, so in this case, LINT 1 or LINT B has been

11   applied.

12        Q    And what is a LINT 1 or a LINT B?

13        A    LINT 1 is for a lack of maintenance,

14   LINT B for being boarded.

15        Q    So currently, none of his properties are

16   under a Letter of Intent to Condemn, correct?

17        A    No.

18        Q    But in the past, 28 of his 50 properties

19   have had a Letter of Intent to Condemn?

20        A    Correct.

21        Q    What does that tell you?

22             MR. ROONEY:  Object, Your Honor,

23   calls for speculation.  No foundation for that

24   opinion.

25             HEARING OFFICER GUROVITSCH:  If you

1    could further refine your question as to

2    particularity.

3    BY MR. WOLF:

4         Q    If a property gets a Letter of Intent to

5    Condemn, what must happen to keep it out of

6    condemnation?

7         A    When a property gets a Letter of Intent to

8    Condemn, it is a very good indicator that the property

9    hasn't been maintained, and there are a lot of

10   maintenance issues.  That's a very good indicator.

11             And in order to comply with a Letter of

12   Intent to Condemn, they have to get the work done to a

13   point that there's a threshold to bring the building

14   under that threshold to prevent condemnation.

15        Q    And your experience dealing with Mr. Khan,

16   when he gets a Letter of Intent to Condemn, does he

17   bring the property into compliance?

18        A    Well, Mr. Khan, in every instance, he has

19   complied with Letter of Intent, but the process has

20   been very lengthy.

21                  MR. ROONEY:  I'm sorry, very what?

22                  HEARING OFFICER GUROVITSCH:  Lengthy.

23                  MR. ROONEY:  I am sorry.  Thank you.

24                  THE WITNESS:  And due to the fact

25   that the very first three inspections, Mr. Khan does

1    enough work to bring the building under the threshold

2    and not completing the rest of the work, and then, as

3    I mentioned yesterday, repeated reinspection has to

4    take place before compliance is achieved.

5    BY MR. WOLF:

6         Q    And from your experience, does Mr. Khan

7    get just above the minimum, or does he do above and

8    beyond what is necessary?

9                   MR. ROONEY:  Your Honor, I object

10   again.  This witness has testified that he has not

11   inspected Mr. Khan's properties for the last year and

12   a half.

13                  HEARING OFFICER GUROVITSCH:  If you

14   have direct personal knowledge of what Mr. Wolf was

15   asking, you can answer, otherwise I would sustain the

16   objection.

17                  THE WITNESS:  Well, I have a direct

18   experience with Mr. Khan.  I've done almost, I would

19   say, more than half of Mr. Khan's properties'

20   inspections in the last seven, eight years, and I've

21   been directly involved with Mr. Khan's property, and

22   in my professional opinion, Mr. Khan's quality of work

23   is not even minimum.  It's way below minimum, and the

24   property is in total disrepair.

25                  If you walk around the property, you would

1    see that every window has a different size, different

2    shape, different color.  In a lot of meetings -- and a

3    lot of requests have been that you have to do the work

4    in a professional manner, and Mr. Khan never has used

5    a professional contractor -- licensed contractor to

6    achieve that.

7    BY MR. WOLF:

8         Q    So you are saying, in your opinion, it is

9    not done to what you would consider a professional

10   manner, but it is done enough to get above the minimum

11   threshold?

12        A    Correct.

13        Q    Now, Mr. Rooney talked about the fact that

14   Mr. Khan has had only two revocations that have been

15   completely revoked, and you indicated that there were

16   13 Revocation Actions, and that is listed in the

17   summary on Exhibit 11, correct?

18        A    Correct.

19        Q    The fact that he has had 13 properties

20   where Revocation Actions have started, in your

21   professional opinion, what does that tell you about

22   the management of the properties?

23        A    My experience with the inspections the

24   last 15 years has been that property owners that have

25   multiple properties, that they utilize management

1    companies, and if the number of properties --

2                    MR. ROONEY:  Object, Your Honor.  It

3    is not responsive.

4                    HEARING OFFICER GUROVITSCH:

5    Sustained.

6                    MR. WOLF:  Can we have the question

7    read back for Mr. Azmoudeh.

8                    (At this time the question was read back

9                    by the court reporter.)

10                    THE WITNESS:  As I was mentioning,

11   my experience being that the owners of the multiple

12   properties, they have management companies --

13                    MR. ROONEY:  Once again, Your Honor,

14   it is not responsive.

15                    HEARING OFFICER GUROVITSCH:  I will

16   allow it, provisionally, because I believe that the

17   witness is trying to explain his answer within that

18   context.

19                    THE WITNESS:  My experience being

20   that the companies -- or the owners, that they utilize

21   management companies, their properties are

22   well-managed and take less City resources, and if I'm

23   not mistaken, Mr. Khan utilized Alex Eaton, from EIG,

24   I think for the very short period of time, I think he

25   had the least amount of inquiries and complaints, and

1    he was in charge, but for one person to manage 40, 50

2    rental properties, in my opinion, is a rather tall

3    mountain to climb.

4    BY MR. WOLF:

5        Q    Mr. Rooney also talked about building

6    permits.

7        A    Uh-huh.

8        Q    And you have worked with Mr. Khan, not

9    only through the PPU, but the Restoration Agreements

10   that Mr. Rooney was also talking about, and in many of

11   those situations, Mr. Khan is required to have a

12   licensed contractor perform either plumbing or

13   mechanical or that type of work; is that correct?

14       A    Most of the properties and most of the

15   permit that Mr. Khan has obtained from the City has

16   not been proactive; it's been reactive to the orders

17   issued by the City.

18               MR. ROONEY:  Object, Your Honor.

19   Once again, it is not responsive.

20               HEARING OFFICER GUROVITSCH:  I will

21   allow it.

22               THE WITNESS:  The property was

23   condemned and he had to apply for a code compliance,

24   and certain code violations required permit, or

25   inspection was done for the rental licensing, and they

1    found violations that permits require, and he had to

2    pull permits.

3              It was a reactive thing, rather than

4    proactive.

5    BY MR. WOLF:

6         Q    And looking at Exhibit 11, under the Flag

7    Information -- the un-permitted work -- how many

8    properties were flagged for having un-permitted work?

9         A    Fourteen.

10        Q    So if Mr. Khan is told at a licensing

11   inspection that this plumbing work was done without a

12   permit, you need to get a permit, will he get a

13   permit?

14        A    Yes.

15        Q    But initially when the work was done, the

16   permit was not obtained, correct?

17        A    That could be at the initial inspection,

18   or another inspector, for any other reason, may find

19   un-permitted work, and that would trigger un-permitted

20   work, or it could be at the initial inspections.

21        Q    And we are not saying that he does not

22   follow through after that; you are just saying that he

23   has not been proactive?

24        A    Correct.

25        Q    Now, we talked about having all of

1    Mr. Khan's properties under PPU for a year or so, and

2    then you said some started to get in compliance and

3    fell off.

4            Mr. Khan is not the first person who has

5    had all of his properties brought under PPU.

6        A    Absolutely not.

7        Q    In your time in PPU as an inspector and a

8    supervisor of PPU, how many other owners have -- if

9    you know a number or an estimate -- how many owners

10   have come into that purview where all their properties

11   are taken on by the Problem Properties Unit?

12       A    I have quiet a few, quite a few.  I would

13   say lot of owners with a lot of properties we have

14   dealt with, we have taken all the properties into

15   Problem Properties, and our process is being that we

16   have owners with 1 unit, up to owners with 50, 60, 150

17   units.

18       Q    Now, talking about Restoration Agreements

19   that Mr. Khan has worked with the City on, you

20   indicated that they are not always done in the

21   timeframe and sometimes, then, VBR fee is not waived.

22            Could you give an estimate on -- do you

23   know how many times Mr. Khan has had a Restoration

24   Agreement with the City?

25       A    Mr. Khan had six Restoration Agreements.

1          Q     Do you know how many of those Restoration

2     Agreements were finished on time?

3          A     I don't have that number.  I'm sorry.

4          Q     Based on your memory, can you give us an

5     idea?

6          A     I would say out of six -- if my memory

7     serves me correctly, I think two out of six have

8     complied with the Restoration Agreement, and the other

9     four, I think they were canceled.

10          Q     And those four that got canceled, Mr. Khan

11     has eventually finished the work, correct?

12          A     In one way or the other, correct.

13          Q     So it is not that he does not get the work

14     done, again, it is just not in the timeframe set?

15          A     Correct.

16          Q     Would you say that that issue with the

17     Restoration Agreements not finished in a timely manner

18     is consistent with his response to citations issued by

19     the department?

20          A     Correct.

21                    MR. WOLF:  I have nothing further,

22     Your Honor.

23                    HEARING OFFICER GUROVITSCH:  Recross.

24

25

```
 1                     RECROSS-EXAMINATION

 2   BY MR. ROONEY:

 3        Q    Mr. Azmoudeh -- I am still on Exhibit 11

 4   from the City's Book that I think you have in front of

 5   you -- you agree that there is nothing in that exhibit

 6   that breaks down the cumulative numbers shown by year,

 7   quarter, half year, anything?

 8        A    No.

 9        Q    Completely cumulative over the time of

10   ownership?

11        A    Since ownership.

12        Q    Okay.  So you do not know how many of

13   those things listed have occurred in the last two

14   years or three years?

15        A    I don't.

16        Q    Okay.  And you acknowledged that you

17   haven't personally inspected any of Mr. Khan's

18   properties in the last year and a half?

19        A    Correct.

20        Q    Okay.  Well, you agree, don't you, that

21   the LINT B, Letter of Intent to Condemn, can be sent

22   out for any number of reasons.  One, for example, if

23   the water bill is not paid, that can be a basis for a

24   Letter of Intent to Condemn?

25        A    That wouldn't be LINT 1, that would be
```

1    LINT 2.

2             Q    Okay.  That is LINT --

3             A    This is LINT 1 and LINT B.

4             Q    Well, where is LINT 2 showing on that

5    list?

6             A    It does not, because LINT 2 is the type of

7    condemnation that doesn't require -- if it gets

8    condemned, doesn't require a code compliance.  For

9    that reason, it's not included in this list.

10            Q    Okay.  Now, you said, with respect to your

11   opinion of Mr. Khan's work and repairs to his

12   buildings, that the quality is not -- what I wrote

13   down is, "Quality of work below minimum."

14                 If a building permit has been taken out

15   for the work in question, it has to pass a building

16   inspector?

17            A    Correct.

18            Q    And the building inspector finds it

19   satisfactory, presumably.

20            A    Correct.

21            Q    So your judgment might be different than

22   the City Building Inspector's?

23            A    My judgment as to why I express my

24   professional opinion is because I've been in the

25   construction business for the last 45 years, and I can

1    tell a good quality work and a bad quality work.

2              That was my professional opinion.

3         Q    Do you think a Minneapolis Building

4    Inspector can also tell good quality work from bad

5    quality work?

6         A    For the minimum code, that's what they're

7    looking for.

8         Q    Okay.  That's all the rental licensing

9    requires, isn't it?

10        A    Correct.

11        Q    Okay.  You don't have to have an A average

12   to graduate from high school, do you?

13        A    No.

14        Q    Okay.  So as long as you are below

15   minimum, you meet the requirement, right?

16        A    You have to meet the minimum.

17        Q    Okay.  And that is not a concession that

18   Mr. Khan is only at minimum, but with respect to

19   un-permitted work, if Mr. Khan buys, say, ten

20   condemned properties at auction, or whatever, there is

21   going to be an initial inspection, isn't there?

22        A    Before the owner sells to Mr. Khan, they

23   go through the code compliance.  They have to do the

24   initial inspection before they can sell the properties

25   at auction to Mr. Khan, so Mr. Khan -- they disclose

1    those violations to Mr. Khan at the time of sale,

2    Mr. Khan knows what exactly is wrong with the

3    property.

4         Q    Sure.  But when he has become the owner of

5    the property and has it inspected, an inspector might

6    find un-permitted work that was done by the previous

7    owner that needs to be done according to professional

8    permits in order to get it past inspection under

9    Mr. Khan's ownership, right?

10        A    Well, code compliance -- if Mr. Khan buys

11   a condemned property, then the initial inspection is

12   done, everything is going to be considered by

13   different inspectors:  Plumbing, heating, gas,

14   building, housing, and electrical.

15        So anything that doesn't meet the code is

16   going to be addressed at that time, and that would not

17   be considered as un-permitted, because of the fact

18   that he has to have a permit to meet those

19   violations -- to comply with those violations.

20        Un-permitted work -- you're talking about

21   properties that are occupied, and something has to be

22   done that requires permit, and that is done without a

23   permit, and somehow the property gets inspected and

24   un-permitted work is discovered.

25        We are not talking about the condemned

1    properties.

2         Q    Do you agree that housing inspectors have

3    a certain amount of discretion as to when they can say

4    permits are not required for particular work?

5         A    It's very clear what items need a permit

6    and what items do not require permits.

7         Q    So there would never be an instance where

8    one inspector did not say a permit was needed, and a

9    subsequent inspector at the same property would say

10   that a permit was needed.

11              That would never occur then, right?

12        A    That may happen.

13        Q    Okay.  And once again, the City Rental

14   Licensing Code does not require, as a condition of

15   licensing, that all Restoration Agreements be

16   completed on time, does it?

17        A    Well, Restoration Agreements usually are

18   done on the vacant properties.

19        Q    Okay.

20        A    So if the property stays vacant, it

21   depends.  Is it a condemned property?  Or is it only a

22   vacant property?  If it's condemned, they have to go

23   through the code compliance.  Completing the code

24   compliance meets the requirement of the Restoration

25   Agreement.

1        Q     Okay.

2        A     If it's vacant, then they have to comply

3   with the condition of the Restoration Agreement, and

4   if they don't, they go back to the vacant status and a

5   fee will apply.

6        Q     But if Mr. Khan had a property which had a

7   Restoration Agreement that was revoked, or whatever,

8   for not being completed on time, and he proceeded to

9   have the needed repairs done, and he applied for

10  rental licensing for that property, he would not be

11  disqualified for rental licensing because of the

12  history of his once having failed to meet a

13  Restoration Agreement; is that correct?

14       A     He would not be denied if it's not

15  condemned.  If it is only vacant, Mr. Khan would be

16  given a provisional rental license.

17       Q     And if it had been condemned, and if there

18  had been a Restoration Agreement, and if Mr. Khan had

19  not been able to perform that Restoration Agreement

20  timely, but if he subsequently did all the required

21  things to get the property code compliant, but my

22  question to you is:  In that circumstance, he would

23  not be denied his rental license if the property was

24  presently code compliant because in the past he had

25  failed to perform the Restoration Agreement timely.

1    A    Restoration Agreement --

2    Q    I think that can be answered yes or no,

3    sir.

4    A    Well, there is a difference between a

5    Restoration Agreement and condemnation.  Restoration

6    Agreement is under Chapter 249, just for the waiving

7    of the vacant building registration fee.

8    Code compliance means that the building

9    has lost its certificate of occupancy, and they have

10   to meet the code to get that certificate back.

11   Now, Restoration Agreement completed or

12   not, once the property is condemned, they have to go

13   through the code compliance inspections and have it

14   completed.

15   Q    I am not going to let you go on this one.

16   The failure to complete a Restoration

17   Agreement is not a black mark against an application

18   for licensing, with respect to that property, right?

19   A    If it's not condemned, no, you're correct.

20   Q    If it is condemned, but he nevertheless

21   subsequently brings it code compliant, he is going to

22   get licensed, right?

23   A    Of course.

24   Q    And he is going to get licensed regardless

25   of the fact that in the past, he failed to do a timely

1    completion of the Restoration Agreement?

2         A    Correct.

3                   MR. ROONEY:  That was a long time

4    getting that.  Thank you.

5              I have no further questions.

6                   THE WITNESS:  Thank you.

7                   MR. WOLF:  I just have --

8                   HEARING OFFICER GUROVITSCH:

9    Redirect.

10                  MR. WOLF:  I just have two quick

11   follow-ups.

12

13             FURTHER REDIRECT EXAMINATION

14   BY MR. WOLF:

15        Q    Mr. Rooney asked you that if it meets the

16   minimum standards, it meets minimum standards, and you

17   stated you agree with that.

18             What happens to properties that are

19   maintained just at or just above the minimum

20   standards?  In your experience, what is the history of

21   those properties going to be?

22        A    Well, first of all, in the long run it is

23   going to be more expensive to maintain it, for one;

24   secondly, the quality of housing is very poor.  It is

25   very obvious.

1          Q    Is that going to require additional City

2     resources to monitor those?

3          A    Yes, it does.

4                    MR. WOLF:  That is all I have, Your

5     Honor.

6                    MR. ROONEY:  I hate to re, re,

7     redirect -- or re, re, recross.

8                    HEARING OFFICER GUROVITSCH:  Re, re,

9     recross.

10

11                 FURTHER RECROSS EXAMINATION

12    BY MR. ROONEY:

13         Q    There is nothing in the City Rental

14    Housing Code that specifically says a licensee is

15    either ineligible for licensing because inspections of

16    his property use City resources, is there?

17         A    No.

18                    MR. ROONEY:  Thank you.

19                    HEARING OFFICER GUROVITSCH:  If

20    there is nothing further, you may be excused.

21                    MR. WOLF:  Thank you, Your Honor.

22                    THE WITNESS:  Thank you.

23                    MR. WOLF:  Your Honor, the City

24    would rest at this time, pending any rebuttal

25    witnesses after Mr. Khan has been put -- but we have

1   no further witnesses at this time.

2                         HEARING OFFICER GUROVITSCH:  All

3   right.

4                         MR. WOLF:  And I believe all the

5   City exhibits have been entered, is that correct,

6   1 through 11?  I would ask that the City exhibits be

7   entered into evidence.

8                         MR. ROONEY:  No objection.

9                         HEARING OFFICER GUROVITSCH:  So

10  ordered.  And they should all be marked.

11                        MR. WOLF:  I believe they have all

12  been marked.

13                        HEARING OFFICER GUROVITSCH:  They

14  have been marked, offered, and received.

15                        MR. ROONEY:  For the record,

16  Mr. Khan's exhibits are certainly all marked and

17  offered, I presume, subject to the ones that have been

18  excluded on the grounds of relevancy.  I assume that

19  they are all received, as well?

20                        MR. WOLF:  I had to go through --

21                        MR. ROONEY:  But yours were not

22  marked, and mine are.

23                        HEARING OFFICER GUROVITSCH:  Yes,

24  they are marked.

25                        MR. WOLF:  I would say there was a

1    couple that we needed the foundation for, but, I mean,

2    once those are in, I have no objection.

3                    HEARING OFFICER GUROVITSCH:  I have

4    already indicated which opposed exhibits are,

5    consistent with the City's objections, not going to be

6    offered.

7                    MR. ROONEY:  Well, they are offered,

8    they are not going to be received.

9                    HEARING OFFICER GUROVITSCH:  Do you

10   plan to offer them now?

11                   MR. ROONEY:  I can offer, with the

12   offer of proof, the six exhibits the Court sustained

13   the City's objections.  We had the discussion where I

14   would like those, at least, to be a part of the record

15   by way of an offer of proof.

16           I can offer all of the City's [sic]

17   exhibits at this time, but Mr. Wolf has said, with

18   respect to a couple of them having to do with

19   photographs, he would prefer to have me establish

20   foundation, so I think it may be more efficient to do

21   that and offer all the Licensee's exhibits at the end

22   of the Licensee's case.

23                   HEARING OFFICER GUROVITSCH:  I think

24   that sounds like the best procedure.  I agree with

25   you.

1            All right.  The City has rested.

2                 MR. ROONEY:  I am prepared to call a

3     witness.  I presume I do not have to make additional

4     motions to dismiss, and I am not waiving by proceeding

5     with my case.

6            At that point, we would call Donna Graham.

7                 DONNA GRAHAM,

8          the witness in the above-entitled

9         matter, having been first duly sworn,

10            testifies and says as follows:

11

12                 DIRECT EXAMINATION

13     BY MR. ROONEY:

14        Q    Ma'am, I am Edward Rooney.  I am

15     Mr. Khan's attorney.  You and I have met before; is

16     that correct?

17        A    Correct.

18        Q    Could you state you full name for the

19     record, please.

20        A    Donna Maria Knight Graham.

21        Q    And how do you spell Graham?

22        A    G-R-A-H-A-M.

23        Q    And how do you spell Knight?

24        A    K-N-I-G-H-T.

25        Q    Thank you.  Ms. Graham, where do you

1    currently live?

2         A    315 Buchanan Street Northeast,

3    Minneapolis 55413, Apartment Number 5.

4         Q    Ms. Graham, are you currently employed?

5         A    No.

6         Q    Are you currently disabled from

7    employment?

8         A    Yes.

9         Q    Okay.  Are you receiving disability

10   benefits from the federal government on account of

11   that disability?

12        A    Yes.

13        Q    And I am sorry, you are soft-spoken, and

14   the court reporter is on the other side of the room.

15   It would help if you speak up.

16             Did you have a work career before becoming

17   disabled?

18        A    Yes.

19        Q    What kind of work did you do?

20        A    My past was -- I did nursing, secretarial

21   business, I worked at West Point.

22        Q    The US military academy?

23        A    Yes.  I worked at Letchworth Village,

24   which is the largest mental retardation [sic] in the

25   state of New York.  I've done nursing homes.  I've

1    worked for the first agency -- we were the first ones

2    that started -- the agency is now for TCA Services.

3          Q    Was that here in Minnesota, or elsewhere?

4          A    No, that started first in New York before

5    it ever went nationwide.

6               I've done things.  I went back for a

7    bachelor of arts degree and a bachelor of science

8    about ten years ago, so I continue my education.

9          Q    Did you obtain either of those degrees?

10         A    No.  Things happened.  I'm not far.  I

11   have about 18 credits left.

12         Q    Okay.

13         A    But raising four sons and a daughter at

14   that time, and things got rough.

15         Q    You said four sons and a daughter.

16              Are they all adults?

17         A    Yes.  I have one that works at the

18   University of Saudi Arabia, teaches English.  I

19   have -- my eldest has his own business in New

20   Richmond, Wisconsin.  I have one son continuing his

21   education, and he does PCA services for me, and I have

22   my baby boy, which has given me some problems, but

23   Minnesota has helped me raise my boys, and --

24         Q    What do you mean by that?

25         A    You know, teenage boys sometimes get in

1    trouble.

2         Q    I mean, what -- Minnesota?

3         A    When I say Minnesota, I mean, as the law

4    you got to go to court, they got on each one of them,

5    they spanked them, but they helped them.  They got

6    their education finished and they became decent

7    citizens.

8         Q    How about your daughter?

9         A    She is okay.

10        Q    Good.

11        A    She's okay.

12        Q    Do you have any grandchildren?

13        A    I have 17.

14        Q    Any here in town?

15        A    Yes.

16        Q    Okay.  Do you see them very much?

17        A    Yes.

18             MR. WOLF:  Your Honor, I don't know

19    if we need to go through the formalities.

20             MR. ROONEY:  It has to do with the

21    residence.  I am sorry, I should have made that clear.

22    BY MR. ROONEY:

23        Q    Do they come and visit you at your

24    residence?

25        A    Yes.

1      Q      How long have you lived in Minnesota?

2      A      I came here in 1987, October 4, 1987.

3      Q      Have you ever owned a home in Minnesota?

4      A      Yes.

5      Q      Where?

6      A      417 Sinnen Street in St. Paul.

7      Q      Do you currently rent from Mahmood Khan?

8      A      Yes.

9      Q      How long have you known Mr. Khan?

10     A      About two years, two years.

11     Q      How did you first hear of Mr. Khan?

12     A      Word of mouth.

13     Q      Okay.  What was the word of mouth you

14  heard about Mr. Khan?

15     A      That he was a decent landlord, and he's

16  always willing to help anybody, and they gave me the

17  number.  I called him and we met up.

18     Q      Okay.  Is this property at 315 Buchanan

19  Street Northeast the first property that you have

20  rented from Mr. Khan?

21     A      Yes.  I've been to another one, but I was

22  in 315 Buchanan Street, Number 1.

23     Q      Oh, thank you for clarifying that.

24            How many different rental properties have

25  you rented from Mr. Khan?

```
1              A    Two.

2              Q    There is 315 Buchanan Street.  What is the

3     other one?

4              A    2714-35th Avenue North.

5              Q    Okay.  Where were you living before you

6     began this current rental from Mr. Khan?

7              A    I was living in St. Paul.

8              Q    Have you ever been homeless in your adult

9     life?

10             A    Recently.  Other than that, no.

11             Q    What was the circumstance of your being

12    homeless recently?

13             A    Well, I got into some financial problems,

14    death in the family, and so forth, and Mr. Khan was --

15    he's my brother.

16             Q    What do you mean by that?

17             A    Well, we're servants of God.

18                       HEARING OFFICER GUROVITSCH:  I am

19    sorry.  I did not hear that.

20                       THE WITNESS:  I said he's my

21    brother.  We're servants of God.

22                       HEARING OFFICER GUROVITSCH:  Thank

23    you.

24                       THE WITNESS:  And he stood by my

25    side, but I was getting in too deep, and we both
```

```
 1   agreed for me to leave and then I would get up on my
 2   feet and come back.
 3   BY MR. ROONEY:
 4        Q    And you were homeless in between?
 5        A    Yes.
 6        Q    Okay.  When you left Mr. Khan's property,
 7   were you behind on your rent?
 8        A    Yes.
 9        Q    Did you promise him that you would pay him
10   that rent?
11        A    Yes.
12        Q    In fact, have you?
13        A    Yes.
14        Q    In the course of your life, have you
15   rented from landlords other that Mr. Khan?
16        A    Yes.
17        Q    All right.  How would you rate Mr. Khan as
18   a landlord in comparison to others you have rented
19   from?
20        A    I would say up there with the others that
21   I rented from.  I've always had a good relationship
22   with everyone that I rented from.
23        Q    Are you familiar with whether Mr. Khan has
24   relationship as a landlord in the North Side of
25   Minneapolis -- excuse me, a reputation as a landlord
```

```
 1   in the North Side of Minneapolis?

 2        A    At that time, no.

 3        Q    But now?

 4        A    Yes.

 5        Q    What would you say his reputation is?

 6        A    I don't socialize with a lot of

 7   individuals, so I don't know, really, much of anyone

 8   who has rented from him on that level.  I can only

 9   speak from my own experience.

10        Q    And the person who gave you word of mouth?

11        A    Yes.

12        Q    Have you ever heard negative things about

13   him?

14        A    No.

15        Q    Are you satisfied with Mr. Khan as a

16   landlord in terms of him taking care of the properties

17   you rent from him?

18        A    Yes, yes.  He always does whatever I ask

19   of him.

20        Q    Okay.  Do you have an opinion whether it

21   would be a loss to Minneapolis if Mr. Khan was no

22   longer able to provide rental housing in Minneapolis?

23        A    Yes.

24        Q    What is your opinion?

25        A    There was a small boy that lived in the
```

1    apartment that I just moved into.  He knocked on the

2    door and he said, Excuse me, ma'am, but you don't live

3    here, somebody else brought this stuff in here, they

4    live here.  And I looked down at him and I said -- I

5    said, Thank you for looking out, but it belongs to me.

6              And I thought about him and all the

7    babies.  What happens to them?  I looked at him and I

8    told him, I said, You know, you're the next head of

9    the CIA of the United States of America, and he looked

10   up at me and he laughed.  I thought about that.

11             I worry about the babies more than

12   anything, because Minnesota, like I said, helped me

13   raise mine, looked out for mine, and I'm proud of

14   them, and they are the future, and my move gave him --

15   is giving that boy a chance --

16        Q    You think he has done that for other

17   people?

18        A    -- instead of ending up sleeping --

19             MR. WOLF:  Your Honor, that last

20   question was speculation.

21             HEARING OFFICER GUROVITSCH:  She has

22   already testified that she is not familiar with any

23   other families that rent from Mr. Khan, so I will

24   sustain the objection.

25

1   BY MR. ROONEY:

2        Q    Are there families, that you are aware of,

3   living in the building at 315 Northeast Buchanan

4   besides the one with this little boy nextdoor?

5        A    I know -- yeah, there's family there.  I

6   can see the babies.

7                  MR. ROONEY:  Okay.  Your Honor, I

8   know you have sustained the objection.  By way of an

9   offer of proof, I would like the record to reflect

10  that this witness has said that Mr. Khan's willingness

11  to provide low-income tenancy keeps families out of

12  shelters.  That is part of the --

13                 MR. WOLF:  Your Honor, I object

14  to --

15                 MR. ROONEY:  That is part of the

16  Fair Housing issue that I have, and if want an offer

17  of proof that if permitted, that is what this witness

18  would testify.

19                 HEARING OFFICER GUROVITSCH:  I do

20  not even think there is a foundation for such an

21  opinion, at this point, in the record.

22                 MR. ROONEY:  Thank you.  Let me

23  attempt to lay some foundation.

24                 MR. WOLF:  Your Honor, I would

25  object to the relevancy of that.  We are here to

1   determine whether or not Mr. Khan should have his

2   properties license based on two prior revocations, and

3   a good cause concerning his maintenance and management

4   of those remaining properties, not whether he is

5   providing housing for low-income or high-income or

6   any-income individuals.

7               MR. ROONEY:  Your Honor, with

8   respect to that, we are here for good cause.  I don't

9   think we should be, I think it is an unfair surprise,

10  but the city ordinance does not say good cause with

11  respect to maintenance and management, the city

12  charter does not say good cause with respect to

13  maintenance and management, it says, Good cause.

14              And to me, if you are going to consider

15  that issue, that opens the whole door to what benefit

16  it is to have a low-income landlord who helps families

17  have stable homes, rather than being in shelters, and

18  that is what this witness was in the process of

19  testifying about.

20              HEARING OFFICER GUROVITSCH:  As far

21  as her own experiences, that testimony is certainly

22  allowable and should be in the record because the City

23  Council is going to have to weigh the benefits from

24  Mr. Khan's having his status as a licensed landlord in

25  the city against the burdens that were brought out by

1    the City's witnesses, as far as the use of resources

2    to make sure that the properties are in safe and

3    habitable condition.

4              That is a decision for the Council, but I

5    think it is still relevant that this witness testifies

6    to her own experiences with Mr. Khan, but if you are

7    going to ask her about other people's experiences,

8    that is really going a little bit beyond, and it is

9    probably hearsay.

10             MR. ROONEY:  Well, then let me try

11   to narrow it to what she has personally observed.

12             HEARING OFFICER GUROVITSCH:  That is

13   fine.  Go ahead.

14             MR. ROONEY:  Thank you.

15   BY MR. ROONEY:

16        Q    Ms. Graham, in your life in raising your

17   four children --

18        A    Five.

19        Q    Excuse me.  Four sons.  I don't mean to

20   diminish the girl.

21             In raising your five children, has it been

22   a benefit for them to be raised in a stable home, and

23   have there been times in their life when they lacked a

24   stable home?

25             HEARING OFFICER GUROVITSCH:  That is

1    a multiple question.  Ask one at the same time,

2    please.

3                    MR. ROONEY:  Thank you.

4    BY MR. ROONEY:

5         Q    Have there been any times when you were

6    raising your children when you could not provide a

7    stable home for them, or homeless, or anything like

8    that?

9         A    No.

10        Q    Okay.  Have you seen other children raised

11   in situations where they don't have a stable home?

12        A    Yes.

13        Q    Can you, in your own experience, observe

14   any difference in the benefit to the children of being

15   raised in a stable home versus what you observed in

16   children who are not raised in a stable home?

17                    MR. WOLF:  Your Honor, I would

18   object.  It is speculation, it is not relevant.

19                    HEARING OFFICER GUROVITSCH:  And I

20   don't understand what definition goes with "stable."

21                    MR. ROONEY:  Okay.

22   BY MR. ROONEY:

23        Q    In your own mind, what characterizes a

24   stable home?

25        A    Something -- to me, a stable home is a

```
1    safe place and a comfortable place.

2         Q    Okay.

3         A    Well, for my children.  And I received

4    that.

5         Q    Okay.  Now, you have never actually had to

6    live in a homeless shelter; is that correct?

7         A    No.

8         Q    So you don't know firsthand whether

9    homeless shelters provide a safe and stable

10   environment as an apartment, do --

11                   MR. WOLF:  Your Honor, she just

12   stated that she has never stayed in a homeless

13   shelter.

14                   HEARING OFFICER GUROVITSCH:

15   Sustained.

16                   THE WITNESS:  Well, I stayed in a

17   homeless shelter when --

18                   HEARING OFFICER GUROVITSCH:  When I

19   say sustained, that means you don't answer.

20                   THE WITNESS:  Oh, I'm sorry.

21   BY MR. ROONEY:

22        Q    Have you ever stayed in a homeless

23   shelter?

24        A    Yeah, I did, but not because I was

25   homeless.
```

1          Q     What was the situation that put -- how did

2     you happen to be in a homeless shelter?

3          A     That was in Dallas, Texas.  My second son

4     was born with a rare disease and they was tracking

5     down the father, so I would go there, and I stayed in

6     a Salvation Army shelter for the homeless for a few

7     days until we got in touch with him.

8          Q     What did you observe with respect to the

9     safety and stability of --

10                    MR. WOLF:  Your Honor, I would

11     object.  She testified that she stayed there for two

12     days or a few days.

13                    HEARING OFFICER GUROVITSCH:  The

14     objection is sustained.

15                    MR. ROONEY:  Okay.

16     BY MR. ROONEY:

17          Q     Ms. Graham, when you were living at

18     2713 -- were you living at 2713-35th Avenue North?

19          A     2714.

20          Q     I am sorry.  Thank you.

21                    Were you living there earlier this year

22     when a Notice of Revocation placard was put on the

23     door of the building?

24          A     Yes.

25          Q     Was that in February or March of this

```
 1    year?

 2          A    Somewhere up in there.

 3          Q    Did you have a conversation with the

 4    person who was putting the placard on the building?

 5          A    Yes.

 6          Q    Can you relate to the judge what that

 7    conversation was, and what that person's attitude

 8    appeared, to you, to be?

 9          A    I can't quite remember everything from

10    word to word because I was surprised.  My daughter was

11    there and she was the one who spoke with him first,

12    but I was surprised.

13          Q    What surprised you?

14          A    That they were putting the notes up on the

15    door -- front door and back door.

16          Q    Did he say anything about it when he was

17    putting it up?

18                      MR. WOLF:  Your Honor, I would

19    object, calls for hearsay.

20                      HEARING OFFICER GUROVITSCH:

21    Sustained.

22                      MR. ROONEY:  Your Honor, it is not

23    for the truth of what he said; it is for his state of

24    mind and that it was said.

25                      HEARING OFFICER GUROVITSCH:  I think
```

1    it still calls for hearsay.  I am going to --

2                    MR. ROONEY:  Your Honor --

3                    HEARING OFFICER GUROVITSCH:  --

4    sustain the objection.

5                    MR. ROONEY:  Well, in that case, I

6    would like to make an offer of proof, because what

7    this witness will testify is that the person

8    stating -- placarding -- putting the placard up

9    stated, We got him this time.  He's not going to get

10   out of it.  We got him good.

11                   HEARING OFFICER GUROVITSCH:  Well,

12   if we are asking the witness to relate a conversation

13   she had with the person who was putting up the

14   placard, I will allow it, but if you are asking the

15   witness about what her daughter observed and what her

16   daughter said --

17                   MR. ROONEY:  Oh, I am sorry.

18                   HEARING OFFICER GUROVITSCH:  -- that

19   is not really anything but hearsay.

20   BY MR. ROONEY:

21        Q    Did you have a conversation with this

22   person?

23        A    Yes.

24        Q    First of all, what did the person say to

25   you about --

1          MR. WOLF:  Your Honor, I object.  It

2     calls for hearsay, especially if he is trying to state

3     that the inspector is stating that, We got him.  It is

4     going to the truth of what that inspector said.

5          MR. ROONEY:  Your Honor --

6          HEARING OFFICER GUROVITSCH:  We

7     don't even know who that person was, whether it was an

8     inspector or somebody else.  Again, I am going to

9     allow her to testify as to her conversation with this

10    person insofar as I have to accept hearsay on

11    occasions, and I have to weigh the evidence

12    accordingly.

13         And, certainly, if you feel that you wish

14    to pursue the matter, you can call a rebuttal witness,

15    the person who actually had the conversation with this

16    witness, to testify as to his or her version of the

17    conversation, but I am given some latitude with

18    respect to hearsay in these proceedings, and I am

19    going to allow it.

20    BY MR. ROONEY:

21         Q    I am sorry.  What was the conversation you

22    had with this person?

23         A    There seems to be a little confusion here.

24    When I spoke with him, it was -- when you are speaking

25    on their saying, We got him, it was when I called the

1    City to explain to me what was going on, so the phone

2    records should show that conversation.

3         Q    Was there one or two times that you had

4    conversations with anybody?

5         A    It was the guy at the door from the City.

6         Q    Okay.  That was a face-to-face

7    conversation?

8         A    Face-to-face conversation.

9         Q    I want to ask you about that face-to-face

10   conversation.

11        A    Yes.

12        Q    Did he say anything about the placard he

13   was putting up, or about the revocation?

14        A    Yes, because I needed for him to explain

15   to me exactly what was happening and why he was

16   putting that up there.

17        Q    Okay.

18        A    And he told me who he was.

19        Q    Did he say that he was from the City?

20        A    Yes.  And he put it up so quick, but he

21   was in a good mood for doing it.  I said, So why do I

22   have to move out in three months?  He said, Because

23   he's probably going to lose, and so I would suggest

24   that you start looking for a place within the next

25   three months, because most likely, you're going to

1    have to move.

2              That's what he said to me, but he didn't

3    explain it good enough for me to understand what was

4    going on.  This is why I called the City.  I wanted

5    someone to explain to me exactly why I have to leave.

6         Q    As this man was putting up the placard or

7    as you were talking to him, did he seem to show any

8    attitude about the prospect of revocation?  Was he sad

9    about it?  Was he glad about it?  Was --

10                  MR. WOLF:  Your Honor, I object.  It

11   is a speculation of a person's state of mind.

12                  MR. ROONEY:  I am asking what he

13   showed, Your Honor.

14                  HEARING OFFICER GUROVITSCH:  Well,

15   it is a leading question, besides.

16   BY MR. ROONEY:

17        Q    How would you describe this person's

18   actual feelings as he was --

19        A    I would describe him as something was

20   going on, like, I take it, with my mood in the City

21   anyway, and he was happy about what he was doing.  I

22   didn't know, that's why I asked questions.

23        Q    Did he say, We got him, or was that later?

24        A    Well, he insinuated, but, then, like the

25   judge said, that could be hearsay.

1          Q     You followed that up with a phone call?

2          A     Twice, I called the City.

3          Q     And in either of those conversations with

4     the City -- well, you called the City.  Did someone

5     pick up at the -- and that was the number that was

6     listed on the revocation?

7          A     Yes.

8          Q     And did you talk to people when you

9     called?  Did they pick up the phone?

10         A     Yes.

11         Q     Did those people -- and you explained why

12    you were calling?

13         A     Well, when I mentioned that I was calling

14    about the notices that was placed on my door and gave

15    them my address and my landlord's name, he said, We

16    got him, and he's not going to win this time.  I'm

17    like, What?  He was very happy -- the young man was

18    very happy on the phone.

19         Q     Thank you.

20               HEARING OFFICER GUROVITSCH:  You do

21    not know who you spoke to, the name of the person?

22               THE WITNESS:  No, no.  When I called

23    again, the next person said the same thing, so I left

24    it alone.  I assumed I was getting put out.

25

1    BY MR. WOLF:

2          Q    But both times you called the number that

3    was on the placard?

4          A    Right, right.  And I was told by each of

5    them -- each one that, We got him, and he's not going

6    to win.  He's going to lose this time, and I would

7    suggest -- they suggested that I start finding

8    someplace else to live.

9                    MR. ROONEY:  Thank you, Ms. Graham.

10   That is all the questions I have.

11

12                    CROSS-EXAMINATION

13   BY MR. WOLF:

14         Q    Okay.  Ms. Graham, just a few questions.

15   How long have you lived at 315 Buchanan Street

16   Northeast?

17         A    I just recently moved back in there.

18                    HEARING OFFICER GUROVITSCH:  Could

19   you speak up a little bit, please.

20                    THE WITNESS:  I just recently moved

21   back in.

22   BY MR. WOLF:

23         Q    Okay.  So you lived there previously?

24         A    Yes.

25         Q    When did you live there?

```
1          A    I believe I moved -- Buchanan -- sometimes
2     I'm not good with exact dates.
3          Q    Approximately when did you live there the
4     first time you lived there?
5          A    It all happened so quick, June '13 or '14,
6     I think, '14.
7          Q    Of this year, you moved back in?
8          A    Yes.
9          Q    When did you live there the --
10         A    Well, it was last year.
11                   MR. ROONEY:  I think you said
12     June of '13.
13                   THE WITNESS:  Yeah, so I bounced
14     around a couple of times.
15     BY MR. WOLF:
16         Q    When did you live there the first time you
17     lived at the Buchanan Street address?
18         A    Buchanan -- June, I'd say -- okay.
19     Buchanan, I believe, was June 1, 2014, maybe, 2014
20     sounds like.
21         Q    So a little over a year ago you were
22     there?
23         A    Yeah, I little over a year.
24         Q    And when did you move to 2714-35th?
25         A    I wasn't even at Buchanan a month.
```

```
 1        Q    Why did you leave?

 2        A    Because he offered me a house.

 3        Q    So in July of 2014, you moved into --

 4        A    Yeah.

 5        Q    -- 2714?

 6        A    Yes.

 7        Q    And you moved out of 2714 in June of this

 8   year, back into Buchanan?

 9        A    No.  I left 2714 -- that was during the

10   time that I had financial issues.  This was back in

11   sometime at the end of February, March, and I owed

12   him, and we had an agreement, and I handled my

13   business and I came back.

14        Q    So you were in 2714-35th for only about

15   six months or so?

16        A    No, a little longer than that.  Let me

17   see -- about eight months.  Somewhere -- a little over

18   eight months.

19        Q    So total, you have only lived in the two

20   properties -- so Buchanan about a month, and then --

21        A    Yeah, somewhere in there.  Yeah.

22        Q    And 2714 --

23        A    About, over a year.

24        Q    Total at his properties?

25        A    Yes.
```

1          MR. WOLF:  I have nothing further,

2     Your Honor.

3          HEARING OFFICER GUROVITSCH:  I am a

4     little bit confused about something.  You had

5     indicated that you currently live in Apartment

6     Number 5.

7          THE WITNESS:  Yes.

8          HEARING OFFICER GUROVITSCH:  And in

9     your testimony, you said you had occupied Apartment 1.

10          THE WITNESS:  Yes.

11          HEARING OFFICER GUROVITSCH:  You

12     started --

13          THE WITNESS:  I moved out --

14          HEARING OFFICER GUROVITSCH:  Let me

15     ask the question.

16          So you started living in Apartment 1.

17          THE WITNESS:  Yes.

18          HEARING OFFICER GUROVITSCH:  Okay.

19     And when did you living in Apartment 1?  From what

20     date to what date?

21          THE WITNESS:  It was just before

22     June 1, but it wasn't on June 1.

23          HEARING OFFICER GUROVITSCH:  Of what

24     year?

25          THE WITNESS:  Well, '14 -- 2014,

1    yes.

2                        HEARING OFFICER GUROVITSCH:  So you

3    lived if Apartment Number 1?

4                        THE WITNESS:  Yes.

5                        HEARING OFFICER GUROVITSCH:  So you

6    started living in Apartment 1 starting in June of '14?

7                        THE WITNESS:  Yes.

8                        HEARING OFFICER GUROVITSCH:  Until

9    when?  Was it January or February?

10                       THE WITNESS:  No, it was the next

11   month -- three weeks.  I was there three weeks before

12   I went into 2714.  Yeah, somewhere up in there.

13                       HEARING OFFICER GUROVITSCH:  Okay.

14   And you were at 2714-35th for about eight months?

15                       THE WITNESS:  About eight months.

16                       HEARING OFFICER GUROVITSCH:  Thank

17   you.  And then you moved out of 2714-35th when?

18                       THE WITNESS:  Around March; March of

19   2015.

20                       HEARING OFFICER GUROVITSCH:  And

21   from there you moved back to the Buchanan property?

22                       THE WITNESS:  Yes, yes.

23                       HEARING OFFICER GUROVITSCH:  But

24   this time it was Apartment 5?

25                       THE WITNESS:  Yes.

1              HEARING OFFICER GUROVITSCH:  Thank

2    you.  I have nothing further.

3                     MR. ROONEY:  I have a little bit of

4    redirect, Your Honor.

5

6                     REDIRECT EXAMINATION

7    BY MR. ROONEY:

8         Q    Ms. Graham, when I came out and visited

9    you earlier this week about your being a witness, at

10   that point you were staying at a property at 410-30th

11   Avenue North?

12        A    Yes.

13        Q    And that was temporary?

14        A    Yes, I was there for about a week.

15        Q    And that was while Mr. Khan was getting

16   the apartment --

17        A    Completed for me.

18        Q    Did Mr. Khan make that arrangement, to let

19   you stay there at 410-30th Avenue North temporarily?

20        A    Yes.  It was like being homeless, still.

21   He gave me that place until he got everything together

22   for me.

23        Q    I am sorry, instead of being what, still?

24        A    Homeless.

25        Q    Okay.  And then you say, after -- back in

1    2014, after you had been in Apartment 1 at Buchanan

2    Street, he offered you a house, and that is the

3    2714-35th Avenue?

4         A    Yes, that's why I moved.  Yes.

5         Q    Do you know why he offered you a house?

6         A    Well, at the time I was going to buy --

7    going to buy the house from him.

8         Q    But you wound up just renting it?

9         A    Yeah, yeah.  We was just going to take our

10   time and let me see the area and everything like that,

11   and decide if I wanted to move forward to try to buy

12   another home.

13        Q    And it was when you were in 2714 that

14   family things --

15        A    Yes.

16        Q    -- started happening, and that is when you

17   had to move out?

18        A    Yes.

19              MR. ROONEY:  Thank you.  I have no

20   further questions.

21              MR. WOLF:  No follow-up.

22              HEARING OFFICER GUROVITSCH:

23   Ms. Graham, thank you.  You may be excused.

24              THE WITNESS:  Okay.

25              HEARING OFFICER GUROVITSCH:  And I

1    think it is time to take a break, before you start

2    with Mr. Khan's testimony.

3                    MR. ROONEY:  That's correct, Your

4    Honor.

5                    HEARING OFFICER GUROVITSCH:  We can

6    reconvene about quarter to 11:00.

7                    MR. ROONEY:  Great, thank you.

8                 (At this time a short break was taken

9                 from 10:30 a.m. to 10:49 a.m.)

10                   HEARING OFFICER GUROVITSCH:  All

11   right.  We are ready to proceed.

12              Can you please swear in Mr. Khan.

13                    MAHMOOD KHAN,

14          the witness in the above-entitled

15          matter, having been first duly sworn,

16             testifies and says as follows:

17

18                    HEARING OFFICER GUROVITSCH:

19    Mr. Rooney.

20                    MR. ROONEY:  Thank you, Your Honor.

21

22                    DIRECT EXAMINATION

23   BY MR. ROONEY:

24        Q    Mr. Khan, for the record, can you state

25    your first and last name, spelling them both.

1          A     Mahmood Khan, M-A-H-M-O-O-D, K-H-A-N.

2          Q     Thank you.  And, Mr. Khan, where do you

3   live?

4          A     2972 Old Highway 8, Roseville 55113.

5          Q     Is that a single-family home or an

6   apartment.

7          A     Single-family.

8          Q     Who do you live there with?

9          A     My wife and three children.

10         Q     Okay.  Mr. Khan, where were you born?

11         A     Pakistan.

12         Q     And what is your educational background?

13         A     I went two years of college and a

14  bachelor's degree, but I haven't completed it yet.

15         Q     Was that here in the US, or in Pakistan?

16         A     In the US -- In Karachi, Pakistan.

17         Q     When did you first move to the US?

18         A     1979.

19         Q     And have you lived anywhere in the US

20  other than Minnesota?

21         A     No.

22         Q     How long have you been involved in the

23  ownership and management of rental real estate?

24         A     Since 1985.  About 30 years.

25         Q     Have you done both commercial and

1    residential real estate?

2         A    Yes.

3         Q    Has the focus been more on one than the

4    other?

5         A    Yes.

6         Q    And that is the residential rental --

7         A    Correct.

8         Q    -- real estate?

9              Mr. Khan, how do you support your family?

10        A    I support my family through my rental

11   income, and I also have a part-time job with the

12   airline.

13                    HEARING OFFICER GUROVITSCH:  Could

14   you speak up little bit.

15                    THE WITNESS:  Yes, Your Honor.  I

16   also have a part-time job with the airlines.

17   BY MR. ROONEY:

18        Q    That is as a flight attendant?

19        A    That's right.

20        Q    You take short overnight flights?

21        A    Correct.

22        Q    Your seniority permits you to choose those

23   flights?

24        A    Right.

25        Q    How long have you owned rental properties

1    in the city of Minneapolis?

2          A    Again, for the last 35 -- 30 years, 1985.

3          Q    And in that time, you have had two of your

4    rental property licenses revoked?

5          A    Correct.

6          Q    3223 Bryant Avenue North?

7          A    Yes.

8          Q    And that was for illegal occupancy because

9    there was someone residing in the basement?

10         A    Correct.

11         Q    Were you aware of that being done?

12              MR. WOLF:  Your Honor, I would

13   object that that case has already been heard, it has

14   been appealed.  He has already had an opportunity to

15   testify regarding the underlying facts of that

16   situation.

17              MR. ROONEY:  Your Honor, the reason

18   I ask him is one of your criteria for evaluating your

19   recommendation is the nature of the violation, and we

20   don't dispute for a moment it is going to the

21   Minnesota Court of Appeals.

22              There is no dispute for a moment that the

23   revocation happened, but I think I am entitled to

24   point out Mr. Khan's minimal personal knowledge of it.

25              HEARING OFFICER GUROVITSCH:  Well,

1    these revocations were appealed to the Minnesota Court

2    of Appeals.  There was findings, conclusions, and

3    recommendations from the City, and they are -- as far

4    as Mr. Khan's defenses, those were explored in those

5    proceedings, so I really don't think we need to go

6    into that.

7                I am aware of what Mr. Khan's defenses

8    were to those proceedings from reading the record.

9                     MR. ROONEY:  I take it, then, that

10   you are also aware that the Minnesota Court of Appeals

11   says that it does not matter whether you are aware of

12   it or not?

13                     HEARING OFFICER GUROVITSCH:  That is

14   correct.

15                     MR. ROONEY:  Okay.  And that is all

16   I was trying to establish.

17                     HEARING OFFICER GUROVITSCH:  That is

18   why I am concluding that it is really not relevant,

19   and the objection is sustained.

20   BY MR. ROONEY:

21        Q    How, over the years, have you gone about

22   acquiring the residences that you rent in Minneapolis?

23        A    Well, in 1985, I bought a new place in

24   South Minneapolis, and then in 1986, I bought two

25   pieces of land about three blocks from where I lived

1    at Buchanan Street Northeast, from the neighborhood

2    across the street.

3              And since, I built, from scratch, a

4    nine-unit building that was supposed to only have two

5    single-family homes.  I combined the lots, and I put a

6    nine-unit building up there, and I've owned that

7    property and rented -- licensed and rented that

8    property since 1986.

9         Q    And that is the property at 315 Buchanan

10   Street?

11        A    315 Buchanan Street Northeast.

12        Q    When you say you combined the lots, you

13   did that going through whatever procedures the City

14   required to approve that combination of lots?

15        A    Correct.  I went to Zoning and Planning,

16   everybody else, and I built the whole building from

17   scratch, myself.

18        Q    Okay.  And after that one, how did you

19   keep --

20        A    Then I had the building at 2501 Golden

21   Valley Road building, and then, I had, you know, I

22   bought them over a period of time by taking savings --

23   you know, using my money and using the banks to

24   finance them.

25        Q    Okay.

1      A     And I bought a few other buildings, and

2  then in 2008, there was a big auction in the City of

3  Minneapolis in the Convention Center.  I bought, I'd

4  say, about 25 or 30 properties that were mostly, you

5  know, in bad condition, either dilapidated or

6  condemned.

7      Q     Was that an auction by the lenders for

8  foreclosures or by the County for tax forfeitures, or

9  do you recall what brought those properties into

10 auction?

11     A     I think it was a big depression at that

12 time.  There was a lot of properties in foreclosure.

13 There with a big convention, there was over a thousand

14 people in the convention waiting for properties to

15 buy, and I ended up buying in, you know, North

16 Minneapolis, most of the properties.

17     Q     Okay.  And what was the status of -- were

18 those properties occupied when you bought them, or

19 were they vacant?

20     A     All of them were vacant, and they needed

21 either a code compliance or -- I didn't know about it

22 when I bought it, that they needed code compliance, or

23 that I had to get rental licenses for them.

24     Q     Okay.  And this is 2008?

25     A     May 31, 2008.

1    Q    Okay.  So how many of the properties that

2  you bought at that auction on May 31, 2008 -- you said

3  you bought 25, roughly?

4    A    About 15, 20, I can't remember the exact

5  number.

6    Q    How many of them did you do the work

7  necessary to bring them up to code compliance?

8    A    Some of them are not code compliance, some

9  of them just needed rental license, and some of them

10  were code compliance, and I found out later on after I

11  had bought the properties that they were code

12  compliance.

13    Q    Well, I put the question to you poorly,

14  and I apologize.

15         My question is:  How many of those

16  properties were you ultimately able to get qualified

17  for rental licenses?

18    A    All of them.

19    Q    Okay.  How many of those properties would

20  you say you had to put significant additional

21  investments in beyond the purchase price to get them

22  into a condition where they qualify for the licensing?

23    A    Almost all of them I had to put a

24  significant amount of money into it.

25    Q    Did your investments, at that time,

1    improve the quality of those properties?

2          A    Yes, they did.  Because they were vacant.

3    Some of them were subject to vacant building

4    registration fee.  At that time it was only $300 when

5    I had bought them, then it went up to $2,000, then it

6    went up to $6,500, now it's up to $6,940.  So the

7    vacant building registration has gone up, but when I

8    bought it, they were only $300 a charge.

9          Q    It looks like you, right now, have about

10   39 different properties that are licensed, is that --

11         A    I think I have 43 or 44.  I can't

12   remember.  Some of them are rental units and some of

13   them are single-families and one is a nine-unit

14   building and some are duplexes.

15         Q    Are any of your properties qualified for

16   participation in the US Section 8 Subsidized Housing

17   Program?

18         A    All of them are.

19         Q    So you can accept Section 8 tenants?

20         A    Correct, I have Section 8 tenants.

21         Q    As I understand that program, those are

22   basically low-income tenants who need help with

23   payment for rent for a living place?

24         A    Correct.  According to their income, they

25   get assistance.

```
1          Q    Now, the remaining properties -- would you
2     say it is fair to state that you basically rent your
3     properties to the lower income affordable housing
4     section of the rental market?
5                    MR. WOLF:  Your Honor, I would
6     object.  It does not go to the case that the City is
7     presenting, as far as the two license revocations and
8     the management of his property.
9                    MR. ROONEY:  It certainly goes to
10    Good Cause, Your Honor.
11                   HEARING OFFICER GUROVITSCH:  Well,
12    it is a leading question, for one thing.  Why don't
13    you rephrase it.
14                   MR. ROONEY:  Okay.
15    BY MR. ROONEY:
16         Q    How would you characterize the tenants in
17    your buildings?  Can you characterize in terms of
18    income level?
19         A    I can.
20         Q    Well, how -- what would you --
21         A    They are low-income people that are
22    struggling to make a living.  Most of them -- I would
23    say 90 percent-plus are in the welfare system, where I
24    get the checks from the County, or they get checks and
25    they will pay me, and most of them are minorities.
```

1       Q    Why do you rent to those kinds of tenants?

2       A    Because the neighborhood is such that, you

3 know, people don't vote.  Higher earning people don't

4 come into those neighborhoods, and I also provide

5 low-income housing because I went through some

6 hardships in my life, and I want to be reasonable, and

7 I work with all the tenants, making sure that when

8 they rent and they have problems, they don't get

9 evicted right away, I give them time.  I work with

10 them.

11       I can go in the middle of night in North

12 Minneapolis and I'm not afraid of anybody hurting me

13 or getting mad at me or my tenants, so I feel

14 comfortable renting to people that are

15 underprivileged, and I work with them, and that's my

16 sincere effort.

17       Q    How do your tenants come to you?  Can you

18 provide any generalization about how your tenants come

19 to you?

20       A    Originally, when I initially bought

21 property a long time ago, which is 30 years ago, I

22 used to run ads in the Minneapolis Tribune, and after

23 a while it's -- I'm saying the last 10, 12 years -- I

24 haven't had to run any ads in the papers, it's word of

25 mouth, the people in Minneapolis, and I work with the

1   agencies downtown.

2          Section 8, I have a listing in their

3   pages.  I have my listing where the people get

4   economic assistance.  I distribute to some of the

5   people there, that if they need housing, they would

6   call me.

7      Q    Do you know if you are listed on any kind

8   of bulletin board at the Minneapolis Public Housing

9   Authority?

10                 MR. WOLF:  Your Honor --

11                 THE WITNESS:  To the best of my

12   knowledge --

13                 MR. WOLF:  -- that is a leading

14   question.

15                 MR. ROONEY:  It just calls for a yes

16   or no.

17                 HEARING OFFICER GUROVITSCH:  I will

18   allow it.

19                 THE WITNESS:  It's just -- I don't

20   know what.  They call me -- I don't know their system

21   is at Section 8, or public housing, or other places

22   is, all I know is I get a call and they say and they

23   say, We got your number from this place, so I don't

24   ask them where it's from.

25

```
1    BY MR. WOLF:

2         Q    Have you ever had involvement with Mary's

3    Place, in terms of --

4         A    It's a homeless shelter.  Yeah, I work

5    with Mary's Place.

6         Q    How about People Serving People?

7         A    I work with them as well.

8         Q    How about Catholic Charities?

9         A    I work with them, as well.

10        Q    How about the Salvation Army?

11        A    Yes.

12        Q    How about Lutheran Social Services?

13        A    Yes.

14        Q    How about St. Steven's Shelter?

15        A    Yes.

16        Q    How about Hennepin County Shelter Program?

17        A    Yes.

18        Q    How about Simpson Housing Services?

19        A    Yes.

20        Q    How about Elim Transitional Housing?

21        A    Yes.

22        Q    How about Community Action Hennepin

23   County?

24        A    Yes.

25        Q    Okay.  And do you go soliciting tenants
```

294

1     from them, or do they call you?

2          A    I don't ever go there.  I just -- they

3     just call me.  It's word of mouth, and I'm approved.

4     They look at my list, whether I'm -- my property is

5     licensed and any outstanding orders they've got and

6     say, Mr. Khan, you need to complete this order and you

7     need to complete that order, and then I'll call the

8     City -- or they'd call the City inspector and say,

9     Well, these are outstanding orders, then I would pass

10    it and they release the check.

11         Q    So these agencies that we just went

12    through, have any of them only been one-time sources

13    of referral for you, or are they more than one time

14    sources?

15         A    Multiple.  The majority of my tenants come

16    from them.

17         Q    And do any of them -- in addition to

18    making you available to their clientele as a potential

19    landlord -- do any of them provide actual financial

20    subsidies for the tenants so that you actually receive

21    checks from these places?

22         A    Yes, I do.  Almost all of them.

23         Q    As far as you can see, do they have any

24    requirement, before they will subsidize a tenant's

25    rent with you, that your property be in licensing

1   compliance?

2       A    Almost all of them check the City and see

3   if I have a license coded, and whether or not there

4   are outstanding work orders.

5            I think it's St. Stevens, or one or two of

6   the departments that come to the house, actually do an

7   inspection, and then they say, well, you know, it

8   needs, you know, carpet replaced or something -- small

9   little things, and once I do that, they will rent.

10      Q    Okay.  Are there any that you can think of

11  that I have overlooked in this list that I gave you?

12      A    There's -- I do have -- I can't -- I do

13  have a few more companies, but I can't recall right

14  off the top of my head.

15      Q    Similar kind of organizations?

16      A    Similar organizations, and there are

17  people, like, from the jail, you know, all of these --

18  sometimes a parole officer will call me and say,

19  Mr. Khan, will you rent to so-and-so?  He has -- I'd

20  say, If it's a felony or something that's very serious

21  in the past five years, I can't do that, but if they

22  have evictions, I don't mind working with them, if

23  they are not too old.

24           And I give them -- I work with the parole

25  department and people that are released from jail.  I

1    work with everybody.

2         Q    Would you regard yourself as a hands-on

3    manager of your business and your properties?

4         A    100 percent.

5         Q    Do you participate, for example, in

6    cleaning up trash from your properties?

7         A    I do, regularly.

8         Q    What was the last time?  Have you done it

9    this week?

10        A    Yes, I was there.  For 1030, the people

11   had left a lot of trash -- or the neighborhood people

12   left it, because there was no -- this Donna lady

13   that's just testified, she was there.

14             But there was an old car parked there.

15   The wheels had been taken off, the engine had been

16   removed, so I had a tow company remove that, and there

17   was trash, a lot of trash, and a sofa, and all of that

18   I cleaned up.

19        Q    How did you find out about that?

20        A    Just by driving by, you know, being there.

21        Q    How often would you say you actually,

22   yourself, drive by your various properties, on

23   average?

24        A    Seven days a week, I'm on the North Side,

25   whether it's a weekend or weekday.  I mean, seven days

1    a week.  I put in about 60, 70 hours on the North

2    Side, whether I'm fixing it, repairing, and driving

3    by, or getting my, you know, crew to do some work.

4              Because lot of these properties are very

5    old, so I am continuously fixing them or monitoring

6    them.

7         Q    Do you have any help in managing your

8    business?

9         A    Yes, I do.

10        Q    Who helps you?

11        A    My wife does the most, in regards to

12   letters that we receive from the City about

13   maintenance or work orders or, you know, yards that

14   need to be mowed, or thing of that nature.  She does

15   all the bookkeeping in the computer and tenants'

16   records.

17        Q    Is your wife employed, or is she able to

18   give full-time attention to that, or as much attention

19   to that as it needs?

20        A    She's not employed.  She's a stay-at-home

21   mom, and that's all she does.

22        Q    Is she good at it?

23        A    She is very good at it.

24        Q    Okay.  Do you have any adult children who

25   provide you any help in your business?

```
 1           A    I have two kids -- two children; one is 34
 2    years old, my daughter, and my son is 28 years old.
 3           Q    And what is your daughter's name?
 4           A    Ayesha Khan.
 5           Q    Does she provide you any help in your
 6    business?
 7           A    Yes, she does.
 8           Q    What does she do for you?
 9           A    Well, she goes around and collects rents
10    and also, you know, monitors the properties.
11           Q    And does she have employment outside of
12    helping you?
13           A    Yeah.  She coaches volleyball, and she
14    also has a real estate license to sell real estate,
15    and she's a broker -- or not a broker, but a Realtor.
16           Q    And your adult son, does he help you with
17    the business?
18           A    Yes.  He does the collection of rents,
19    and, again, he does monitoring stuff, and he's also
20    mortgage broker.
21           Q    How about Leah Stuart, what is her
22    involvement with your business?
23           A    She is a tenant of mine at 1604-27th
24    Avenue, and she does the same thing, she monitors all
25    the properties, she'll serve eviction notices if I
```

1    need it, or she will, also, collect rents

2    occasionally, but her job is to monitor all the

3    properties on a regular basis.

4         Q    Now, there is testimony, I think, from

5    Mr. Azmoudeh today about a management company called

6    EIG Management.

7              Over the course of your owning and

8    managing rental properties, have you ever employed

9    management companies?

10        A    I have.  I've employed about -- within the

11   last 30 years, you know, I've tried 4 or 5 different

12   companies, but EIG was within the last, I think, 2 or

13   3 years.  I can't remember exactly.

14        Q    Why did you terminate your relationship

15   with EIG.

16        A    Well, I explained to Ms. Kellie Jones, who

17   is in charge of the Problem Properties Unit at that

18   time, the reason I terminated was because one of the

19   first conditions when I met were Mr. Alex Eaton at

20   EIG, along with my wife, was, Look, we get all these

21   letters.  My wife's main concern was, I want these

22   letters to stop coming here to my house.  I want you

23   to monitor the properties.  No more letters coming

24   here to my house.

25              I want you to monitor the properties, no

1    more letters, because this is, you know, what makes us

2    look bad and doesn't get done.  I let him manage the

3    properties for over six months, and those letters

4    never stopped.  We were getting the same letters.

5             He was not taking care of all of the

6    issues on the outside of the property, which was the

7    focus of our meeting and my giving him that business.

8             And we had met with Kellie Jones and

9    Mr. Azmoudeh and everybody in that room right here at

10   City Hall in their office, and we discussed this, and

11   we were very particular, and so was Ms. Kellie Jones

12   and Mr. Azmoudeh and the police officer and everybody.

13            We said, you know, We want no more letters

14   coming.  We don't want these headaches to be going on,

15   but that did not stop, because he wasn't doing it.

16        Q    Was he charging you a fee, of course, for

17   that?

18        A    Yeah.  I told Ms. Kellie, also, the same

19   thing.  It cost me over $25,000, but I have got no

20   results.  I have lost a lot of rent money because he

21   wasn't able to collect.  He would write letters to

22   them to pay the rent.  On some of these tenants, you

23   have to stand there and say, Hey, if you can't pay,

24   you will have to be evicted, and you have to file

25   evictions, unless you give them work -- time to pay,

1    but he wasn't doing what I, basically, hired him to

2    do, which was to lessen the load of the City and

3    myself and the headaches I was getting.

4        Q    In terms of the management of your rental

5    property business, would you say it has been the same

6    throughout the last five years, that the management

7    has gotten less capable in the last five years?  It

8    has gotten better?  How would you characterize any

9    trends, with respect to management?

10       A    Initially when I bought the properties in

11   2008, there was a lot of properties that had a lot of,

12   you know, defects, structural defects, maintenance

13   defects, plumbing, electrical, heating.

14            These are -- most of my properties are

15   built in 1890, 1900, early 1900s, so they are over

16   100, 125 years old, and I was going around fixing most

17   of them to the level that the tenant would be

18   comfortable and the City would be happy.

19            So I haven't had -- I haven't given the

20   chance to the City to -- I might have been late in

21   completing my Restoration Agreements, and I stated the

22   same thing to the City Council.  I said, you know, We

23   have a bridge on North Minneapolis, because the

24   Plymouth Bridge connects Northeast to North

25   Minneapolis, the Lowry Bridge -- both of them are

```
 1    closed, and they are -- Lowry Hill is two years behind

 2    schedule.

 3              You're not demolishing those bridges

 4    because you are behind schedule, but you're

 5    demolishing my property at 2501 Golden Valley Road, an

 6    11-unit building -- because I'm behind schedule.

 7              The tornado happened in 2013 -- May

 8    of 2013 -- in December 2013, I had a placard on my

 9    building saying your building is going to be

10    demolished, six months.

11              And I have proof of a lot of property that

12    are still standing after six -- five, six years.  The

13    placards are still there, and the property is still

14    standing.

15         Q    Well, let's zero in a little bit on

16    2501-1st Avenue.  After the tornado damaged the

17    property -- well, first of all, immediately before the

18    tornado damaged the property, was it licensed and

19    occupied by tenants?

20         A    It was licensed and occupied, and I had

21    installed all brand new windows in that property.

22    Brand new windows all throughout the whole property,

23    and I got help from Mr. Tom Deegan, who was in charge

24    of the Problem Properties Unit, and he says, You know,

25    Mr. Khan, why don't you apply with the Lead Department
```

1    and see if they can get you some help.

2              So we worked together and I pulled in my

3    money and I chipped in my money and we did all new

4    windows.  That was a solid brick building.

5         Q    Did those windows have to -- did that

6    involve building permits?

7         A    Yes, and those were all taken properly and

8    done right.

9         Q    And inspected?

10        A    And inspected and passed.

11        Q    As long as you brought up the Health

12   Department and lead, have you had any ongoing

13   involvement with the Health Department, with respect

14   to abating lead paint issues in any of your houses?

15        A    I worked with Ms. Fardoza, from the Lead

16   Department.  She works for the City of Minneapolis.

17        Q    You don't have any way of helping out the

18   court reporter by being able to spell it, or anything?

19        A    Fardoza, F-A-R-D-O-Z-A.

20        Q    Okay.  Thank you.  How do you work with

21   her?

22        A    And Mr. Alex is her boss.

23        Q    Okay.

24        A    I work with them because they come to me

25   and say, you know, We have some issue with your

1    property, or I will approach them myself and say,

2    Look, I'm -- this apartment -- this house is vacant,

3    these windows are, you know, 100 years old.  Can you

4    help me?  And they will come look at it and make an

5    assessment of the lead, and they do the reading and

6    say, Yeah, this house needs it.

7            So they will come in and re-do the whole

8    property and I will way them for their services and

9    make sure the paint is done.  I have done, I would

10   say, close to ten properties with them.

11       Q    And do those lead abatement procedures and

12   replacing the windows -- does that involve inspections

13   and approval by either the Health Department or the

14   City Building Code Department?

15       A    Both.

16       Q    Okay.

17       A    It has to be approved by the City

18   Inspection Department because the permits been pulled

19   at the Health Department because they have to re-do

20   the test.

21       Q    Have you ever had any instances in that

22   kind of work where the work that was done failed to

23   pass the inspection?

24       A    No.

25       Q    I am sorry.  I got off track.  I want to

1    get back to 2501 Golden Valley Road.

2              And I don't want to re-hash -- that

3    property ultimately got ordered to be condemned and

4    demolished and was demolished per City Council orders;

5    is that correct?

6         A    That's right.

7         Q    But between the tornado happening and the

8    ultimate demolition of the building per the

9    Condemnation Order, what efforts did you make to try

10   to rebuild and remodel that building?

11        A    Even -- it's recorded in the City Plumbing

12   Department.  I pulled the permits to do the repair for

13   $140,000 of the repair because they would only give me

14   an emergency permit to do just the outside work, which

15   was the roof and all the brick that got damaged.  This

16   was the 11-unit big, huge building.  I pulled the

17   permits, finished the work, and it passed inspection.

18        Q    So the roof and brick repair passed

19   inspections?

20        A    That's right, and the inside work, the

21   City dragged their feet for close to two years.

22              MR. WOLF:  Your Honor, I would

23   object.

24              HEARING OFFICER GUROVITSCH:  It is

25   nonresponsive, actually.

```
1              MR. WOLF:  Nonresponsive, and the
2  demolition order was appealed by Mr. Khan, went up to
3  City Council, and went to appeal at the Court of
4  Appeals, and the demolition was upheld, so that has
5  already been adjudicated.
6              MR. ROONEY:  Let me narrow the
7  question a --
8              HEARING OFFICER GUROVITSCH:  Let's
9  move on.
10             MR. ROONEY:  May I just ask a couple
11 more brief questions in this area?
12             HEARING OFFICER GUROVITSCH:  As far
13 as 2501 Golden Valley Road, I have heard enough.
14 BY MR. ROONEY:
15     Q    Before the storm, and, so, irrespective of
16 any repair or condemnation issues, had you employed
17 any private security services at the request or
18 direction of the City for Golden Valley Road?
19     A    Yes, I did.  I hired off-duty police
20 officers, and I paid them, at that time.  This was
21 almost 10 years ago.
22             HEARING OFFICER GUROVITSCH:  What
23 property are we talking about?
24             MR. ROONEY:  2501 Golden valley Road
25 before the storm.
```

1              THE WITNESS:  Before the storm, I

2   hired off-duty police officers to monitor the property

3   and they were paid for the services.

4   BY MR. ROONEY:

5         Q    Okay.

6         A    Because the City said there was too much

7   crime going on.  There was a bus stop right in front

8   of the property, right, you know, down the steps, so I

9   hired them and they helped me with it.

10        Q    Okay.  That is enough for 2501 Golden

11  Valley Road.  I want to get back to the tenants who

12  rent from you.

13             Do you obtain written rental applications

14  from your people who want to rent from you?

15        A    Written applications?

16        Q    Do tenants fill out rental applications?

17        A    No, they don't.

18        Q    Do you find out -- do you make the final

19  decision of whether you will accept someone as a

20  tenant for you, or does any of your staff make those

21  decisions?

22        A    No, I do.

23        Q    Okay.  And do you inquire as to criminal

24  history or history of unlawful detainers with the

25  people that apply?

1        A    I do for mostly criminal and unlawful

2   detain, and I'm not really that strict because we all

3   had issues in our life, so I treat them, like, not

4   very harsh, but criminal, I do.  I check the

5   backgrounds.  I have, you know, sources to do that.  I

6   use the computer and access the criminal information.

7        Q    Are there any licensing requirements that

8   you are aware of that forbid you to rent to people

9   with certain levels of criminal history?

10        A    Not to the best of my knowledge, there are

11   no licensing requirements.

12        Q    What standards, then, do you go by when

13   you look at criminal history?

14        A    I just -- you know, I worked with the City

15   police department, Mr. Luther Krueger, and I try to

16   avoid criminals that have, you know, like, felonies,

17   sexual abuse, sexual misconduct, and prostitution

18   within the last five years.  If it's older than five

19   years, I will consider that, but I do check their

20   background, and I do check all that information.

21        Q    Okay.  Now, you said that --

22        A    Drug dealing, illegal prostitution,

23   gambling.  All those things that the City has to do.

24        Q    Now you said you worked with Mr. Krueger.

25             Do you have an agreement with Mr. Krueger

1    for any particular properties that you --

2         A    There's a few properties that had got

3    raided by the police for -- and they found, maybe,

4    small amount of drugs, or possession of a gun, or

5    something like that, illegal possession of a gun, so

6    they gave me a -- what you call -- some kind of

7    agreement.  I have to make -- I have to monitor the

8    properties for the activity of the tenant and be more

9    vigilant about who to rent to.

10        Q    As far as you know, are you in compliance

11   with the City for those kinds of agreements?

12        A    Yes, I work with Mr. Krueger.

13        Q    Okay.  Do you have any way of knowing from

14   your inquiries with tenants how many of them come to

15   you from homeless situations in one way or another,

16   either jail or homeless shelters or -- do you have any

17   way of getting that information when you are talking

18   to tenants?

19        A    No, I don't.

20        Q    Do you have any way of estimating, from

21   the sources of referrals that you get for tenants, how

22   many of your tenants come from those kinds of

23   backgrounds?

24        A    I would say, you know, about half of them

25   come from sources like, you know, shelters and other

1   places.  They call me from there, and I help them out.

2   And normally it is Hennepin County, they will send

3   them to me, but I'm not sure whether they come from

4   homeless shelter or if they're just looking to move.

5       Q    Sure.  Can you state any kind of average

6   of how -- is there any way to average how long --

7   well, let me back up and come from a different place.

8            Do you have tenants -- Ms. Graham

9   testified this morning that she has rented from you at

10  two different locations on three different occasions.

11           Is she unique or unusual in that respect?

12  Or do you have tenants who come back to you to seek

13  rental after they have rented from you before?

14      A    The majority of my people that I have or,

15  you know, that either they have come back to me after

16  I've evicted them or they come back and say, Give us a

17  second chance or a third chance, and, you know, my

18  nature is such that I have forgiven the people much,

19  much more than most tenants -- most landlords would

20  do.

21           We all have -- I've gone through hard

22  times myself in my life, so I'm not very strict, or

23  I'm not very vindictive, or, say, you know, you did

24  this.

25           I just say, If you can make the previous

1    payment somehow, which never happens, but I still

2    granted them, because we all have gone through some

3    hard times.  I don't know.

4          Q    Do you think you accept people as tenants

5    who other landlords would not accept on account of

6    their history of unlawful detainers.

7          A    Most of them, you know, like I said --

8                MR. WOLF:  Your Honor, I would

9    object.  That is speculation as to what other

10   landlords would take as far as unlawful detainers.

11               HEARING OFFICER GUROVITSCH:  There

12   is no foundation for an opinion.

13               MR. ROONEY:  Thank you.

14   BY MR. ROONEY:

15         Q    Do you ever rent to tenants who you become

16   aware have been rejected as tenants by other

17   landlords?

18         A    Oh, yeah.  Most of the people in the

19   shelters that come, they don't like to because they

20   have -- and most of the times, if they have criminal

21   background or eviction in the last six months, year,

22   or two years, people won't even look at it, so I would

23   rent to them.

24         Q    Do you ever turn down prospective tenants?

25         A    I have.

1        Q     Why?

2        A     Because of the criminal backgrounds, you

3    know, they come up with drug dealing or what they call

4    in the computers the criminal thing says disorderly

5    conduct.  It doesn't explain exactly what it was, but

6    when I see disorderly conduct, it raises, you know,

7    some questions.  What was the reason?  And I will --

8        Q     And I am sorry.  I got off track with

9    something I wanted to ask you more about, and that is,

10   I was asking you about the trends, if there had been

11   any trends in your management of your properties over

12   the last five years, and I got the impression that

13   there was an awful lot to do immediately after you

14   bought those properties in 2008.

15         Have you gotten a better handle on

16   managing things since then?

17       A     I think so.  I do have a lot less letters

18   that come now, and a lot less, you know -- whenever

19   the inspectors come, whoever comes for the

20   inspections, I want to make -- I make sure that I meet

21   with them and go with them.

22         And sometimes they just take a picture of,

23   you know, the light fixture was loose, just send it to

24   us, we'll clear it for you, so I have got a lot better

25   handle.

1          I have a lot -- my kids are helping me, my

2     older kids, my wife, and then Leah is helping me, and

3     I do occasionally get -- most of my single-family

4     homes, the tenants are required to do their own yard,

5     which is to mow their lawn, and everybody else -- it

6     says in the lease, and when they don't do it, I find

7     out sometimes a little late that I have to come do it.

8          Whenever I monitor -- whenever I see it I

9     tell them, Are you doing it?  Some of them -- as a

10    matter of fact, most of them don't have lawnmowers, so

11    I send my own people and I do not charge them.  I

12    don't say, you know, You didn't do it so I'm going to

13    charge you.

14         I don't charge any late fees.  Most of --

15    95 percent of my tenants are late -- behind in rent,

16    and I have never -- I would say the majority of the

17    tenants, I don't even ask for a late fee.

18    Q    But you have to do -- well, let me --

19    before I get to that -- so are you managing things

20    better now than you were three years ago?

21    A    Oh, definitely.

22    Q    You do have to evict tenants from time to

23    time; is that true?

24    A    Regularly.  Every month I think four,

25    five, six evictions every month, and that is after I

 1   have given them one, two, three months of leeway, and

 2   say, Please, come up with it.  Please, come up with

 3   it.

 4        Q    Okay.  On the book, there, on the corner,

 5   that is -- the three-ring binder -- I would like, if

 6   you would, to open that to Exhibit Number 7.

 7             Do you have a standard form written that

 8   you use -- it is behind tab 7 -- oh, no.  I am sorry.

 9   It is the big book on the corner of the ledge.  There,

10   that is the one.

11        A    This one?

12        Q    Yes, that is the one.

13        A    Yes.

14        Q    Do you have a standard form residential

15   lease that you use?

16        A    That's right.

17        Q    Is that what is shown there in Exhibit 7?

18        A    That's right.

19        Q    Okay.  So even though it says a late fee

20   of 8 percent will be charged, that is not something

21   that you routinely do?

22        A    I never do.

23        Q    And that is in a combination with --

24        A    I shouldn't say never, but 99 percent of

25   the time I do not charge a late fee.

1        Q    Okay.  And this -- particularly the second

2   page of the lease, under the B heading, Use of

3   Apartment -- does talk about some of the obligations

4   that the tenant has?

5        A    That's right.

6        Q    Okay.

7        A    And as you can see, since that event in

8   3223 Bryant where the people were sleeping in the

9   basement, and I write that specifically in this lease.

10  I say basement and rooms smaller that 70 square feet

11  may not be used as a bedroom.

12       Q    So that was, at least, an effort to deal

13  with that problem that came up at 3223 --

14       A    That's right.

15       Q    And then I would like you to turn to

16  Exhibit 8 -- the document behind Tab 8.  These are a

17  couple of your eviction cases where there is payment

18  agreement?

19       A    That's right.

20       Q    So am I correct in thinking that when you

21  get a payment agreement in an eviction case, the Court

22  says you are entitled to the writ of recovery, and

23  then you make a deal with the tenant where you won't

24  exercise that writ if they can get caught up on the

25  rent in a period of time?

1    A    Correct.  I did follow the agreement,

2  here.  I try to agree with them.

3                    MR. WOLF:  Your Honor, I had

4  previously objected to Exhibit 8.

5                    MR. ROONEY:  Not that I am aware of.

6  I thought 6 was the one that was out.

7                    HEARING OFFICER GUROVITSCH:  I am

8  going to look at Mr. Wolf's letter.

9            "Examples of settlement agreement with

10  tenants made by Mr. Khan in eviction proceedings.

11  Objection for relevancy."

12                    MR. ROONEY:  I don't recall your

13  ruling on that objection, I am sorry.

14                    HEARING OFFICER GUROVITSCH:  I did,

15  in chambers, I believe, just before we started.  I did

16  rule on all of the objections.

17                    MR. ROONEY:  I thought it was 6, and

18  14 through 32.

19                    MR. WOLF:  No, I thought it was --

20                    HEARING OFFICER GUROVITSCH:  Let

21  me --

22                    MR. ROONEY:  I am sorry, then.

23                    HEARING OFFICER GUROVITSCH:  --

24  review that.  Number 6, 8, 9, 10 -- I am sorry -- 10

25  and 11 would be admissible provided that there is a

1   proper foundation laid, 12, 13, 14, 15, 16, 17, 18,

2   19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31

3   and 32 were objected to, and I sustained the

4   objections.

5                      MR. WOLF:  I don't think 12 and 13,

6   I objected to, Your Honor, but 14 through 32 I did.

7                      MR. ROONEY:  14 through 32 I

8   definitely remember an objection being made and

9   sustained, and the two photographed ones, which are 10

10  and 11, I remember, sort of, the objection being

11  reserved, pending certification.

12                     MR. WOLF:  Yes.  But I objected to

13  6, 8; I removed the objection to number 9; 12 and 13,

14  I didn't object to; and 14 through 32, I did.

15                     HEARING OFFICER GUROVITSCH:  All

16  right.  Would you repeat that, please.

17                     MR. WOLF:  I objected to 6, 8; 9, I

18  removed my objection to when we started; 10 and 11

19  were pending foundation; 12 and 13, I did not object

20  to; and 14 through 32.

21                     HEARING OFFICER GUROVITSCH:  I stand

22  corrected.

23                     MR. ROONEY:  And I apologize.  I did

24  not realize Number 8 was not part of the record.  I

25  will take it out.

BY MR. ROONEY:

    Q    In any event, regardless of referring to any document or not, can you tell the Court whether you routinely agree to settlement agreements in unlawful retainer cases that you bring?

            MR. WOLF:  Your Honor, I would object to relevance again.

                HEARING OFFICER GUROVITSCH: Sustained.

            MR. ROONEY:  Okay.

BY MR. ROONEY:

    Q    Mr. Khan, do you remember starting a lawsuit with a tenant -- in other words, you and a tenant at 2123 Oliver Avenue North, named Candace Vance [phonetic], bringing a lawsuit against the City respecting a potential condemnation of that property?

    A    Correct, yes.

    Q    And that lawsuit was ultimately resolved by a settlement in which the Court ordered that the City give you time to finish necessary repairs or improvements in order to avoid the condemnation?

            MR. WOLF:  Your Honor, before Mr. Khan answers that, can we approach?

                HEARING OFFICER GUROVITSCH:  You may.  We are off the record.

```
 1                    (A discussion was held off the record.)

 2                         HEARING OFFICER GUROVITSCH:  Back on

 3    the record.

 4    BY MR. ROONEY:

 5         Q    So do you have your exhibit book opened to

 6    that -- now I am confused.  I think it is behind

 7    Tab 10.

 8                         MR. WOLF:  9.

 9    BY MR. ROONEY:

10         Q    Is that the document entitled Order to

11    Dismiss?

12                         HEARING OFFICER GUROVITSCH:  No.

13                         MR. WOLF:  I think that is

14    Document 9.

15                         HEARING OFFICER GUROVITSCH:  10 is

16    the photo showing damage to licensed properties.

17                         MR. ROONEY:  No.  I have -- okay.  I

18    have got them mixed up.  Anyhow.

19    BY MR. ROONEY:

20         Q    This is Number 9.  That is the copy of the

21    order that was ultimately issued in that case?

22         A    That is right.

23                         MR. ROONEY:  Okay.  That is all the

24    questions I have.

25                         HEARING OFFICER GUROVITSCH:  And 9
```

```
 1    will be received.
 2                    MR. ROONEY:   Thank you.
 3    BY MR. ROONEY:
 4        Q     Do tenants -- given the nature of the
 5    properties you rent and the population of tenants that
 6    you rent to -- do you have occasions when tenants do
 7    damage to your property before leaving it?
 8        A     Almost all of them do.
 9        Q     And there was a property at --
10        A     When I say damage, I mean, you know,
11    carpet is messed up, basic stuff, you know, normal
12    wear and tear, plus some damage to -- doors off the --
13    like the -- cabinets and stuff like that, and things
14    are broken.
15        Q     Are there ever instances where tenants do
16    deliberate damage to your property?
17        A     Yes.
18        Q     And was there an occasion when that was
19    done at 2319-3rd Street North?
20        A     Yes.
21        Q     Did you report that to the police?
22        A     I did.
23        Q     Do you remember when that happened?
24        A     It happened on May 19 -- May 18th or 19th.
25        Q     Of this year?
```

1          A     Of this year.

2          Q     Okay.   Turning to Tab 10, what do those

3     photos represent?

4          A     These are the actual pictures of the

5     property located at 2319-3rd Street, and the police

6     department came and made a report about it, which I

7     have right here.   I got a copy from the City

8     Attorney's Office.

9          Q     Were you out there yourself on that day?

10         A     I was there the next -- the day the tenant

11    was evicted, I went there to take possession, and I

12    saw all this damage.

13         Q     So these photos that are behind Tab 10, do

14    they accurately depict what you saw that day after the

15    tenant was evicted?

16         A     Yes.

17         Q     Did you subsequently clean the apartment

18    up and repair the damage to the wall and doors?

19         A     Yes.

20         Q     And have you re-rented it to other

21    tenants?

22         A     Yes, just recently.

23         Q     Was there considerable expense involved in

24    doing the repairs?

25         A     Yes.

1      Q    Was there something -- a U-Haul left at
2  this property, or do you recall anything about that?
3                    MR. WOLF:  Your Honor, I would
4  object.  It is leading -- or definitely leading.
5                    HEARING OFFICER GUROVITSCH:
6  Sustained.
7                    MR. ROONEY:  Okay.
8  BY MR. ROONEY:
9      Q    Can you recall any damage to the property,
10  at that time, that you saw, that is not depicted in
11  these pictures?
12     A    Yes.  There was windows that were cracked,
13  you know, broken.  There was stuff in the toilet that
14  they had blocked -- plugged it up, and I had to call
15  the plumber to unplug it, and there was a van that was
16  parked outside that was making deep holes inside
17  the -- in the side of the yard because it had a side
18  door, and then the police took pictures of all that
19  and made a note of it, but it wasn't illegal -- it was
20  a legal U-Haul truck.
21     Q    So did U-Haul come and get the truck?
22     A    No, I think it was taken by the tenant
23  later on.  It was stuck in the mud, actually, because
24  it was so wet, and that is why it was there.
25     Q    Okay.  Now, I want to get into the issue

```
1    of what, if any, improvements you make to your rental

2    properties, and if you would look behind Tab 11, I

3    think there is two pictures.  One shows a tile floor

4    in the foreground.

5               Do you see that?

6                    HEARING OFFICER GUROVITSCH:  Excuse

7    me.  Before we get into the next exhibit, I did not

8    hear any testimony about who took these pictures.

9                    MR. ROONEY:  I don't think I need to

10   provide testimony as long as the witness testifies

11   that they accurately reflect what he saw, but I will

12   ask the question.

13                   HEARING OFFICER GUROVITSCH:  I think

14   that is something I would like to know.

15   BY MR. ROONEY:

16        Q    Do you know who took these pictures?  Not

17   these new ones behind Tab 11, but the ones behind --

18                   HEARING OFFICER GUROVITSCH:

19   Pictures of the damage.

20   BY MR. ROONEY:

21        Q    The damage pictures.

22        A    These pictures were taken by Leah Stuart

23   and by myself and our camera is an iPhone 6.

24                   HEARING OFFICER GUROVITSCH:  Thank

25   you.
```

1  BY MR. ROONEY:

2      Q    So Leah Stuart was there that day, as

3  well?

4      A    Yeah, she was there, and then when I got

5  the police report, it says right there in the police

6  report that the owner will be taking photos of the

7  damage.  I got this copy yesterday.

8                  HEARING OFFICER GUROVITSCH:  And you

9  are offering Exhibit 10?

10                 MR. ROONEY:  I thought I would offer

11 them all at the -- you are right.  Yes, I would offer

12 Exhibit 10.

13                 MR. WOLF:  No objection, Your Honor.

14                 HEARING OFFICER GUROVITSCH:

15 Received.

16 BY MR. ROONEY:

17     Q    How about the two photos behind Tab 11 of

18 that book, do you recognize what is shown first in the

19 first one?

20     A    Yes.

21     Q    What is it?

22     A    That's, again, the same property address,

23 2319-3rd Street.

24     Q    This is after it has been cleaned up?

25     A    After it has been cleaned up, but you can

1    see the ceiling was damaged by the tenants.  You can

2    see that the ceiling still needed to be repaired

3    because they had put holes in the same property.  This

4    was the upper unit.  It was a duplex.

5         Q    So the ceiling -- this photograph on the

6    first page of Exhibit 11 still shows damage to the

7    ceiling.

8              Has that been repaired since this

9    photograph was taken?

10        A    Yes.

11        Q    Okay.  And do you know who took these

12   photos?

13        A    Probably Leah did.  I did not take these

14   pictures.

15        Q    Those were taken sometime after the

16   repairs -- did this beyond repairs, this clean-up, was

17   this new tile and new carpeting?

18        A    Yeah, this is new carpeting, but the tile

19   is not new.  It's from the previous owner that had put

20   it in there.

21        Q    How about the second picture behind Tab

22   11, do you recognize what that is?

23        A    I know that I've installed new flooring on

24   there, wood flooring.  I can't recall.  I've done so

25   many properties, this one I can't seem to recall which

1    property this is from, but I did put new flooring,

2    because carpet creates a problem, so I started putting

3    wood flooring in all my properties.

4         Q    Is this representative of the kind of wood

5    flooring that you put in your properties?

6         A    That's right.  Some of them is real wood,

7    some of them is laminate, some of them is engineered

8    wood.  There are three different kinds, but I would

9    use whatever I can find.

10        Q    Who do you have that puts the wood

11   flooring in for you?

12        A    I have a guy that does the woodwork.  He

13   is from Mexico, he's a Mexican guy -- a legal

14   resident.  He does this work.  He does roofing for me,

15   as well, windows and doors, flooring.

16        Q    Okay.  Do you know who took this picture?

17        A    Probably Leah, the manager, did it,

18   because I don't recall taking this picture.

19                   MR. ROONEY:  Offer Exhibit 11, Your

20   Honor.

21                   HEARING OFFICER GUROVITSCH:  Does

22   the City have any objection to 11?

23                   MR. WOLF:  No objection, Your Honor.

24                   HEARING OFFICER GUROVITSCH:  It will

25   be received.

```
 1   BY MR. ROONEY:

 2        Q    Mr. Khan, in the course of owning your

 3   properties, is it fair to say that you have had any

 4   number of housing inspections which pointed out

 5   repairs that needed to be made to the property.  You

 6   have had inspections which resulted in Requests for

 7   Service for you to do particular repairs to the

 8   property; is that correct?

 9        A    Yes.

10        Q    And you have done those repairs; is that

11   correct?

12        A    Correct.

13        Q    In addition to those, have you, on your

14   own initiative, made any repairs or improvement to

15   various properties?

16        A    Yes.  I've made various improvements that

17   does not require any City input or anything from

18   the -- orders from the City, and I think I have a list

19   of it someplace here.

20        Q    Well, I would like you to turn to the

21   exhibit behind Tab 12.  It was a copy of the letter

22   you sent.

23             Is that -- that appears to be a copy of a

24   letter to the Minneapolis City Council dated

25   September 25, 2013?
```

```
1           A     Correct.

2           Q     Did you send this letter?

3           A     That's right, I did.  And e-mailed it, and

4     sent copies of the same letter to all the -- most of

5     the inspectors I knew, Wayne Murphy, Mr. Forbragd -- a

6     few other people.

7           Q     So you have got listed there 23 properties

8     in which you have installed new roofs; is that

9     accurate?

10          A     Very accurate.

11          Q     And did you have -- were you required by

12    the City to do that?

13          A     No.

14          Q     What does it mean -- if you go down that

15    list towards the bottom, there is a number of entries

16    where there is, in parentheses, after the address,

17    code compliant.

18          A     These are properties that I bought at

19    different times.  Like the 1001 Logan that says that

20    was going to be demolished.  The City was going to

21    demolish it, and it was a beautiful property.

22                I met with Mr. Tom Deegan at that time,

23    who was in place of Mr. Farrokh Azmoudeh, he was in

24    charge of that department, and I explained to him, and

25    I had way more people -- the inspectors come in.  I
```

1    said, Look, it is a beautiful property.  Why do you

2    want to demolish it?

3              The bank was going to tell it to me for

4    $10,000, and the City said, No.  It's under demolition

5    order, there's nothing you can do.  You have to

6    demolish it.  So I said, This is a property I can fix.

7    So they said, Okay.  We'll give you a chance.

8              So I took that property, put brand new

9    roof -- architectural shingles.  It was a duplex,

10   three bedrooms upstairs, three bedrooms downstairs.

11        Q    And was it vacant when you bought it?

12        A    It was code compliant, meaning it was

13   boarded up.  It had, you know, code compliance orders

14   on it, and they had a list of new plumbing, new

15   electrical -- everything brand new had to be put in.

16        Q    Did you do all of that, in addition to the

17   new roof?

18        A    That's right.  The roof was not one of

19   them.

20        Q    Okay.  So those ones with the parenthesis

21   code complaint after them, that are listed on this

22   first page of Exhibit 12, that means that those

23   properties were under condemnation orders when you

24   bought them, excuse me, I should not be putting words

25   in your mouth.

1            What does that mean, on that letter?  What

2    does the code complaint mean?

3        A    Code compliant means these are boarded-up

4    properties that the City has condemned them, and what

5    the -- the next option would be to demolish them, or

6    somebody, likely myself or a private investor, comes

7    in and buys it or gets permission from the City, like

8    Mr. Azmoudeh was saying, I took a little longer on

9    some of them, and some of them I finished on time.

10           The VBR was going up, you know, every

11   year, from $300 to $2,000 to 6-,$7,000, so I would

12   take those properties and bring them up to compliance

13   and get the orders to get the rental license from the

14   City.

15           And most of them were done in a short

16   period of time, because, like I said, I bought these

17   properties in a one- or two-year period.  And to do

18   all of those things -- I was doing a lot of properties

19   at that time, which I slowed down now, because I was

20   acquiring a lot of properties because they were still

21   selling them very cheap, like 1001 Logan, I bought it

22   for $10,000, but I put a lot of money in, and it is a

23   nice property, and I would have been very sad if we

24   had demolished that property.  It had a lot of

25   potential.

1          Q    Now, these boarded-up properties that you

2     bought, if they needed plumbing repairs, or if they

3     needed electrical repairs, did those repairs have to

4     be -- did there have to be building permits for them?

5          A    All of them had to be pulled -- all the

6     code compliances, there was not one property that you

7     could do without pulling a building permit, which was

8     for renovation plus professionally done by plumber,

9     electrician, and the heating guy.

10              These three, I could not take permits.

11    They had to take the permits.  All I took permits for

12    was Sheetrock and roofing and things of that nature,

13    which I've been doing for the last 30 years.

14         Q    All of these types of work for which the

15    building permits were pulled, then require a final

16    inspection by someone from the Building Inspector's,

17    right?

18         A    Correct.

19         Q    Even the sheetrocking and roofing that you

20    pulled the permit for yourself?

21         A    Every department of the code compliance,

22    which is, like I explained, plumbing, electrical,

23    heating, all these were done by the Inspection

24    Department, or an inspector from there.

25         Q    Now, the second page of the letter that is

1    Exhibit 12, it makes reference to -- I guess, it

2    starts at the very end of the first page.  You say,

3    I've also installed countless new doors, windows,

4    furnaces, water heaters, and more.

5              Is that true?

6        A    That is absolutely true.

7        Q    Do you install used furnaces, or do you

8    get them brand new?  Or do you need a heating guy to

9    do that work?

10             HEARING OFFICER GUROVITSCH:  Can you

11   just ask the question one at a time, please.

12             MR. ROONEY:  Thank you.  I am sorry.

13   BY MR. ROONEY:

14       Q    When there is a property that has a new

15   furnace installed, do you have to have a licensed

16   contractor do that?

17       A    Correct.

18       Q    With the necessary permits?

19       A    Permits, yes.

20       Q    Same for water heaters?

21       A    Same for water heaters and furnaces and

22   electrical.  Anything that's --

23       Q    Mr. Khan, how would you describe your

24   relationship to the Minneapolis City Housing

25   Inspections Office, if you can make a generalization?

1           A     I personally have very good relationship

2     with all the inspectors.  I do not argue with them.  I

3     do not fight with them.  I'm very cooperative with

4     them.

5                 Whatever they ask me to do, I do it for

6     them, and, whereas concerns about police calls and all

7     those different things about, you know, behavior of

8     the tenants, then I have to have a meeting with the

9     City, come downtown.  I have had, maybe, over the last

10    30 years, over half of the meetings with them.

11                One time, a long time ago, in Northeast

12    Minneapolis when I had the property at 315 Buchanan,

13    even though the records state that I've had license on

14    that from 1999, I've had license on that property --

15    rental license -- since 1986.  I've had it for almost

16    29 years or more, because everybody keeps saying I've

17    owned it since 1999.  No, I built it from scratch.

18                There was some confusion going on at that

19    time, so I had to meet people at Beltrami Park, which

20    is where the City Council people came and said,

21    Mr. Khan, we are having these issues.  This is the

22    problem.

23                So I have just those, and after that, I

24    didn't have any problem.

25          Q     I think I asked, when Mr. Azmoudeh was

1    testifying, I asked him if he had been at a meeting

2    where City officials, whether from the police

3    department or somewhere else, had asked you to put out

4    a tenant there who had some mental issues, a tenant at

5    315 Northeast Buchanan Street.

6                Do you remember that?

7         A    I remember that very distinctly because it

8    was a meeting right here on the third floor, in the

9    conference room, where the police officer was there,

10   the City Mayor's Office -- one of the assistants from

11   the mayor -- was in that meeting, Mr. Tom Deegan,

12   Ms. Kellie Jones.  I'm not sure if Mr. Azmoudeh was

13   there, but there was a group of about six or seven

14   people.

15               I went there with my attorney, and I

16   wanted to address what issues were, and they said

17   there was a lot of police calls at Buchanan.  I

18   explained to them that the lady I rent to is a

19   Section 8 tenant, who was allowed, by Section 8, to

20   live by herself.  Her mental capability -- she is

21   mentally disabled and challenged, and I -- her name

22   was Danielle Johnson, and she had a lot of problems.

23   She would throw all of her clothes outside, become

24   naked, run around, and there were a lot of police

25   calls, and she was allowed to live singly.  I had no

1    reason -- she was my tenant for almost ten years.

2              And I went to the meeting, they said this

3    is what -- I explained to them that this is what the

4    issue is.  The police calls happen, then the police

5    come, they look at the tenant, they say, No, this is

6    not a police case, this is a medical case, so they

7    call the medical -- ambulance and she's taken away for

8    two months for treatment, then she comes back after

9    the treatment.

10             Section 8 pays her rent regularly, so I

11   asked them, I said, If you give it to me in writing

12   that you want me to evict that lady who's mentally

13   challenged, I said, I will do it tomorrow, but I can

14   not put her out because you want me to put her out

15   because she's making the police calls.  Some of these

16   are nonemergency, but they're police calls.

17             So when I said that, none of them said,

18   Okay.  We'll give you something in writing, because

19   they knew that would have been a big mistake.  So I

20   remember that very distinctly.

21        Q    Do you have an opinion whether all of the

22   rental income housing that you provide for your

23   tenants is safe, sanitary, and decent?

24        A    To the best of my knowledge, I do, and

25   I've been doing it for 30 years, so I should know.

```
 1   Even when the tenants damage the property, I still fix
 2   them.  I don't ask them to pay me.  The security
 3   deposit, some of them don't even pay that, and I still
 4   let them move in.
 5        Q    Do you think you are providing a service
 6   to the community for providing homes to these tenants?
 7        A    I do.
 8        Q    Mr. Khan, do you have any estimate that
 9   you can give about how much equity and money you have
10   invested in your various properties?
11        A    That would be very hard, but I would say,
12   you know, I have invested, like, over $2 million or
13   more, in just improvement costs in the last few years.
14        Q    Over and above the purchase prices?
15        A    Over and above the purchase prices,
16   because if you look at my tax statements, I have some
17   big writeoffs because every year, I spend over 2-, 3-,
18   400,000.
19             So when I go and apply for a loan, they
20   say, Mr. Khan, you're operating at a loss, how can
21   you -- we can't give you a loan.  I got denied for a
22   home loan that I wanted to buy, because my taxes show
23   that I'm in the negative because all my income from my
24   other properties goes back into the properties.  My
25   taxes will show that.
```

1          Q    Mr. Khan, last month, at my request, did

2     you try to compile sort of a summary, with respect to

3     your various rental properties, as to which of them

4     had tenants who were either members of protected --

5                    MR. WOLF:  Your Honor, I would

6     object to this.  We have gone over the Fair Housing

7     issues that Mr. Khan and Mr. Rooney want to bring up.

8     It is not relevant to the action that has been brought

9     by the City.

10                    MR. ROONEY:  Your Honor, as I

11    recall, you sustained the objection to the document

12    itself, which is Exhibit 6, but I had thought you had

13    said I can certainly question the witness about issues

14    raised in the document.

15                    HEARING OFFICER GUROVITSCH:  I think

16    that Mr. Khan can testify as to the composition of his

17    tenants.  I don't see that it is going to be extremely

18    relevant, but I will allow it.

19                    MR. ROONEY:  Well, if you

20    consider -- I mean, I won't be --

21                    HEARING OFFICER GUROVITSCH:  If you

22    are going to pursue the violation of the Fair Housing

23    Laws in this proceeding, you are not going to be able

24    to go too far with that.

25                    MR. ROONEY:  I understand that, and

1    I have already got -- in terms of the record, it is

2    part of my offer of proof as one of the excluded

3    proposed exhibits, the document itself, so I will ask

4    is in very summary terms.

5    BY MR. ROONEY:

6         Q    If you think of people who are either

7    African-American, some other nonwhite race, immigrants

8    to the US, religions that might be disfavored by the

9    majority of the population, or single-family parent

10   status, can you give an -- well, first of all, before

11   you get to that, are you personally familiar with who

12   is living in your various rental units?

13        A    I am.

14        Q    Is that part of the consequence of your

15   being a hands-on manager?

16        A    I know them -- each and every one of them

17   by their first and last names.

18        Q    Okay.  How many of your tenants -- or how

19   many tenants would you say, in general, were occupying

20   your licensed housing units as of July of this year?

21             If you have got notes, you can look at it.

22   I think if you look at your third page of your notes,

23   you might find a number.

24        A    No, I don't have to look at this, but

25   most, like I said --

1        Q     No.  I am just asking for the total number

2   of tenants in all of your buildings as of July.

3        A     Approximately 240, 250 people.

4        Q     Okay.  Of that number, can you estimate a

5   percentage that fall within one of those classes that

6   I mentioned?

7        A     Let me explain this briefly before I start

8   going around in the percentages.  What I have -- of

9   all my property that I have, I have two properties

10  that have white people in it, you know, they are

11  Caucasian, in other words, and the rest are

12  African-American, single parents, Indian -- American

13  Indians, couple of Somali families, and the rest.

14           I do not know what percentage that would

15  be, but I have two homes that have two single guys

16  that are, you know, Caucasian -- white people -- and

17  one of the apartments has one white guy, and the rest

18  are all minorities.

19        Q     Thank you.  That should suffice.

20        A     Oh, there is a couple --

21           MR. WOLF:  Your Honor, I think he

22  has already answered the question.

23           THE WITNESS:  Well, I just wanted to

24  be sure.  One white lady and one African man together,

25  so that's --

1              HEARING OFFICER GUROVITSCH:  Does

2    that change your answer, then?  You said there were

3    two Caucasian tenants.

4              THE WITNESS:  Two that are totally

5    100 percent in the apartment that are white people,

6    the rest are -- I have, like, two or three families

7    that are Caucasian -- you know, mix of white people

8    and black people living together -- interracial

9    couple.

10              HEARING OFFICER GUROVITSCH:  But

11    that does not include the two properties you just

12    mentioned?

13              THE WITNESS:  The two are just plain

14    African -- you know, white people.

15              MR. ROONEY:  Vanilla.

16              THE WITNESS:  White -- Caucasian.

17    BY MR. ROONEY:

18         Q    So two units are occupied solely by white

19    people.  There are some units that are occupied by

20    mixed-race couples?

21         A    Correct.

22         Q    Now I would like you to turn to the photos

23    that are behind Tab 5.

24              HEARING OFFICER GUROVITSCH:  We are

25    getting close to lunch break, here.

```
1                      MR. ROONEY:  This is a perfectly
2    satisfactory time, as far as I am concerned.
3                      HEARING OFFICER GUROVITSCH:  Is that
4    okay with the City?
5                      MR. WOLF:  Yes.
6                      HEARING OFFICER GUROVITSCH:  Okay.
7    We will adjourn.  Anybody have a problem with
8    reconvening at 1:00?
9                      MR. ROONEY:  That is fine.  Thank
10   you.
11                     MR. WOLF:  That is fine.
12                     HEARING OFFICER GUROVITSCH:  Then we
13   will be back here at 1:00.
14                     MR. ROONEY:  Thank you.
15                 (At this time a break was taken from
16                 12:05 p.m. to 1:00 p.m.)
17                     HEARING OFFICER GUROVITSCH:  Okay.
18   Mr. Rooney, do you want to resume your direct
19   examination of Mr. Khan.
20              Mr. Khan, you are still under oath.
21                     MR. ROONEY:  Thank you.
22   BY MR. ROONEY:
23        Q    Mr. Khan, something I wanted to ask you
24   about, and that is:  Can you give us any estimate of
25   on a given date, how many phone calls you will get
```

1    from either referral sources or potential tenants

2    themselves inquiring about availability of rental

3    property?

4         A    I would say that on the average at least

5    10 to 12 calls a day.

6         Q    Okay.

7         A    Every day people are looking for housing.

8         Q    I also wanted to ask you, when the tornado

9    came through North Minneapolis in May of 2011, did it

10   do significant damage to any of your properties?

11        We talked about 2501 Golden Valley Road,

12   but aside from that, did it do any damage to your

13   other properties?

14        A    One property that was damaged pretty

15   extensively was the Golden Valley, 11-unit building,

16   and then I had a duplex --

17              HEARING OFFICER GUROVITSCH:  Which

18   building, I am sorry?

19              THE WITNESS:  The Golden Valley

20   building, that 11-unit.  That had extensive damage.

21   BY MR. ROONEY:

22        Q    But besides that one.

23        A    Almost -- besides that one, there was a

24   duplex which was razed down by the City, 2639 Oliver

25   Avenue North, which had extensive damage, which I was

```
 1    trying to get the City to give me permits to do the

 2    work and it was denied, the permit.

 3                    HEARING OFFICER GUROVITSCH:  I am

 4    going to ask you to direct Mr. Khan just to respond to

 5    your question.

 6    BY MR. ROONEY:

 7         Q    I know you want to tell your story, but we

 8    have to do it in question and answer form.

 9         A    Okay.

10         Q    Okay.  So there was another building at

11    2639 Oliver Avenue North.

12                    What was the situation with that building?

13         A    It was badly damaged.  The roof was ripped

14    off, and it had a lot of damage on it.

15         Q    Was it your wish to repair that building?

16         A    Correct.

17         Q    Okay.  Did you have insurance on that

18    building that would let you get funds to repair it?

19         A    Yes.

20                    MR. WOLF:  Your Honor, I would

21    object.  This is a case that also was appealed.  The

22    Order to Demolish was appealed by Mr. Khan.  It was

23    heard by the Nuisance Commission Process Review Panel,

24    went to City Council, and went up to the Minnesota

25    Court of Appeals.
```

1          HEARING OFFICER GUROVITSCH:  Is the

2     appellant decision part the record, here?

3          MR. WOLF:  No, it is not.

4          HEARING OFFICER GUROVITSCH:  Well, I

5     can understand why not, because it does not seem to be

6     relevant.

7          MR. ROONEY:  It is relevant, I

8     believe, Your Honor, to Mr. Khan's wish to continue to

9     provide rental housing in North Minneapolis.  He could

10    have walked away with the insurance money.

11         HEARING OFFICER GUROVITSCH:  Well, I

12    think it is obvious that Mr. Khan wishes to pursue his

13    career as a landlord.

14         MR. ROONEY:  Okay.  Very well.

15    BY MR. ROONEY:

16         Q    Mr. Khan, in your experience owning and

17    renting properties in North Minneapolis, have you,

18    either from firsthand experience or observed in your

19    direct observations, seen any problematic consequences

20    to residences being vacant for extended periods of

21    time?

22         A    Yes.

23         Q    What have you seen in that respect?

24         A    Well, first and foremost, the property

25    gets stolen.  People vandalize.  They break the

```
 1    windows, the doors.  They occupy, sometimes illegally,

 2    and create havoc to the property, and, as a matter of

 3    fact, a block away from the Golden Valley building,

 4    the whole building blew up into pieces, because

 5    someone had torn the copper down.

 6         Q    While it was vacant?

 7         A    It was.  It wasn't owned by me, and that's

 8    a danger to society.

 9         Q    Sure.  I want to ask you about a couple of

10    instances in which you may have had disagreement with

11    the City and its inspectors over issues concerning

12    your licensed property.

13              The one I want to start with is -- I don't

14    know if it is 310 Pierce Street or 315 Buchanan

15    Street, was there an issue on one of those properties

16    on which the inspector claimed that you were parking

17    cars improperly, and there was a question of boundary

18    line?

19         A    Correct.

20         Q    Which property was that?

21         A    310 Pierce Street North.

22         Q    And did you agree that you were allowing

23    cars to be improperly parked on your property?

24         A    None of my tenants had any cars that

25    belonged to them on that property, that I got cited a
```

```
 1    few times.
 2           Q     Were the cars, in fact, on your property,
 3    or were they on a neighbor's property?
 4           A     They were split between the neighbor and
 5    myself, and I finally had to get an appraiser to come
 6    in -- I mean, what do you call --
 7           Q     Surveyor?
 8           A     -- surveyor to come and mark the lines so
 9    I could show the inspector that this was not my
10    property, so finally they backed off after all that.
11    But if I'm not mistaken, that the Honorable Judge was
12    the one who presided on some of those hearings about
13    the cars that were parked there.
14                      HEARING OFFICER GUROVITSCH:  Yes, I
15    did.
16    BY MR. ROONEY:
17           Q     So that was ultimately resolved in your
18    favor?
19           A     Not after I got almost 3- or $4,000 in
20    citations, you know, and after that, it was resolved,
21    and I'm going to be appealing those at the end of the
22    year when I go in front of the district court for
23    those citations.
24           Q     Okay.  Was there an instance where a City
25    inspector demanded that you install a ground fault
```

1    receptacle in a kitchen of one of your properties?

2         A    Yes.  That was a property at 1607 Hillside

3    Avenue North, and the inspector's name was Bruce

4    Frame.  He insisted that I need to install a GFI,

5    which is for the electrical outlet, in both the

6    kitchen and the bathroom, and I told him that it's an

7    older building, it's grandfathered in, I do not have

8    to do it, so he insisted that I have to do it.

9              So I finally called the State Board of

10   Electric, and the inspector for North Minneapolis,

11   which is Dave Sawyer, for the State Board of Electric,

12   and he explained to Mr. Bruce Frame that unless it's

13   defective or it's not working, it's loose, then I need

14   to do it; if it is not, then I do not need to replace

15   it.

16             And then Mr. Frame accepted that he had

17   learned something new.

18        Q    So Mr. Frame was gracious about it

19   afterwards?

20        A    Yeah, he was.

21        Q    Can you think of any other occasions where

22   you had a disagreement -- I mean, do you disagree with

23   every single Request for Service that you received

24   from the City inspectors?

25        A    No, I don't, unless it's outrageous or

1    something that I don't think is right, then I will

2    question it, with respect.  I respect everybody and

3    treat everybody decently.

4              One issue was the property at 2123 Oliver

5    Avenue North.  On that property, the plumbing

6    inspector came and looked at something.  There was an

7    uncapped gas line, and she wanted me to cap it, pull a

8    permit for it, and I said, I don't need a permit,

9    because it was a simple capping of an open gas line,

10   which anybody can do, it is not required to get a

11   permit.

12             So Ms. Kara Topper was the inspector, and

13   she said, You have to pull a permit because there is

14   some defect in the pipe.  You can't put the cap on it.

15             So I took the pipe out and I showed it to

16   another inspector -- he's a heating inspector, Frank

17   Richie -- and I happened to meet him on one of the --

18   within a couple of days after that, and I showed him

19   the pipe and I said, Do I need to get a permit to cap

20   this?  He looked at it and said, There's nothing wrong

21   with this, and you don't need a permit.  And he's an

22   electrical -- I mean, heating inspector, Kara Topper

23   is a plumbing inspector.

24             So I ended up pulling the permit, even

25   though the gas line -- it took a few days for the

1    plumber to pull the permit and do the work -- it was

2    dangerous to the whole -- people in the building,

3    because I didn't spot it, the inspector spotted it.

4    It could have been simply capped and done the same

5    day.

6          Q    And that was something that went on your

7    record as un-permitted work.  The first inspector

8    would have said there is un-permitted --

9                     HEARING OFFICER GUROVITSCH:  Is that

10   a question or a statement?

11                     MR. ROONEY:  It is a leading

12   question, and I will withdraw it.

13                     THE WITNESS:  They said there was

14   illegal work done in there and I had done nothing to

15   it, but they said that it was -- some piping was there

16   that did not have a permit.

17   BY MR. ROONEY:

18          Q    Okay.

19          A    And I still have the pipe as proof when I

20   go to federal court eventually.

21          Q    I would like you to open the exhibit

22   book -- I think it is the one up on the corner -- to

23   the photos behind Tab 5.

24               Do you have it?

25          A    Okay.

1          Q    The first one, on page 1 -- Khan

2    Exhibit 5, page 1 of 27 -- is that the photo of

3    310 Pierce Street Northeast?

4          A    It is.

5          Q    Have you made any improvements since you

6    have owned that property?

7          A    Yes, I have.  I have installed a new roof

8    on the premises.  This is the property that I got the

9    citation for the car being parked incorrectly, and

10   these tenants do not have any car.

11              I did -- there was a repair order for a

12   furnace, and I think, if I am not mistaken, the

13   Honorable Gentleman also presided on that, because I

14   got cited for that because the work wasn't done, but I

15   had installed a new furnace in there.  I had a brand

16   new furnace installed, and that was done by a

17   professional with proper permits.

18              And those are the two things that I can

19   think of that I have done, the roofing and the new

20   furnace.

21         Q    Okay.  The next property is 313, this is

22   page 2 of Khan Exhibit 5.  Can you think of any

23   improvements you have done on the property at 313-26th

24   Avenue North?

25         A    Yes, I have a city and property

1    information line.  I just printed that this morning.

2    I had all new electrical done on that new roof.  I did

3    $40,000 worth of improvements.  It shows right here.

4    I can give a copy to Mr. Wolf or the judge, if you

5    want.

6         Q    From your recollection is good enough.

7         A    Yeah.  And then I pulled the proper

8    permits and had new plumbing, new heating, new roof,

9    brand new flooring, and this is the one that

10   Mr. Farrokh Azmoudeh was saying that he didn't get a

11   chance to look at because the inspector wasn't able to

12   meet up with me.  For some reason, we did not

13   coordinate, but this one has all new -- brand new

14   flooring on it, which is laminate flooring, upstairs

15   in the bedrooms and downstairs, and tiles in the

16   bathroom, and a brand new bathroom, because it had

17   fire damage.

18        Q    Okay.  Now, on page 4 of Exhibit 5, what

19   does that show?

20        A    That's Buchanan Street Northeast.

21        Q    That is the property that you had built

22   from scratch?

23        A    That's the one I built from scratch.

24        Q    It was built in what year?

25        A    1986.

1      Q    Okay.  Is it new enough that you have not

2 had to put a lot more into it, or have you made more

3 improvements to it since it was built?

4      A    No.  I have -- before, it had masonite

5 siding on it, so I installed aluminum -- not aluminum,

6 vinyl siding.  I had a brand new roof installed, with

7 all the proper permits in the last, I think, maybe

8 less than ten years.

9           I also had furnaces -- one furnace, I

10 think, in one of the apartments, the rest were all

11 cleaned up, and then I have remodeled all these nine

12 units to put brand new wood floors -- not laminate --

13 expensive wood floors, and major renovation inside.

14 New appliances and everything else.  It's a good

15 neighborhood, also.

16      Q    How about page 5 of the Exhibit, the

17 property the 321-24th Avenue North.

18      A    Yeah, this one is a Section 8 housing.

19 Section 8 lady is renting for two different tenants

20 I've rented over the last four, five years.  And this

21 one, I have not done much to it except carpeting and

22 things of that nature, and perhaps some cabinets.

23      Q    Okay.  Now I am looking on pages 7 and 8

24 of Exhibit 5.

25           Do you have people clean up things that

1    accumulate in the yards of your rental properties?

2          A    Yes, that happens quite often, and, you

3    know, we try to get there as soon as --

4                      HEARING OFFICER GUROVITSCH:  That is

5    calling for a yes-or-no answer.

6                      THE WITNESS:  Yes.

7    BY MR. ROONEY:

8          Q    And do you have try to have the people who

9    do that document a before-and-after situation with

10   their clean-up work they do?

11         A    Recently, I have been doing that for the

12   last few months.

13         Q    Okay.  Does Leah Stuart do that?

14         A    Yeah, Leah does it and my daughters and my

15   son and myself.

16         Q    Okay.  Is this a documentation of before

17   and after clean-up on pages 7 and 8?

18         A    Correct.

19         Q    Okay.  How about page 9, which is the

20   property at 310-30th Avenue North.

21              What have you done to this property?

22         A    This one is the one that I just mentioned

23   about Ms. Donna Graham was living here for a short

24   period of time before she moved to Buchanan.

25              I've improved -- brand new siding on it,

1    brand new roof, all new laminate flooring, and

2    possibly a water heater.

3           Q    Okay.

4           A    And brand new windows.  This is one of the

5    houses that the lead people came and helped with the

6    windows.

7           Q    Do you regard the new windows as being in

8    any way substandard?

9           A    No.  These are professionally ordered by

10   the lead people, and they did all the work, with

11   proper permits.  All I had to do was to pay the

12   difference that they wanted me to pay.

13          Q    Okay.  Page 11 of Exhibit 5 is the

14   property at 819 Sheridan Avenue North?

15          A    That is right.

16          Q    Could you think of anything you have done

17   on this property?

18          A    Just some wood flooring.  That's about it.

19   I don't think I've done anything else in there.

20   Possibly kitchen cabinet.

21          Q    And then if you would look at Exhibit 5,

22   pages 13 through 16.

23               Are those more before and after pictures

24   of clean-up that your people did there?

25          A    Yes, sir.

1       Q    Do you know whether all of the instances

2   of clean-up that you do are in response to City

3   orders, or do you ever have your people do clean-up

4   that they notice before it gets to the point of the

5   City ordering it?

6       A    Most of the time it is before the City

7   gets to the point to do it.

8       Q    For example, the clean-up you testified

9   you were doing behind 410-30th Avenue North earlier

10  this week, was that in response to an order?

11      A    No, I was there myself with my hands

12  dirty, and I had two other people with a truck.  We

13  loaded up as much as we could.

14      Q    That tells me how it was done, but I am

15  asking if it was in response to a City order.

16      A    No, it was not a response.

17      Q    Okay.  I would like you to look at

18  page 17 and 18 of Exhibit 5, and the property at

19  1001 Logan Avenue North -- I guess 19 is one of the

20  photos of it too -- what can you tell us about what

21  you have done to improve this property?

22      A    Like I said earlier in my testimony, that

23  this is the one that they were going to tear down, and

24  I improved the roofing.  I put new flooring in the

25  kitchen, bathroom.

1   Q Is it a fourplex?  Duplex?

2   A It was a big duplex.  It was a really

3 beautiful house.

4   Q Okay.  You say they were going to tear it

5 down.

6   Was it subject to condemnation orders?

7   A Yes.  So I put new brand new architectural

8 shingles, new plumbing, heating, electrical.  This was

9 a code compliance.

10   Q With permits?

11   A With permits.  The City won't inspect it

12 without permits.

13   Q So this was a property that was vacant

14 that now provides two rental homes?

15   A Correct.

16   Q The next, page 20 of Exhibit 127, is

17 property 1204 Knox Avenue North?

18   A That's right.

19   Q Have you done anything to this property?

20   A Yes.  There's a brand new roof on it, and

21 I -- there was an old deck here -- which you can see

22 the deck right now -- it was glass and broken out, so

23 I repaired that, and that was one of the ones that

24 they said when you took the old glass windows out, you

25 didn't pull a permit, so I had to pay double permit

1    fee and get this done.

2              This is what the City was telling us about

3    earlier.  So I just had it done with proper permits,

4    and the inspector passed it.

5         Q    Okay.  How about page 22 of the exhibit,

6    the property at 1237-39 Knox Avenue North.

7         A    Also on the 1204 Knox, I put a new furnace

8    in there, and it was passed by the City.

9              1237 Knox is a beautiful duplex, big

10   huge-sized duplex.  It was code compliance.

11   Everything is brand new in there, two furnaces, two

12   water heaters.  The roof is not new, but all the

13   flooring is laminate flooring.

14             This is the one that Mr. Farrokh Azmoudeh

15   was saying that the windows are not the right kind of

16   windows, but it passed inspections.  I put the windows

17   in enclosures.  I made them fit so it would pass

18   inspections, and this is the one that they were

19   talking about, that they were not made to size, but it

20   wouldn't pass inspection if they were not made to

21   size.

22        Q    So when you say it was brought into code

23   compliance, this was another one that was on status of

24   condemnation orders?

25        A    Correct.

1        Q    And it was vacant?

2        A    It was vacant, and it was owned by the

3    bank, and they sold it to me for $4,000.  I went to

4    the City and asked for permits and did all the work.

5    Everything is brand new in there.

6        Q    And there is now two families living

7    there?

8        A    Two families.

9        Q    How about page 25, 1607 Hillside?

10       A    That's the property Mr. Frame asked me to

11   put electrical GFI's, and I told him that I do not

12   need.  That is the one.

13            And this one has a new roof, and I've

14   painted the siding on this one, and I put new siding

15   on the garage and the back part of the house, and this

16   one I had new flooring and cabinets put in there, and

17   new appliances.

18       Q    On the interior?

19       A    Interior.

20       Q    How about page 27, which is 1611 Sheridan

21   Avenue North.

22       A    This one got damaged in the tornado.  I

23   had about 30 or 40 properties that got damaged in the

24   tornado of 2011, and this was one of them.

25            The garage was torn off, so I just have a

1   parking pad there.  I have repaired -- put a new roof

2   on there, but other than that, I haven't done much.

3        Q    Is there anything that you -- do you have

4   any reason to believe that not having a garage and

5   just a parking surface is out of code compliance?

6        A    No.  The parking pad is a concrete parking

7   pad.

8        Q    Now, throughout this exhibit there is

9   various before clean-up and after clean-up photos, and

10  I am not going to go through all of those, but in each

11  instance, that is done by your people to document what

12  they have done?

13            HEARING OFFICER GUROVITSCH:  That is

14  repetitious.  I believe we already established that.

15            MR. ROONEY:  I did for the

16  particulars.  I am just trying so that we can avoid

17  repetition.

18  BY MR. ROONEY:

19       Q    Whenever there are pictures throughout the

20  various properties in this exhibit that show the

21  before and -- say, before clean-up and after clean up,

22  those pictures where taken by your people to document

23  what they have done?

24       A    Exactly.

25       Q    Thank you.  How about page 29 of the

1    exhibit, 1614-22nd Avenue North?

2        A    That's, again, an older house, big,

3    beautiful house inside, good woodwork.  I put new roof

4    on that and it has a new boiler put in there, with

5    proper permits, and also new flooring.

6        Q    Any of these old houses that you have

7    purchased, when you inspect them, do you notice if any

8    of them have old woodwork that is worth preserving

9    that is architecturally nice and worth preserving?

10       A    I do.  When I do, I preserve them.  I use

11   proper, you know -- especially the wood and the

12   pillars that are old.  I try to preserve those -- the

13   woodwork.

14       Q    Okay.  Page 33 of the Exhibit, 1714-4th

15   Avenue North.

16       A    Page?

17       Q    Page 33.

18       A    Yes.

19       Q    Have you done anything to this property?

20       A    This was the one that I bought from the

21   State of Minnesota, it was after the sale of taxable

22   land.  Nobody bought it, it was sitting in delapidated

23   property, totally messed up, in bad shape, and the

24   City was going to tear it down.

25            I bought it from the County, and I did a

1    complete code compliance on it, new roof, new siding

2    new insulation.  I preserved the wood pillars in

3    there, and the flooring -- I put new flooring, new

4    appliances.

5              And this is the one that I lost the

6    license, for trash being thrown out.

7                   HEARING OFFICER GUROVITSCH:  I am

8    sorry, can you speak up.

9                   THE WITNESS:  This is the one

10   property that I lost my second license for the tenant

11   throwing trash, or for people throwing trash.

12                  (Khan Exhibit Number 36 was marked for

13                  identification by the court reporter.)

14   BY MR. ROONEY:

15        Q    Mr. Khan, before I ask about the exhibit,

16   this property was vacant -- at 2714-4th North -- when

17   you bought it?

18        A    On 4th Street, yes.

19        Q    Yes, I am sorry.  After your renovations,

20   did you get any compliments on the work that you did

21   from anybody from the City Inspector's Office?

22        A    Yes, I did.  Ms. Sheila Rawski, who is in

23   charge of that neighborhood -- she's an inspector,

24   Sheila Rawski -- and she came in and commented that

25   this was eyesore for the whole neighborhood, and we

1    are so happy to see that you've done wonders to this

2    property.

3             Q     And you still own this property?

4             A     Well, I own it.  I sold it on a contract

5    to my daughter, so I still own it.  She hasn't paid me

6    off yet.

7             Q     And your daughter is a licensed realtor?

8             A     Correct.

9             Q     And she is listing it for sale; is that

10   correct?

11            A     That's right.

12            Q     And this Exhibit 36, that is in front of

13   you, are those photos that she has taken to show the

14   interior and exterior of the property?

15            A     That's right.

16            Q     Now, do those photos, on Exhibit 36,

17   accurately show the improvements that you made after

18   you bought the property from the County?

19            A     That's right.  And I had -- the cabinets

20   were not there when I bought it.  I had different

21   cabinets.  I had cherrywood cabinets at that time, and

22   I got compilements from even Ms. Kellie Jones and some

23   of the Inspections Department that I have done a good

24   job and it's looking really nice.

25                  These are little less expensive, the ones

```
 1    that are in there now, but when I did the complete

 2    code compliance, the inspectors were very happy to see

 3    cherrywood and excellent quality cabinets, but they

 4    got damaged by the tenants, so I had to replace them

 5    again.

 6          Q    The photo on the bottom left of the front

 7    page of Exhibit 36, that looks like older woodwork.

 8    Is that woodwork that you preserved?

 9          A    That's right, and if you look at the

10    backdoor in the back, there's a swinging door that

11    swings both ways, like, in the kitchen pantry.  You

12    can't see it, but it's all the way in the back.

13          Q    If you look on the second page of the

14    Exhibit 36, there is two pictures on the bottom of the

15    six that are there.

16               Do they show the old swinging door in the

17    back?

18          A    Yeah, it does show some of the older doors

19    and the pillars that are there, and the columns.

20          Q    And then on the third and final page of

21    Exhibit 37, does that stairway with the newel post --

22    is that old, or is that something you preserved?

23          A    I preserved it.

24          Q    And that was the condition that it was

25    in -- well, shown in Exhibit 36 is, basically, the
```

1    condition it was in when you had the license for it

2    revoked?

3          A    That's correct.

4                    MR. ROONEY:  Offer Exhibit 36, Your

5    Honor.

6                    MR. WOLF:  No objection, Your Honor.

7                    HEARING OFFICER GUROVITSCH:  Now,

8    since I did not have it in hand while Mr. Khan --

9                    MR. ROONEY:  I apologize.

10                   HEARING OFFICER GUROVITSCH:  -- was

11   testifying, I am wondering if Counsel can explain what

12   is being depicted on the front page.  Is that the

13   after?

14                   MR. ROONEY:  This represents the

15   after.  This all represents the after.  Mr. Khan has

16   testified he bought it in a -- slated for demolition

17   for Hennepin County, so this reflects his improvements

18   were made to the property.

19                   HEARING OFFICER GUROVITSCH:  Okay.

20   So this is all after the improvements were made; is

21   that right?

22                   MR. ROONEY:  After improvements, at

23   the time -- yes, after improvements, while he was

24   getting --

25                   HEARING OFFICER GUROVITSCH:  You

1    mentioned before pictures, but I do not see those.

2                       MR. ROONEY:  I am sorry, I do not

3    have any for that property.

4                       HEARING OFFICER GUROVITSCH:  All

5    right.  Exhibit 36 will be received.

6                       MR. ROONEY:  Thank you, sir.

7    BY MR. ROONEY:

8         Q    Turning back to the photos.  The tab

9    behind Khan Exhibit 5, page 34, shows 1714 Oliver

10   Avenue North?

11        A    Correct.

12        Q    Have you done anything to that property?

13        A    Yes.  I put a new roof on it, and I've had

14   a furnace installed, new wood floors, new kitchen

15   cabinets, and appliances -- they're the same old

16   appliances, I didn't replace those, but there's new

17   flooring on both levels, even the bedrooms, and I'm

18   trying to get away from carpeting because I have to

19   replace it every three months.  New carpet -- new

20   floors.

21        Q    Page 36 of that Exhibit, 2007 Russell

22   Avenue North.

23        A    This was, again, damaged in the tornado,

24   and I put a brand new roof on it, and new flooring in

25   the bathroom and kitchen and the living room.

1          Q    Okay.  How about page 4, 2008-21st Avenue.

2          A    This is, again, a Section 8 property.

3    Section 8 rents from me.  They do their own

4    inspections.  It has a brand new roof, new siding.

5    The porch was totally dilapidated.  I put new

6    windows -- none of this was asked by the City.

7               I did that brand new flooring, and in the

8    kitchen, living room, dining room, bedroom,

9    everything, wood flooring, and upstairs, as well.

10         Q    On page 42, 2116-25th Avenue North.

11         A    This one, again, was damaged in the

12   tornado, and I put a new roof on it.  This porch was,

13   again, all messed up.  It had bad windows on it, so I

14   took the windows out and put new siding on it -- on

15   part of it, and if you can see the front, it's new

16   siding.  The rest of it is older siding.  And new

17   furnaces.

18              This was a code compliance.  When I bought

19   this property in 2008, this was one of my first

20   properties that I had the experience of meeting with

21   all the City inspectors and all the things they were

22   looking for.

23         Q    Is it occupied now?

24         A    It is occupied.

25         Q    It was vacant when you bought it?

1        A    Yes, correct.

2        Q    Has it been pretty much continually

3    occupied by tenants?

4        A    Except it got damaged in the tornado for a

5    short period of time.  When I fixed it, it was still

6    rentable.

7        Q    Okay.  Page 47 of the exhibit, it is a

8    rear view of 2123 Oliver Avenue North.  For some

9    reason, I don't have a front view.

10            It looks like a relatively new garage door

11   on that?

12       A    Yeah, the garage door was all bad,

13   dilapidated.  I had a garage door company come in and

14   replace it.  The garage itself was in fairly poor

15   condition, but I had re-sided the whole thing, new

16   roof on the garage, new roof on the building itself,

17   and this is the one that the City wanted to condemn.

18            I took it to district court and won the

19   case, and I am still renting to the same tenant.

20       Q    How about page 48, 2126 Queen Avenue

21   North.

22       A    This one --

23       Q    It looks like a relatively new one.

24       A    I have not done much to it, except that it

25   got damaged in the tornado, and, basically, it's in

1    good shape.  It probably needs a new -- the roof needs

2    to be replaced, because it's warping right now, but it

3    will be done fairly soon.

4         Q    Okay.  Now, did the tornado damage in

5    2011, to your various properties, cause you to have a

6    lot of work and repair and interactions with the City?

7         A    Yes, a lot of them.

8         Q    Has it settled down since all that work

9    was done?

10        A    Yes, it's settled down quite a bit.

11   Before it was -- some of the trees were uprooted, and

12   they were huge trees, and it wasn't easy, everybody

13   was busy -- there were no contractors, they were all

14   busy.  Big-time damage to the North Side.

15             For that -- some of us -- I got some

16   letters and reminders and citations for the property,

17   because I had like 30-plus properties that got

18   damaged.  I got paid by insurance for some of it, some

19   of them, they were not that heavily damaged, but about

20   10 or 12 properties got paid by the insurance to do

21   the work.

22        Q    How about page 50, 2127 North 4th Street.

23        A    This one, again, I bought it in 2008.

24   This one, I have -- I can't recall if I did any

25   roofing on this or not, but it does have two new

1    furnaces with the permits, and new wood flooring.

2        Q    Okay.  I would like you to look at page 53

3    of Exhibit 5, 2223 Emerson Avenue North.

4        A    This one I have not done much to it.

5        Q    Okay.

6        A    Just the wood floors.

7        Q    Okay.  Next is page 56, 2319 North 3rd

8    Street.  Is this the one that you had the police

9    report on?

10       A    Correct.

11       Q    Okay.  All of that damage that was shown,

12   you have testified, has been repaired.

13            Anything else that you have done to

14   improve this property?

15       A    I don't think so.  This one I haven't done

16   much with.

17       Q    How about page 57, 2325 James Avenue.

18       A    James Avenue North, when I bought it, was

19   in good shape.  It had a new roof, and siding, and

20   double-car garage on it, so I haven't done much to it

21   at all.  I have replaced the wood flooring on both

22   upstairs and downstairs with laminate flooring

23   throughout, bedrooms and bathrooms.

24       Q    Okay.  Get to page 63 of the exhibit,

25   2401 Ilion Avenue North.

```
1          A    I think, without looking at it, I can say

2    that I did get a permit to do a new roof on it and

3    installed a furnace on that.

4          Q    Very well-wooded lot.

5          A    Pardon?

6          Q    Very well-wooden lot?

7          A    Yeah, it is very large, and it's a nice

8    location.  It's a three-bedroom.  Great location.

9          Q    Next on page 66.  2414 Bryant Avenue

10   North.

11         A    This one, again, I had to -- again, the

12   front porch was in bad shape, so I had to redo it and

13   put some siding on it, put two windows, and put a door

14   on the side -- I don't think you can see it, but there

15   is a side door to the porch -- and this one, the

16   garage was reroofed and sided.

17         Q    Okay.

18         A    The main property was not.

19         Q    Okay.  If you look on page 67, that is the

20   garage?

21         A    That is the garage door.  It's been banged

22   up a little bit, but that's a brand new garage door,

23   and new siding and roof on that garage.

24         Q    Okay.  Even though the property at

25   2501 Golden Valley Road has been demolished, you
```

1    continue to maintain the lot, in terms of mowing and

2    debris removal?

3         A    I still do.

4         Q    I would like you to look at page 72 of

5    Exhibit 5, the 2600 Oliver Avenue North property.

6         A    This one had tornado damage, again, and

7    has a brand new roof on it, new laminate flooring in

8    the living room and bedrooms upstairs, and the

9    kitchen, as well.

10        Q    Okay.  On page 78 of the exhibit, at

11   2631 Newton Avenue North.

12        A    This was damaged real bad in the tornado

13   and has brand new roof, brand new siding, new furnace,

14   and the old flooring -- it was wood flooring, so I

15   just refinished it, but other than that, the kitchen

16   floor is new.

17        Q    How about page 80, 2714-25th Avenue North.

18        A    That's the one that Ms. Donna Graham was

19   living at.  This is -- again, I put a new roof on this

20   one on the garage, as well as house, I wasn't

21   requested by the City, but I still did most of this

22   house.

23        Q    As I look at that picture on page 80, it

24   looks like somebody, at some point, added a bedroom

25   and a roof -- the room that seems to have the window

1    air conditioner -- did you do that, or was that in

2    there when you bought that property?

3          A    No, that was there.

4          Q    Okay.  On page 82, 2714 Emerson Avenue

5    North.

6          A    Yeah, this is the one that I had -- I

7    worked with the Lead Abatement Department.  We redid

8    all windows, brand new windows, and new furnace in

9    this one, brand new -- two new furnaces.  This is one

10   of the ones I was cited on for -- I'm still working on

11   the citations because the heating contractor hasn't

12   coordinated with the heating inspector, and until that

13   gets resolved, I keep getting the citations.

14         They asked me to do a repair on it, but I

15   put a new furnace instead.

16         Q    Okay.  Page 85 is 2722 Oliver Avenue

17   North.

18         Did you do anything on this building?

19         A    Yeah.  This was damaged in the tornado,

20   again.  This has a brand new roof on it and has some

21   new windows and new laminate flooring in both -- all

22   the living room and bedrooms.

23         Q    Okay.  Now, I think you testified, when

24   you were talking about the vandalism that the exiting

25   tenant did at the 3rd Street North.  You said it is

1    not uncommon for tenants to leave different levels of

2    trash behind when they vacate; is that correct?

3           A    That is correct.

4           Q    So, for example, if you look at page 83

5    and page 87 of Exhibit 5, are those examples of the

6    kind of trash that you see that you have to pick up

7    when a tenant vacates?

8           A    Majority of the time, yes.

9           Q    Okay.  Please look at page 89 of

10   Exhibit 5, property 2813 Aldrich Avenue North.

11              Anything you have done to that property?

12          A    A totally brand new roof on that one, new

13   furnaces -- with permits -- brand new furnaces.  It's

14   a duplex -- upstairs and downstairs -- it's a

15   three-car garage.  I had new garage doors installed on

16   that, and other than that, new flooring, again,

17   laminate flooring, upstairs and downstairs.

18          Q    Can you give any estimate of what

19   percentage of your licensed properties in Minneapolis

20   you have put new flooring in since you acquired them;

21   is it the majority of them?

22          A    I would say more than half have new roofs,

23   new siding, new flooring, new appliances -- I mean,

24   new furnaces.

25              HEARING OFFICER GUROVITSCH:  Let's

1    do one type of improvement at a time when you are

2    talking about flooring.

3    BY MR. ROONEY:

4         Q    Just flooring, can you give any estimate

5    of what percentage of your properties you put -- you

6    said you are trying to convert from carpet to flooring

7    wherever you could.

8              I was wondering, how far along are you?

9         A    Well, to answer your question, I have put

10   new floorings in all the properties.  What kind of

11   flooring is different -- is a different issue.

12        Q    Sure.  I am not asking laminate versus --

13        A    Yeah.  All the property that I have

14   received, I have got -- I have put carpeting in

15   there -- new carpeting and sometimes I have put

16   laminate floors, so I would say half of them have

17   laminate floors, half of them are carpeting.

18             It's a big mess to clean up carpet.  It's

19   not easy.

20        Q    Please look at page 96 of the exhibit,

21   2906 Emerson Avenue North.

22             Have you done any improvements to that

23   property?

24        A    Yes.  This was a code compliance.  I

25   bought it from the bank for, like, $4,000, you know,

1   and I went to City and, you know, I pulled the permits

2   and I went through A to Z -- everything on that

3   property is new.  New furnace, new -- everything new,

4   and new roof, like I said, windows and insulation.

5        Q    Thank you.

6        A    This was duplex.  I had pulled permits,

7   and I have to give them drawings to make it from a

8   duplex, because the City has a lot of problems with

9   duplexes because of fighting tenants or too many

10  police calls, so I try to convert as many properties

11  to single-families as I could, if it was code

12  compliance.

13       Q    Did you follow whatever regulatory

14  procedure is required to convert a duplex to a

15  single-family?

16       A    That's the only way it is done.  When --

17  you have to give the plans, you have to get it

18  reviewed, and the Zoning Department has to approve it.

19       Q    Okay.  Let's look at page 97, please,

20  3228 Bryant Avenue North.

21       A    This one, again, has brand new roof, new

22  laminate flooring all throughout upstairs.  This is a

23  five-bedroom house, with two bathrooms, and this was

24  damaged in the tornado.  The garage was ripped off,

25  but I have parking back there right now, but the

1    roofing is new, and so is this soffit and fascia area.

2         Q    Let me ask you, since you brought it up,

3    this being a five-bedroom house, do you make any

4    effort to provide housing for large families?

5         A    Yeah, any kind of family.

6              MR. WOLF:  Your Honor, I object.

7    The size of the house would determine and the zoning

8    would determine how many people can be in a property.

9              HEARING OFFICER GUROVITSCH:  Of

10   course.

11   BY MR. ROONEY:

12        Q    Has anybody from the City Inspector's

13   Office ever told you that a house that you own and had

14   renovated could not be approved for the number of

15   people that you hoped to have live in it?

16        A    Yes.  I met with -- at this property right

17   here, 3238 Bryant, they placarded my property saying

18   that there were too many people staying there.

19        Q    How many people were in it?

20        A    There was two sisters and a relative.

21   There were, I think, four or five kids.  Inspector

22   Marvin Forbragd -- I think his name is Marvin

23   Forbragd -- and he said that you are not allowed to

24   have more than -- I think he said five or six people

25   in a property.

1        I said, What about if it is a large

2   family?  He said, I don't care what it is, but that's

3   the rule the City has.  You need to talk to the City

4   if you have any objections.

5        I told him it's a five-bedroom,

6   two-bathroom, but he would not accept my -- he

7   placarded the property, and I had evict everybody, and

8   he said it was overoccupancy.

9             HEARING OFFICER GUROVITSCH:  He said

10  what?

11            MR. ROONEY:  Overoccupancy, he said.

12            HEARING OFFICER GUROVITSCH:

13  Overoccupied.  Thank you.

14            THE WITNESS:  Five bedrooms, two

15  baths.  And I asked him specifically, What if it is a

16  large family, if it is a wife, kids, husband, and five

17  kids?

18            MR. WOLF:  Your Honor, I would

19  object.  3228 Bryant is not part of the Revocation

20  Action.  I believe Mr. Khan sold the property.  It was

21  on the initial Director's Determination of

22  Noncompliance and it was crossed out and not included

23  in the revocation.

24            THE WITNESS:  It's -- Your Honor,

25  may I correct?  It's 3238 Bryant, not 28.  It's 3238

1   Bryant.

2                       HEARING OFFICER GUROVITSCH:  Well,

3   Exhibit 5, page 98, purports to show 3228 Bryant.

4                       THE WITNESS:  That's incorrect, Your

5   Honor.

6                       HEARING OFFICER GUROVITSCH:  You are

7   saying that the exhibit is mislabeled?

8                       THE WITNESS:  Yes.  The address is

9   3238 Bryant.

10                      MR. ROONEY:  3238, I apologize.

11                      MR. WOLF:  Could I have just a

12   second, Your Honor?

13                      HEARING OFFICER GUROVITSCH:

14   Certainly.

15                      MR. WOLF:  Your Honor, I would still

16   object.  My understanding is that Mr. Khan does not

17   own this property, and it was under a revocation

18   action previously.  It was sold to another individual,

19   and then was sold to, I believe, Mr. Khan's daughter.

20                      MR. ROONEY:  Your Honor, if I may

21   respond?

22                      HEARING OFFICER GUROVITSCH:  Yes.

23                      MR. ROONEY:  It does not matter

24   whether Mr. Khan owns the property now.  We are

25   talking about the renovations he did to it while he

1    owned it.

2                     HEARING OFFICER GUROVITSCH:  I

3    agree.  I will hear it.

4              And you may correct the page reference of

5    the --

6                     MR. ROONEY:  For the address.

7                     HEARING OFFICER GUROVITSCH:  --

8    house number on page 98.

9                     THE WITNESS:  And 97, as well, Your

10   Honor.

11                    MR. ROONEY:  Thank you.

12                    HEARING OFFICER GUROVITSCH:  Yes,

13   that is correct.

14   BY MR. ROONEY:

15        Q    Okay.  Page 99 of Exhibit 5, a little

16   house at 3406 Penn Avenue North.

17        A    I'm trying to recall if I did the roof on

18   this, but I can't remember.

19        Q    I want to ask you about this one because

20   there was a story in the newspaper when you filed your

21   HUD complaint.  Somebody spoke to Ms. Credit --

22   Rashida Credit [phonetic]-- who used to live here?

23                    MR. WOLF:  Your Honor, I would

24   object.  He is testifying, not asking a question.

25                    HEARING OFFICER GUROVITSCH:  Highly

```
 1    leading.

 2   BY MR. ROONEY:

 3         Q    Okay.  Did you ever rent this property to

 4   Rashida Credit.

 5         A    Correct.

 6         Q    Did she ever call you with any complaints

 7   with repairs that were needed to the property?

 8                   MR. WOLF:  Your Honor, it is still

 9   leading.

10                   HEARING OFFICER GUROVITSCH:  I am

11   just trying to speed this up so that we are not going

12   to be here for another week.

13                   MR. ROONEY:  Okay.  Well, this is

14   one of the few ones about which I have any questions,

15   and if we are here for a week to save this man's

16   livelihood, then that is what is required, but I don't

17   think it will be.

18                   HEARING OFFICER GUROVITSCH:  No.  I

19   agree with that statement 100 percent.

20   BY MR. ROONEY:

21         Q    Okay.  Did you have any difficulty making

22   any repairs that Ms. Credit notified you about?

23         A    No.  This one, again, like I said, I can't

24   remember if I put a new roof, I think I did, I did all

25   new laminate flooring on this one -- laminate
```

1    flooring, and everything was in good shape.

2              Before she rented this property, the City

3    economic people that help with the rent, they called

4    and they said there was some outstanding order.

5              They sent Inspector Wayne Murphy, who is

6    one of the Problem Property Unit inspectors, he came

7    and inspected it and he looked at everything and

8    approved it, and after he approved it, the City sent

9    me the check and they said I could rent it to her.

10   And I rented that to her at that time.

11        Q    Okay.  Do you ever have any problems

12   making arrangements to meet with tenants and get in

13   the house if repairs are called for?

14        A    No, I don't.  Sometimes they will not open

15   the door or they are not there, but I have to give

16   them notice.  Normally I do them on the phone.  Most

17   of them cooperate.

18        Q    Okay.  Let's move on to page 101,

19   3414 Emerson Avenue North.

20        A    This one was, again, I bought it in 2008,

21   in the auction.  This was a duplex when I bought it.

22   I converted this to a single-family home.  It does

23   still have two furnaces, two electrical meters,

24   because the gas and electric company didn't move it.

25   I have put a brand new roof on this one, two new

1    furnaces, one upstairs in the attic, one in the

2    basement.

3              This is a stucco building, and I have new

4    facia, soffit, and I dealt with the inspector here, I

5    think it was Jody Waulters, and we have worked well on

6    that.  I put new windows in there, as well.  And it

7    wasn't code compliance.  I did this all without

8    asking -- being asked by the City.

9         Q    Okay.  How about page 104, 3420 Chicago.

10   What is the status of that building?  Page 104.

11        A    This one was -- when I bought this, this

12   was a five-unit apartment building.  The zoning had

13   expired on it, so the City wanted to say, either, you

14   know, build a duplex or apply for zoning, and they

15   said it's a long uphill battle, so I just went with

16   the duplex, converted all the units back to two units,

17   so I have a five-bedroom, three-bath, three-bedroom,

18   two-bath, because it's five units.

19             And everything is new, and again, I got

20   help from the Health Department.  They said there was

21   lead in this property, so we got the lead abated.  We

22   have got all brand new -- almost 16 new windows in

23   there, and permitted work with code compliance --

24   complete code compliance.  New wood floors, new

25   appliances -- stainless appliances.  Everything's

1    nice.

2         Q    Is this property currently licensed?  It's

3    not occupied, is it?

4         A    It is not occupied.  I am in the final

5    stages of getting Mr. Wayne Murphy to do it, and the

6    building inspector to pass the final inspections and

7    all the other inspections have passed:  Electrical,

8    plumbing, and heating.

9                   (Khan Exhibit Number 37 was marked for

10                   identification by the court reporter.)

11   BY MR. ROONEY:

12        Q    Mr. Khan, I am showing what has been

13   marked as Exhibit 37.  Is this property currently

14   listed for sale?

15        A    That's right.

16        Q    And your daughter, Ayesha, is listing it?

17        A    Yes.

18        Q    Are these photos that she has taken

19   showing the front and then interior of the property?

20        A    Correct.

21        Q    Are the renovations or interior work and

22   exterior work that is shown there, the work that you

23   did or had done?

24        A    That's correct.

25        Q    And they reflect the current status of the

1    property?

2          A    Yes.

3                    MR. ROONEY:  Offer Exhibit 37, Your

4    Honor.

5                    MR. WOLF:  No objection, Your Honor.

6                    HEARING OFFICER GUROVITSCH:  All

7    right.  Received.

8                May I ask, Mr. Khan:  This property was

9    never rented to tenants, then?

10                   THE WITNESS:  No, Your Honor.  This

11   property was a very old property that was --

12                   HEARING OFFICER GUROVITSCH:  Yes or

13   no.

14                   THE WITNESS:  This is a brand new

15   property that I refinished, but it was rented

16   previously to five tenants, but before I bought it.

17                   HEARING OFFICER GUROVITSCH:  Before

18   you bought it.  So you did work on the property, and

19   then you sold it?

20                   THE WITNESS:  I haven't sold it,

21   Your Honor.

22                   HEARING OFFICER GUROVITSCH:  Is it

23   for sale?

24                   THE WITNESS:  I'm offering it for

25   sale.

1           HEARING OFFICER GUROVITSCH:  And it

2    is not occupied now?

3           THE WITNESS:  Well, I am denied

4    getting a license for it.  I went to apply for a

5    license --

6           HEARING OFFICER GUROVITSCH:  Yes or

7    no.

8           THE WITNESS:  It's not occupied.

9           HEARING OFFICER GUROVITSCH:  Okay.

10   Thank you.

11   BY MR. ROONEY:

12        Q    Have you sought rental licensing for this

13   property?

14        A    Not yet, but I have applied for other

15   rental property that they said I am not eligible to

16   get any more rental licensing, because I bought a

17   couple of properties in North Minneapolis, so this

18   hasn't passed the final inspection.

19           I was going to do that, but see uphill

20   battle, so I didn't do it.

21        Q    Okay.

22           HEARING OFFICER GUROVITSCH:  It

23   would be helpful if we could focus on properties that

24   are currently rented and licensed.

25           MR. ROONEY:  Well, except that this

```
1    is a property that is being denied occupancy because

2    of this pendency of this preceding, but I will only --

3    I think that is the last one that is in that boat.

4    BY MR. ROONEY:

5         Q    Page 106 of Exhibit 5, 3557 Dupont Avenue

6    North.

7         A    This is, again, damaged.  I put a brand

8    new roof on this one, new laminate flooring upstairs

9    in all the bedrooms, and downstairs in all the -- in

10   the living room, and it has a two-car garage.  I sided

11   the garage and put new roofing, as well.

12        Q    New garage door?

13        A    Yes.

14        Q    Let's look at, then --

15        A    New windows, as well, to that one.

16        Q    I am looking at page 110 of the exhibit.

17   Is 3639-6th Avenue North currently a licensed property

18   of yours?

19        A    No, it's a vacant land.

20        Q    Okay.  Then that is an outdated picture.

21             Let us go to page 111, 4000 Dupont Avenue

22   North.

23        A    This one I had brand new roof installed,

24   new windows, on, like, the upper bedroom, and new

25   laminate flooring, and new furnace, with the proper
```

1    permits.

2         Q    Have you ever had a conversation with City

3    Inspector Jody Waulters about this property,

4    specifically about trash on it?

5         A    Yes, I did.  I think it was a few years

6    ago.

7         Q    What was the substance of the

8    conversation?

9         A    Well, she said, Mahmood, as long as -- you

10   know, if I see anything on your property, even a piece

11   of paper that is there, I have to write you up.

12   Whereas other properties, if they have junk all over

13   the place, I don't care.  I mean, I'm required to

14   write you up more than anybody else.

15                    MR. WOLF:  Your Honor, I object to

16   hearsay.

17   BY MR. ROONEY:

18        Q    Did she say why?

19        A    That's what she told me.

20                    HEARING OFFICER GUROVITSCH:  This

21   conversation is with who?

22                    THE WITNESS:  Jody Waulters is an

23   inspector for the City of Minneapolis.

24                    HEARING OFFICER GUROVITSCH:  I

25   believe that is on your witness list, so I am going to

1    allow it.

2                      MR. ROONEY:   Thank you.

3    BY MR. ROONEY:

4         Q    Just out of curiosity, page 114 of the

5    exhibit, is the individual in that picture doing

6    clean-up you?

7         A    That's me.   I don't know who took it,

8    though.

9         Q    Now, page 116, 4010 Dupont Avenue North.

10        A    Yeah, this one is a duplex.   I bought it,

11   again, in -- sometime in 2009, I think.   I can't

12   remember.

13             But this one I'm having remodeled.   I

14   pulled a permit on it to do some remodeling work on

15   the kitchen and the bathroom, and opened up the

16   bathroom a little bit more, and did -- this did have

17   some tornado damage, as well.

18        Q    Okay.

19        A    And it is stucco, and I haven't done

20   anything else to it.   I am working on it right now.

21        Q    Okay.

22        A    And this is one property, I think, if I

23   remember correctly, Mr. Azmoudeh came to visit, and he

24   stated that I take out the windows that had been in

25   place for about a hundred years, that I remove it and

1    fix something that was kind of hard to do, and I

2    explained to him, and he said, No, you have to take it

3    all out.

4             So I had to remove the window, and it was

5    the fixed part of the window.  It was a kind of hard

6    thing to do, but I satisfied his requirement.

7        Q    So you did it, what he told you had to do?

8        A    Yes.

9                 MR. ROONEY:  Mr. Khan, thank you.

10   That is all the questions that I have.

11                HEARING OFFICER GUROVITSCH:

12   Cross-examination.

13                MR. WOLF:  If we could have just a

14   second, Your Honor?

15

16                CROSS-EXAMINATION

17   BY MR. WOLF:

18       Q    When, Mr. Khan, you stated that you work

19   part time as a flight attendant, but your main source

20   of income, your main job, is rental properties?

21       A    Correct.

22       Q    So this is how you support your family,

23   you and your wife?

24       A    Yes.

25       Q    It is your main source of income, correct?

1        A     Correct.

2        Q     So the fact that you have tenants, you are

3   not doing that for charity, you are doing that to

4   support yourself?

5        A     Correct.

6        Q     And you indicated that you work with

7   numerous Section 8, the County, to have tenants

8   placed, and when you have a Section 8 tenant, you are

9   guaranteed that portion of the rent that Section 8 is

10  going to pay, correct?

11       A     Which portion?

12       Q     Well, Section 8 is going to pay for either

13  all or some of their rent?

14       A     They never pay all of it.  They pay

15  certain percentages, yes.

16       Q     Yes.  But you are guaranteed to get that?

17       A     Correct.

18       Q     And you say at one point, I think it was

19  Hennepin County Social Services, that you stated they

20  will check with the City and see if work is done, and

21  if they confirm the work done, then they will release

22  the check to you?

23       A     Yes.

24       Q     So your incentive to get that work done is

25  so you can get the tenant in the place and start

1    collecting the rent.

2         A    Most of the time they don't, but

3    occasionally they come.  It's not 100 percent.

4         Q    But you said they will release the check

5    once the violations have been cleared?

6         A    If there is no license on it, they will

7    not issue me a check.  First they check for the

8    license, and then they'll see if --

9         Q    Check for violations.

10             You stated that currently your wife helps

11   with the paperwork, your son and daughter help with

12   collecting rents, and you have -- is it a Leah

13   Stewart? -- helps collect checks and monitor the

14   property.

15        A    (Witness nods head.)

16        Q    But your structure has changed on and off

17   over the years, hasn't it?

18        A    Yes.

19        Q    You have had management companies at some

20   points and gotten rid of them and then managed

21   yourself and then gone back to management companies;

22   is that correct?

23        A    On and off, yes.

24        Q    And the times you have hired management

25   companies, has that been based on pressure from the

1   City because of the number of incidents that have been

2   occurring at your property?

3         A    I would say not 100 percent, partially.

4   My wife wants me to take breaks and go on vacations

5   with her, but I don't do it.  I haven't done it in a

6   few years.  If I go, it's maybe for a few days, but

7   for both reasons, so I could get peace of mind, as

8   well as not get letters from the City.

9         Q    But it costs a lot to have a management

10  company manage 50 properties, or 43?

11        A    No, it doesn't cost that much.  I had an

12  agreement in place where I would pay them a certain

13  amount, and I was happy with that work, but the work

14  wasn't being done.  I was getting the same amount of

15  letters from the City, and he wasn't collecting the

16  rents.  That was the big thing.  If he had collected

17  the rents, he would be still in business, with me, at

18  least.

19        Q    But you stated one of the main reasons is

20  your wife was tired of getting all these notices from

21  the City for violations and grass cutting and such,

22  and she was tired of having to deal with that

23  paperwork?

24        A    No, she wasn't tired of it.  She just

25  doesn't want to have those issues at our properties.

1   She said that is important that we satisfy -- we don't

2   have these issues.  If you wanted a Mr. Alex Eaton,

3   you go around the properties and you take care of the

4   outside, and don't get any letters, then we don't have

5   a problem with the City.

6        Q    But you were getting numerous amounts of

7   letters that she was tired of getting and having to

8   deal with?

9        A    She wasn't tired of getting anything.  She

10  was just --

11       Q    Well --

12       A    She wasn't tired of getting letters.  She

13  still gets the letters.  It's not a matter of getting

14  tired, it is a matter of getting it done, so that you

15  monitor -- before it happens, you should be able to

16  say, Hey --

17       Q    But that is one of the reasons she wanted

18  somebody else to do it, so it would take care of those

19  issues so she wouldn't get those letters.

20       A    The letters -- the actual work being done

21  is more important than just the letters.

22                    HEARING OFFICER GUROVITSCH:

23  Mr. Khan, I think what Counsel is getting at is that

24  your testimony on direction examination was that one

25  of the reasons that you went to a management company

1    is your wife did not want to see anymore letters, and

2    I believe that what Mr. Wolf is trying to explore that

3    a little further, as far as what was behind that.

4                        THE WITNESS:  She wasn't tired of

5    getting letters, Your Honor.  She just didn't want

6    them.

7                        MR. WOLF:  But you testified that

8    that was one of the reasons she wanted a management

9    company.

10                       THE WITNESS:  I'm not sure what I

11   testified exactly, but all I said is that we needed to

12   get things --

13                       MR. WOLF:  Judge Gurovitsch just

14   stated what you had said on the record.

15                       THE WITNESS:  Right.  What I'm

16   saying is that she wanted to stop --

17                       MR. WOLF:  Can you please just

18   answer the question?

19                       THE WITNESS:  Yes.

20   BY MR. WOLF:

21        Q    Now, you indicated when we were going

22   through these properties that several of the

23   properties you got new windows through the Lead Paint

24   Program, correct?

25        A    A few properties, yeah, probably about --

1          Q    And that is when the environmental unit

2     that lead paint is in, when they get indication that

3     there is either a child been poisoned -- or they get

4     that case, then they will come to you, and they have a

5     program set up where they can help you replace the

6     funding, and I believe you stated that you pay a

7     portion of it that is not covered by the Lead Paint

8     Program, correct?

9          A    Yeah.

10                   MR. ROONEY:  Wait a minute.  I

11     object, that is multiple questions.

12                   HEARING OFFICER GUROVITSCH:

13     Rephrase.

14     BY MR. WOLF:

15          Q    So you have worked with the City's Lead

16     Paint Program, as far as getting new windows in some

17     of your houses?

18          A    Yes.

19          Q    And you are only responsible for covering

20     the portion that the program does not cover, correct?

21          A    Correct.

22          Q    And that is after the Lead Paint

23     Department has been informed or has reason to believe

24     that you have lead paint in your windows, correct?

25          A    No, not correct.

1          Q    How would they get notice that there may

2    lead pint, that the windows need to be --

3          A    Because I approached them, and I said,

4    Here are some windows, these are old windows.  I have

5    talked to them before, and there have been occasions

6    where there was some lead poisoning, but it wasn't

7    because of that they came to me.

8               I found out about this program from

9    Mr. Tom Deegan, who was in charge of the Problem

10   Properties Unit.

11         Q    That helps you defer the cost of having

12   the windows replaced?

13         A    Correct.

14         Q    But it is also a safety issue for the

15   tenants?

16         A    Then I cooperate with them, and if they

17   say there is lead on a certain property, I go and

18   start taking -- take care of the paint, and they will

19   give me orders that they don't cover and they will

20   say, Mr. Khan, you need to pay this portion of what we

21   don't cover.

22         Q    If you could please just answer the

23   question, not continue.

24               MR. ROONEY:  I think he did answer

25   the question.

```
 1                    HEARING OFFICER GUROVITSCH:  And
 2    then some.
 3                    THE WITNESS:  You don't want the
 4    then some, Your Honor?
 5                    HEARING OFFICER GUROVITSCH:  Just
 6    try to listen to Counsel's question and just answer
 7    only the question and no more.  I know you have a lot
 8    that you would like to say, but Mr. Wolf was asking
 9    very specific questions --
10                    THE WITNESS:  Okay.
11                    HEARING OFFICER GUROVITSCH:  -- that
12    call for very specific answers.
13    BY MR. WOLF:
14         Q    Looking at Exhibit 7, your standard
15    residential lease, specifically --
16         A    What page is it?
17                    MR. ROONEY:  Behind Tab 7.
18    BY MR. WOLF:
19         Q    In the boxed-in portion, the second to
20    last line.  Can you read -- it is underlined.  Could
21    you read what that states?
22         A    The one that says, There may be lead-based
23    paint --
24         Q    Yes.
25         A    -- in the units; tenant takes full
```

1   responsibility to protect the child/children of all

2   injuries, acknowledgment required below.  No drug

3   activity permitted by the tenant or tenant's guests.

4   Tenant is responsible for guest's behavior on the

5   property.

6          Q    With regard to the lead paint section,

7   isn't it your responsibility as a landlord if there is

8   peeling or chipping paint on a property that was built

9   prior to 1978, to make sure that those surfaces are

10  covered and protect your tenants?

11         A    Your Honor, can I give a detailed answer,

12  or just a yes or no?

13              HEARING OFFICER GUROVITSCH:  The

14  question is whether or not it is the landlord's

15  responsibility so prevent lead paint in the units.

16              THE WITNESS:  Yes and no.

17              HEARING OFFICER GUROVITSCH:  Okay.

18  You can go ahead and answer in detail, then.

19              THE WITNESS:  Your Honor, I'm just

20  required to -- if I find out there is lead-based

21  paint, to abate it, but the final responsibility lies

22  on the parents to make sure the kids are not putting

23  paint in their mouth.  I'm not there to protect them

24  from that.

25

```
1    BY MR. WOLF:

2         Q    But you are the owner of the property,

3    correct?

4         A    Yes.

5         Q    And you have a rental license for that

6    property?

7         A    Yes.

8         Q    And part of that is to maintain a safe

9    environment for your tenants?

10        A    I do.

11        Q    And it would be your responsibility to

12   view the property on an adequate-enough basis that if

13   you saw that there is chipping paint --

14        A    Yes.

15        Q    -- to take care of that --

16        A    Yes.

17        Q    -- and have that abated, so it does not

18   become a hazard to the people living in that property.

19        A    Correct, and I do.

20        Q    But you cannot push that off onto the

21   tenants, correct?

22        A    I'm required to given him a notice about

23   if there is lead-based paint, any property, federal

24   law says you have to inform them about it, and that is

25   my way of informing them that there may be lead-based
```

1    paint.

2              Any property that was built before 1978

3    has to be given this notice saying that there may be

4    lead-based paint underneath the coating that you put

5    on, there may be lead-based paint underneath there in

6    the windowsills, anywhere else.  Any time --

7         Q    I understand that, but you are stating

8    here that you are having the tenant take full

9    responsibility to protect their children from all

10   injuries with regard to the lead paint.

11        A    Yes.

12             MR. WOLF:  I have nothing further on

13   that, Your Honor.

14   BY MR. WOLF:

15        Q    Now, you stated that, with regard to your

16   rental applications, you do not do a written app, and

17   you take responsibility for checking criminal history,

18   correct?

19        A    That's right.

20        Q    You don't have access to all criminal

21   history information, do you?

22        A    I don't.  I was utilizing the service of

23   the Minneapolis Police Department sometimes, because

24   they said, You can call us, and then they stopped.

25   They said, We don't do it anymore.

1          Q    But you do not have access -- you are a

2     private citizen.  You do not have access to some data

3     that may be protected that other individuals have

4     access to, to check for a full criminal history?

5          A    No, I don't.

6          Q    And you did state that you will take

7     parolees and people with a criminal history, depending

8     on how you feel the situation is.  If it is something

9     you are not comfortable with, you don't take that

10    person, correct?

11         A    And then I stated specifically who I don't

12    take and how many -- how many years it has to be

13    before I can take them, and that is why I worked with

14    the police department.  Mr. Luther asked, What are

15    your conditions?  And I have given them to him in

16    writing, if they are five years or older, with

17    felonies, then I will --

18         Q    And you have worked with Luther on a

19    couple of properties where you have had incidents

20    of --

21         A    Yes.

22         Q    I believe one property there was

23    prostitution going on, 315 Buchanan Street had an

24    issue, and that is the one you are currently working

25    with a management plan with Mr. Krueger, correct?

1          A     That's the one that I had that lady -- the

2     Section 8 lady that was mentally disabled.  She was

3     doing prostitution and she got arrested somewhere

4     else, and she was totally -- and if you had met her,

5     you would see that she was --

6          Q     But you are working with Luther on that

7     one after he sent the notice that this activity

8     occurred on the property?

9          A     Yes, I work with him.

10          Q     You stated that the part of your

11     agreements with the tenants, the tenants'

12     responsibility to cut the grass and keep the yard

13     clean, but that on some occasions, the tenants don't

14     have lawnmowers and stuff.

15               You were here when we went through your

16     properties in the property information summaries, and

17     how many properties were on the City's Abate List.

18               There was a lot of properties where the

19     City has had to take responsibility.  After two times

20     of informing you that the grass or rubbish needs to be

21     caught up, they've gotten to the point where, We will

22     send you notice, but we are going to come out and do

23     it within a certain amount of days.

24               You had a lot of properties on that Abate

25     List.

1          MR. ROONEY:  Object, Your Honor,

2    that is not a question.

3          HEARING OFFICER GUROVITSCH:  You are

4    asking if that is correct?

5          THE WITNESS:  Answer no, and yes.

6    BY MR. WOLF:

7      Q    So you did not think there was a lot of

8    properties on the Abate List when we went through your

9    properties yesterday?

10     A    I didn't say that.  Some of the

11   properties, the City has done it, and you're talking

12   about eight, nine, ten years of things compiled

13   together.  I don't know which property you're talking

14   about exactly.

15     Q    I am just asking when we went through the

16   property individually yesterday, that there was a lot

17   of properties that were on the City's Abate List when

18   Ms. Zierke pulled property information in March to

19   April of this year.

20          HEARING OFFICER GUROVITSCH:  That

21   would be the City's Exhibit 7.

22          MR. WOLF:  Yes.

23          MR. ROONEY:  And probably 8, as

24   well.

25          THE WITNESS:  Your Honor, that is

```
1    from about eight years of history, so I can't remember

2    which ones are --

3    BY MR. WOLF:

4         Q    I believe Ms. Zierke had testified that

5    the Abate List is only available to her when she ran

6    that report, not for past years, so at the time she

7    ran that report, the properties that were marked as

8    being on the Abate List were on the Abate List as of

9    between that month that she --

10                        HEARING OFFICER GUROVITSCH:

11   March 23 and April 23.

12                        THE WITNESS:  I have no idea about

13   any Abate List that I was provided.  She said

14   something in the Court, but I was never given or sent

15   a letter saying, These are your properties that are on

16   the Abate List.

17   BY MR. WOLF:

18        Q    But you get the notices when the City

19   states that, This is your second notice.  After any

20   further notices, the City will --

21        A    Yes.

22        Q    Do you think it is the City's

23   responsibility to have to go to these properties --

24   not only yours, any property -- and take their time to

25   call a contactor and have a contractor to come out and
```

1    cut grass?

2         A    No.

3         Q    Do you think it is the City's

4    responsibility to have to come out and pick up the

5    rubbish around the solid waste stations on

6    properties -- not only yours, but any property.  Do

7    you think the City should have to take care of those

8    issues?

9         A    Yes and no.

10        Q    Can you explain?

11        A    Things happen, so the City is responsible

12   to do some of the work, and they charge you for it,

13   and, you know, like you said, the letter is sent out,

14   and the second time they don't give you a notice, and

15   the tenants have overthrown too much garbage outside.

16   They will do it and they will charge me for it, so

17   therefore, they're providing a service, I pay for it.

18        Q    They are providing a service after the

19   fact that they have warned you twice that you have not

20   met that responsibility, so after that, they are going

21   to have to do it and then charge you a fee.

22        A    Right.

23        Q    Do you think it is a good use of City

24   resources to have to come to a property numerous

25   occasions to verify completion with orders that they

1    write a landlord?

2         A    They get paid for it.  I pay with my

3    taxes.

4         Q    But if the work is completed on a timely

5    basis, the inspector has time to work on other rental

6    license inspections?

7         A    They come to a property and I pay them for

8    it.  Every time they visit, there's a $100 charge for

9    it, and I pay that.  So they get paid and the City

10   gets paid, so it's utilizing their time.  If they had

11   no properties to inspect, they would be sitting doing

12   nothing, so --

13        Q    They would probably be happy if they did

14   not have to go find violations at rental properties,

15   don't you think?

16        A    Yeah, they would be happy.

17        Q    But to make sure that properties are safe

18   and the --

19                 MR. ROONEY:  Your Honor, I object.

20   I think this is getting quite argumentative.

21                 HEARING OFFICER GUROVITSCH:  I am

22   going to allow it.

23   BY MR. WOLF:

24        Q    But part of the inspector's job is to make

25   sure that properties are safe and clean and habitable?

1          A     Yes.

2          Q     And the fact that the inspectors have to

3     come back time and time again to a property to ensure

4     that those properties are safe and clean and

5     habitable, don't you think that is wasting their time?

6          A     I'm not sure I can't answer that.

7          Q     Now, we went through the exhibits showing

8     the photos of your properties.

9                Do you know when those photos were taken?

10         A     I think they were taken within the last

11    month.

12         Q     And we did not have any photos of the

13    interior to see what the conditions were.  We did not

14    have any photos of the interior of those properties?

15                     MR. ROONEY:  I believe there is a

16    couple.

17    BY MR. WOLF:

18         Q     The interiors showing clothing and stuff,

19    but the majority of the properties did not have the

20    interior pictures; is that correct?

21         A     Correct.

22         Q     Now, you indicated on a lot of the

23    properties -- and you do rent or own numerous

24    properties in North Minneapolis that were subject to

25    the tornado damage in -- was that 2008?

1          A     Yes.

2          Q     And you stated most of those properties,

3     then, you had to replace the roof, windows, exterior

4     damage that was caused.

5                Would you also have had to replace floors

6     that were caused due to rain damage after the damage

7     to the roofs and stuff?

8          A     No.

9          Q     So none of the interior work --

10         A     No.

11         Q     -- was needed due to the damage?

12         A     No.  Most of these were done by myself

13    without any --

14         Q     Just answer the question, please.

15               You indicated that the majority of your

16    properties were purchased in 2008 at the auction.  I

17    believe you indicated 25 to 30 properties were bought

18    in 2008 at the auction?

19         A     You know, my memory is not that good, but

20    I think about 15, 20.  I can't say exactly, so I'm

21    giving a ballpark idea.

22         Q     But looking at when we reviewed the

23    property summary information, most of your rental

24    licenses were purchased -- or properties were

25    purchased in 2008 and rental licenses 2008, 2009?

1        A      Yeah, but not 20, 25.  I think I bought

2  from the auction itself maybe 10, 15, maybe 20.

3        Q      But then purchased through different

4  means?

5        A      Yes.

6        Q      You indicated when we were going through

7  that you purchased several properties for as low as

8  $4,000?

9        A      Correct.

10       Q      I am assuming a house for $4,000 is not

11 going to be in real good shape?

12       A      No.

13       Q      So it is going to be a necessity to put in

14 work to get a property like that --

15       A      Uh-huh, yes.

16       Q      -- to the minimum level so you are able to

17 rent it, correct?

18       A      Correct.

19       Q      And you bought numerous properties that

20 were in condemnation?

21       A      Correct.

22       Q      And to get a property out of condemnation

23 and up to minimum standards to rent it, you have to go

24 through the complete -- so you have the mechanical

25 inspectors, heating inspectors, building inspectors,

1    plumbing inspectors, go through the property and you

2    have to upgrade all that to the current code, correct?

3         A    That's right.

4         Q    So that is something that you are required

5    to do just to make the property up to the minimum

6    level, correct?

7         A    Yes.

8         Q    And that is so you can rent it so you can

9    support your family?

10        A    That is right.

11        Q    And you stated that when your tenants

12   leave, a lot of time there is damage to the property,

13   and you have to fix that prior to renting it again,

14   correct?

15        A    Yes.

16        Q    And as you stated, the majority of your

17   properties are in North Minneapolis, and that presents

18   certain -- a different dynamic than, say, South

19   Minneapolis?

20        A    I don't know what --

21        Q    By lakes.  Say if you are renting

22   properties by the lakes, renting properties to people

23   in North Minneapolis is going to present different

24   challenges, correct?

25        A    That's right.

1          Q     And part of that challenge has got to be

2     that you have to be on top of those properties more

3     than you would in the other areas of the City?

4          A     That's right.

5          Q     And if you are not on top of those

6     properties on a regular basis, you are going to start

7     getting notices from the City, correct?

8          A     That's correct.

9          Q     And then you are going to have to react

10    and try to get into compliance with those notices,

11    correct?

12         A     That's correct.

13         Q     Now, yesterday, when Mr. Azmoudeh was on

14    the stand, he indicated that the property -- what is

15    that, 1204 Knox? -- that the Problem Properties Unit

16    found out that the garage was being used by two

17    individuals to repair cars, and that the tenants did

18    not have access to the garage.

19               Can you explain how that would happen.

20         A     So it is not a yes-or-no question, right?

21    So I can explain the details?

22         Q     Yes, you can explain.

23         A     All right.  The property at 1204 Knox, all

24    of my garages -- most of my garages I do not rent to

25    my tenants.  It says right in the lease, garage, no --

1    yes, no.

2            So I will -- that property, somebody --

3    the mechanic was a guy.  He said, I just want to park

4    my car in that garage.  I'm just going to rent the

5    garage from you to park it, and I did not have any

6    idea that he was going to do mechanical work on it,

7    that was his word, and then he started doing the work,

8    and I told him he needs to get out.

9            I had a talk with the inspector, and I

10   said, He needs to get out.  He said, I'll put a fence

11   around it.  I said, But you can't do the work.

12       Q    But they did but a fence up there.

13       A    They did but a fence up there, and I told

14   them they have to move.  I told them --

15       Q    And they put up a privacy fence without

16   your notice until you were informed of what was going

17   on, correct?

18       A    Yes.  The inspector told me that, and I

19   took care of it, yes.

20       Q    So after the inspector told you about what

21   was going on, you kicked them out.

22            Why do the majority of your properties not

23   have -- the tenants don't have access to the garage?

24       A    Because the majority of the people move

25   out of my places, they leave so much furniture and

```
1    garbage and other things -- the garbage I throw away,

2    but I am required by the State -- by the laws -- that

3    before it used to be 60 days I have to hold those, and

4    the City -- the police department would take pictures,

5    and they will have me keep copies of what is left

6    behind, and I am responsible for it for 60 days.

7              So I have nowhere to store it, because

8    they say if you don't do storage on-site -- this is

9    what the inspector -- police department tells me.

10        Q    So you use the garage as storage?

11        A    So I have to use that temporarily until I

12   get it rented out to somebody else, and that's one

13   reason on most of my leases I say the garage is not

14   included.

15        Q    Okay.

16        A    And I have a lot of furniture, and I use

17   the transfer station to take a lot of the garbage

18   to -- I mean the furniture.

19        Q    Mr. Khan, if you could look at the Khan

20   Exhibit 5, page 66.

21        A    Which book?

22        Q    I think it is labeled as Licensee's

23   Hearing Exhibits.

24              HEARING OFFICER GUROVITSCH:  That is

25   the book your attorney prepared for this proceeding.
```

1          MR. WOLF:  With all the photos of

2   your properties.

3          THE WITNESS:  This one here?

4          MR. WOLF:  Yes.

5          HEARING OFFICER GUROVITSCH:  Yes.

6          MR. ROONEY:  Behind Tab 5 should be

7   the photos.  You want to be on page 66.

8          THE WITNESS:  Okay.  Oh.

9          HEARING OFFICER GUROVITSCH:  And we

10  are going to take a short break about 2:45.

11          MR. WOLF:  Okay.  I should not have

12  too much left.  I should be able to get done before

13  then.

14          HEARING OFFICER GUROVITSCH:  If you

15  do, fine.

16  BY MR. WOLF:

17      Q    So, Mr. Khan, you indicated that you

18  re-did the porch on this property because it was in a

19  dilapidated condition, correct?

20      A    Yes.

21      Q    But you did not use the same siding to

22  match the rest of the house, did you?

23      A    Looks like I did not.

24      Q    Okay.  And if you could turn to page 28.

25  That is 1611 Sheridan Avenue North, correct?

```
1          A     That's right.

2          Q     And I believe you had indicated that the

3     tornado destroyed the garage on this, so you tore it

4     down and just used the parking slab, correct?

5          A     That's right.

6          Q     Do you think that that esthetically looks

7     nice?

8                         MR. ROONEY:  I object, Your Honor,

9     irrelevant.

10                        HEARING OFFICER GUROVITSCH:  I

11    agree.  Sustained.

12    BY MR. WOLF:

13         Q     If you can turn to page 9, 410-30th Avenue

14    North.

15         A     Yes.

16         Q     Does it appear that the grass needs to be

17    cut at this property?

18         A     Not really.  It's not 8 inches long.

19         Q     So you do not think that grass needs to be

20    cut?

21                        MR. ROONEY:  Object, Your Honor,

22    asked and answered.

23                        HEARING OFFICER GUROVITSCH:  I was

24    not too clear on Mr. Khan's answer.

25                        THE WITNESS:  It's not 8 inches long
```

1    or longer, Your Honor.

2                        HEARING OFFICER GUROVITSCH:  And

3    that is the requirement.  If it exceeds 8 inches, it

4    needs to be cut?

5                        THE WITNESS:  That's right.

6                        HEARING OFFICER GUROVITSCH:  And you

7    are saying that this does not exceed 8 inches?

8                        THE WITNESS:  It does not look like

9    it.

10   BY MR. WOLF:

11        Q    And the page in front of that, page 8, for

12   321-4th Avenue North.  Do you believe the grass would

13   need to be cut at that property?

14        A    I don't think so.  Those are bushes around

15   the fence that you're looking at.  The grass is not

16   that big, it's the bushes.

17        Q    Looking at page 3 of the exhibit, for

18   313-26th Avenue North.  Looking at the side yard, do

19   you think the grass needs to be cut in that property?

20        A    Again, I don't think -- if you're looking

21   at the bushes, no, but the grass is not more than

22   8 inches long.

23        Q    So when you are going to have the grass

24   cut, if you go by a property, do you wait until it is

25   8 before you cut it?

1           A     No, I cut it before that, but sometimes

2     there's certain times that people come and cut it.

3     Actually, the owner of that property is one of the

4     ones that who has a lawnmower that helps me with my

5     other properties, as well.

6           Q     But it is still your responsibility as the

7     property owner to make sure that it is cut.

8           A     Yes.

9           Q     And part of liveability is how the

10    properties look and appear, and that affects the

11    property values of properties around?

12          A     Yes.

13                    MR. ROONEY:  I don't see a question,

14    Your Honor.

15                    THE WITNESS:  It would be cut.

16    BY MR. WOLF:

17          Q     The esthetics of a property do affect the

18    property values of the properties around the property;

19    is that correct?

20          A     Right.  If it's knee-high or something,

21    then I can understand, but it doesn't look like more

22    than 8 inches to me.

23                    THE WITNESS:  Your Honor, can I go

24    back to one of the questions I was asked about the

25    siding, on page --

1        MR. WOLF:  I have nothing further.

2        MR. ROONEY:  I will give you a

3  chance to get to that.

4        HEARING OFFICER GUROVITSCH:  You

5  have no further cross-examination?

6        MR. WOLF:  No, Your Honor.

7        HEARING OFFICER GUROVITSCH:  I have

8  a couple of questions.  Did I hear you correctly say

9  that you are also employed as a flight attendant?

10        THE WITNESS:  That's right.

11        HEARING OFFICER GUROVITSCH:  And how

12  many hours a month do you have to put in?

13        THE WITNESS:  Your Honor, I fly as

14  little as possible to keep my insurance for my family,

15  and I fly, I would say, about eight to ten days a

16  month that I go for one night in the evening and then

17  come back in the morning, so my hours is not what you

18  think of 9:00 to 5:00.  Our flight attendant hours are

19  totally different, so it kind of needs explanation.

20        HEARING OFFICER GUROVITSCH:  You are

21  flying eight to ten days a month; is that right?

22        THE WITNESS:  Eight to ten nights a

23  month.  I'm gone only like eight hours at nighttime.

24  I do my night job.

25        HEARING OFFICER GUROVITSCH:  Okay.

1    Are any of the rental properties that are the subject

2    of this proceeding condominiums?

3                      THE WITNESS:  One.  1800 LaSalle,

4    Your Honor was a condo -- is a condo.

5                      HEARING OFFICER GUROVITSCH:  All

6    right.  And how is the maintenance of a condo unit

7    handled versus the maintenance of a single-family,

8    free-standing home?

9                      THE WITNESS:  There is no

10   maintenance required, Your Honor, because it's all

11   kind of the small and there's no grass or anything on

12   the property.  It is right downtown.

13                     HEARING OFFICER GUROVITSCH:  Do you

14   pay maintenance fees, or do you have your tenants pay

15   the maintenance fees that the condo association

16   charges?

17                     THE WITNESS:  No, Your Honor.  There

18   is an association fee, which pays for the heat and

19   hallway cleaning and things -- lights, but I do my own

20   maintenance.

21                     HEARING OFFICER GUROVITSCH:  The

22   tenants don't pay the association?

23                     THE WITNESS:  No, Your Honor.

24                     HEARING OFFICER GUROVITSCH:  And you

25   do not pay the association?

1        THE WITNESS:  I pay the association.

2        HEARING OFFICER GUROVITSCH:  Okay.

3   So you pay the association, the monthly fees.

4        THE WITNESS:  That's right.

5        HEARING OFFICER GUROVITSCH:  And

6   that includes maintenance, I would assume?

7        THE WITNESS:  No, Your Honor.  It

8   includes the heat, the hallway lights, and the

9   cleanliness of the hallways.  There is no maintenance.

10  I do the maintenance.

11       HEARING OFFICER GUROVITSCH:  That, I

12  would assume, would be classified as maintenance if

13  they are cleaning the hallways.

14       THE WITNESS:  Yes, that's about it.

15  But I do the maintenance inside the apartment --

16  inside the condo.

17       HEARING OFFICER GUROVITSCH:  And

18  they shovel the walks in the winter?

19       THE WITNESS:  They shovel the walks.

20  Underground parking.

21       HEARING OFFICER GUROVITSCH:  All

22  right.  I have no further questions.

23       MR. ROONEY:  We could probably be

24  wrapped up very quickly here.  I just have a couple of

25  things.

```
 1              REDIRECT EXAMINATION
 2    BY MR. ROONEY:
 3         Q    With respect to the condominium, within
 4    the walls of your unit, you do all the maintenance; is
 5    that correct?
 6         A    Correct.
 7         Q    The association covers common area
 8    maintenance?
 9         A    Correct.
10         Q    With respect to your being a flight
11    attendant, do you have enough seniority that you can
12    pretty much choose the flights that you want to be
13    called for?
14         A    That's right.  I've been there 36 years.
15         Q    And, for example, last night, what did you
16    do?
17         A    I went to Duluth at about 10:00 at night,
18    and I was back home at about 7:00 in the morning --
19    8:00 in the morning.
20         Q    And you were here at 9:05 this morning?
21         A    That's right.
22         Q    Tonight what are you going to do?
23         A    I'm going to Fargo again, leaving at
24    10:00, and I'll be back home at about 7:00, 8:00.
25         Q    Okay.  So does any of your flying
```

1    interfere with daytime activities?

2         A    None whatsoever, because I sleep there.

3    It's a short flight -- one-hour flight, sleep there at

4    the hotel, come right back, and that was my insurance.

5         Q    Okay.  I think you wanted to -- I am

6    trying to find the property that Counsel asked you

7    about, the apparent mismatched --

8         A    866.

9         Q    866, thank you.

10        What can you explain about the apparent

11   mismatch on the siding?

12        A    Well, I've asked this question before,

13   it's just a matter of what you choose to do, I mean,

14   there are million-dollar projects on Plymouth Avenue

15   that have two side -- two-color siding on it, but if I

16   put it on, I get questioned by the City Council and

17   everybody else, Why are you going to do that?

18        That's what I like to do.  That's my

19   color, that's what I choose.

20        Q    Thank you.  The standard that you say you

21   have adopted after five years elapsed since a felony

22   conviction, you will look that tenant over.  You won't

23   automatically exclude them.

24        Is that something that Luther Krueger from

25   the police department has said is okay?

1        A     Yes.  We have come to an agreement on

2   that, and he says -- and I have given it to him in

3   writing, that I will not consider somebody else.

4                    MR. ROONEY:  Thank you.  That is all

5   the questions I have.

6                    HEARING OFFICER GUROVITSCH:  All

7   right.  We will take a break until 3:00.

8                    MR. ROONEY:  We, I believe, are

9   finished with testimony today.

10                   HEARING OFFICER GUROVITSCH:  I

11  thought you had some witnesses from the City.

12                   MR. WOLF:  Well, we have to check

13  and see how quickly they can get here.

14                   MR. ROONEY:  I think they are out

15  on --

16                   MR. WOLF:  So I think they can be

17  here at 3:00.

18                   MR. ROONEY:  That is fine.

19                   HEARING OFFICER GUROVITSCH:  How

20  many will you be calling?

21                   MR. WOLF:  Two.  Wayne Murphy and

22  Jody Waulters.

23                   MR. ROONEY:  And they will be,

24  seemingly, brief questions.

25                   HEARING OFFICER GUROVITSCH:  And

1    then we will adjourn.

2                    MR. WOLF:  Then we will have to get

3    our calendars together and pick the next date and get

4    the subpoenas to Mr. Khan's tenants that are going to

5    testify.

6                    MR. ROONEY:  Or to me, so that I can

7    serve them.

8                    MR. WOLF:  And we have to check

9    Sheila Rawski's calendar.

10                   HEARING OFFICER GUROVITSCH:  And I

11   would highly recommend instead of e-mails incessantly

12   back and forth, we maybe have a conference call to

13   settle on dates.

14                   MR. ROONEY:  That is a good idea.

15                   MR. WOLF:  That will work.

16                   HEARING OFFICER GUROVITSCH:  I think

17   that would be a little more efficient.

18                   THE WITNESS:  Am I able to step

19   down?

20                   HEARING OFFICER GUROVITSCH:  Yes,

21   you may step down.

22                   (At this time a short break was taken

23                   from 2:45 p.m. to 3:00 p.m.)

24                   MR. ROONEY:  We call Jody Waulters,

25   please.

```
1                      JODY WAULTERS,

2              the witness in the above-entitled

3           matter, having been first duly sworn,

4               testifies and says as follows:

5

6                    DIRECT EXAMINATION

7    BY MR. ROONEY:

8          Q    Ms. Waulters, I briefly introduced myself

9    to you in the hallway, but for the record, I am Edward

10   Rooney, I'm representing Mr. Khan in this proceeding.

11              The reason you are here is that I wanted

12   to ask you if you recall a conversation with Mr. Khan

13   about his licensed property at 4000 Dupont Avenue

14   North.

15              First of all, do you have a territory that

16   you inspect regularly?

17         A    I do have a territory.  My territory back

18   when I was responsible for inspecting the properties

19   on Dupont is different than the district that I'm

20   responsible now.

21         Q    Oh, okay.  But there was a time that you

22   were responsible for that 4000 block of Dupont?

23         A    Correct.

24         Q    Do you recall having a conversation with

25   Mr. Khan about violations for trash in the yard where
```

1    you indicated to him that you were on instructions to

2    cite him for any trash in the yard, even though if it

3    were in a neighboring yard, you would not be required

4    to?

5            A    I do not recall such a conversation, no.

6                    MR. ROONEY:  Thank you.  That is all

7    the questions I have.

8                    Oh, wait a minute.  Mr. Wolf can ask

9    questions, if he wants to.

10                    MR. WOLF:  I was just waiting for

11   Mr. Gurovitsch.  Are you ready?

12                    HEARING OFFICER GUROVITSCH:  Thank

13   you.  I appreciate that.

14

15                    CROSS-EXAMINATION

16   BY MR. WOLF:

17           Q    Ms. Waulters, you indicated that you used

18   to -- and your district was 4000 Dupont and Dupont

19   Avenue North, correct?

20           A    Correct.

21           Q    As part of your inspections in that

22   territory, did you have regular contact with Mr. Khan

23   and his licensed properties?

24           A    I did, yes.  I did, at, actually,

25   4000 Dupont Avenue North, which was owned by him at

1   the time, 4010 Dupont Avenue North and 4011 Dupont

2   Avenue North.

3       Q    Those were the properties of his that you

4   would have inspected?

5       A    Correct.

6       Q    And just as a general, when you -- were

7   you required to write orders for him to correct

8   violations at his property?

9       A    Actually, all of those properties were on

10  the systematic licensing inspections for one year or

11  another, so, yes, I did conduct licensing inspections

12  on all three of those properties.

13      Q    And did you issue orders to Mr. Khan to

14  make repairs?

15      A    Yes, I did.

16          MR. ROONEY:  Your Honor, I object.

17  This is beyond the scope of the direction examination.

18          HEARING OFFICER GUROVITSCH:  Well,

19  if you want to the get technical about it, the City

20  can call this inspector as a witness.

21          MR. ROONEY:  They certainly can,

22  just that she has a parking meter, so I was just

23  trying to give her a little help, but that is fine.

24          HEARING OFFICER GUROVITSCH:  Well,

25  Mr. Wolf will pay the ticket.

1          MR. WOLF:  It will be quick.

2  BY MR. WOLF:

3          Q    Did you have to issue violations to

4  correct at those addresses?

5          A    Yes, I did.

6          Q    And did you have to go -- were the

7  corrections made in the initial time period given to

8  make corrections in?

9          A    Yes, they were.

10          Q    And do you recall what those violations

11  were?

12          A    I have a few, it would depend on which

13  inspection, but licensing inspections, depending on

14  what property we're talking about, let me see, here.

15          I conducted -- for 4000 Dupont Avenue

16  North, I was out there conducting a licensing

17  inspection back on the -- it was January 20th of 2011,

18  for 4000 Dupont Avenue North; for the property at

19  4010, I was out there on March 24th of 2009; and for

20  the property at 4011, it was conducted on January 16th

21  of 2009.

22          Q    And when was the last date you were -- do

23  you recall when you were switched out of that

24  district?

25          A    I can't recall a specific date, but I have

1    been out of that area, I want to say, for at least

2    three or four years now.

3         Q    But on those instances where you issued

4    those, Mr. Khan did come into compliance on those

5    occasions?

6         A    Correct.

7              MR. WOLF:  I have nothing further,

8    Your Honor.

9              HEARING OFFICER GUROVITSCH:  All

10   right.

11

12              REDIRECT EXAMINATION

13   BY MR. ROONEY:

14        Q    Ms. Waulters, during the time that you

15   were inspecting Mr. Khan's properties, did you and he

16   have a satisfactory professional relationship?

17        A    Mr. Khan always brought everything into

18   compliance that met minimum code requirements at the

19   time.

20        Q    Personally cordial and agreeable?

21        A    My personal opinion doesn't matter when I

22   am on the clock.

23        Q    No, I just mean within those interactions.

24        A    Yes, yes.

25              MR. ROONEY:  Thank you.  That is all

1   the questions I have.

2                       HEARING OFFICER GUROVITSCH:  You may

3   be excused.

4                       THE WITNESS:  Thank you, sir.

5                       MR. ROONEY:  We will call Wayne

6   Murphy, when the Court is ready.

7                       HEARING OFFICER GUROVITSCH:  You may

8   proceed.

9                       WAYNE MURPHY,

10          the witness in the above-entitled

11          matter, having been first duly sworn,

12                testifies and says as follows:

13

14                  DIRECT EXAMINATION

15   BY MR. ROONEY:

16       Q    Mr. Murphy, for the record, I am Edward

17   Rooney.  I am Mahmood Khan's attorney, and just, for

18   the record, you are a Minneapolis City Housing

19   Inspector; is that correct?

20       A    That's correct.

21       Q    I was to ask you about two incidents that

22   you remember.  One has to do with one of Mr. Khan's

23   licensed properties at 3406 Penn Avenue North, and

24   there was a story in the paper earlier this year about

25   Ms. Credit, who was a tenant there, who was saying

1    there were problems after she moved in with a nail in

2    the stairway and with a loose balcony or banister on

3    the stairway.

4            I understand, from Mr. Khan, that you

5    performed the inspection of the property before

6    Ms. Credit moved in as a tenant.

7            Is that your recollection?

8        A    That's correct.

9        Q    Okay.  If there had been a loose nail on

10   the stairway, would you have noted that in your

11   inspection?

12       A    Yes, I would have.

13       Q    If there had been a loose stairway balcony

14   or banister, would you have noted that in your

15   inspection?

16       A    Yes, I would have.

17       Q    Would those have been obstacles to making

18   the property available for renting to a tenant?

19       A    They would not have been life safety, so I

20   would have given them time to repair them.

21       Q    No, but, I mean, they would have had to be

22   repaired in order for it be rented?

23       A    Correct.

24       Q    And you did not see any of those?

25       A    No, I did not.

1          MR. ROONEY:  Thank you.  That is all

2    the questions I -- oh, no, that is one property.  The

3    other is --

4    BY MR. ROONEY:

5          Q    Do you remember an occasion where you

6    walked through Mr. Khan's property at 1604-27th Avenue

7    North?  I believe the director of your office, Nuria

8    Rivera -- and I don't know how to pronounce the rest

9    of her last name -- was along just to see an example

10   of Mr. Khan's work on his properties.

11          Do you recall that?

12          A    Yes, I do.

13          Q    And did it appear that the people who were

14   being asked to look, like you and your boss, were -- I

15   don't necessarily want to say impressed, but pleased

16   with the condition of the property as they inspected

17   it?

18          A    If I recall correctly, they were -- there

19   was workers on-site doing repairs, and they looked

20   like they were doing satisfactory work.

21          Q    Do you recall any compilements being

22   issued to Mr. Khan from the people who were there

23   looking it over?

24          A    I do not at this time.

25          Q    Okay.  Now, you are also involved in the

1    inspections right now at the property of 3420 Chicago

2    Avenue, South Minneapolis?

3         A    That's correct.

4                   MR. ROONEY:  Okay.  May I see

5    Exhibit 37, Your Honor?

6    BY MR. ROONEY:

7         Q    Mr. Murphy, I am showing you what is Khan

8    Exhibit 37, here, and I am going to represent to you

9    that those are pictures taken by Mr. Khan's daughter,

10   the Realtor who is listing the property, and, of

11   course, they don't show every aspect of the property,

12   but does that appear to be an accurate depiction of

13   what is shown, as far as the current status of the

14   property -- current appearance of the property?

15        A    That appears to be the way it looks at

16   this time.

17                   MR. ROONEY:  Thank you.  That is all

18   the questions I have, sir.

19                   HEARING OFFICER GUROVITSCH:

20   Mr. Wolf?

21                   MR. WOLF:  No questions, Your Honor.

22                   HEARING OFFICER GUROVITSCH:  All

23   right.  You may be excused.

24              If you have no further witnesses to

25   present today --

1              MR. ROONEY:  Today, I don't.

2              HEARING OFFICER GUROVITSCH:  -- we

3     are adjourned.

4              MR. WOLF:  Thank you.

5              MR. ROONEY:  Thank you.

6              HEARING OFFICER GUROVITSCH:  You are

7     all welcome.

8              (At this time the proceedings were

9              adjourned at 3:13 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF MINNESOTA)
                       ) SS.
 2   COUNTY OF ANOKA   )

 3

 4                    REPORTER'S CERTIFICATE

 5

 6

 7        I, Kelly L. Brede, do hereby certify that the

 8   above foregoing transcript, consisting of the

 9   preceding 228 pages is a correct transcript of my

10   stenographic notes, and is a full, true, and complete

11   transcript of the proceedings to the best of my

12   ability.

13

14        Dated and signed the 20th day of August, 2015.

15

16

17                          _____

                            Kelly L. Brede
18                          Court Reporter

19

20

21

22

23

24

25
```